UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| Jennifer A. Connors, *Plaintiff*, | § § § | |
| v. | § | Civil Action No. 2:10-cv-00094-wks |
| Dartmouth Hitchcock Medical Center, Dartmouth Medical School, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Clinic and Trustees of Dartmouth College, *Defendants*. | § § § § § § | |

**DEFENDANTS' (PRELIMINARY) REQUESTS FOR FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendants Dartmouth Hitchcock Medical Center, Dartmouth Medical School, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Clinic and Trustees of Dartmouth College, by and through their counsel, Sulloway & Hollis, P.L.L.C., submit the following (preliminary) requests for findings of fact and conclusions of law:[1]

THE COURT'S AUTHORITY

1. The Court may hold an evidentiary hearing to first resolve the legal question of whether plaintiff Jennifer Connors' ("Dr. Connors") failure to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in a timely manner is subject to equitable tolling or estoppel. *Sinha v. New York City Dept. of Education*, 127 Fed. Appx. 546, 547 n.1 (2d Cir. April 8, 2005) (where disposition of the equitable claim would make consideration of the legal claim unnecessary, common sense dictates that the equitable claim be determined first).

[1] An evidentiary hearing concerning whether Dr. Connors filed a timely charge of discrimination with the EEOC is scheduled for February 3, 2012. Defendants reserve the right to supplement their requests for findings of fact and conclusions of law following this evidentiary hearing.

2. In considering this issue, the Court may assess the credibility of witnesses and resolve factual disputes. *Id.* (district court properly resolved "credibility dispute" between two witnesses because plaintiff's equitable tolling claim regarding the "filing limitation period" was "wholly unrelated to her legal claim" that she was terminated based on her race, ethnicity, or national origin). *See also Melendez-Arroyo v. Cutler-Hammer de P.R. Co., Inc.*, 273 F.3d 30, 39 (1st Cir. 2001) (question of equitable tolling is for a judge, and, therefore, the district court should hold a hearing to decide whether equitable tolling is appropriate before any trial on the merits); *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 579 (D.C. Cir. 1998) ("equitable tolling and estoppel, which ask whether equity requires extending a limitations period, are for the judge to apply, using her discretion, regardless of the presence of a factual dispute").

RELEVANT FACTS

3. On or about April 16, 2006, Dr. Connors and Mary Hitchcock Memorial Hospital ("MHMH") entered into a Resident/Fellow Agreement of Appointment for her "graduate training as a Psychiatry Resident" from June 26, 2006 to June 25, 2007 (the "2006 Resident Agreement"). The 2006 Resident Agreement states that Dr. Connors will be notified in the event "it is determined by Responsible Person(s) that renewal of [the] Agreement for a subsequent year of residency/fellowship will not be made." Exhibit A.

4. MHMH is a teaching hospital located in Lebanon, New Hampshire.

5. Dr. Connors was placed on administrative leave in early March 2007 by Dr. Ronald Green ("Dr. Green"), the Psychiatry Residency Training Director, because of performance issues. Dr. Connors returned from leave in September 2007, after agreeing to a remediation plan. Exhibit E (January 2, 2009 note of Dr. Green).

6. On or about September 26, 2007, Dr. Connors and MHMH entered into a Resident/Fellow Agreement of Appointment for her "graduate training as a Resident in Psychiatry at the PGY-2 Level" from September 17, 2007 to January 6, 2008. Exhibit B.

7. On or about January 3, 2008, Dr. Connors and MHMH entered into a Resident/Fellow Agreement of Appointment for her "graduate training as a Resident in Psychiatry at the PGY-3 Level" from January 7, 2008 to January 6, 2009 (the "2008 Resident Agreement"). The 2008 Resident Agreement states that Dr. Connors would be notified in the event "it is determined by Responsible Person(s) that renewal of [the] Agreement for a subsequent year of residency/fellowship will not be made." Exhibit C.

8. As the director of the psychiatry residency training program (the "Program"), Dr. Green was a "responsible person" within the meaning of the 2008 Resident Agreement between Dr. Connors and MHMH.

