UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| JENNIFER A. CONNORS, | \| |
| PLAINTIFF | \| |
| v. | \| |
| | \|   CASE NO.  2:10-cv-94 |
| DARTMOUTH HITCHCOCK MEDICAL CENTER, | \| |
| DARTMOUTH MEDICAL SCHOOL, | \| |
| MARY HITCHCOCK MEMORIAL HOSPITAL, | \| |
| DARTMOUTH-HITCHCOCK CLINIC and | \| |
| TRUSTEES OF DARTMOUTH COLLEGE, | \| |
| DEFENDANTS | \| |

### *PLAINTIFF'S PRELIMINARY REQUESTS FOR FINDINGS OF FACT AND CONCLUSIONS OF LAW*

THE PLAINTIFF, Jennifer A. Connors, submits the following preliminary requests for findings of fact and conclusions of law, based upon the evidence presented at the hearing to be held on February 3, 2012, concerning the timeliness of her filing of a complaint with the Equal Employment Opportunities Commission ("EEOC"): [1]

1.  Jennifer A. Connors is a physician licensed to practice medicine in the State of Vermont.

2.  Dr. Connors is employed by two Vermont health care providers, the State of Vermont Department of Corrections and Health Care and Rehabilitation Services.

3.  Previously, Dr. Connors was a resident physician, from June 2006 until July 2009, in defendants' psychiatric residency training program. The psychiatry resident training is composed of four post-graduate years. Dr. Connors completed her PGY1

---

[1] Plaintiff requests the opportunity to supplement the proposed findings and conclusions after the 2/3/12 hearing.

      year at the University of Utah medical school. Her course at the defendants' institution was slated for three years.

4. Dr. Connors has a learning disability, Attention Deficit Hyperactivity Disorder ("ADHD").

5. The Accreditation Council for Graduate Medical Education ("ACGME") is the agency that evaluates and accredits medical residency programs throughout the United States. (Exhibit 4). The ACGME periodically audits residency programs to ensure that "sponsoring institutions," such as the defendants, comply with its rules and guidelines. The ACGME specifies the requirements for residency programs, including, *inter alia*, the duties and responsibilities of the "program director" who administers the residency program at each "sponsoring institution." (Exhibit 5). In order to maintain accreditation, such institutions must adhere to the policies and procedures.

6. The defendants issued a manual, that the Accreditation Council for Graduate Medical Education ("ACGME") approved, for defendants' residency programs. (Exhibit 1). It delineates "Institutional Requirements" for "sponsoring institutions," including defendants'. (Exhibit 5, p.3).

7. Each "sponsoring institution" has a graduate medical education ("GME") physician director and staff people who administer the program at the institution's facilities.

8. The defendants' GME department issued Dr. Connors' appointment for January 16, 2006 through June 25, 2009. Usually, residents are employed as resident physicians with annual contracts. In Dr. Connors' case, the timing of the annual contracts was irregular – they did not adhere to annual segments. (Exhibit 9).

9.  The ACGME manual specifies a "GME Fair Hearing Policy" that delineates Fair Hearing procedures "which assure due process to residents who have concerns or are recommended for non-renewal or dismissal from a program due to academic deficiency, non-academic deficiency or behavior incompatible with the role of the physician, or for other reasons that, if not resolved, could significantly threaten a Resident's intended career development." (Exhibit 1, p. 41).

10. According the ACGME manual, program directors administer the residency program under the Council's guidelines. The guidelines prescribe that, should academic, non-academic deficiencies, behavior issues or other reasons arise, the program director must notify the resident of the concerns. If the program director deems that correction is infeasible, the program director, "after discussion with the Director of GME, may recommend the resident's dismissal without intervening probationary period." *Id.* When a resident is to be non-renewed or dismissed from the program, the program director "shall" notify the GME officials and express his/her recommendation for non-renewal or dismissal. *Id.*

11. The residency program director does not have unilateral authority to non-renew or dismiss a resident. The GME takes over from there and administers the "fair hearing process" in which the resident may present a case supporting continuing in the program. The resident also may resign, in which case she loses the right to the "fair hearing" process. *Id.,* p. 42.

12. When Dr. Connors commenced the psychiatry residency, she received, read and believed she understood the ACGME Manual. She understood that the program

director, Dr. Ronald Green, lacked authority to non-renew or dismiss her.  [2/]

13. On January 28, 2009, Dr. Green gave Dr. Connors a letter indicating that he was dismissing her from the program. (Exhibit 12). Based on the manual provisions, Dr. Connors assumed that the GME rules protected her from unilateral dismissal. After receiving the Green letter, Dr. Connors engaged in a series of communications and meetings with defendants' officials to secure her position in the program. Based on that assumption, Dr. Connors did not file a grievance or formal protest or engage counsel until it became clear, later, that the defendants were operating under a different assumption – that the program director had dismissed her. Defendants have a formal grievance process that is unrelated to the GME process. (Exhibit 6).

