UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| Jennifer A. Connors, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 2:10-cv-00094-wks |
| | § | |
| Dartmouth Hitchcock Medical Center, | § | |
| Dartmouth Medical School, Mary Hitchcock | § | |
| Memorial Hospital, Dartmouth-Hitchcock | § | |
| Clinic and Trustees of Dartmouth College, | § | |
| *Defendants*. | § | |

---

## DEFENDANTS' REQUESTS FOR FINDINGS OF FACT AND CONCLUSIONS OF LAW (INCLUDING POST-HEARING SUPPLEMENTAL REQUESTS)

---

Defendants Dartmouth Hitchcock Medical Center, Dartmouth Medical School, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Clinic and Trustees of Dartmouth College, by and through their counsel, Sulloway & Hollis, P.L.L.C., submit the following requests for findings of fact and conclusions of law:

### *ORIGINAL REQUESTS*

<u>The Court's Authority</u>

1.      The Court may hold an evidentiary hearing to first resolve the legal question of whether plaintiff Jennifer Connors' ("Dr. Connors") failure to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in a timely manner is subject to equitable tolling or estoppel.  *Sinha v. New York City Dept. of Education*, 127 Fed. Appx. 546, 547 n.1 (2d Cir. April 8, 2005) (where disposition of the equitable claim would make consideration of the legal claim unnecessary, common sense dictates that the equitable claim be determined first).

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

{C0910176.1 }

2.      In considering this issue, the Court may assess the credibility of witnesses and resolve factual disputes.  *Id.* (district court properly resolved "credibility dispute" between two witnesses because plaintiff's equitable tolling claim regarding the "filing limitation period" was "wholly unrelated to her legal claim" that she was terminated based on her race, ethnicity, or national origin).  *See also Melendez-Arroyo v. Cutler-Hammer de P.R. Co., Inc.*, 273 F.3d 30, 39 (1st Cir. 2001) (question of equitable tolling is for a judge, and, therefore, the district court should hold a hearing to decide whether equitable tolling is appropriate before any trial on the merits); *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 579 (D.C. Cir. 1998) ("equitable tolling and estoppel, which ask whether equity requires extending a limitations period, are for the judge to apply, using her discretion, regardless of the presence of a factual dispute").

<u>Relevant Facts</u>

3.      On or about April 16, 2006, Dr. Connors and Mary Hitchcock Memorial Hospital ("MHMH") entered into a Resident/Fellow Agreement of Appointment for her "graduate training as a Psychiatry Resident" from June 26, 2006 to June 25, 2007 (the "2006 Resident Agreement"). The 2006 Resident Agreement states that Dr. Connors will be notified in the event "it is determined by Responsible Person(s) that renewal of [the] Agreement for a subsequent year of residency/fellowship will not be made."  Exhibit A.

4.      MHMH is a teaching hospital located in Lebanon, New Hampshire.

5.      Dr. Connors was placed on administrative leave in early March 2007 by Dr. Ronald Green ("Dr. Green"), the Psychiatry Residency Training Director, because of performance issues.  Dr. Connors returned from leave in September 2007, after agreeing to a remediation plan.  Exhibit E (January 2, 2009 note of Dr. Green).

6.      On or about September 26, 2007, Dr. Connors and MHMH entered into a Resident/Fellow Agreement of Appointment for her "graduate training as a Resident in Psychiatry at the PGY-2 Level" from September 17, 2007 to January 6, 2008.  Exhibit B.

7.      On or about January 3, 2008, Dr. Connors and MHMH entered into a Resident/Fellow Agreement of Appointment for her "graduate training as a Resident in Psychiatry at the PGY-3 Level" from January 7, 2008 to January 6, 2009 (the "2008 Resident Agreement").  The 2008 Resident Agreement states that Dr. Connors would be notified in the event "it is determined by Responsible Person(s) that renewal of [the] Agreement for a subsequent year of residency/fellowship will not be made."  Exhibit C.

8.      As the director of the psychiatry residency training program (the "Program"), Dr. Green was a "responsible person" within the meaning of the 2008 Resident Agreement between Dr. Connors and MHMH.

9.      Indeed, Dr. Connors routinely referred to the Program as being Dr. Green's Program.  *See* Exhibit H (January 29, 2009 e-mail from Dr. Connors to Dr. Green, wherein she asked Dr. Green to reconsider his "decision to dismiss me from *your* program"); Exhibit K (February 10, 2009 letter from Dr. Connors to Dr. Green, wherein she asked Dr. Green to reconsider his decision and "allow me to complete my training in *your* residency program"); Exhibit Q (June 24, 2009 letter from Dr. Connors to the Fair Hearing Committee, wherein she asked it to "overturn" Dr. Green's "decision to dismiss me from *his* psychiatry training program").

10.     Dr. Green had the authority to determine and notify psychiatry residents that their residency agreements would not be renewed for a subsequent year of residency, and, as such, that they were dismissed from the Program.

11.     On January 28, 2009, Dr. Connors met with Dr. Green.  At the meeting, Dr. Connors was given a letter from Dr. Green, wherein Dr. Green stated that Dr. Connors was being "given notice that [she was] dismissed from our training program."  Exhibit F (January 28, 2009 letter from Dr. Green to Dr. Connors).

12.     According to Dr. Connors, at the meeting, she asked Dr. Green if he was "firing" her and he said "yes."  In response, Dr. Connors told Dr. Green that she "didn't want to be fired" and "asked to have [her] job back."  Dr. Green said he was sorry, but she was dismissed from the Program.

13.     Although dismissed from the Program, Dr. Green told Dr. Connors that she would be allowed to complete her current rotations [*i.e.*, "4 weeks of neurology and 2 weeks of C/L psychiatry"] so that she could "be eligible for a PGY-4 elsewhere."  Exhibit J (February 2, 2009 note of Dr. Green).

