```
                  UNITED STATES DISTRICT COURT
                            FOR THE
                       DISTRICT OF VERMONT

JENNIFER A. CONNORS,              :
                                  :
          Plaintiff,              :
                                  :
     v.                           :    Case No. 2:10-cv-94
                                  :
DARTMOUTH HITCHCOCK MEDICAL CENTER,:
DARTMOUTH MEDICAL SCHOOL, MARY    :
HITCHCOCK MEMORIAL HOSPITAL,      :
DARTMOUTH-HITCHCOCK CLINIC and    :
TRUSTEES OF DARTMOUTH COLLEGE,    :
                                  :
          Defendants.             :
                                  :
```

**FINDINGS OF FACT and CONCLUSIONS OF LAW**

In this action arising from the dismissal of Dr. Jennifer Connors from the Dartmouth Hitchcock Medical Center's graduate residency program in psychiatry, the parties have stipulated on the record to try two issues to the Court: whether Dr. Connors's charge of disability discrimination was timely filed with the Equal Employment Opportunity Commission ("EEOC"); and if it was not timely filed, whether circumstances warrant equitable tolling. The following constitutes the Court's Findings and Conclusions, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**I.   Findings of Fact**

In April 2006, Dr. Connors and Mary Hitchcock Memorial Hospital ("MHMH") of the Dartmouth Hitchcock Medical Center ("DHMC") entered into a Resident/Fellow Agreement of Appointment

for graduate training as a psychiatry resident from June 26, 2006, through June 25, 2007.  The expected duration of her training was three years.  According to her Second Amended Complaint ("SAC"), at the time of her initial appointment Dr. Connors advised DHMC that she has a learning disability, Attention Deficit Hyperactivity Disorder ("ADHD").  She requested reasonable accommodation for her condition, and DHMC agreed to provide reasonable accommodation.  SAC ¶¶ 17-18.

Dr. Connors was placed on administrative leave in early March 2007 by Dr. Ronald Green, the psychiatry residency program director, following complaints regarding her performance.  Dr. Connors returned from leave in September 2007, after agreeing to a remediation plan.

In September 2007, Dr. Connors and MHMH entered into a Resident/Fellow Agreement of Appointment for graduate training as a psychiatry resident at the PGY-2 level[1] from September 17, 2007, through January 6, 2008.  In January 2008, Dr. Connors and MHMH entered into a Resident/Fellow Agreement of Appointment for graduate training as a psychiatry resident at the PGY-3 level, from January 7, 2008, through January 6, 2009.  All three agreements provided that Dr. Connors agreed that reappointment would be "dependent upon satisfactory evaluations [by the program director and/or departmental chair] and fulfillment of program

---

[1]  "PGY-2" stands for "post-graduate year two."

and institutional requirements." Defs.' Ex. A, B, C. All three agreements provided that "[i]n the event that it is determined by Responsible Person(s) that renewal of this Agreement for a subsequent year of residency/fellowship will not be made," written notice would be provided. *Id.* The agreements do not identify or define "Responsible Person(s)."

The Accreditation Council for Graduate Medical Education ("ACGME") is the agency that evaluates and accredits residency programs in the United States. The ACGME ensures that "sponsoring institutions" like DHMC comply with program requirements, which include, among other things, the duties and responsibilities of the program director, who has "authority and accountability for the operation of the program." Pl.'s Ex. 5. In order to maintain accreditation, the sponsoring institution must adhere to the ACGME requirements.

DHMC has a graduate medical education ("GME") designated institution official ("DIO") and administrative director and staff. During the time period relevant to this case the DIO was Dr. Marc Bertrand, the Director of GME. The GME administrative director was Jake Kelleher. Dr. Connors's appointment agreements were executed by Kelleher or the GME assistant director.