9. Indeed, Dr. Connors routinely referred to the Program as being Dr. Green's Program. *See* Exhibit H (January 29, 2009 e-mail from Dr. Connors to Dr. Green, wherein she asked Dr. Green to reconsider his "decision to dismiss me from *your* program"); Exhibit K (February 10, 2009 letter from Dr. Connors to Dr. Green, wherein she asked Dr. Green to reconsider his decision and "allow me to complete my training in *your* residency program"); Exhibit Q (June 24, 2009 letter from Dr. Connors to the Fair Hearing Committee, wherein she asked it to "overturn" Dr. Green's "decision to dismiss me from *his* psychiatry training program").

10. Dr. Green had the authority to determine and notify psychiatry residents that their residency agreements would not be renewed for a subsequent year of residency, and, as such, that they were dismissed from the Program.

11. On January 28, 2009, Dr. Connors met with Dr. Green. At the meeting, Dr. Connors was given a letter from Dr. Green, wherein Dr. Green stated that Dr. Connors was being "given notice that [she was] dismissed from our training program." Exhibit F (January 28, 2009 letter from Dr. Green to Dr. Connors).

12. According to Dr. Connors, at the meeting, she asked Dr. Green if he was "firing" her and he said "yes." (Connors Dep. at 50.) In response, Dr. Connors told Dr. Green that she "didn't want to be fired" and "asked to have [her] job back." (Connors Dep. at 52.) Dr. Green said he was sorry, but she was dismissed from the Program. (Connors Dep. at 52.)

13. Although dismissed from the Program, Dr. Green told Dr. Connors that she would be allowed to complete her current rotations [*i.e.*, "4 weeks of neurology and 2 weeks of C/L psychiatry"] so that she could "be eligible for a PGY-4 elsewhere." Exhibit J (February 2, 2009 note of Dr. Green).

14. Although dismissed from the Program, Dr. Green also told Dr. Connors that she would be paid "her stipend through the end of the current academic year even though she will no longer be working … after approximately 7 weeks from now." Exhibit J (February 2, 2009 note of Dr. Green).

15. On January 28, 2009, Dr. Connors wrote to Sara Koury (an EAP counselor) and stated: "I wanted to let you know that I was notified today by RG [*i.e.*, Dr. Green] that I am dismissed from the psychiatry residency program." Exhibit G.

16. Dr. Connors was given notice of her dismissal from the Program on January 28, 2009.

17. Dr. Connors knew that she was being dismissed from the Program on January 28, 2009.

18. At their January 28, 2009 meeting, Dr. Green provided Dr. Connors with a copy of the Fair Hearing Policy. Exhibit F (January 28, 2009 letter from Dr. Green to Dr. Connors); Exhibit G (January 28, 2009 e-mail from Dr. Connors to Sara Koury, wherein she stated that Dr. Green "gave me a hand-out about Fair Hearings"). *See also* Exhibit AA.

19. Dr. Connors already had a copy of the Fair Hearing Policy.

20. On January 29, 2009, Dr. Connors wrote again to Ms. Koury and stated: "I was not expecting to be dismissed [from the Program] yesterday." Exhibit I.

21. On January 29, 2008, Dr. Connors sent an e-mail to Dr. Green, wherein she asked him to reconsider his "decision to dismiss me from your program." Exhibit H (January 29, 2009 e-mail from Dr. Connors to Dr. Green).

22. After receiving a copy of the Fair Hearing Policy, Dr. Connors continued to acknowledge that Dr. Green had dismissed her from the Program on January 28, 2009.

23. For example, on February 10, 2009, Dr. Connors wrote to Dr. Green and stated: "Your dismissal of me from your program will result in permanent and serious consequences …. Dr. Green, please reconsider your decision and allow me to complete my training in your residency program." Exhibit K.

24. Dr. Green was emphatic in denying Dr. Connors' requests for reconsideration of his non-renewal decision. *See* Exhibit L (February 13, 2009 letter from Dr. Connors to Dr. Green, wherein she stated that Dr. Green told her he would "not reconsider the decision to dismiss [her] from the program as notified in the 1/28/09 letter").