14. In the interim, Dr. Connors continued in the program with academic and clinical duties. (Exhibit 6)

15. Dr. Connors' communications included inquiries with a GME official, Jake Kelleher, concerning her status in the program after Dr. Green "dismissed" her. Dr. Green used the term "dismiss" which, to her, was inconsistent with the manual protection. *Id.*

16. In her communication with an employee assistance program official, Sara Koury, on January 28, 2009, using Dr. Green's term "dismiss," Dr. Connors pointed out that Dr. Green's claims were erroneous. She asserted that Dr. Green has given her a

---

[2/]   Plaintiff contends that the program director lacked authority to dismiss her and requests the finding. She also requests the conclusion, expressed at the end of this presentation, beginning at paragraph 26, that he did not dismiss her, that the GME process was the only dismissal mechanism and that it did not begin until her request for a "fair hearing," on April 14, 2009 - Exhibit 13.

memo dated November 20, 2008, that she had never seen before then. Dr. Connors asserted that Dr. Green also asserted that she would be terminated from the program if she invoked the "fair hearing" process. (Exhibit 17). In reply, Ms. Koury asserted that a "dismissal" should not be a "complete surprise." (Exhibit 17).

17. On February 4, 2009, Dr. Connors informed Mr. Kelleher at GME that she understood Dr. Green had contacted the employee assistance program to verify one of his contentions that she found to be erroneous. Mr. Kelleher also noted that alternatives to the "fair hearing" process might be to resign and obtain reference letters from Dr. Green. (Exhibit 8).

18. Marc L. Bertrand, MD, was the GME "Designated Institutional Official" (DIO") in 2009. Dr. Bertrand reviewed the Green allegations against Dr. Connors in April, 2009, to determine her "status in the program and how to proceed from here." (Exhibit 10). To that end, Dr. Bertrand met with Dr. Connors and officials at the Veterans Administration facility in White River Junction.

19. Dr. Connors also communicated with an official of defendants' "Educational and Employee Relations Department," Michael Landon, in early February. She indicated to Mr. Landon that Dr. Green had "dismissed" her but was also seeking her resignation. She noted that she had "been down this road before." (Exhibit 14). On previous occasions, Dr. Green had expressed dismissal intentions towards Dr. Connors although she continued in the program without disciplinary action. (Exhibit 15).

20. Mr. Landon met with Dr. Green in order to explore alternatives to Green's "dismissal," including the appointment of an alternative supervisor for Dr. Connors'

final term - "PGY4." Mr. Landon indicated to Dr. Connors that he had a "constructive" meeting with Dr. Green. The result of the meeting was that she could continue in the program under a "formal improvement agreement to address the concerns identified at the VA, an environment with appropriate support and structure." He asserted that if Dr. Connors was "not satisfied with the outcome, [she] may wish to request a formal hearing." (Exhibit 11).

21. Theses communications, and others, led Dr. Connors to conclude that she may be continuing in the program and that she need not assert her legal rights, either of internal appeal, the civil process or even to consult counsel.

22. But when Mr. Kelleher informed Dr. Connors, on April 10, 2009, that Dr. Green would not permit her to continue in the program, she requested a "fair hearing" rather than accede to Dr. Green's suggestion that she resign. In other words, she had no alternative except the "fair hearing" process if she was to remain in the program. (Exhibits 13 & 16).

23. In sum, defendants' GME department appointed a "fair hearing" committee that heard from Drs. Green and Connors and others. The committee's decision read that it was upholding Dr. Green's decision. Dr. Green's "decision" was a "recommendation" under the GME rules. Coupled with the confusing array of communications from defendants' officials, during the January - 2009 period, the circumstances led Dr. Connors to reasonably conclude that she might continue in the program and that there was no need to file a grievance or a formal protest until she was clearly on the "fair hearing" track.

24. In sum, the defendants' officials had a variety of communications with Dr. Connors

that expressed a wide range of sentiments concerning her status in the program .

25. The "fair hearing" committee rendered its decision on July 24, 2009, Dr. Connors had 300 days in which to file her charge with the EEOC. She filed her charge on December 7, 2009 by letter from her counsel. (Exhibit T). July 24 to December 7 is considerably less than 300 days.