14.     Although dismissed from the Program, Dr. Green also told Dr. Connors that she would be paid "her stipend through the end of the current academic year even though she will no longer be working … after approximately 7 weeks from now."  Exhibit J (February 2, 2009 note of Dr. Green).

15.     On January 28, 2009, Dr. Connors wrote to Sara Koury (an EAP counselor) and stated:  "I wanted to let you know that I was notified today by RG [*i.e.*, Dr. Green] that I am dismissed from the psychiatry residency program."  Exhibit G.

16.     Dr. Connors was given notice of her dismissal from the Program on January 28, 2009.

17.     Dr. Connors knew that she was being dismissed from the Program on January 28, 2009.

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

{C0910176.1 }                                          -4-

18.     At their January 28, 2009 meeting, Dr. Green provided Dr. Connors with a copy of the Fair Hearing Policy.  Exhibit F (January 28, 2009 letter from Dr. Green to Dr. Connors); Exhibit G (January 28, 2009 e-mail from Dr. Connors to Sara Koury, wherein she stated that Dr. Green "gave me a hand-out about Fair Hearings").  *See also* Exhibit AA.

19.     Dr. Connors already had a copy of the Fair Hearing Policy.

20.     On January 29, 2009, Dr. Connors wrote again to Ms. Koury and stated:  "I was not expecting to be dismissed [from the Program] yesterday."  Exhibit I.

21.     On January 29, 2009, Dr. Connors sent an e-mail to Dr. Green, wherein she asked him to reconsider his "decision to dismiss me from your program."  Exhibit H (January 29, 2009 e-mail from Dr. Connors to Dr. Green).

22.     After receiving a copy of the Fair Hearing Policy, Dr. Connors continued to acknowledge that Dr. Green had dismissed her from the Program on January 28, 2009.

23.     For example, on February 10, 2009, Dr. Connors wrote to Dr. Green and stated: "Your dismissal of me from your program will result in permanent and serious consequences …. Dr. Green, please reconsider your decision and allow me to complete my training in your residency program."  Exhibit K.

24.     Dr. Green was emphatic in denying Dr. Connors' requests for reconsideration of his non-renewal decision.  *See* Exhibit L (February 13, 2009 letter from Dr. Connors to Dr. Green, wherein she stated that Dr. Green told her he would "not reconsider the decision to dismiss [her] from the program as notified in the 1/28/09 letter").

25.     On February 26, 2009, Dr. Connors sent an e-mail to Dr. Green, wherein she stated that she hoped that Dr. Green would "change [his] mind and allow [her] to complete [her] training here."  Dr. Connors also advised Dr. Green that she would be presenting the matter to

the Fair Hearing Committee.  Exhibit M (February 26, 2009 e-mail from Dr. Connors to Dr. Green).

26.     Dr. Connors completed her "PGY3" on April 12, 2009.  Exhibit O (April 7, 2009 letter from Dr. Green to American Board of Psychiatry and Neurology).

27.     Dr. Connors' psychiatry residency ended on April 12, 2009.

28.     On or about April 16, 2009, Dr. Connors consulted with Norman E. Watts, Esq. ("Attorney Watts") concerning her dismissal from the Program.  Exhibit W at 2958 and 2972 ("Summary Chart" submitted by Dr. Connors to the EEOC in response to question 16 of the EEOC's Intake Questionnaire asking whether she had "sought help about this situation from … an attorney").

29.     Attorney Watts specializes in employment law.  *See* http://www.wattslawfirmpc. com/Attorneys.

30.     A hearing concerning Dr. Connors' dismissal from the Program was held by the Fair Hearing Committee on June 1, 2009 and June 16, 2009.  Exhibit R.

31.     Dr. Connors asked the Fair Hearing Committee to "overturn" Dr. Green's January 28, 2009 "decision to dismiss [her] from his psychiatry training program."  Exhibit Q (June 24, 2009 letter to Fair Hearing Committee); Exhibit R (Decision of Fair Hearing Committee, noting that "Dr. Connors [had] requested that the committee *overturn* Dr. Ronald Green's decision not to renew her residency appointment and allow her to complete her residency at DHMC in good standing").

32.     The fact that Dr. Connors sought to "overturn" Dr. Green's January 28, 2009 decision demonstrates that she understood that the decision was final unless overturned by the Fair Hearing Committee.

33.     Following a hearing, the Fair Hearing Committee determined that "Dr. Green's decision not to renew Dr. Connors for her fourth year should stand."  Exhibit R.

34.     Dr. Connors did not believe that Dr. Green was merely recommending to the Fair Hearing Committee that she be dismissed from the Program.

35.     Dr. Connors understood that Dr. Green's determination was final, such that if she did not request a hearing and convince the Fair Hearing Committee to "overturn" Dr. Green's decision, then she would not continue in the Program.

36.     By letter dated October 19, 2009, counsel for Dr. Connors noted that he and counsel for defendants had "exchanged emails concerning Dr. Connors as a DHMC psychiatry resident earlier this year."  Counsel also acknowledged that Dr. Connors had been "terminated" from the Program and that the "'fair hearing' group [had] sustained her termination."  Exhibit S (October 19, 2009 letter from Norman Watts, Esq. to Edward Kaplan, Esq.).

37.     By letter dated December 7, 2009 to the New York District Office of the EEOC, counsel for Dr. Connors stated that he was "filing a complaint for disability and gender discrimination in employment" on behalf of Dr. Connors.  Exhibit T.

38.     However, counsel for Dr. Connors did not submit the form used for filing an initial charge of discrimination with the EEOC (*i.e.*, EEOC Form 5).

39.     No charge of discrimination was filed by Dr. Connors concerning her dismissal from the Program with the EEOC or any state or local agency prior to December 7, 2009.