DHMC has issued a GME Policy & Procedure Manual for Residents and Fellows, known as the "Red Book." Pl.'s Ex. 1. Included in the Red Book is the GME Fair Hearing Policy, which

sets forth fair hearing procedures to "assure due process to Residents who . . . are recommended for non-renewal or dismissal from a program . . . ."  Red Book 41.  The Policy provides that a resident be informed in writing of any recommendation for non-renewal or dismissal, in a private meeting with the program director.  The program director must submit written notification to the resident, and the Director of GME, among others, of the recommendation for non-renewal or dismissal.  When a remedial plan is not recommended, the resident must either "submit a resignation" or "request a review of the case from the Director of GME."  *Id.* at 41-42.  If the resident does not reach a resolution after meeting with the Director of GME and attempted mediation, the resident may request a Fair Hearing Process review.  *Id.* at 42.  A Fair Hearing process is therefore an optional procedure that a resident may request to review an impending nonrenewal or dismissal.

If a resident requests a Fair Hearing, a committee is formed, chaired by the Director of GME or his designee.  The committee conducts a hearing at which participants have an opportunity to present oral and documentary evidence.  *See id.* at 42-43.  Following the hearing the committee deliberates in closed session and reaches a decision which is communicated in writing to the resident and the program director.  *Id.* at 43.  If the committee does not agree with the program director's

4

recommendation for dismissal, the program director may be asked to accept the resident back into the program for an additional remedial period.  *Id.*  The decision of the committee is final.  *Id.*

Dr. Connors was familiar with GME policies and procedures contained in the GME Red Book, including the GME Fair Hearing Policy.

On January 28, 2009, Dr. Connors met with Dr. Green.  At the meeting, Dr. Green gave Dr. Connors a letter in which he stated that "you are hereby given notice that you are dismissed from our training program."  Defs.' Ex. F.  Dr. Green advised Dr. Connors that she might complete the rotations she needed to be eligible for a PGY-4 year elsewhere.  *Id.*

In the days and weeks that followed, Dr. Connors communicated with several individuals at DHMC concerning the meeting with Dr. Green.  In January 28 and 29 emails to her DHMC Employee Assistance Program counselor she stated "I wanted you to know that I was notified today by [Dr. Green] that I am dismissed from the psychiatry residency program," Defs.' Ex. I, and "I was not expecting to be dismissed yesterday."  Pl.'s Ex. 7.  In a January 29 email to Dr. Green, she asked him to reconsider his "decision to dismiss her" from his program.  Defs.' Ex. H.  In a February 2 email to Jake Kelleher, she acknowledged that Dr. Green notified her that she was dismissed, and noted that she

5

"pleaded with him to reconsider his decision."  Pl.'s Ex. 6.  In a February 3 email to Michael Landon, an Organizational Development Specialist in DHMC's Education and Employee Relations Department, Dr. Connors advised that she was notified by Dr. Green on January 28 that she was dismissed from the psychiatry training program.  Pl.'s Ex. 14.  After providing details of her current situation, she stated:  "Bottom line is that I do not want to leave my program."  *Id.*

   On or before February 4, in an email exchange with Kelleher, Dr. Connors mentioned an upcoming meeting with Dr. Green in which she expected to discuss "the reason for his dismissal of me from the program."  Pl.'s Ex. 8.  In a February 10 letter to Dr. Green, she asked him to reconsider his decision and allow her to complete her training in his residency program.  Defs.' Ex. K.  Dr. Connors acknowledged in writing that Dr. Green refused to reconsider the decision to dismiss her from the program.  Defs.' Ex. L.  On February 26 Dr. Connors again asked Dr. Green to reconsider his decision to dismiss her from his residency program.  Defs.' Ex. M.  On March 4, 2009, Dr. Connors wrote to Dr. Bertrand, Kelleher and Landon.  In the letter she stated:  "I met with Dr. Green briefly yesterday morning, Tuesday, 3/3/09.  I asked him again for my job back. . . . I appreciate your review of my dismissal from the Psychiatry Training Program, and I hope that I may be able to influence a change of heart . . . ."

Defs.' Ex. N.

Dr. Connors's negotiations were unsuccessful, and a review of her case by Dr. Bertrand did not alter the determination that her residency be terminated.  In a letter dated April 10, 2009, Kelleher stated:  "Your last training day is April 12th.  This is to confirm that the Hospital will continue your stipend through June 30th and your benefits through July 31st."  Pl.'s Ex. 16.