25. On February 26, 2009, Dr. Connors sent an e-mail to Dr. Green, wherein she stated that she hoped that Dr. Green would "change [his] mind and allow [her] to complete [her] training here." Dr. Connors also advised Dr. Green that she would be presenting the matter to

the Fair Hearing Committee. Exhibit M (February 26, 2009 e-mail from Dr. Connors to Dr. Green).

26. Dr. Connors completed her "PGY3" on April 12, 2009. Exhibit O (April 7, 2009 letter from Dr. Green to American Board of Psychiatry and Neurology).

27. Dr. Connors' psychiatry residency ended on April 12, 2009.

28. On or about April 16, 2009, Dr. Connors consulted with Norman E. Watts, Esq. ("Attorney Watts") concerning her dismissal from the Program. Exhibit W at 2958 and 2972 ("Summary Chart" submitted by Dr. Connors to the EEOC in response to question 16 of the EEOC's Intake Questionnaire asking whether she had "sought help about this situation from … an attorney").

29. Attorney Watts specializes in employment law. *See* http://www.wattslawfirmpc.com/Attorneys.

30. A hearing concerning Dr. Connors' dismissal from the Program was held by the Fair Hearing Committee on June 1, 2009 and June 16, 2009. Exhibit R.

31. Dr. Connors asked the Fair Hearing Committee to "overturn" Dr. Green's January 28, 2009 "decision to dismiss [her] from his psychiatry training program." Exhibit Q (June 24, 2009 letter to Fair Hearing Committee); Exhibit R (Decision of Fair Hearing Committee, noting that "Dr. Connors [had] requested that the committee *overturn* Dr. Ronald Green's decision not to renew her residency appointment and allow her to complete her residency at DHMC in good standing").

32. The fact that Dr. Connors sought to "overturn" Dr. Green's January 28, 2009 decision demonstrates that she understood that the decision was final unless overturned by the Fair Hearing Committee.

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

33. Following a hearing, the Fair Hearing Committee determined that "Dr. Green's decision not to renew Dr. Connors for her fourth year should stand." Exhibit R.

34. Dr. Connors did not believe that Dr. Green was merely recommending to the Fair Hearing Committee that she be dismissed from the Program.

35. Dr. Connors understood that Dr. Green's determination was final, such that if she did not request a hearing and convince the Fair Hearing Committee to "overturn" Dr. Green's decision, then she would not continue in the Program.

36. By letter dated October 19, 2009, counsel for Dr. Connors noted that he and counsel for defendants had "exchanged emails concerning Dr. Connors as a DHMC psychiatry resident earlier this year." Counsel also acknowledged that Dr. Connors had been "terminated" from the Program and that the "'fair hearing' group [had] sustained her termination." Exhibit S (October 19, 2009 letter from Norman Watts, Esq. to Edward Kaplan, Esq.).

37. By letter dated December 7, 2009 to the New York District Office of the EEOC, counsel for Dr. Connors stated that he was "filing a complaint for disability and gender discrimination in employment" on behalf of Dr. Connors. Exhibit T.

38. However, counsel for Dr. Connors did not submit the form used for filing an initial charge of discrimination with the EEOC (*i.e.*, EEOC Form 5).

39. No charge of discrimination was filed by Dr. Connors concerning her dismissal from the Program with the EEOC or any state or local agency prior to December 7, 2009.

40. The December 7, 2009 letter to the EEOC makes no reference to any alleged retaliation.

41. The December 7, 2009 letter to the EEOC does not request that anything be filed with any state or local agency.

42. December 7, 2009 is 313 days after January 28, 2009.

43. There is no evidence that the EEOC received the December 7, 2009 letter from Dr. Connors' counsel.

44. By letter dated December 28, 2009 to the EEOC's New York District Office, counsel for Dr. Connors stated that he had filed a complaint on her behalf on December 7, 2009, and that he was "transmitting it again requesting delivery confirmation" because "no acknowledgment of the [December 7, 2009] filing" had been received. Exhibit U (December 28, 2009 letter from Attorney Watts to EEOC).

45. By letter dated January 7, 2010 from the Boston Area Office of the EEOC to Dr. Connors, the EEOC informed Dr. Connors that if she wanted "to file a charge, [she could] *start the process* by filling out [an attached] questionnaire." The letter further states that "[f]illing out and sending us this questionnaire does not mean that you have filed a charge." Exhibit V.