## Proposed Conclusions of Law

26. Under the governing rules, defendants' program director lacked unilateral authority to dismiss a resident in the program. Only the GME may dismiss a resident, based on the recommendation of the program director.

27. Here, defendants' decision to dismiss Dr. Connors occurred on July 24, 2009, when the "fair hearing" committee rendered its decision which essentially accepted Dr. Green's recommendation and rejected Dr. Connors' request to continue in the program.

28. According to the EEOC, a party may file a charge with the EEOC by sending a letter that includes certain required information. [3]

29. Dr. Connors' charge, as the EEOC defines, it, was filed on December 7, 2009. Her filing satisfied the statute of limitations.

## Alternative Proposed Conclusions of Law

**[Note: Should the Court find that there is another date of "clear, official notice" of dismissal, aside from July 24, 2009, plaintiff proposes the following conclusions.]**

30. A claimant must file with the EEOC within 300 days of when the "alleged unlawful

---

[3] Please refer to EEOC website page entitled "How fo File a Charge of Employment Discrimination," attached as a non-hearing exhibit.

employment practice" occurred. It is decided on a case-by-case basis. *Delaware State College v. Ricks,* 449 U.S. 250, FN9 (1980).

31. The EEOC statute of limitations begins to run when the employer gives its employee "definite notice of termination." *Smith v. United States Parcel Serv. Of Am.,* 65 F.3d 266, 268 (2nd Cir. 1995) (citations omitted). The employer must make it clear that the employer's decision is its "official position" and it is made clear to the employee. The communications must not be equivocal or tenuous in any way. *Economu v. Borg-Warner Corp.,* 829 F.2d 311, 315 (2nd Cir. 1987).

32. Here, it was not until July 2009, that Dr. Connors received the "official notice" and "definite notice of termination." *Economu, supra. Smith, supra.* The dismissal decision was not clear or effective until that time.

33. In the factual context enumerated above, there was no "definite notice of termination." *Smith, supra.* Defendants failed to make it clear that Dr. Green's recommendation was its "official position." Nor did it make that point clear to Dr. Connors. The communications from defendants' officials are quite equivocal and tenuous. *Economu, supra.* Their communications undermined Dr. Green's position that he was immediately terminating Dr. Connors from the residency program.

34. For policy reasons, a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel and equitable tolling. *Zipes v Trans World Airlines, Inc.,* 455 U.S. 385, 393 (1982); *Valente v. Moore Business Forms, Inc.,* 596 F.Supp. 1280 (D.Vt. 1984).

35. Courts must construe the procedural requirements of Title VII with liberality in view

      of its beneficial purposes in exposing unlawful discrimination. *Smith v. America President Lines, Ltd.*, 571 F.2d 109 (2nd Cir. 1978) (citing *Love v. Pullman,* 404 U.S. 522 (1972).

36. The 300-day period, in the case of a discriminatory discharge, starts running on the date when the employee receives a definite notice of the termination. *Miller v. Intern. Telephone and Telegraph Corp.*, 755 F.2d. 20, 23 (2nd Cir. 1985). The time period commences upon the employer's commission of a discriminatory act and is not tolled or delayed pending the employee's realization that the conduct was discriminatory unless the employee was actively misled by his employer. *Id.*, 24.

37. The doctrine of equitable tolling is applied when an employer's actions prevent an employee from taking steps to enforce or protect her rights. *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380 (3rd Cir. 1994). Where the employer provides the wrong rationale for termination or otherwise misleads the employee about the circumstances of her dismissal, equity will toll filing deadlines. *Id.*

38. In the present matter, by providing plaintiff with guidance and encouragement that she might continue in the residency program after Dr. Green's 1/28/09 letter, defendants' actively misled her about her status in the program. Defendants' misinformation guided plaintiff to withhold asserting her rights until after the "fair hearing" decision.

39. At minimum, defendants' actions lulled plaintiff into inaction, preventing her from filing earlier with the EEOC. *Carlile v. South Routt School Dist. RE 3-J,* 652 F.2d 981) (10th Cir. 1981).

40. Plaintiff was not represented by counsel until early May, 2009. Using that date as

commencing the EEOC filing period means that plaintiff filed within the 300 day requirement.

41. Using May 10, 2009 as the trigger for the statutory period, it ran on March 14, 2010, well after plaintiff actually filed with the EEOC.

                                    Respectfully submitted,

                                    JENNIFER A. CONNORS
                                    PLAINTIFF

Dated:   2/2/12   .                  /s/Norman E. Watts
                                    Norman E. Watts, Esq.
                                    Watts Law Firm, PC
                                    PO Box 270
                                    Woodstock, VT 05091
                                    Plaintiff's Attorney