40.     The December 7, 2009 letter to the EEOC makes no reference to any alleged retaliation.

41.     The December 7, 2009 letter to the EEOC does not request that anything be filed with any state or local agency.

42.     December 7, 2009 is 313 days after January 28, 2009.

43.     There is no evidence that the EEOC received the December 7, 2009 letter from Dr. Connors' counsel.

44.     By letter dated December 28, 2009 to the EEOC's New York District Office, counsel for Dr. Connors stated that he had filed a complaint on her behalf on December 7, 2009, and that he was "transmitting it again requesting delivery confirmation" because "no acknowledgment of the [December 7, 2009] filing" had been received.  Exhibit U (December 28, 2009 letter from Attorney Watts to EEOC).

45.     By letter dated January 7, 2010 from the Boston Area Office of the EEOC to Dr. Connors, the EEOC informed Dr. Connors that if she wanted "to file a charge, [she could] *start the process* by filling out [an attached] questionnaire."  The letter further states that "[f]illing out and sending us this questionnaire does not mean that you have filed a charge."  Exhibit V.

46.     The "Intake Questionnaire" sent by the EEOC asked Dr. Connors whether she wanted to "talk to an EEOC employee before deciding whether to file a charge" or whether she "want[ed] to file a charge of discrimination."  Exhibit W at 2958.

47.     By letter dated January 21, 2010 (mistakenly dated January 21, 2009), counsel for Dr. Connors stated that he was "filing a charge, signed by [Dr. Connors] and counsel, for disability and gender discrimination in employment."  Exhibit W (January 21, 2009 [sic] letter from Attorney Watts to the EEOC's Boston Area Office).

48.     The 4-page "charge" referred to by counsel for Dr. Connors in his January 21, 2010 letter is merely the completed Intake Questionnaire, as no EEOC Form 5 was attached to counsel's letter.  *See* Exhibit W.

49.     The EEOC received the Intake Questionnaire back from Dr. Connors on January 25, 2010.  Exhibit X at 2980.

50.     In response, the EEOC prepared a Charge of Discrimination (EEOC Form 5) and sent it to Dr. Connors for her signature and verification.  *See* Exhibit X and Y (February 11, 2010 letter from Attorney Watts to EEOC).

51.     By letter dated February 11, 2010, counsel for Dr. Connors asked the EEOC to "revise the Charge of Discrimination" it had prepared for Dr. Connors' "approval and signature." Exhibit Y.

52.     No Charge of Discrimination (EEOC Form 5) signed by Dr. Connors ever was filed with the EEOC or any state or local agency.

53.     On or about March 9, 2010, the EEOC issued a Notice of Right to Sue to Dr. Connors, at her request.  Exhibit Z.

54.     Dr. Connors has asserted "disability discrimination" and "illegal retaliation" claims against the defendants under Title I of the Americans with Disabilities Act of 1990 ("ADA").  Complaint, Counts One and Two.

55.     In Count One of her Complaint, Dr. Connors claims that defendants failed to provide reasonable accommodations for her alleged disability before she was notified of her dismissal from the Program, and also claims that she was dismissed from the Program because of her alleged disability.  Complaint, ¶ 33 (plaintiff's "discharge was based on her disability in the contexts of [defendants'] failure/refusal to provide reasonable accommodations for her disability").  In Count Two of her Complaint, Dr. Connors also claims that she was dismissed from the Program in retaliation for her having requested reasonable accommodations for her alleged disability.  Complaint, ¶ 40.

<u>Applicable Law</u>

56.    A plaintiff must file a timely charge of discrimination or retaliation with the Equal

Employment Opportunity Commission ("EEOC") as a condition precedent to the filing of an

action in federal court under the ADA.  *Cherry v. City of New York*, 381 Fed. Appx. 57, 58 (2d

Cir. June 18, 2010).  *See Legani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d

Cir. 2001).

57.    The ADA adopts the filing requirements of section 706(e) of Title VII of the Civil

Rights Act of 1964 for claims brought under Title I of the ADA.  42 U.S.C. § 12117(a).

58.    Under section 706(e)(1), a charge of discrimination must be filed with the EEOC

within 180 days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-

5(e)(1).

59.    However, if an employee initially institutes proceedings with a state or local

agency with authority to grant or seek relief for the alleged unlawful employment practice, then a

charge of employment discrimination may be filed with the EEOC up to 300 days after the

alleged unlawful employment practice occurred.  42 U.S.C. § 2000e-5(e)(1).

60.    The state in which the alleged discrimination occurred is New Hampshire.

61.    New Hampshire has a law prohibiting discrimination on the basis of disability

(RSA ch. 354-A) and authorizes a state agency (the New Hampshire Commission for Human

Rights) to enforce the law.

62.    Section 706(c) provides that where an alleged discriminatory employment

practice has occurred in a so-called "deferral state" (*i.e.*, a state that has its own anti-

discrimination laws and enforcement agency), the deferral state has 60 days of exclusive

jurisdiction over the claim, and only after the 60 days have expired or the proceedings have been "earlier terminated" may the charge be filed with the EEOC.  42 U.S.C. § 2000e-5(c).

63.      The 300-day period for Dr. Connors to file a charge of discrimination began, at the latest, when she first received notice of her dismissal from the Program on January 28, 2009. *Miller v. IT&T*, 755 F.2d 20, 23 (2d Cir.), *cert. denied*, 474 U.S. 851 (1985) (the 300-day filing period begins on the date "when the employee receives a definite notice of the termination, not upon his discharge").  *See also Shockley v. Vermont State Colleges*, 793 F.2d 478 (2d Cir. 1986) (timeliness of filing charge of discrimination measured from issuance of July 17, 1981 letter from college president notifying faculty member that he would not be reappointed for the 1982-1983 academic year and that, therefore, the 1981-1982 academic year would be his final year at the college, notwithstanding that the academic year did not end until June 1982 and that faculty member was awaiting the outcome of a grievance procedure); *Francis v. Blaikie Group*, 372 F.Supp.2d 741, 746 (S.D.N.Y. 2005), *aff'd*, 177 Fed. Appx. 121 (2d Cir. 2006) ("The 300-day period starts to run when the claimant receives notice of the allegedly discriminatory act, not when the allegedly discriminatory decision takes effect").