Dr. Connors left the program on April 12, 2009, having completed her PGY-3 training requirements.  Defs.' Ex. O; *see also* Defs.' Ex. A-3 (April 7 & 10 emails from psychiatry residency program administrator concerning Dr. Connors's departure).  After her PGY-3 year ended, she would not have been able to rejoin the program for her PGY-4 year unless Dr. Green changed his mind or a Fair Hearing Committee asked him to accept her back in the program for an additional remedial period.  *See* Red Book 43.  On April 14, Dr. Connors requested a Fair Hearing under the GME Fair Hearing Policy.  Pl.'s Ex. 13.

The Fair Hearing took place on June 1 and June 16, 2009.  Defs.' Ex. R.  Dr. Connors referred to "the problems with Dr. Green's decision to dismiss [her] from his psychiatry training program," and asked the Fair Hearing Committee to "overturn Dr. Green's actions."  Defs.' Ex. Q.  On July 28, 2009, the Fair Hearing Committee concluded in a written decision "that Dr. Green's decision not to renew Dr. Connors for her fourth year

should stand." Defs.' Ex. R at 4.

Dr. Connors was informed as of January 28, 2009, that Dr. Green had decided to dismiss her from his psychiatry training program. He communicated his decision to her both orally in a private meeting and in writing, as required by the GME Fair Hearing Policy. Dr. Connors's counsel indicated, in his submission to the EEOC on her behalf, that Dr. Connors received notice of termination on January 28, 2009. Defs.' Ex. W at 2965.

Through counsel, Dr. Connors lodged a complaint of discrimination with the New York District Office of the EEOC on December 7, 2009. Pl.'s Ex. 2. The Boston Area Office responded in a letter dated January 7, 2010, informing Dr. Connors that in order to start the process of filing a charge she must complete and return a questionnaire. Defs.' Ex. V. On January 21, 2010,[2] Dr. Connors, through counsel, submitted the completed intake questionnaire. Defs.' Ex. W. The EEOC prepared a charge of discrimination. Defs.' Ex. X. The EEOC issued a notice of right-to-sue on March 9, 2010. Defs.' Ex. Z.

Dr. Connors filed this lawsuit on April 19, 2010, alleging disability discrimination and retaliation in violation of the Americans with Disabilities Act of 1990 ("ADA"), breach of

---

[2] The cover letter bears a date of January 21, 2009, evidently a typographical error, given that the enclosures accompanying the letter were created in December 2009 and January 2010.

8

contract, and breach of an implied covenant of good faith and fair dealing.  Specifically, Dr. Connors alleged that "defendants placed plaintiff in a position that they believed would justify terminating her for just cause from the residency program," SAC ¶ 31; and "terminated plaintiff's employment," *id.* ¶ 32, "based on her disability."  *Id.* ¶ 33.  She also alleged that her termination "constituted retaliation against her for having complained of disability discrimination."  *Id.* ¶ 41.

## II.  Conclusions of Law

A precondition to bringing an action based on the ADA in federal court is the timely filing of a charge with the EEOC. *See* 42 U.S.C. § 12117(a) (adopting the filing requirements of 42 U.S.C. § 2000e-5); 42 U.S.C. § 2000e-5(e)(1); *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (holding that a timely EEOC filing is a prerequisite to a Title VII suit).  In a "deferral" state--one with its own anti-discrimination laws and agency--a complainant must file a charge with the EEOC within the earlier of three hundred days after the alleged unlawful practice, or if a complaint was filed with the state agency, thirty days after receiving notice of termination of proceedings under the state law.  *Hodge v. N.Y. Coll. of Podiatric Med.*, 157 F.3d 164, 166 (2d Cir. 1998).

New Hampshire, the location of DHMC, is a deferral state. *See Dressler v. Daniel*, 315 F.3d 75, 78 (1st Cir. 2003).  The

parties agree that Dr. Connors had three hundred days from the date of the alleged unlawful practice in which to file her charge with the EEOC.  *See* Defs.' (Prelim.) Reqs. for Findings of Fact & Conclusions of Law ¶¶ 63-69, ECF No. 94; Pl.'s Prelim. Reqs. for Findings of Fact & Conclusions of Law ("Pl.'s Reqs.") ¶¶ 25, 30, ECF No. 97.