46. The "Intake Questionnaire" sent by the EEOC asked Dr. Connors whether she wanted to "talk to an EEOC employee before deciding whether to file a charge" or whether she "want[ed] to file a charge of discrimination." Exhibit W at 2958.

47. By letter dated January 21, 2010 (mistakenly dated January 21, 2009), counsel for Dr. Connors stated that he was "filing a charge, signed by [Dr. Connors] and counsel, for disability and gender discrimination in employment." Exhibit W (January 21, 2009 [sic] letter from Attorney Watts to the EEOC's Boston Area Office).

48. The 4-page "charge" referred to by counsel for Dr. Connors in his January 21, 2010 letter is merely the completed Intake Questionnaire, as no EEOC Form 5 was attached to counsel's letter. *See* Exhibit W.

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

49. The EEOC received the Intake Questionnaire back from Dr. Connors on January 25, 2010. Exhibit X at 2980.

50. In response, the EEOC prepared a Charge of Discrimination (EEOC Form 5) and sent it to Dr. Connors for her signature and verification. *See* Exhibit X and Y (February 11, 2010 letter from Attorney Watts to EEOC).

51. By letter dated February 11, 2010, counsel for Dr. Connors asked the EEOC to "revise the Charge of Discrimination" it had prepared for Dr. Connors' "approval and signature." Exhibit Y.

52. No Charge of Discrimination (EEOC Form 5) signed by Dr. Connors ever was filed with the EEOC or any state or local agency.

53. On or about March 9, 2010, the EEOC issued a Notice of Right to Sue to Dr. Connors, at her request. Exhibit Z.

54. Dr. Connors has asserted "disability discrimination" and "illegal retaliation" claims against the defendants under Title I of the Americans with Disabilities Act of 1990 ("ADA"). Complaint, Counts One and Two.

55. In Count One of her Complaint, Dr. Connors claims that defendants failed to provide reasonable accommodations for her alleged disability before she was notified of her dismissal from the Program, and also claims that she was dismissed from the Program because of her alleged disability. Complaint, ¶ 33 (plaintiff's "discharge was based on her disability in the contexts of [defendants'] failure/refusal to provide reasonable accommodations for her disability"). In Count Two of her Complaint, Dr. Connors also claims that she was dismissed from the Program in retaliation for her having requested reasonable accommodations for her alleged disability. Complaint, ¶ 40.

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

APPLICABLE LAW

56. A plaintiff must file a timely charge of discrimination or retaliation with the Equal Employment Opportunity Commission ("EEOC") as a condition precedent to the filing of an action in federal court under the ADA. *Cherry v. City of New York*, 381 Fed. Appx. 57, 58 (2d Cir. June 18, 2010). *See Legani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001).

57. The ADA adopts the filing requirements of section 706(e) of Title VII of the Civil Rights Act of 1964 for claims brought under Title I of the ADA. 42 U.S.C. § 12117(a).

58. Under section 706(e)(1), a charge of discrimination must be filed with the EEOC within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).

59. However, if an employee initially institutes proceedings with a state or local agency with authority to grant or seek relief for the alleged unlawful employment practice, then a charge of employment discrimination may be filed with the EEOC up to 300 days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e-5(e)(1).

60. The state in which the alleged discrimination occurred is New Hampshire.

61. New Hampshire has a law prohibiting discrimination on the basis of disability (RSA ch. 354-A) and authorizes a state agency (the New Hampshire Commission for Human Rights) to enforce the law.

62. Section 706(c) provides that where an alleged discriminatory employment practice has occurred in a so-called "deferral state" (*i.e.*, a state that has its own anti-discrimination laws and enforcement agency), the deferral state has 60 days of exclusive

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

jurisdiction over the claim, and only after the 60 days have expired or the proceedings have been "earlier terminated" may the charge be filed with the EEOC. 42 U.S.C. § 2000e-5(c).