64.      The 300-day period for Dr. Connors to file a charge of discrimination began, at the latest, when she first received notice of her dismissal from the Program on January 28, 2009, notwithstanding that she was allowed to complete her PGY-3 residency.  *Delaware State College v. Ricks*, 449 U.S. 250, 257 (1980) ("continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination"); *Economu v. Borg-Warner Corp.*, 829 F.2d 311, 315 (2d Cir. 1987) (in an unlawful discharge case, "the last date of employment may not always coincide with the start of the statutory limitation clock. . . .  Rather,

the limitation period begins to run on the date when the employee receives a definite notice of

the termination").

65.      The 300-day period for Dr. Connors to file a charge of discrimination began, at

the latest, when she first received notice of her dismissal from the Program on January 28, 2009,

notwithstanding that she asked Dr. Green on several occasions to reconsider his decision and

also may have asked others to intervene on her behalf.  *Ricks*, 449 U.S. at 261 n.15 ("requests to

reconsider … cannot extend the limitations period applicable to the civil rights laws").

66.      The 300-day period for Dr. Connors to file a charge of discrimination began, at

the latest, when she first received notice of her dismissal from the Program on January 28, 2009,

notwithstanding the she sought to have Dr. Green's decision "overturned" by the Fair Hearing

Committee.  *Ricks*, 449 U.S. at 261 ("the pendency of a grievance, or some other method of

collateral review of an employment decision, does not toll the running of the limitation period");

*Morse v. University of Vermont*, 973 F.2d 122, 125 (2d Cir. 1992) (the availability of an internal

administrative review of the alleged discriminatory decision has no effect on when the statute of

limitations period begins to run); *Miller*, 755 F.2d at 20 ("the mere possibility that the decision

might be reversed was not enough to label [the decision] advisory or ineffective for time-bar

purposes"); *Cherry*, 381 Fed. Appx. at 58 (rejecting employee's equitable tolling argument

because the "pendency of a grievance, or some other method of collateral review of an

employment decision, does not toll the running of the limitations period").

67.      The 300-day period for Dr. Connors to file a charge of discrimination began, at

the latest, when she first received notice of her dismissal from the Program on January 28, 2009,

regardless of whether she was given time to consider having her dismissal from the Program

characterized as a resignation rather than a termination.  *See Hill v. St. Louis University*, 920 F.

Supp. 124, 126 n.4 (E.D. Mo. 1996), *aff'd*, 123 F.3d 1114 (8th Cir. 1997) (the time for filing a charge of discrimination began on the date plaintiff was informed that she could either resign or be terminated, not on the date when she actually submitted her letter of resignation); *Barnes v. Hillhaven Rehabilitation & Convalescent Center*, 686 F. Supp. 311, 313 (N.D. Ga. 1988) ("[Plaintiff] argues that the filing period was not triggered until April 14, 1986 when [her immediate supervisor] asked her to submit her letter of resignation and send it overnight mail. However, the record shows that on April 4, [plaintiff] had been clearly informed that she would have to resign or be terminated.  Either was an adverse employment action ….  Under the reasoning of *Ricks*, [plaintiff] was notified on April 4, 1986 of [her employer's] adverse employment decision.  The fact that she did not prepare her resignation letter until April 14 and worked until April 28 does not render the April 4 decision any less final").  *See also Pfister v. Allied Corp.,* 539 F. Supp. 224, 227 (S.D.N.Y. 1982) (an employee's participation in private settlement negotiations with her employer does not toll the limitations period for filing a discrimination complaint where there was no allegation that the employer attempted to prevent the employee from filing a timely claim).

68.     The 300-day period for Dr. Connors to file a charge of discrimination began, at the latest, when she first received notice of her dismissal from the Program on January 28, 2009, notwithstanding that Dr. Green agreed that she would be paid until the end of the academic year. *See Ricks*, 449 U.S. at 257 ("continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination"); *Kriegesmann v. Barry-Wehmiller Co.*, 739 F.2d 357, 358-59 (8th Cir.), *cert. denied*, 469 U.S. 1036 (1984) (that an employer paid severance benefits and helped employee find other employment following termination did not support equitable tolling).

69.     The 300-day period for Dr. Connors to file a charge of discrimination ended, at the latest, on November 24, 2009.

70.     Dr. Connors did not file a charge of discrimination with the EEOC or any state or local agency on or before November 24, 2009.

71.     Because the December 7, 2009 letter from Dr. Connors' counsel to the EEOC was sent more than 300 days after January 28, 2009, the Court need not determine whether the letter satisfies the requirements of 42 U.S.C. § 2000e-5(b) insofar as:  (a) it did not conform to the form required by the EEOC; (b) it was not treated by the EEOC as a charge of discrimination; (c) it was not processed or investigated as a charge of discrimination; and (d) it resulted in no notice to defendants.

72.     Because the December 7, 2009 letter from Dr. Connors' counsel to the EEOC was sent more than 300 days after January 28, 2009, the Court need not determine whether the fact that the letter does not mention retaliation precludes Dr. Connors' retaliation claim.