Dr. Connors alleges that the termination of her residency and her employment was based on disability discrimination and retaliation for her requests for reasonable accommodation for her disability.  In her submission to the EEOC she identified three dates on which DHMC took discriminatory action:  January 28, 2009, when she received notice of termination; April 12, 2009, her last day of work; and July 28, 2009, when the final decision was made to uphold the nonrenewal of her contract.  Pl.'s Ex. W at 2965.

"[I]n the case of a discriminatory discharge, [the 300-day period] starts running on the date when the employee receives a definite notice of the termination, not upon [her] discharge." *Miller v. Int'l Tel. & Tel.*, 755 F.2d 20, 23 (2d Cir. 1985); *see also Shockley v. Vt. State Colls.*, 793 F.2d 478, 481 (2d Cir. 1986) ("[T]he timeliness of a discrimination claim is measured from the date the claimant receives notice of the allegedly discriminatory act, not from the date the decision takes effect."); *accord Smith v. United Parcel Serv. of Am., Inc.*, 65

F.3d 266, 268 (2d Cir. 1995); *Economu v. Borg-Warner Corp.*, 829 F.2d 311, 315 (2d Cir. 1987).

In *Delaware State College v. Ricks*, 449 U.S. 250 (1980), the United States Supreme Court considered whether a college professor timely complained that he was denied academic tenure because of his national origin.  In order to determine whether his complaint of discrimination was timely, the Court had to identify precisely the unlawful employment practice.  The Court determined that the alleged discrimination occurred at the time the tenure decision was made and communicated to Ricks.  *Id.* at 258.  At the latest this occurred when the college board of trustees notified Ricks of its "official position-and made that position apparent to Ricks. . . ."  *Id.* at 262.  The Court rejected both Rick's final date of employment and the date Rick's subsequent grievance was denied as the date on which the limitations period began to run.  *Id.* at 259, 261-62.

If the 300-day period began on January 28, when Dr. Connors received her letter from Dr. Green, her initial complaint to the EEOC,[3] submitted three hundred thirteen days later on December 7, was untimely.  Dr. Connors contends that the January 28 meeting and letter did not communicate a final decision, only a

---

[3]   The Court assumes, for purposes of deciding whether her claim is time-barred, that Dr. Connors's earliest communication with the EEOC, sent December 7, 2009, qualified as a charge of employment discrimination.

11

recommendation, and that the official notice of the termination of her residency did not occur until July 28, when the Fair Hearing Committee completed its review and decided to uphold her nonrenewal.  Alternatively Dr. Connors argues that her official notice of dismissal occurred when she received Kelleher's letter dated April 10, 2009.

Neither Dr. Connors nor DHMC consistently characterize the January 28, 2009 meeting and letter.  Shortly after the meeting, Dr. Connors repeatedly referred to having been notified that Dr. Green was dismissing her from the program.  She testified, however, that she used these terms in her desire to avoid challenging Dr. Green's authority while attempting to persuade him to change his mind.  Although DHMC's Fair Hearing Policy repeatedly refers to a program director's "recommendation" of nonrenewal or dismissal, *see* Pl.'s Ex. 1 at 41, 43, it also refers to the same action as a program director's "decision." *See id.* at 43.  The Fair Hearing Committee repeatedly referred to Dr. Green's action as a "decision" not to renew Dr. Connors's residency.  *See* Defs.' Ex. R at 1, 4.

Regardless, although the Fair Hearing Policy refers to a program director's action as a recommendation of nonrenewal or dismissal, there is no suggestion in the policy (or elsewhere in the Red Book) that a program director lacks the authority to terminate a resident's training program.  To the contrary,

12

following a program director's written notice and meeting with the resident, a resident is terminated from her program unless she takes action.  *See* Red Book 42.  She may resign.  She may request a review from the GME Director or she may request a Fair Hearing, but only if she secures a favorable outcome will she avoid termination.  *See id.*  Thus, a resident *may* invoke the Fair Hearing process in order to receive a review of a program director's actions; the Fair Hearing Process is not the "only way [she] could be dismissed."  Pl.'s Supplemental Proposed Findings of Fact & Conclusions of Law ¶ 11, ECF No. 103.