63. The 300-day period for Dr. Connors to file a charge of discrimination began, at the latest, when she first received notice of her dismissal from the Program on January 28, 2009. *Miller v. IT&T*, 755 F.2d 20, 23 (2d Cir.), *cert. denied*, 474 U.S. 851 (1985) (the 300-day filing period begins on the date "when the employee receives a definite notice of the termination, not upon his discharge"). *See also Shockley v. Vermont State Colleges*, 793 F.2d 478 (2d Cir. 1986) (timeliness of filing charge of discrimination measured from issuance of July 17, 1981 letter from college president notifying faculty member that he would not be reappointed for the 1982-1983 academic year and that, therefore, the 1981-1982 academic year would be his final year at the college, notwithstanding that the academic year did not end until June 1982 and that faculty member was awaiting the outcome of a grievance procedure); *Francis v. Blaikie Group*, 372 F.Supp.2d 741, 746 (S.D.N.Y. 2005), *aff'd*, 177 Fed. Appx. 121 (2d Cir. 2006) ("The 300-day period starts to run when the claimant receives notice of the allegedly discriminatory act, not when the allegedly discriminatory decision takes effect").

64. The 300-day period for Dr. Connors to file a charge of discrimination began, at the latest, when she first received notice of her dismissal from the Program on January 28, 2009, notwithstanding that she was allowed to complete her PGY-3 residency. *Delaware State College v. Ricks*, 449 U.S. 250, 257 (1980) ("continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination"); *Economu v. Borg-Warner Corp.*, 829 F.2d 311, 315 (2d Cir. 1987) (in an unlawful discharge case, "the last date of employment may not always coincide with the start of the statutory limitation clock. . . . Rather,

the limitation period begins to run on the date when the employee receives a definite notice of the termination").

65. The 300-day period for Dr. Connors to file a charge of discrimination began, at the latest, when she first received notice of her dismissal from the Program on January 28, 2009, notwithstanding that she asked Dr. Green on several occasions to reconsider his decision and also may have asked others to intervene on her behalf. *Ricks*, 449 U.S. at 261 n.15 ("requests to reconsider … cannot extend the limitations period applicable to the civil rights laws").

66. The 300-day period for Dr. Connors to file a charge of discrimination began, at the latest, when she first received notice of her dismissal from the Program on January 28, 2009, notwithstanding the she sought to have Dr. Green's decision "overturned" by the Fair Hearing Committee. *Ricks*, 449 U.S. at 261 ("the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitation period"); *Morse v. University of Vermont*, 973 F.2d 122, 125 (2d Cir. 1992) (the availability of an internal administrative review of the alleged discriminatory decision has no effect on when the statute of limitations period begins to run); *Miller*, 755 F.2d at 20 ("the mere possibility that the decision might be reversed was not enough to label [the decision] advisory or ineffective for time-bar purposes"); *Cherry*, 381 Fed. Appx. at 58 (rejecting employee's equitable tolling argument because the "pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations period").

67. The 300-day period for Dr. Connors to file a charge of discrimination began, at the latest, when she first received notice of her dismissal from the Program on January 28, 2009, regardless of whether she was given time to consider having her dismissal from the Program characterized as a resignation rather than a termination. *See Hill v. St. Louis University*, 920 F.

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

Supp. 124, 126 n.4 (E.D. Mo. 1996), *aff'd*, 123 F.3d 1114 (8th Cir. 1997) (the time for filing a charge of discrimination began on the date plaintiff was informed that she could either resign or be terminated, not on the date when she actually submitted her letter of resignation); *Barnes v. Hillhaven Rehabilitation & Convalescent Center*, 686 F. Supp. 311, 313 (N.D. Ga. 1988) ("[Plaintiff] argues that the filing period was not triggered until April 14, 1986 when [her immediate supervisor] asked her to submit her letter of resignation and send it overnight mail. However, the record shows that on April 4, [plaintiff] had been clearly informed that she would have to resign or be terminated. Either was an adverse employment action …. Under the reasoning of *Ricks*, [plaintiff] was notified on April 4, 1986 of [her employer's] adverse employment decision. The fact that she did not prepare her resignation letter until April 14 and worked until April 28 does not render the April 4 decision any less final"). *See also Pfister v. Allied Corp.,* 539 F. Supp. 224, 227 (S.D.N.Y. 1982) (an employee's participation in private settlement negotiations with her employer does not toll the limitations period for filing a discrimination complaint where there was no allegation that the employer attempted to prevent the employee from filing a timely claim).