73.     Because the December 7, 2009 letter from Dr. Connors' counsel to the EEOC was sent more than 300 days after January 28, 2009, the Court need not determine whether the letter from Dr. Connors' counsel to the EEOC "instituted proceedings" with the New Hampshire Commission for Human Rights ("NHCHR"), thereby satisfying the sequential filing requirement of 42 U.S.C. § 2000(e)(1).  *See Equal Employment Opportunity Commission v. Green*, 76 F.3d 19, 23 (1st Cir. 1996) (the court must ascertain whether the language of any work-sharing agreement between the EEOC and state agency provides that the parties intended that state agency proceedings be deemed "initiated upon the EEOC's receipt" of a charge of discrimination).

74.     Because the December 7, 2009 letter from Dr. Connors' counsel to the EEOC was sent more than 300 days after January 28, 2009, the Court need not determine whether the completed Intake Questionnaire received by the EEOC on January 25, 2010 constitutes the filing of an administrative charge with the NHCHR.  *See Black v. May Depart. Stores, Co.*, 1999 U.S. Dist. LEXIS 21555 *3 (D. Ma. February 10, 1999) (filing of intake questionnaire with EEOC did not constitute a filing of an administrative charge with the NHCHR).  *See also Jordan v. Bates USA*, 4 Fed. Appx. 73, 77 (2d Cir. February 16, 2001) (court need not address whether unsworn Intake Questionnaire was inadequate as a "charge" under the ADA where the "300 day period for filing plaintiff's EEOC charge expired on December 4, 1995, the day before plaintiff first arrived at the EEOC office and completed her Intake Questionnaire").

75.     Because the December 7, 2009 letter from Dr. Connors' counsel to the EEOC was sent more than 300 days after January 28, 2009, the Court need not determine whether the failure of Dr. Connors to ever file a signed Charge of Discrimination (EEOC Form 5) precludes her claims.

76.     While the time period for filing a charge of discrimination is subject to equitable doctrines, such as tolling or estoppel, "such doctrines … are to be applied sparingly."  *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  *See Zerilli-Edelglass v. New York City Transit Authority*, 333 F.3d 74, 79 (2d Cir. 2003).  *See also Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152 (1984) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants").

77.     A plaintiff who asserts the applicability of equitable tolling or equitable estoppel has the burden of proving that the doctrines should apply.  *Zerilli-Edelglass*, 333 F.3d at 79

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

78.     Equitable tolling is "only appropriate in rare and exceptional circumstances, in which a party is prevented in some extraordinary way from exercising [her] rights." *Zerilli-Edelglass*, 333 F.3d at 79. *See also* Miller, 755 F.2d at 24 (the 300-day period is not tolled or delayed unless the employee was "actively misled by his employer" or "prevented in some extraordinary way" from exercising his rights).

79.     Dr. Connors has not proven that any conduct on the part of defendants or anything else "prevented [her] in some extraordinary way" from filing her charge of discrimination within 300 days of January 28, 2009.

80.     Dr. Connors has not proven that defendants "actively mislead" her concerning the time for filing any charge of discrimination. *Compare Leake v. University of Cincinnati*, 605 F.2d 255 (6th Cir. 1979) (equitable tolling applied where the University's counsel asked for time to investigate employee's claim and *expressly* stated that the "time for [his or her] investigation will not be used by the University to in any way prejudice [the employee's] rights with regard to any statute of limitations").

81.     Dr. Connors was represented by counsel prior to November 24, 2009.

82.     Equitable tolling is not warranted because Dr. Connors was represented by counsel during the EEOC filing period. *Keyse v. California Texas Oil Corp.*, 590 F.2d 45, 47 (2d. Cir. 1978) ("tolling would be improper if [employee] was represented by counsel during the [EEOC filing] period"); *McCain v. Eaton Corp.*, 1990 U.S. Dist. LEXIS 15735 *12 (E.D.N.Y. August 29, 1990) (rejecting equitable tolling argument because plaintiff was represented by counsel and, therefore, "had *access* to a means of acquiring knowledge of his rights and responsibilities").

83.     Dr. Connors has not proven that anything extraordinary occurred between January 28, 2009 and November 24, 2009, so as to make this case one of the rare and exceptional circumstances for application of the equitable tolling doctrine.  *See Scheir v. Temple University*, 576 F. Supp. 1569 (E.D. Pa. 1984) (statements of an employee representative that he would write a letter of recommendation for plaintiff, would rehire her, and would "keep his eyes open for other employment opportunities at the hospital" deemed insufficient to support equitable tolling, particularly where plaintiff "had retained an attorney before she filed her EEOC charge").

84.     Dr. Connors has not met her burden of proving that the 300-day period for her to file a charge of discrimination which began on January 28, 2009, should be tolled for any period of time prior to its expiration.

85.     While equitable estoppel may be appropriate when an employee is aware of her rights, but does not make a timely filing due to her reasonable reliance on her employer's misleading representations or conduct, *Dillman v. Combustion Engineering Corp*., 784 F.2d 57, 60-61 (2d Cir. 1986), the employee must show "evidence of either the employer's improper purpose or [its] constructive knowledge of the deceptive nature of [its] conduct."  *Kale v. Combined Ins. Co. of Am.*, 861 F.2d 746, 752 (1st Cir. 1988).  *See Wall v. Constr. & Gen. Laborers' Union, Local 230*, 224 F.3d 168, 176 (2d Cir. 2000).  That evidence must be in the form of some "definite, unequivocal behavior . . . fairly calculated to mask the truth or to lull an unsuspecting person into a false sense of security."  *Clauson v. Smith*, 823 F.2d 660, 663 (1st Cir. 1987).

86.     Dr. Connors has not met her burden of proving that defendants should be equitably estopped from asserting their defense that Dr. Connors failed to file a timely charge of discrimination.

### *POST-HEARING SUPPLEMENTAL REQUESTS*

87.    Dr. Connors waived her right to a jury trial on the issue of whether she filed a

charge of discrimination in a timely manner.  *Maher v. Long Island University*, 1997 U.S. App.