Focusing on Dr. Green's action rather than the terminology used to describe it, he clearly, definitely and unambiguously notified Dr. Connors on January 28, orally and in writing, that she was being dismissed from her residency.  Unless she managed to alter the course of ensuing events--whether by pleas, by seeking allies to influence Dr. Green to change his mind, by seeking a review of her case by the Director of GME, or by invoking the Fair Hearing process--her training was to end by April 12, and she would not receive a renewal of her appointment.

Dr. Connors argues that the January 28 letter was not a "definite notice of the termination," *see Miller*, 755 F.2d at 23, because "[t]he dismissal decision was not clear or effective until [July 2009]," Pl.'s Reqs. ¶ 32, DHMC did not make it clear that Dr. Green stated its official position, and DHMC's

13

communications were "quite equivocal and tenuous," "undermin[ing] Dr. Green's position. . . ." *Id.* ¶ 33.

There was nothing whatsoever unclear about Dr. Green's letter or his oral communication on January 28. Although Dr. Connors may have believed, based on her interpretation of the Fair Hearing Policy and other ACGME rules, that Dr. Green lacked the authority to dismiss her from her residency, there is no doubt that Dr. Green's letter constituted an assertion of such an authority, and that Dr. Connors viewed it as such.

"[F]or the notice to be effective, it must be made apparent to the employee that the notice states the 'official position' of the employer." *Smith*, 65 F.3d at 269. The January 28 letter, written on DHMC Department of Psychiatry letterhead, from the Director of the Psychiatry residency program, stated "you are hereby given notice that you are dismissed from our training program." Pl.'s Ex. 12. Although Dr. Connors may have believed that the termination of her residency could not be effective until after the Fair Hearing Committee acted, there is no question that she was informed on January 28 that DHMC's official position was that she was being dismissed. *See Miller*, 755 F.2d at 24 ("[T]he mere possibility that the decision might be reversed was not enough to label it advisory or ineffective for time-bar purposes."); *see also Ricks*, 448 U.S. at 161 n. 15 (noting that "requests to reconsider . . . cannot extend the

14

limitations periods applicable to the civil rights laws").

Dr. Connors alludes to communications from DHMC "officials" that undermined the effect of the January 28 communications from Dr. Green. Pl.'s Reqs. ¶ 33. Dr. Connors testified repeatedly as to her belief that Dr. Green could not dismiss her. There is however no evidence that any communication from representatives of DHMC was ambiguous or equivocal or in any way misleading or confusing. There is no evidence that anyone said or did anything that would lead Dr. Connors to believe that she had not received notice of her dismissal from the residency program. There is no evidence that anyone encouraged her to believe that Dr. Green lacked the authority to decide to terminate her residency. There is assuredly evidence that several individuals from DHMC provided advice and/or assistance to Dr. Connors in her efforts to use informal and formal means to attempt to alter the decision. Such advice or assistance may have caused Dr. Connors to indulge in wishful thinking, but could not reasonably lead her to conclude that she had not received definite notice of termination.

From the evidence it is apparent that it is precisely because Dr. Green had the power to terminate her residency--and had exercised it--that Dr. Connors directed her efforts toward persuading him to change his mind. Jake Kelleher reminded Dr. Connors that she could resign or invoke the Fair Hearing process; there is no evidence that he suggested Dr. Green could not

terminate her residency.  Dr. Bertrand reviewed Dr. Connors's case in March and April 2009.  There is no evidence that Dr. Bertrand encouraged her to believe that Dr. Green's dismissal letter was not a dismissal.

Dr. Connors solicited advice from Michael Landon of DHMC's Employee Relations Department; after meeting with Dr. Green he advised Dr. Connors to articulate a basis for a request to return for another year under a formal performance improvement agreement, with mutually acceptable supervision.  He reminded her that if the outcome of the discussion of her proposal was not satisfactory she could request a formal hearing.  Pl.'s Ex. 11.  He did not suggest that Dr. Green had not told her she was dismissed from her residency program or that Dr. Green lacked the power to terminate her.

These communications may have led Dr. Connors to hope that she might be able to change Dr. Green's mind, or have his decision overridden, and that she would be able to pursue a fourth residency year at DHMC.  They have nothing to do with the unambiguous fact that Dr. Green notified Dr. Connors on January 28 that she was dismissed from her residency.