68. The 300-day period for Dr. Connors to file a charge of discrimination began, at the latest, when she first received notice of her dismissal from the Program on January 28, 2009, notwithstanding that Dr. Green agreed that she would be paid until the end of the academic year. *See Ricks*, 449 U.S. at 257 ("continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination"); *Kriegesmann v. Barry-Wehmiller Co.*, 739 F.2d 357, 358-59 (8th Cir.), *cert. denied*, 469 U.S. 1036 (1984) (that an employer paid severance benefits and helped employee find other employment following termination did not support equitable tolling).

69. The 300-day period for Dr. Connors to file a charge of discrimination ended, at the latest, on November 24, 2009.

70. Dr. Connors did not file a charge of discrimination with the EEOC or any state or local agency on or before November 24, 2009.

71. Because the December 7, 2009 letter from Dr. Connors' counsel to the EEOC was sent more than 300 days after January 28, 2009, the Court need not determine whether the letter satisfies the requirements of 42 U.S.C. § 2000e-5(b) insofar as: (a) it did not conform to the form required by the EEOC; (b) it was not treated by the EEOC as a charge of discrimination; (c) it was not processed or investigated as a charge of discrimination; and (d) it resulted in no notice to defendants.

72. Because the December 7, 2009 letter from Dr. Connors' counsel to the EEOC was sent more than 300 days after January 28, 2009, the Court need not determine whether the fact that the letter does not mention retaliation precludes Dr. Connors' retaliation claim.

73. Because the December 7, 2009 letter from Dr. Connors' counsel to the EEOC was sent more than 300 days after January 28, 2009, the Court need not determine whether the letter from Dr. Connors' counsel to the EEOC "instituted proceedings" with the New Hampshire Commission for Human Rights ("NHCHR"), thereby satisfying the sequential filing requirement of 42 U.S.C. § 2000(e)(1). *See Equal Employment Opportunity Commission v. Green*, 76 F.3d 19, 23 (1st Cir. 1996) (the court must ascertain whether the language of any work-sharing agreement between the EEOC and state agency provides that the parties intended that state agency proceedings be deemed "initiated upon the EEOC's receipt" of a charge of discrimination).

74. Because the December 7, 2009 letter from Dr. Connors' counsel to the EEOC was sent more than 300 days after January 28, 2009, the Court need not determine whether the completed Intake Questionnaire received by the EEOC on January 25, 2010 constitutes the filing of an administrative charge with the NHCHR. *See Black v. May Depart. Stores, Co.*, 1999 U.S. Dist. LEXIS 21555 *3 (D. Ma. February 10, 1999) (filing of intake questionnaire with EEOC did not constitute a filing of an administrative charge with the NHCHR). *See also Jordan v. Bates USA*, 4 Fed. Appx. 73, 77 (2d Cir. February 16, 2001) (court need not address whether unsworn Intake Questionnaire was inadequate as a "charge" under the ADA where the "300 day period for filing plaintiff's EEOC charge expired on December 4, 1995, the day before plaintiff first arrived at the EEOC office and completed her Intake Questionnaire").

75. Because the December 7, 2009 letter from Dr. Connors' counsel to the EEOC was sent more than 300 days after January 28, 2009, the Court need not determine whether the failure of Dr. Connors to ever file a signed Charge of Discrimination (EEOC Form 5) precludes her claims.

76. While the time period for filing a charge of discrimination is subject to equitable doctrines, such as tolling or estoppel, "such doctrines … are to be applied sparingly." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). *See Zerilli-Edelglass v. New York City Transit Authority*, 333 F.3d 74, 79 (2d Cir. 2003). *See also Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152 (1984) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants").

77. A plaintiff who asserts the applicability of equitable tolling or equitable estoppel has the burden of proving that the doctrines should apply. *Zerilli-Edelglass*, 333 F.3d at 79

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

78. Equitable tolling is "only appropriate in rare and exceptional circumstances, in which a party is prevented in some extraordinary way from exercising [her] rights." *Zerilli-Edelglass*, 333 F.3d at 79. *See also* Miller, 755 F.2d at 24 (the 300-day period is not tolled or delayed unless the employee was "actively misled by his employer" or "prevented in some extraordinary way" from exercising his rights).