LEXIS 33980 *4 (2d Cir. December 2, 1997) (plaintiff waived her right to a jury trial on issue of

when she received notice of her termination so as to start 300-day EEOC filing period by

agreeing to let district court decide issue; as such, district court "was not limited to identifying

whether genuine issues of material fact existed as to when [plaintiff] received notice of her

termination but was entitled to make its own factual findings as to that question").

88.    Distilled to their essence, Dr. Connors' claims under Title I of the ADA are

premised on her assertion that defendants' alleged failure to accommodate her claimed disability

was the cause of the performance "difficulties" upon which Dr. Green based his January 28, 2009

decision regarding her continuation in "his" Program.  *See* Exhibit T (Dr. Connors alleging to the

EEOC that "Defendants dismissed [her] from the residency program because of the putative

shortcomings that they induced by failing to accommodate [her] disability").  *See also* Exhibit H

(January 29, 2009 e-mail from Dr. Connors to Dr. Green, wherein she asked Dr. Green to

reconsider his "decision to dismiss me from *your* program"); Exhibit K (February 10, 2009 letter

from Dr. Connors to Dr. Green, wherein she asked Dr. Green to reconsider his decision and

"allow me to complete my training in *your* residency program"); Exhibit Q (June 24, 2009 letter

from Dr. Connors to the Fair Hearing Committee, wherein she asked it to "overturn" Dr. Green's

"decision to dismiss me from *his* psychiatry training program") (emphasis added).

89.    At the February 3, 2012 hearing, Dr. Connors testified that, from the time her

residency began in 2006 to the time she met with Dr. Green on January 28, 2009, she always

believed that Dr. Green lacked the authority to dismiss her from the Program and could only
recommend her non-renewal or dismissal from the Program.

90.     Dr. Connors also testified that she always believed that Dr. Green's written and
oral statements to her on January 28, 2009, merely reflected his "recommendation" regarding her
continuation in the Program, and that her dismissal could not be effectuated until and unless the
Fair Hearing Committee acted upon Dr. Green's recommendation.

91.     As such, Dr. Connors has argued that her cause of action could have accrued only
when she received a copy of the Fair Hearing Committee's decision on July 28, 2009, by which
the Committee informed her of its determination that "Dr. Green's decision not to renew Dr.
Connors for her fourth year should stand."  Exhibit R.  *See* Exhibit W at 2972 (Dr. Connors
informing the EEOC that she had received notice from the Fair Hearing Committee that it would
not "overturn [her] residency termination" on July 28, 2009).

92.     Dr. Connors' February 3, 2012 testimony on these points was inconsistent with
every one of her contemporaneous communications submitted to the Court reflecting her
understanding of the outcome of her January 28, 2009 meeting with Dr. Green.  *See* Exhibit G
(Dr. Connors informing Sara Koury on January 28, 2009 that "I was notified today by RG [*i.e.*,
Dr. Green] that I am dismissed from the psychiatry residency program"); Exhibit I (Dr. Connors
informing Sara Koury on January 29, 2009 that "I was not expecting to be dismissed [from the
Program] yesterday"); Exhibit H (Dr. Connors asking Dr. Green on January 29, 2009 to
reconsider his "decision to dismiss me from your program"); Exhibit A-4 (Dr. Connors
informing Jake Kelleher that "I have pleaded with Dr. Green to reconsider his decision to dismiss
me from his program" and asking him if he "will attempt to influence a reconsideration of RG
[*i.e.*, Dr Green's] decision to terminate me prior to … Fair Hearing"); Exhibit K (Dr. Connors

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

telling Dr. Green on February 10, 2009 that "[y]our dismissal of me from your program will result in permanent and serious consequences" and asking him to "please reconsider your decision and allow me to complete my training in your residency program"); Exhibit L (Dr. Connors acknowledging on February 13, 2009 that Dr. Green had told her that he would "not reconsider the decision to dismiss [her] from the program as notified in the 1/28/09 letter"); Exhibit M (Dr. Connors telling Dr. Green on February 26, 2009 that she hoped that he would "change [his] mind and allow [her] to complete [her] training here"); Exhibit N (Dr. Connors informing Mark Bertrand, Jake Kelleher and Mike Landon that on March 4, 2009 she had "asked [Dr. Green] again for my job back"); Exhibit Q (Dr. Connors asking the Fair Hearing Committee on June 24, 2009 to "overturn" Dr. Green's January 28, 2009 "decision to dismiss me from his psychiatry training program"); Exhibit W at 2972 (Dr. Connors informing the EEOC in January 2010 that the Fair Hearing Committee "[f]ailed to overturn [her] residency termination").

93.     Dr. Connors has submitted no document from the relevant time period (*i.e.*, from the time her residency began in 2006 to the date she received her Notice of Right to Sue from the EEOC in March 2010) wherein she states that she believed that:  (a) Dr. Green lacked the authority to dismiss her from the Program; (b) Dr. Green could only recommend her non-renewal or dismissal from the Program; (c) Dr. Green's written and oral communications to her on January 28, 2009, merely reflected his recommendation regarding her continuation in the Program; and/or (d) her dismissal from the Program could not be effectuated until and unless the Fair Hearing Committee (or some other person or body) acted upon Dr. Green's recommendation.

94.     Dr. Connors did not submit an affidavit (or offer any other sworn testimony) in connection with defendants' summary judgment motion wherein she asserted that she ever

believed that:  (a) Dr. Green lacked the authority to dismiss her from the Program; (b) Dr. Green

could only recommend her non-renewal or dismissal from the Program; (c) Dr. Green's written

and oral communications to her on January 28, 2009, merely reflected his recommendation

regarding her continuation in the Program; and (d) her dismissal from the Program could not be

effectuated until and unless the Fair Hearing Committee (or some other body) acted upon Dr.