Dr. Connors understood that DHMC had agreed not to impose a deadline for invoking the Fair Hearing process while she attempted to negotiate a different outcome than termination of her residency.  After her negotiations failed she requested and

16

was provided a Fair Hearing, and she engaged counsel, well within three hundred days of receiving Dr. Green's dismissal letter. If she harbored any illusions about the nature of Dr. Green's January 28 communications about her residency, they would have been dispelled long before the deadline for filing her EEOC charge.

The Court concludes that Dr. Connors received definite notice of her termination from her residency on January 28, 2009. She was clearly, definitely and unambiguously notified, orally and in writing, that she was being dismissed from her residency. She herself characterized the event as notice that she was being dismissed.

Dr. Connors's utilization of the GME Fair Hearing procedure did not alter or delay the commencement of the limitation period. *See, e.g.*, *Ricks*, 449 U.S. at 261 ("[E]ntertaining a grievance complaining of the . . . decision does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made."). Although the Fair Hearing procedure provided to aggrieved residents is quite separate from the grievance procedure available to all employees of MHMH, it is a method of collateral review of an employment decision to "assure due process to Residents." Red Book 41. Its "pendency . . . does not toll the

17

running of the limitations periods." *Ricks*, 449 U.S. at 261 (noting that "[t]he existence of careful procedures to assure fairness in the . . . decision should not obscure the principle that limitations periods normally commence when the employer's decision is made"); *see also Morse v. Univ. of Vt.*, 973 F.2d 122, 125 (2d Cir. 1992) ("The fact that [the university] allowed appellant to continue to take courses and undertook an internal administrative review of its allegedly discriminatory decision has no effect on when the statute of limitations period begins to run."). Dr. Connors does not claim that DHMC's discriminatory actions infected the Fair Hearing process itself, or that the Fair Hearing Committee discriminated against her. The Fair Hearing Committee's decision allowing Dr. Green's decision to stand was simply the final consequence of the allegedly discriminatory treatment she received while in the psychiatry residency program.

There is no dispute that Dr. Connors failed to file a charge with the EEOC within three hundred days of receiving the January 28 notice: on or before November 24, 2009. Accordingly, DHMC is entitled to judgment on the discrimination claims unless circumstances would warrant the application of equitable tolling.

Equitable tolling may apply if a "plaintiff actively pursued judicial remedies but filed a defective pleading during the specified time period, . . . was unaware of . . . her cause of

action due to misleading conduct of the defendant, or where a plaintiff's medical condition or mental impairment prevented her from proceeding in a timely fashion." *Zerilli-Edelglass v. N.Y. City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (internal quotation marks and citations omitted). This Court "must consider whether [Dr. Connors] (1) has 'acted with reasonable diligence during the time period she seeks to have tolled,' and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Id.* at 80-81 (quoting *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002)). "[E]quitable tolling is only appropriate in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising his rights." *Id.* at 80 (internal quotation marks and ellipses omitted).

Although Dr. Connors has offered evidence that she believes misled her, or lulled her into inaction, she has offered no evidence that she was therefore unaware that she had a cause of action. In fact, well within the 300-day period she had retained counsel, who was actively involved in negotiations with DHMC on her behalf. *See* Defs.' Ex. S (Oct. 19, 2009 letter in which attorney for Plaintiff advised attorney for Defendants that "DHMC terminated Dr. Connors from its residency program within a few months of completion. The 'fair hearing' group sustained her termination."). Tolling is generally not warranted if a

19

plaintiff was represented by counsel during the period of limitation.  *See Keyse v. Cal. Tex. Oil Corp.*, 590 F.2d 45, 47 (2d Cir. 1978) (per curiam).

Dr. Connors has not shown that she acted with reasonable diligence during the time period she seeks to have tolled, or that her circumstances are in any way unusual.  She does not claim that a medical condition or impairment prevented her from filing a timely claim.  She has acknowledged that no one at DHMC said anything to her about an extension or tolling of the 300-day period for filing a charge with the EEOC.  Accordingly, she has not shown any basis for the application of equitable tolling to her case.

### III. Conclusion

Judgment is entered for DHMC on Counts One and Two, alleging disability discrimination and illegal retaliation.

Dated at Burlington, in the District of Vermont, this 13th day of February, 2012.

/s/ William K. Sessions III
William K. Sessions III
District Judge