79. Dr. Connors has not proven that any conduct on the part of defendants or anything else "prevented [her] in some extraordinary way" from filing her charge of discrimination within 300 days of January 28, 2009.

80. Dr. Connors has not proven that defendants "actively mislead" her concerning the time for filing any charge of discrimination. *Compare Leake v. University of Cincinnati*, 605 F.2d 255 (6th Cir. 1979) (equitable tolling applied where the University's counsel asked for time to investigate employee's claim and *expressly* stated that the "time for [his or her] investigation will not be used by the University to in any way prejudice [the employee's] rights with regard to any statute of limitations").

81. Dr. Connors was represented by counsel prior to November 24, 2009.

82. Equitable tolling is not warranted because Dr. Connors was represented by counsel during the EEOC filing period. *Keyse v. California Texas Oil Corp.*, 590 F.2d 45, 47 (2d. Cir. 1978) ("tolling would be improper if [employee] was represented by counsel during the [EEOC filing] period"); *McCain v. Eaton Corp.*, 1990 U.S. Dist. LEXIS 15735 *12 (E.D.N.Y. August 29, 1990) (rejecting equitable tolling argument because plaintiff was represented by counsel and, therefore, "had *access* to a means of acquiring knowledge of his rights and responsibilities").

83. Dr. Connors has not proven that anything extraordinary occurred between January 28, 2009 and November 24, 2009, so as to make this case one of the rare and exceptional circumstances for application of the equitable tolling doctrine. *See Scheir v. Temple University*, 576 F. Supp. 1569 (E.D. Pa. 1984) (statements of an employee representative that he would write a letter of recommendation for plaintiff, would rehire her, and would "keep his eyes open for other employment opportunities at the hospital" deemed insufficient to support equitable tolling, particularly where plaintiff "had retained an attorney before she filed her EEOC charge").

84. Dr. Connors has not met her burden of proving that the 300-day period for her to file a charge of discrimination which began on January 28, 2009, should be tolled for any period of time prior to its expiration.

85. While equitable estoppel may be appropriate when an employee is aware of her rights, but does not make a timely filing due to her reasonable reliance on her employer's misleading representations or conduct, *Dillman v. Combustion Engineering Corp.*, 784 F.2d 57, 60-61 (2d Cir. 1986), the employee must show "evidence of either the employer's improper purpose or [its] constructive knowledge of the deceptive nature of [its] conduct." *Kale v. Combined Ins. Co. of Am.*, 861 F.2d 746, 752 (1st Cir. 1988). *See Wall v. Constr. & Gen. Laborers' Union, Local 230*, 224 F.3d 168, 176 (2d Cir. 2000). That evidence must be in the form of some "definite, unequivocal behavior . . . fairly calculated to mask the truth or to lull an unsuspecting person into a false sense of security." *Clauson v. Smith*, 823 F.2d 660, 663 (1st Cir. 1987).

86. Dr. Connors has not met her burden of proving that defendants should be equitably estopped from asserting their defense that Dr. Connors failed to file a timely charge of discrimination.

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

Respectfully submitted,

DARTMOUTH HITCHCOCK MEDICAL CENTER, DARTMOUTH MEDICAL SCHOOL, MARY HITCHCOCK MEMORIAL HOSPITAL, DARTMOUTH-HITCHCOCK CLINIC AND TRUSTEES OF DARTMOUTH COLLEGE

By Their Attorneys,
SULLOWAY & HOLLIS, P.L.L.C.

DATED: February 2, 2012

By: /s/ William D. Pandolph, Esq.

Edward M. Kaplan, Esq.
William D. Pandolph, Esq.
9 Capitol Street
P.O. Box 1256
Concord, NH 03302-1256
(603)224-2341
e-mail: wpandolph@sulloway.com

**CERTIFICATE OF SERVICE**

I hereby certify that this Answer was served on the following persons on this date and in the manner specified herein: Electronically Served Through ECF: Norman E. Watts, Esq.

DATED: February 2, 2012

By: /s/ William D. Pandolph, Esq.
William D. Pandolph, Esq.