Green's recommendation.

      95.     Dr. Connors' testimony on these issues is not credible and must be disregarded.

      96.     Dr. Green, Dr. Connors' counsel, and the Fair Hearing Committee also understood

and believed that Dr. Green had dismissed Dr. Connors from the Program on January 28, 2009,

and that the only way she was going to be able to rejoin the Program was if the Fair Hearing

Committee "overturned" Dr. Green's decision. *See* Exhibit F (Dr. Green's informing Dr. Connors

on January 28, 2009 that she was "dismissed from our training program"); Exhibit R (Fair

Hearing Committee acknowledging in July 2009 that Dr. Connors had "requested that the

committee overturn Dr. Ronald Green's decision not to renew her residency appointment and

allow her to complete her residency at DHMC" and finding that "Dr. Green's decision not to

renew Dr. Connors for her fourth year should stand"); Exhibit S (counsel for Dr. Connors noting

on October 19, 2009 that "DHMC terminated Dr. Connors from its residency program" and the

"'fair hearing' group [had] sustained her termination").

      97.     On January 28, 2009, Dr. Connors was advised by Dr. Green that she "may, if you

wish, complete the PG-1/2 rotations needed to be eligible for a PGY-4 elsewhere."  Exhibit F.

      98.     Dr. Connors' testimony that she believed she would be able to finish her

residency, notwithstanding Dr. Green's January 28, 2009 letter dismissing her from the Program,

is inconsistent with her contemporaneous communications.  Exhibit K (Dr. Connors asking Dr.

Green on February 10, 2009 to "please reconsider your decision and allow me to complete my training in your residency program"); Exhibit M (February 26, 2009 letter from Dr. Connors to Dr. Green, wherein she states: "Please allow me to advance on my current merit to the PGY4, and to graduate from your program by next January, 2010"); Exhibit N (Dr. Connors stating on March 4, 2009 that "I hope that I may be able to influence a change of [Dr. Green's] heart so that I may finish my residency here in the next 10 months").

99.    Dr. Connors' testimony that she was told by Jake Kelleher that she need not worry about a supposed two-week deadline to request a review of Dr. Green's determination by the Fair Hearing Committee because she had not been terminated is inconsistent with her contemporaneous communications.  *See* Exhibit A-4 (January 29, 2009 letter wherein Dr. Connors noted that Jake Kelleher had merely informed her that "the time frame of 2 weeks within which to request a Fair Hearing by a House Officer [*i.e.*, a resident] is no longer done"). *See also* Exhibit 13 (April 14, 2009 e-mail from Dr. Connors to Jake Kelleher wherein she states: "I'd like to request a Fair Hearing.  I'm unsure of the timing involved since you and I left that open-ended.  I didn't want to miss any administrative deadlines, so this email is to notify you of my request").  *See also* Exhibit M (Dr. Connors informing Dr. Green on February 26, 2009 that she would be presenting the matter to the Fair Hearing Committee).

100.    Moreover, Dr. Connors' apparent assertion that she need not have sought a review by the Fair Hearing Committee because she had not been terminated, but also that she could not be terminated other than by a decision of the Fair Hearing Committee makes no sense.

101.    Any delay by Dr. Connors in requesting a review by the Fair Hearing Committee was *not* because she believed such action unnecessary since Dr. Green had merely recommended her non-renewal, but rather was because her "preference [was] for a review of [Dr. Green's

dismissal] decision without it becoming adversarial."  Exhibit L.  *See* Exhibit N (Dr. Connors

stating on March 4, 2009 that "I hope that I may be able to influence a change of [Dr. Green's]

heart so that I may finish my residency here in the next 10 months").

      102.    Dr. Connors "left the program after completion of her PGY3 year on 4/12/09."

Exhibit O.  *See* Exhibit P (noting that Dr. Connors' "last training day is April 12th").  *See also*

Exhibit A-3 (April 7, 2009 e-mail from Jennifer Clerkin to Dr. Connors of list of "things to do

before you leave").

      103.    After April 12, 2009, Dr. Connors testified that she no longer performed the

duties of a resident, even though there had been no review by the Fair Hearing Committee of Dr.

Green's determination.

      104.    Dr. Connors requested a review of Dr. Green's determination by the Fair Hearing

Committee on April 14, 2009.  Exhibit 13.

      105.    The 300-day period for Dr. Connors to file a charge of discrimination did not

begin on the day Dr. Connors actually left the Program.  *Delaware State College v. Ricks*, 449

U.S. 250, 257 (1980) ("continuity of employment, without more, is insufficient to prolong the

life of a cause of action for employment discrimination"); *Economu v. Borg-Warner Corp.*, 829

F.2d 311, 315 (2d Cir. 1987) (in an unlawful discharge case, "the last date of employment may

not always coincide with the start of the statutory limitation clock. . . .  Rather, the limitation

period begins to run on the date when the employee receives a definite notice of the

termination").

      106.    The 300-day period for Dr. Connors to file a charge of discrimination did not

begin when Dr. Connors abandoned her efforts to get Dr. Green to reconsider his decision.

*Ricks*, 449 U.S. at 261 n.15 ("requests to reconsider … cannot extend the limitations period applicable to the civil rights laws").

107.    A review by the Fair Hearing Committee is an optional proceeding that may or may not be invoked by a resident in connection with his or her non-renewal or dismissal.  *See* Exhibit A-1.

108.    Notwithstanding its use of the phrase "recommendation for non-renewal or dismissal," the Fair Hearing Policy, when read as a whole, makes clear that a program director's actions regarding non-renewal or dismissal of a resident are subject to "review" by the Fair Hearing Committee only if the resident requests such a review in writing.  Exhibit A-1.  *See also* Exhibit A-1 at 43 (indicating that the program director must present "evidence in support of the *decision* being questioned by the Resident" and that the resident must present evidence that indicates "that the Program Director's *decision* was arbitrary, unreasonable or capricious") (emphasis added).

109.    Indeed, there is no standing Fair Hearing Committee.  Rather, a committee is "form[ed]" only "[u]pon notification by the Resident that a review is [being] requested."  Exhibit A-1.

110.    As such, Dr. Connors' assertion that she could not have been dismissed from the Program without some action by the Fair Hearing Committee is illogical, as it would mean that she could not have been dismissed from the Program had she not sought a review of Dr. Green's determination.

111.    Apart from making no sense, Dr. Connors' assertion that she could not have been dismissed from the Program without some action by the Fair Hearing Committee is also inconsistent with the express terms of her residency agreements.  *See* Exhibit C (Dr. Connors

would be notified in the event "it is determined by Responsible Person(s) that renewal of [the] Agreement for a subsequent year of residency/fellowship will not be made").

112.    Dr. Green's notification to Dr. Connors on January 28, 2009, however characterized, would have caused (and did cause) her residency to end absent some action by the Fair Hearing Committee.  *See* Exhibit K (Dr. Connors' February 10, 2009 letter to Dr. Green, wherein she states:  "Your dismissal of me from your program will result in permanent and serious consequences").

113.    After her residency officially ended in April 2009, Dr. Connors would not have been able to rejoin the Program unless:  (a) Dr. Green reconsidered his January 28, 2009 determination; or (b) she requested a review by the Fair Hearing Committee and the Fair Hearing Committee "overturned" Dr. Green's determination.

114.    In *Ricks*, the Supreme Court held that the proper focus for statute of limitations purposes is on the time of the alleged discriminatory acts, and not the time at which the consequences of the acts become most painful.  449 U.S. at 258.  The Court also rejected the argument that the availability of a review procedure extends the limitations period because a "grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made."  449 U.S. at 261 (emphasis in original).

115.    However characterized, Dr. Green's notice to Dr. Connors on January 28, 2009 was sufficiently definite to commence the 300-day period for Dr. Connors to file a charge of discrimination with the EEOC.

116.    Indeed, Dr. Green's notice to Dr. Connors on January 28, 2009 caused her training to end in April 2009 before its completion, caused her to retain legal counsel, and forced her to seek a review by the Fair Hearing Committee in order to rejoin the Program.

Law Offices of
Sulloway & Hollis, PLLC.
Concord, N.H. 03302

117.    Dr. Green's notice to Dr. Connors on January 28, 2009 was not indefinite or equivocal, notwithstanding that it may have been subject to further review by the Fair Hearing Committee (or some other person or body).  *See* Ricks, 449 U.S. at 261.  *Compare Smith v. United Parcel Service of America, Inc.*, 65 F.3d 266, 267 (2d 1995) (whether statements like employee should "go home and think about his future with the company" and "perhaps continuing with UPS was not what was best for him" were too indefinite to start limitations period was a question for the jury).

118.    Nothing occurred between January 28, 2009 and November 24, 2009 that would support a tolling of the 300-day period for Dr. Connors to file a charge of discrimination.

119.    Dr. Connors testified that defendants made no statement regarding any extension or tolling of the 300-day period for her to file a charge of discrimination.

120.    Even if Dr. Green's decision was merely a recommendation and a review by the Fair Hearing Committee (or some other person or body) was automatic and necessary before her non-renewal or discharge could be effectuated, then Dr. Connors' cause of action still would have accrued on January 28, 2009.  *Sims v. Fort Wayne Community Schools*, 2005 U.S. Dist. LEXIS 6174 (N.D. Ind. February 2, 2005) (where employee alleged that race and retaliation motivated her manager to "recommend" her termination, her cause of action accrued *on the date she was informed of her manager's recommendation*, not the date of the board's decision "to uphold the [manager's] recommendation to terminate ….  The board's final action in accepting the recommendation was a painful consequence of the alleged discriminatory decision by [her manager] to terminate her; it was not a separate discriminatory act.  The board's act to ratify the termination recommendation was only a part of the harm that continued to flow to the [employee] as a result of [her manager's] alleged discriminatory acts").

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

121.    Dr. Connors failed to file a timely charge of discrimination with the EEOC and, therefore, her ADA claims (Counts One and Two) must be dismissed.  *Cherry v. City of New York*, 381 Fed. Appx. 57, 58 (2d Cir. June 18, 2010) (a plaintiff must file a timely charge of discrimination or retaliation with the EEOC as a condition precedent to the filing of an action in federal court under the ADA).

Respectfully submitted,

DARTMOUTH HITCHCOCK MEDICAL
CENTER, DARTMOUTH MEDICAL SCHOOL,
MARY HITCHCOCK MEMORIAL HOSPITAL,
DARTMOUTH-HITCHCOCK CLINIC AND
TRUSTEES OF DARTMOUTH COLLEGE

By Their Attorneys,
SULLOWAY & HOLLIS, P.L.L.C.

DATED:  February 7, 2012          By:   /s/ William D. Pandolph, Esq.
Edward M. Kaplan, Esq.
William D. Pandolph, Esq.
9 Capitol Street
P.O. Box 1256
Concord, NH 03302-1256
(603)224-2341
e-mail:  wpandolph@sulloway.com

## CERTIFICATE OF SERVICE

I hereby certify that this pleading was served on the following persons on this date and in the manner specified herein:  Electronically Served Through ECF:  Norman E. Watts, Esq.

DATED:  February 7, 2012          By:   /s/ William D. Pandolph, Esq.
William D. Pandolph, Esq.

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

{C0910176.1 }                        -27-