UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| Jennifer A. Connors, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 2:10-cv-00094-wks |
| | § | Civil Action No. 2:12-cv-00051-wks |
| Dartmouth Hitchcock Medical Center, | § | |
| Dartmouth Medical School, Mary Hitchcock | § | |
| Memorial Hospital, Dartmouth-Hitchcock | § | |
| Clinic and Trustees of Dartmouth College, | § | |
| *Defendants*. | § | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Dartmouth Hitchcock Medical Center, Dartmouth Medical School, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Clinic and Trustees of Dartmouth College submit this Memorandum of Law in support of their Motion for Summary Judgment.  Summary judgment should be granted in favor of defendants with respect to plaintiff's remaining claims because, among other reasons:  (a) the Vermont Fair Employment Practices Act does not apply to claims brought by a New Hampshire licensed medical resident concerning her participation in a residency program sponsored and maintained by a New Hampshire licensed teaching hospital; (b) there is insufficient evidence to support plaintiff's claim that she was a qualified disabled individual, particularly given the deference that must be accorded to academic determinations made by teaching hospitals; (c) plaintiff received all reasonable accommodations she requested from defendants, and her dismissal is unrelated to any alleged failure to accommodate; (d) there is insufficient evidence supporting plaintiff's claim that her resident agreement was not renewed because of any disability or that she was retaliated against because she complained about not receiving a requested accommodation; and (e) plaintiff cannot premise contract claims on an

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

{C0992456.2 }

alleged lack of "just cause" for non-renewal because a medical resident's contract claims

concerning academic determinations are limited to whether the resident received due process.

## BACKGROUND FACTS

1.    Residency Programs

In July 2005, Dr. Jennifer Connors submitted an "application for residency training in the

Department of Psychiatry at Dartmouth-Hitchcock Medical Center" to Dr. Ronald Green, the

then psychiatry residency program director.  *See* July 25, 2005 letter from Dr. Connors to Dr.

Green with Application for Graduate Training, attached hereto as Exhibit A.

The "term 'residency program' in the United States refers to offerings in graduate medical

education."  *United States v. Mount Sinai Medical Center of Florida, Inc.*, 2008 U.S. Dist.

LEXIS 57808 *10 (S.D. Fla. July 28, 2008).  Graduate medical education "is the phase of formal

medical education beginning at graduation from medical school and ending after the educational

requirements for one of the medical specialty certifying boards have been completed."  Graduate

Medical Education Red Book/Policy & Procedure Manual For Residents and Fellows/Mary

Hitchcock Memorial Hospital (2008-09) (the "Red Book") at 1, attached hereto as Exhibit B;

February 13, 2012 Order/Findings of Fact and Conclusions of Law [Doc. 105] ("Findings") at 3

("DHMC has issued a GME Policy & Procedure Manual for Residents and Fellows, known as

the 'Red Book.'  Pl.'s Ex. 1.").

The "objective [of graduate medical education] is to prepare physicians for the

independent practice of medicine."  Exhibit B (Red Book) at 1.  It "is generally accepted that

physicians are not deemed fully trained to independently practice medicine in a specialty or

subspecialty without completing a residency program.  Moreover, satisfactory completion of a

residency program also is mandatory for physicians to become eligible for 'board certification'

and to be credentialed (*i.e.*, receive privileges) at the vast majority of hospitals." *Mount Sinai Medical Center of Florida*, 2008 U.S. Dist. LEXIS 57808 at *11.  *See* Exhibit B (Red Book) at 1 ("State licensing boards have varying requirements for post-MD clinical training, and almost every medical school graduate spends from three-to-seven years in postgraduate training").  *See also United States v. Mayo Foundation for Medical Education and Research*, 282 F.Supp.2d 997, 1007 (D. Minn. 2003) ("… to practice medicine in a given field, and in most cases to be admitted to a hospital staff, an individual holding an M.D. degree typically must (1) complete an accredited residency training program of at least three years' duration in a clinical specialty field, and (2) become certified by a specialty board that is a member of the American Board of Medical Specialties").  Residency programs "are accredited by the Accreditation Council for Graduate Medical Education (ACGME), which, in turn, acts on the recommendations of 26 Residency Review Committees (RRCs), each of which serves a medical and surgical specialty." Exhibit B (Red Book) at 1.  *See* Findings at 3.

    2.    Teaching Hospitals

    The "locations where residency programs are offered is generically called a 'teaching hospital.'" *Mount Sinai Medical Center of Florida*, 2008 U.S. Dist. LEXIS 57808 at *13-14 (internal quotes omitted).  Mary Hitchcock Memorial Hospital ("MHMH") is a teaching hospital located in Lebanon, New Hampshire.[1]  *See* Exhibit B (Red Book) at 1.  MHMH "has sponsored

---

[1]MHMH is a non-profit corporation organized under the laws of the State of New Hampshire.  Dartmouth Hitchcock Medical Center ("DHMC") is a New Hampshire non-profit corporation with its principal place of business in Lebanon, New Hampshire.  Dartmouth Hitchcock Clinic ("DHC") is a New Hampshire non-profit corporation with its principal place of business in Lebanon, New Hampshire.  Dartmouth College is a New Hampshire non-profit established by Royal Charter in 1769 and located in Hanover, New Hampshire.  Dartmouth Medical School (renamed the Geisel School of Medicine at Dartmouth in 2012) is not a legal entity, but rather is a trade name registered in New Hampshire by Dartmouth College.  *See* Exhibit V, attached hereto.

Graduate Medical Education programs since 1895 and is the sponsoring institution of GME

accredited training programs," including the psychiatry residency program applied to by Dr.

Connors in July 2005.  Exhibit B (Red Book) at 1.

MHMH maintains "institutional oversight" over such programs through its Graduate

Medical Education Advisory Committee ("GMEAC").  Exhibit B (Red Book) at 1.  The "GME

Office … implements institutional policies and procedures approved by the GMEAC ….

maintains house-staff and accreditation records, facilitates internal reviews of educational

programs, serves as liaison with the ACGME, coordinates benefit programs for house staff, and

supports the administration of individual programs."[2]  Exhibit B (Red Book) at 1.

>        3.        Educational Training, Not Employment

As noted, a "residency program is an extension of a medical student's formal education."

*Mount Sinai Medical Center of Florida*, 2008 U.S. Dist. LEXIS 57808 at *15.  For this reason,

as observed by the district court in *Mount Sinai Medical Center of Florida*:

> When a resident is picking residency programs, he does not view the process to be
> one of picking his first job.  In fact, no medical student would say their residency
> is their first job….  The medical student/aspiring resident looks at residency
> training as an element in his or her education in the same way high school
> students, when applying to college, judge whether a degree from college A or a
> degree from college B is going to help them more.  Residents thus think of
> residencies as education and not on-the-job training.  Teaching hospitals and
> residents know from the outset of their training that residents that enroll in a
> particular program are not likely to stay on staff as an attending physician after
> completion of their residency.  Ultimately, residency programs are training for a
> physician's first job – *i.e.*, there always is a next step after residency.  Conversely,
> one's first job in medicine could be their only job.

*Id.* at *20 (internal brackets, quotes and citations omitted).

---

[2]Residents "are commonly referred to as house staff" as compared to "physicians hired to
the medical staff at a hospital [who] are referred to as attending physicians."  *Mount Sinai
Medical Center of Florida*, 2008 U.S. Dist. LEXIS 57808 at **14, 15 n.8 (internal quotes
omitted).

As dictated by the ACGME, "[r]esidents receive what is commonly termed a 'stipend' as part of their residency." *Id.* at *22. These "stipends [are] non-negotiable; rather, they [are] uniformly paid to all residents based on their PGY [*i.e.*, post-graduate year] level." *Id.* at *46. *See* Exhibit B (Red Book) at 12 ("All house staff in the same Program Level will be paid at the same Stipend Level"). "Consistent with accreditation requirements, stipend amounts paid to residents [are] not paid as a wage to earn a living but [are] intended to defray expenses for residents so they [may] pursue the residency curriculum at [the teaching hospital]." *Mount Sinai Medical Center of Florida*, 2008 U.S. Dist. LEXIS 57808 at **46-47.

    4.    <u>Dr. Connors' Resident Agreements</u>

In response to her application for residency training, in October 2005, Dr. Green made Dr. Connors a "formal offer to join our program … as a PGY 2 resident in psychiatry to begin on June 26, 2006." *See* October 27, 2005 letter from Dr. Green to Dr. Connors, attached hereto as Exhibit C. Dr. Green advised Dr. Connors that her "stipend as a PGY 2 resident [would] be $45,350.00." *Id.* In November 2005, Dr. Connors accepted Dr. Green's offer. *Id.* At the time, Dr. Connors was living in Utah. *Id.*

Although the anticipated duration of her training may have been three years, Dr. Connors, like all residents, entered into a Resident/Fellow Agreement of Appointment on a yearly basis. *See* Findings at 1-2. More specifically, in April 2006, Dr. Connors and MHMH entered into a Resident/Fellow Agreement of Appointment for her graduate training as a psychiatry resident from June 26, 2006 to June 25, 2007 "at the stipend level of $45,350.00 per year so long as resident performance is satisfactory within the terms of [the] Agreement." *See* April 2006 Resident Agreement, attached hereto as Exhibit D; Findings at 1-2.

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

Before she started, Dr. Connors told Dr. Green that she needed some extra time for testing, which she was given.[3]  *See* May 27, 2006 e-mail from Dr. Connors, attached hereto as Exhibit E ("Dr. Green says I'll be getting [test accommodations] for the In-Training exams").  *See also* Deposition of Dr. Ronald Green at 56 (recalling that Dr. Connors "requested longer time to take tests"); 2009 Decision of Fair Hearing Committee at 3, attached hereto as Exhibit F (noting that Dr. Connors was given "extra time for testing"); Dr. Connors Dep. at 89-91 (acknowledging that the only specific accommodation she initially requested from Dr. Green was related to testing, which accommodation was provided).  During the first six or so months of her residency, Dr. Connors was also "given accommodations to have access to a psychiatrist" and a "quiet place to work."  Dr. Connors Dep. at 93-95, 110, 224.

In September 2007, Dr. Connors and MHMH entered into a second Resident/Fellow Agreement of Appointment for her graduate training as a resident in psychiatry at the PGY-2 level from September 17, 2007 to January 6, 2008 "at the stipend level of $47,410 per year as long as resident performance is satisfactory within the terms of [the] Agreement."[4]  *See* September 2007 Resident Agreement, attached hereto as Exhibit G; Findings at 2.  In January 2008, Dr. Connors and MHMH entered into a Resident/Fellow Agreement of Appointment for her graduate training as a resident in psychiatry at the PGY-3 level from January 7, 2008 to January 6, 2009 "at a stipend level of $50,070 per year as long as resident performance is satisfactory with the terms of [the] Agreement."  *See* 2008 Resident Agreement, attached hereto as Exhibit H; Findings at 2.  The 2008 Resident Agreement states that Dr. Connors would be

---

[3]Dr. Connors testified that she was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") in 2003.  Deposition of Dr. Jennifer Connors at 150.

[4]As will be discussed, Dr. Connors was placed on administrative leave in early March 2007.  Findings at 2.  As such, she did not complete her PGY-2 in June 2007.  The September 2007 Resident Agreement allowed Dr. Connors to complete her PGY-2, though the delay caused Dr. Connors to start her PGY-3 "off cycle" in January 2008.  *See* Exhibit F at 2.

notified in writing if it was determined "that renewal of this Agreement for a subsequent year of residency/fellowship will not be made."  Exhibit H; Findings at 3.

The Resident Agreements all state that:  (a) MHMH "agrees to provide a resident training program that meets the requirements of the [ACGME];" (b) the policies and procedures contained in the "GME Red Book … are considered to be part of [the] Agreement[s];" (c) Dr. Connors' "[p]erformance will be evaluated periodically" and "[r]eappointment will be dependent upon satisfactory evaluations and fulfillment of program and institutional requirements and availability of positions;" and (d) Dr. Connors must maintain "a valid training or permanent New Hampshire [medical] license."[5]  Exhibits D, G, H.

5.      <u>Progressive Training</u>

As "their training progresses, resident physicians are expected to gain competence and require less supervision, progressing from on-site and contemporaneous supervision to more indirect and periodic supervision."  Exhibit B (Red Book) at 28.  *See Mount Sinai Medical Center of Florida*, 2008 U.S. Dist. LEXIS 57808 at *18 ("The distinguishing characteristic of residency training is that there is progressively more and more responsibility that the resident takes on … as they progress through the residency training, but always under the supervision of the attending faculty") (internal quotes omitted).

As stated by Dr. William Torrey, Vice-Chair for Clinical Services for the Dartmouth College Department of Psychiatry:

> … the nature of psychiatry training is that with each year, there is less direct supervision and more of an expectation that trainees will have the capacity for independent action, independent judgment, and be able to put a picture together and take clinical action with less and less supervision over time.  So that … the

---

[5]Dr. Connors applied for and obtained a "training license" from the New Hampshire Board of Medicine in June 2006.  *See* Application for Training License and Certificate, attached hereto as Exhibit M.

ability to function with each passing year with more sophistication and
independence is an expectation of residency training.

Deposition of Dr. William Torrey at 26.  *See also* Deposition of Dr. James Beck (Dr. Connors'

retained expert) at 21-22 ("… in the course of a residency … the faculty would expect that the

resident would be able to take on increasing responsibility for making clinical decisions" and

"increasingly … be able to [manage patients]").

      6.    <u>Dr. Connors Is Placed On Administrative Leave</u>

From the outset, Dr. Connors performance was "not up to [the] usual standards" of other

psychiatry residents.  Deposition of Dr. Donald West at 22.  Among other issues, Dr. Connors

had problems with "[r]epeated lateness" and "not completing [progress] notes in a timely

fashion."  *See* June 11, 2009 Memorandum from Dr. Green to Fair Hearing Committee Members

at 000896, attached hereto as Exhibit I.  *See also* October 16, 2006 Memorandum of Dr. Green,

attached hereto as Exhibit J (Dr. Connors has "encountered difficulties in completing progress

notes in a timely fashion" and "has a chronic problem of lateness"); March 10, 2007

Memorandum of Dr. Green, attached hereto as Exhibit K ("Since Dr. Connors joined our

residency … she had been noted by all faculty who have supervised her to have major problems

with organization both in the area of documentation and in meeting her clinical responsibilities

satisfactorily").

In early 2007, Dr. Connors was engaged in an inpatient psychiatry rotation at the White

River Junction VA Medical Center ("VAMC").  *See* Exhibit K.  VAMC is a "60-bed, acute care

facility" operated by the federal government.  *See* http://www.whiteriver.va.gov.  VAMC is one

of the psychiatry residency program's "affiliated sites."  *See* November 20, 2008 Memorandum

of Dr. Green, attached hereto as Exhibit L.  During this rotation, Dr. Connors was supervised by

Dr. Jonathan Schwartz, a federal employee.  Deposition of Dr. Jonathan Schwartz at 7.

In February 2007, Dr. Schwartz gave Dr. Connors a document setting forth a number of concerns that he had with her performance, including that:  (a) her progress notes needed to be done in a timely manner, should not contain the names of other patients, should be properly dated, and should not reflect conflicts between her and the patient's attending physician; (b) her presentations needed to be more concise and focused; (c) she needed to focus more on the patient's presenting complaint when developing a treatment plan; (d) she needed to listen to the recommendations of her supervisors; (e) she needed to complete any focused testing she was asked to perform on a patient within 24 hours; (f) she needed to discuss discharge medications with her supervisors before writing prescriptions for them; (g) she needed to be available when on-call; (h) she needed to stop spending excessive time with certain patients; and (i) she needed to work on performing adequate suicide assessments.  *See* February 28, 2007 list [Dr. Schwartz Dep. Ex. 6], attached hereto as Exhibit N; Dr. Connors Dep. at 258, 276-77 (confirming that Dr. Schwartz gave her Exhibit N "sometime in the last week of February" 2007); Dr. Schwartz Dep. at 12-13, 17 (confirming that Exhibits N "outlines" his concerns regarding Dr. Connors and "things that need to happen on the inpatient unit and things that shouldn't happen on the inpatient unit").  *See also* Exhibit I at 000896.  Dr. Schwartz could not "think of another resident who needed this type of feedback."[6]  Dr. Schwartz Dep. at 24.

Dr. Suzanne Brooks, who also supervised Dr. Connors during her rotation at VAMC, had certain difficulties in her interactions with Dr. Connors as well in early 2007, including Dr. Connors being argumentative and formulating treatment plans for patients without discussing them with her.  Deposition of Dr. Suzanne Brooks, attached hereto.  In fact, Dr. Brooks never "supervised another resident who interacted with [her] in quite that way."  Dr. Brooks Dep. at 14.

---

[6]As will be discussed, Dr. Connors primary complaint is that Dr. Schwartz did not provide her with a sufficiently quiet place to work at VAMC in 2007 because he asked her to work in an area that had a coffee pot.  Dr. Connors Dep. at 101-02, 105-06.

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

On or about March 2, 2007, Dr. Connors falsified a medical record by reporting that an examination of a patient's heart and lungs were normal when she had not done the examination. *See* March 2, 2007 e-mail from Dr. Schwartz to Dr. Green [Dr. Schwartz Dep. Ex. 2], attached hereto as Exhibit O (Dr. Connors admitted that she "had not done a physical exam prior to signing her note"); Exhibit K ("… on March 2 Dr. Schwartz discovered that Dr. Connors falsified a medical record, which involved her making entries about results [of] an examination of a certain patient's heart and lungs, indicating they were normal.  Dr. Connors admitted to Dr. Schwartz that she had not done the examinations"); Exhibit I at 000897 (on March 2, 2007, Dr. Schwartz "discovered that Dr. Connors had entered physical exam findings on a patient she had, by her own admission, not yet examined (nor did she observe anyone else doing an examination)").  *See also* Dr. Schwartz Dep. at 35-36 (the patient told him "that no one had done a physical exam on him.  I looked at the medical record and saw that there was a documented physical exam.  I explained that to Dr. Connors and asked her if she had actually done a physical exam, and she said, no, she had not, and that the note was incorrect").

Dr. Connors also admitted to Dr. Beck, her retained expert, that she had entered made-up physical examination results for a patient that she had not actually examined.  Dr. Beck Dep. at 97.  *See also* Dr. Connors Dep. at 188-91, 194, 197 (wherein Dr. Connors admits that she "recorded the [results of a patient's] heart and lung examination" before she had actually "listened to the patient's chest" and that doing so was not proper procedure).  Dr. Beck agreed that this was unacceptable, stating:

> I don't consider it acceptable ….  I mean I say [in my report] very explicitly that she made an error in falsely entering a physical finding and then signing a note before she completed the exam.  And I would testify in any venue that is an error.  And if [Dr. Connors] denies that she made any error, then her opinion is different than mine ….

Dr. Beck Dep. at 99-100.  *See also* Dr. Torrey Dep. at 40-41 (residents "know that when they sign [a medical] note, they are attesting to the veracity of what's in the note and also taking professional responsibility for the findings.  They know that someone else might take action based on their note.  And you don't sign something that you haven't done"); Dr. Schwartz Dep. at 33 (falsifying a medical record "is behavior that we cannot tolerate" because its puts "people at risk"); Dr. Green Dep. at 110 (Dr. Connors "entered results of an examination into a record which was not a consequence of having examined the patient.  That is an untruth, however you want to define it").

In addition, Dr. Connors failed to perform a timely physical exam on a patient who had thrombophlebitis, a potentially life threatening condition.  *See* Exhibit O (Dr. Schwartz reporting to Dr. Green that "[o]n 3/1/07 between 9 and 10 am [Dr. Connors] and I specifically discussed her completing a focused exam later in the day on a patient who was admitted with a thrombophlebitis.  [Dr. Connors] agreed to do this but did not as of 9 am on 3/2/07"); Exhibit K (memorandum of Dr. Green noting same) and Exhibit I at 000897 (same).  *See also* Dr. Beck Dep. at 94 (admitting that he is troubled by Dr. Connors' failure to perform a timely exam on the patient).  Dr. Schwartz reported these incidents to Dr. Green because he was "gravely concerned about Dr. Connors' behavior."  Dr. Schwartz Dep. at 32-33.  Dr. Schwartz also told Dr. Connors to stop seeing patients.  Dr. Connors Dep. at 210-212.  *See also* Dr. Green Dep. at 46 (Dr. Schwartz thought that Dr. Connors "ought to stop her clinical work at that point").

As "a result of these mounting incidents, especially with the falsification of records," Dr. Green initially wanted to dismiss Dr. Connors from the program, but instead placed her on administrative leave.  Exhibit K; Deposition of John Kelleher at 71-72.  *See also* Dr. Beck Dep. at 101 (agreeing that these two incidents "raise concerns for him" and that he is unable to say that

it was an error to "order[] her off service"); 76 (agreeing that a single instance of negligence, unsafe treatment or unprofessional behavior is sufficient cause to scrutinize a resident's competency, even if a resident's global evaluations are above average or even outstanding).

      7.    <u>Dr. Connors' Remediation Plan</u>

By letter dated April 13, 2007, Dr. Green outlined a six-week remediation plan for Dr. Connors, which included having her taking responsibility for "being on time to functions at work, not being argumentative in supervision, not memorializing conflicts between [her] and other staff in patient clinical notes, not mentioning one patient's name in another patient's file, doing physical examinations on any patient when [her] faculty supervisor believes it is necessary and not signing off on [her] physical examination results on patients whom [she has] not examined." *See* April 13, 2007 letter from Dr. Green to Dr. Connors, attached hereto as Exhibit P. Dr. Connors was also told that she needed to complete documentation in a timelier manner. *Id.* *See* Dr. Torrey Dep. at 45-46 (noting that the remediation plan "asks for very basic things" and the "fact that people felt the need to write them down shows that they had a very high level of worry …. [and] concern about [Dr. Connors'] ability to function in this clinical setting").

Dr. Connors' administrative leave was "extended indefinitely" because she was unwilling to "accept responsibility for her actions" and commit to being on time. Exhibit I at 000897. According to the Fair Hearing Committee, Dr. Connors also had requested an accommodation "around her problem with lateness." Exhibit F at 3. *But see* Dr. Connors Dep. at 227 (wherein Dr. Connors denies that she ever expected an accommodation so that she could be late). In any event, Dr. Green determined "that arriving late to see patients and [for] other related duties was not something [the] program could accommodate." Exhibit F at 3. *See* Dr. Green Dep. at 58 ("I

was concerned when [Dr. Connors] thought [that] lateness was something that could be accommodated").

In September 2007, Dr. Connors finally agreed to a remediation plan (which was similar to the plan first proposed by Dr. Green in April 2007), and resumed her training.  *See* September 14, 2007 Remediation Plan for Dr. Jennifer Connors, attached hereto as Exhibit Q.  The remediation plan provided that Dr. Connors' "[c]ontinuation on to complete her PGY-2 [was] contingent upon successful performance as outlined in this remediation plan" and that "[p]resuming a successful outcome of remediation, her PGY-2 would be completed on January 6, 2008." *Id.*  The remediation plan also provided that Dr. Connors would be "excused from clinical duties on Thursday afternoons to meet with her two health care providers." *Id.  See* Exhibit F at 3 (noting that Dr. Connors was given "time away to take care of her medical needs").

As noted, around the same time she agreed to the remediation plan, Dr. Connors and MHMH entered into a second Resident/Fellow Agreement of Appointment so that she could complete her PGY-2.  *See* Exhibit G.  The September 2007 Resident Agreement also states that the parties "agree to the terms of the September 14, 2007 remediation plan" which is "made a part of" the 2007 Resident Agreement.  *Id.*  In December 2007, after her remedial period had ended, Dr. Green told Dr. Connors that he would try "to work it out for her to do her PGY-3 at the VA."  Exhibit I at 000913.  Dr. Green also noted that "should Dr. Connor[s] relapse into a pattern of irresponsible behavior, she [would] not be allowed to continue her training." *Id.*

8.    Dr. Connors Returns To VAMC For Her PGY-3

In early January 2008, Dr. Green wrote to Dr. Eric Shirley, Acting Chief of Staff at VAMC, asking that Dr. Connors "be restored to normal status as a psychiatry resident at

[VAMC]," notwithstanding the "serious clinical and judgment issues that resulted in her being put on administrative leave by both our psychiatry residency program and the White River Junction VAMC" in March 2007. *See* January 1, 2008 letter from Dr. Green to Dr. Shirley, attached hereto as Exhibit R.  Dr. Green told Dr. Shirley that Dr. Connors would be completing her PGY-2 in early January 2008, that she would be provided with "a one year contract to do her PGY-3 … with a begin date of January 7, 2008 and [an] end date of January 7, 2009," and that the "plan [was] for Dr. Connors to do her PGY-3 at the White River Junction VA and the Burlington [Community Based Outpatient Clinic]" under the supervision of Dr. Lisa Lambert, a psychiatrist employed by the federal government. *Id.  See* Dr. Lambert Dep. at 96.

On or about January 7, 2008, Dr. Connors began her PGY-3 at VAMC.  *See* January 2, 2009 Note of Dr. Green, attached hereto as Exhibit S.  Because most residents start their PGY-3 year in July, Dr. Connors "started her rotation off cycle."  Exhibit F at 2.  *See* Dr. Lambert Dep. at 93 ("Usually the PGY3 residents start as a group in July [when] the former PGY3 residents are leaving, and [Dr. Connors] started in January not with a group and not with another group leaving").

Although Dr. Connors never told Dr. Lambert that she needed any specific accommodation because of ADHD, she did request her own office.  Dr. Lambert Dep. at 101, 104-05.  Notwithstanding a lack of office space at VAMC, shortly after she began her rotation, Dr. Connors was assigned to an office.  *Id.  See* Exhibit F at 3 (noting testimony from Dr. Lambert that "[a]lthough Dr. Connors did not have her own office for a month, Dr. Lambert made sure that she had an office to work in each day.  After a month she had secured her an office"); Dr. Lambert Dep. at 91 (confirming that Exhibit F accurately portrays what she told the Fair Hearing Committee).

A few months after Dr. Connors started her rotation at VAMC, Dr. Lambert began to observe problems with her performance.  Dr. Lambert Dep. at 24 (noting that in April/May 2008 Dr. Connors "had difficulty with … diagnosis and organization of her notes and [making] good therapeutic decisions").  *See* Exhibit S (Dr. Connors did "well at first" but around April 2008 she had "a repeated lateness problem and had several instances of not following the rules regarding obtaining appropriate faculty supervision in the care of her patients").

In May 2008, Dr. Connors, in violation of VAMC's "clear" policy that residents are "not supposed to see any new patients … outside [of their] designated [supervision] time," scheduled a "very unstable [new] patient into an unsupervised time [such] that she would have seen him alone, and [Dr. Lambert] wouldn't have been available to see the patient or be in the building while [Dr. Connors] was seeing the patient," which was a "major safety issue."  Dr. Lambert Dep. at 62.  It was necessary for Dr. Lambert to be present for the patient's initial appointment because "there's a lot of risk involved in that and primarily [because Dr. Lambert was] responsible for the patient."  Dr. Lambert Dep. at 102.  *See also* Dr. Lambert Dep. at 103 (Dr. Connors is "a trainee.  She can't independently take care of patients and might not have the skills to manage what comes in and it's very dangerous").

According to Dr. Sheldon Benjamin (defendants' expert), it was a "fairly significant breach" of duty for Dr. Connors to schedule an appointment with a high risk patient when her supervisor was not available.  Deposition of Dr. Sheldon Benjamin at 105.  As Dr. Benjamin explained:

> … if you're assigned to work in a clinic supervised by a particular attending, it's understood that that attending is going to be responsible for your clinical work regardless of whether they're in the room, so that they need to know about it and they need to be able to supervise you for that …. it's not as if the [resident] has only two choices to either find a time with the supervisor present or to strike out on [her] own and treat the person without a supervisor present, you can also say

[to the patient] I can't do it because I don't have a supervised time, you'll have to
use the emergency room.

Dr. Benjamin Dep. at 106-107.

9.      Dr. Connors' Performance Further Declines

In late October/early November 2008, a substantial decline in Dr. Connors' clinical

performance and judgment was observed by Dr. Lambert and her other supervisors at VAMC.

Dr. Lambert Dep. at 75, 83, 106-109.  This caused Dr. Lambert to conclude that patients were

again at risk.  Dr. Lambert Dep. at 109.

For example, on October 24, 2008, Dr. Lanier Summerall reported some "occurrences"

involving Dr. Connors, including that Dr. Connors had appropriately determined that she needed

to call the Department for Children and Families with respect to a particular patient, but had

failed to do so some 48 hours after the fact.  *See* October 24, 2008 e-mail from Dr. Summerall to

Dr. Lambert [Dr. Lambert Dep. Ex. 17], attached hereto as Exhibit T; Dr. Lambert Dep. at 65-66

(confirming that Dr. Summerall brought the concerns raised in Exhibit T to her attention).  When

later asked whether she made the call, Dr. Connors told Dr. Summerall that she had forgotten all

about it.  Exhibit T.  Dr. Summerall was also critical of a "way off base" diagnosis made by Dr.

Connors and her failure to write a timely note after seeing another patient.  *Id.*   *See also* Exhibit

I at 000924 (November 20, 2008 e-mail from Dr. Summerall to Dr. Green, wherein she states:

"My concerns are occasioned by the fact that [Dr. Connors] will not change her diagnosis on a

young man – she insists that he has a psychotic disorder when no one else thinks so, and keeps

telling him this (He has PTSD).  Given her disorganized and bizarre documentation and case

presentations and her unusual patient interactions and interventions, I wonder if she is projecting

some of her own distress onto the patient").  Around the same time, Dr. Keith Warren at VAMC

also raised concerns to Dr. Lambert about Dr. Connors' "presenting a case in a very disorganized way" and her treatment of a patient.  Dr. Lambert Dep. at 67-68.

In November 2008, Dr. Lambert wrote an e-mail to Dr. Green stating that "several people had come to [her] recently and expressed concern" about Dr. Connors.  *See* Exhibit I at 000922. When she tried to speak with Dr. Connors about it, she received a "very paranoid response." *Id.* Dr. Lambert reported that she found "it really hard to give [Dr. Connors] feedback." *Id.*  Dr. Lambert also reported that Dr. Connors' notes were "getting entered later and later" and that her "therapy progress notes … have gotten to be almost bizarre." *Id.  See also* Dr. Lambert Dep. 69-75; Exhibit I at 000927 (November 21, 2008 e-mail from Dr. Lambert to Dr. Green wherein she states:  "I got a call from Dr. Bolton at [VAMC-]FEA this morning with concerns about Jennifer Connor's [sic] performance there.  She states that her performance has been inconsistent ….  Dr. Bolton is concerned about a pattern of inconsistent clinical care and diagnoses and her not responding well to feedback and supervision lately").

There were also patient complaints about Dr. Connors during this time period, including a complaint from a patient that Dr. Connors was playing cards during his outpatient appointment. Dr. Lambert Dep. 77-80.  Other patients said that they did not want to be seen by Dr. Connors. Dr. Lambert Dep. at 80, 82; Exhibit I at 000925.  When asked about the card-playing incident, Dr. Lambert testified as follows:

> Q.      Why is it wrong?
>
> A.      Because it's clinically not appropriate to be playing cards in a psychiatric appointment.
>
> Q.      Well, it is appropriate to calm down the patient [by playing cards], isn't it? By whatever means possible.

A.     Well, it wasn't appropriate and it made the patient upset, so even if that was the intention, that wasn't what happened and that's not a … therapeutic modality that we use.

Dr. Lambert Dep. at 79.[7]

As stated by Dr. Benjamin:

I think the first thing [Dr. Connors] should have done was decide whether or not this patient was too dangerous to be in an outpatient setting, find a reason to leave the room, seek help and then come back and conclude the interview once she had help available.  I think it was a very dangerous decision that Dr. Connors made to try and de-escalate a potentially violent person using any kind of trick including cards.  I think that was a poor judgment call and could have resulted in Dr. Connors being severely injured, could have resulted in the patient being severely injured or maybe someone else in the vicinity.

Dr. Benjamin Dep. at 111-12.

By e-mail dated November 7, 2008, Dr. Bradley Watts informed Dr. Green that there were "lots of concerns" about Dr. Connors at VAMC, and that he doubted she would be welcome back there after her PGY-3 ended in December.  Exhibit I at 000922.  *See* Deposition of Dr. Bradley Watts at 6-9.  *See also* Dr. Lambert Dep. at 80 ("… several supervisors … said that they would not want to continue to work with her if she wanted to come back" for her PGY-4).

On November 20, 2008, Dr. Green and Dr. Watts met with Dr. Connors because Dr. Lambert "had informed [them] that several of Dr. Connor's [sic] clinical supervisors were concerned about her behavior and judgment."  Exhibit L.  Dr. Green and Dr. Watts reviewed the various e-mails "from her supervisors expressing their concerns" with Dr. Connors.  *Id.*  Dr. Connors "offered no explanation of any of the issues raised in the emails (save for her explanation of the card playing incident)."  *Id.*

---

[7]Dr. Connors told Dr. Beck that she "had played cards [with the patient] and he calmed down."  Dr. Beck Dep. at 119.  In her deposition, Dr. Connors denied playing cards *with* the patient, but admitted that she had played solitaire during the patient's appointment.  Dr. Connors Dep. at 175-76.

Law Offices of
Sulloway & Hollis, PLLC.
Concord, N.H. 03302

In December 2008, Dr. Lambert told Dr Green that "she and Dr. [Andrew] Pomerantz, head of the VA's psychiatry service, were unwilling for Dr. Connors to continue training at the VA – because of her repeated unsatisfactory performance."  Exhibit S.  Because Dr. Connors had already had a "remedial period" and because it "failed to have abiding effects," Dr. Green determined that the program "could not provide Dr. Connors training for her PGY-4."  *Id.*

On January 28, 2009, Dr. Connors met with Dr. Green.  Findings at 5.  At the meeting, Dr. Connors was given a letter in which Dr. Green stated that Dr. Connors was being "given notice that [she was] dismissed from our training program."[8]  *See* January 28, 2009 letter from Dr. Green to Dr. Connors, attached hereto as Exhibit U; Findings at 5.  As succinctly stated by Dr. Torrey, based on his review of Dr. Connors' training file and certain progress notes she had asked him to review, Dr. Connors simply "didn't have the required skills to function independently at a level that would be required for moving from [a] third to fourth year."  Dr. Torrey Dep. at 26.

### 10.   The Fair Hearing Committee

At their January 28, 2009 meeting, Dr. Green provided Dr. Connors with a copy of the GME Fair Hearing Policy, which is part of the Red Book.  Exhibit U; Exhibit B (Red Book) at 41.  However, Dr. Connors was already familiar with the GME Fair Hearing Policy, having read the Red Book.  Findings at 5; Dr. Connors Dep. at 58.

The GME Fair Hearing Policy "sets forth hearing procedures to 'assure due process to Residents who … are recommended for non-renewal or dismissal from a program ….'"  Findings at 4; Exhibit B (Red Book) at 41.  A "Fair Hearing process is … an optional procedure that a

---

[8]Although dismissed from the program, Dr. Green told Dr. Connors that she would be allowed to complete the rotations she needed to be eligible for a PGY-4 elsewhere.  Exhibit F; Findings at 5.

resident may request to review an impending nonrenewal or dismissal."  Findings at 4.  If "a resident requests a Fair Hearing, a committee is formed, chaired by the Director of GME or his designee.  The committee conducts a hearing at which participants have an opportunity to present oral and documentary evidence."  Findings at 4; Exhibit B (Red Book) at 42-43.  If "the committee does not agree with the program director's recommendation for dismissal, the program director may be asked to accept the resident back into the program for an additional remedial period."  Findings at 4-5; Exhibit B (Red Book) at 43.  The "decision of the committee is final."  *Id.*

Dr. Connors "left the program on April 12, 2009, having completed her PGY-3 training requirements."  Findings at 7.  After her PGY-3 training had ended, Dr. Connors "would not have been able to rejoin the program for her PGY-4 … unless Dr. Green changed his mind or a Fair Hearing Committee asked him to accept her back in the program for an additional remedial period."  Findings at 7.  On or about April 14, 2009, Dr. Connors "requested a Fair Hearing under the GME Fair Hearing Policy."  *Id.*  Dr. Connors asked that the "committee overturn Dr. Ronald Green's decision not to renew her residency appointment and allow her to compete her residency at DHMC in good standing."  Exhibit F at 1; Findings at 7.

A hearing concerning Dr. Connors' dismissal from the program was held by the Fair Hearing Committee on June 1, 2009 and June 16, 2009.  Exhibit F at 1; Findings at 7.  At the hearing, Dr. Connors was "given the opportunity … to present [her] case[], review concerns and provide written documentation to committee members."  Exhibit F at 2.  *See* Dr. Connors Dep. at 64-65 (wherein Dr. Connors acknowledges that she submitted materials to the committee, brought witnesses to the hearing, and was able to ask questions of other individuals).

Following the hearing, the Committee determined that, although Dr. Connors "ha[d] had some successful rotations during her tenure at DHMC, VA and [New Hampshire Hospital], serious underlying problems have also inhibited her success.  We believe Dr. Connors was provided with support and direction as appropriate.  The decision to terminate Dr. Connors' residency was a difficult one made after appropriate attempts at remediation.  The opinion of the committee is that Dr. Green's decision not to renew Dr. Connors for her fourth year should stand."  Exhibit F at 4.

## ARGUMENT

1.    <u>Dr. Connors' Action</u>

As it currently stands, Dr. Connors' consolidated action involves claims brought under the Vermont Fair Employment Practices Act ("FEPA") (Counts One and Two of March 2010 Complaint filed in *Connors II*) and certain contract claims (Counts Three and Four of March 2010 Complaint filed in *Connors II* and Second Amended Complaint filed in *Connors I*).[9]  By Count One ("Disability Discrimination"), Dr. Connors asserts that defendants violated FEPA by: (a) failing to provide her with requested reasonable accommodations; (b) subjecting her to a "higher standard of performance" on account of her disability; and (c) failing to renew her Resident Agreement on account of her disability.  By Count Two ("Illegal Retaliation"), Dr. Connors asserts that defendants retaliated against her (including dismissing her from the residency program) in violation of FEPA for complaining about their failure to provide her with reasonable accommodations.  By Count Three ("Breach of Contract"), Dr. Connors asserts that defendants breached an express or implied promise to:  (a) provide her with a "safe, accommodating work environment free from harassment and unfair treatment"; and (b) not

---

[9]Dr. Connors also had asserted claims under the Americans with Disabilities Act ("ADA") in *Connors I* (Counts One and Two of Second Amended Complaint), but judgment was entered in favor of defendants with respect to those claims in February 2012.  Findings at 20.

Law Offices of
Sulloway & Hollis, PLLC.
Concord, N.H. 03302

dismiss her from the residency program without just cause.  By Count Four ("Breach of

Covenant of Good Faith and Fair Dealing"), Dr. Connors claims that for the same reasons

defendants also breached an "implied [contractual] obligation of good faith and fair dealing."

> 2.    <u>Summary Judgment Should Be Granted In Defendants' Favor With Respect To Dr. Connors' FEPA Claims</u>

> a.    *Dr. Connors Lacks Standing To Assert Claims Under FEPA And/Or FEPA Does Not Apply To Her Claims*

As its name makes clear, FEPA is intended to prohibit discrimination in *employment*,

including discrimination against qualified disabled individuals (*i.e.*, a person with a disability

who is capable of performing the essential functions of a *job*).  *See* 21 V.S.A. § 495 ("Unlawful

employment practice"); § 495d(6) (defining qualified individual with a disability).  In the first

instance, Dr. Connors' FEPA claims must be dismissed as against DHC, Dartmouth College and

Dartmouth Medical School (*i.e.*, any defendant other than MHMH and DHMC) because she was

plainly not an employee of any such defendant and, accordingly, has no right of action against

them under FEPA.  *See Connors II* Complaint, ¶ 17 ("Technically, plaintiff was employed as a

'House Officer' for MHMH, under contract as a resident physician with MHMH and DHMC");

Findings at 1-2 (finding that Dr. Connors and MHMH entered into certain Resident/Fellow

Agreements of Appointment for her graduate training as a psychiatry resident).

In any event, because FEPA is merely intended to prohibit discrimination in employment,

it cannot be disputed that a medical student would not have standing to assert a discrimination

claim under FEPA against a medical school.  *See Bhatt v. University of Vermont*, 184 Vt. 195,

958 A.2d 637 (2008) (medical student's disability discrimination claims brought under the

Vermont Public Accommodations Act ("VPAA"), not FEPA).  For the reasons stated above, the

relationship between Dr. Connors and defendants concerning accommodations and the decision

to dismiss her from a hospital-based residency program is more akin to the relationship between a medical student and a medical school than it is to the relationship between and an employer and employee. *See Hernandez v. Overlook Hospital*, 692 A.2d 971, 973 (N.J. 1997) ("Residents, unlike licensed physicians, are generally considered students subject to the academic requirements of a residency program"); *Ross v. University of Minnesota*, 439 N.W.2d 28, 35 (Minn. App.1989) (plaintiff "was a student in the University of Minnesota's psychiatry residency program for the purpose of academic dismissal; therefore, employment concepts are not applicable"). As such, Dr. Connors lacks standing to assert claims against defendants under FEPA.

Even if *arguendo* some medical residents may have standing to assert claims under FEPA, there is nothing in the statute that suggests that it is intended to be (or should be) applied to the relationship between a New Hampshire licensed medical resident and a residency program sponsored and maintained by a New Hampshire licensed teaching hospital. *See Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866 (2d Cir. 1994) (applying New Hampshire law to claims relating to contract made in New Hampshire); *Audsley v. RBS Citizens, N.A. d/b/a Citizens Bank*, 2012 U.S. Dist. LEXIS 132253 (D. Vt. September 17, 2012) (applying New Hampshire law to wrongful termination claim brought by Vermont resident employed as a store manager in New Hampshire). *See also* Findings at 9 (noting that "New Hampshire, the location of DHMC [and the place where Dr. Connors' administrative charge was filed – *see* Exhibit W], is a deferral state").

Plainly, New Hampshire has the most significant relationship to the occurrences and the parties, and is the "center of gravity" of the contractual relationship between Dr. Connors and defendants insofar as it is the primary "location of the subject matter of the contract" and is

"predominantly or most intimately concerned with the matter at hand" (*i.e.*, the performance of and the relationship between a New Hampshire licensed medical resident and a New Hampshire licensed teaching hospital). *See Sprayregen v. Bank of America, N.A.*, 2012 U.S. Dist. LEXIS 101910 *9 (D. Vt. July 23, 2012). In such case, the fact that Dr. Connors also had rotations at VAMC and "resides in Vermont, not [New Hampshire] … is not sufficient to impact the choice-of-law question." *Id.* at *10.

If New Hampshire law applies to her discrimination claims, then Dr. Connors cannot maintain her claims under FEPA, and any motion to amend to try and assert claims under New Hampshire's Law Against Discrimination (RSA ch. 354-A) would be futile for the same reasons her ADA claims were dismissed – a timely complaint ("within 180 days after the alleged act of discrimination") was not filed with the New Hampshire Commission for Human Rights ("NHCHR").[10] *See* NH RSA 354-A:21. *See also* Findings at 18 ("There is no dispute that Dr. Connors failed to file a charge with the EEOC within three hundred days of receiving the January 28 notice [of dismissal]"). For all these reasons, summary judgment should be granted in favor of defendants with respect to Dr. Connors' claims under FEPA (Counts One and Two of her Complaint in *Connors II*).

> b.    *Summary Judgment Should Be Granted In Defendants' Favor With Respect To Dr. Connors' Disability Discrimination Claims*

If the Court determines that Dr. Connors may maintain claims against one or more defendants under FEPA, then, for the reasons discussed herein, summary judgment still must be granted in favor of any such defendant. In this regard, the Vermont Supreme Court has

---

[10]By letter dated February 9, 2010, the NHCHR advised counsel for Dr. Connors that it would not be "docketing [Dr. Connors' filed] charge under state law" because it was "filed more than 180 days from the alleged last date of discrimination." *See* February 9, 2010 letter attached hereto as Exhibit W. The fact that a charge was filed with the NHCHR in late 2009 or early 2010 should preclude Dr. Connors from now arguing that Vermont law applies to her discrimination claims.

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

{C0992456.2 }                                                    -24-

cautioned that courts adjudicating disability discrimination claims involving an "academic institution" must "accord deference to the academic institution['s]" decisions and judgments "about the ethical and academic standards applicable to its students." *Bhatt*, 184 Vt. at 201 (*citing Falcone v. University of Minnesota*, 388 F.3d 656, 659 (8th Cir. 2004) (a university has "virtually unrestricted discretion to evaluate academic performance"); *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225 n.11 (1985) ("University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation")).

After all, like a medical school, a teaching hospital "is acting for multiple purposes: to enforce academic standards, to protect patients being treated by [residents], to maintain trust between [residents] and others, and to produce [residents] who can go on to … a profession practicing medicine." *Bhatt*, 184 Vt. at 201. *See Hernandez*, 692 A.2d at 975 ("The circumstances surrounding plaintiff's termination arose entirely out of her status as a medical student participating in an academic residency program that was designed to teach plaintiff the skills necessary to become a fully-licensed physician. Thus, [the hospital's] dismissal of plaintiff was indistinguishable from any other institutional decision to pass or fail a student for failure to meet academic requirements …. Assessing a student's academic performance must be left to the sound judgment of the individual academic institution"). For all these reasons, Dr. Connors' claims should be subjected to a higher level of scrutiny at the summary judgment stage.

c.     *Dr. Connors' Failure To Accommodate Claim Fails*

While FEPA presumably requires that an "employer" reasonably accommodate the known physical or mental limitations of an otherwise qualified disabled individual, Dr. Connors must establish that she was "otherwise qualified to continue [her residency] – that is, that [she

could] meet its essential requirements with reasonable accommodation" and also "bears the burden of showing that [she] requested a reasonable accommodation." *Bhatt,* 184 Vt. at 203. *See McBride v. BIC Consumer Products Manufacturing Co., Inc.*, 583 F.3d 92, 96-97 (2d Cir. 2009) (setting forth elements of prima facie case of disability discrimination arising from an alleged failure to accommodate).[11]

The facts set forth above detail many serious incidents whereby Dr. Connors improperly diagnosed and treated (or failed to treat) patients, failed to consult with and obtain necessary and important approvals from supervising attending physicians before making clinical decisions, and otherwise demonstrated a lack of judgment necessary to advance "from [her] third to fourth [post-graduate] year," including falsely reporting the results of a physical exam before she actually examined the patient. *See Bhatt*, 184 Vt. at 205 ("The College has the academic discretion to make honesty and personal accountability essential qualifications for its [medical] students"). These incidents were deemed so significant that she was ordered by VAMC physicians to stop seeing patients. *See Robertson v. Neuromedical Center*, 983 F. Supp. 669, 674 (M.D. La. 1997), *aff'd*, 161 F.3d 292 (5th Cir. 1998) (the ADA does not require an employer to accommodate a physician whose ADHD symptoms posed a direct threat to the safety of patients by causing "mistakes to be made in patients charts and mistakes in dispensing medicine").

Dr. Connors also had significant difficulties dealing with her supervisors, arriving on time to see patients and for other events, and completing treatment notes in a timely and proper manner. These are the most basic things required of a medical resident, particularly one seeking

---

[11]FEPA's disability discrimination provisions are modeled on federal legislation, and, therefore, federal case law and regulations provide guidelines for construing them. *Lowell v. International Business Machines Corp.*, 955 F. Supp. 300 (D. Vt. 1997).

to advance from a PGY-3 to a PGY-4.  *See* Dr. Benjamin Dep. at 56-58 (the "need for professionalism in medical trainees and the presence of technical standards … are the minimum bar that we require trainees to demonstrate").  *See Mancini v. General Electric Co.*, 820 F. Supp. 141, 147 (D. Vt. 1993) (the "ability to follow the orders of supervisors is an essential element of any position" and employees "must be on-time and at work in order to perform the essential functions of their jobs").  Because Dr. Connors could not satisfactorily perform these basic, essential functions required of a resident (*see* Exhibit B (Red Book) at 2-5), she was not a "qualified disabled individual" and cannot maintain disability discrimination claims against defendants under FEPA.  *See State of Vermont v. G.S. Blodget Co.*, 163 Vt. 175, 184 (1995) (if a court concludes that plaintiff is not a qualified disabled individual, then there is no actionable claim under FEPA).

This is especially true given that defendants provided all of the specific accommodations requested by Dr. Connors (*i.e.*, extra time for testing, time off for medical treatment, a quiet place to work), and she still was unable to satisfactorily perform her duties as a resident.  Apart from the issue of whether Dr. Connors is a qualified disabled individual, the fact that defendants provided these accommodations is also fatal to Dr. Connors' failure to accommodate claim.  *See McElwee v. County of Orange*, 2012 U.S. App. LEXIS 23564 *11-12 (2d Cir. November 15, 2012) (an element of a failure to accommodate claim is that defendant failed to make a reasonable accommodation requested by plaintiff).

The fact that Dr. Connors complains that Dr. Schwartz did not provide her with a sufficiently quiet place to work at VAMC in 2007 when he asked her to work in an area with a coffee pot does not alter this conclusion.[12]  Even assuming that one or more defendants can be

---

[12]According to Dr. Schwartz, he was unaware that Dr. Connors had ADHD and does not recall her asking for "an office assignment."  Dr. Schwartz Dep. at 9-10.

held responsible for VAMC's alleged failure to accommodate a request by Dr. Connors for an office in 2007,[13] Dr. Connors bears the burden of both production and persuasion that such accommodation was both reasonable and necessary to allow her to perform the essential functions of her position. *See McElwee*, 2012 U.S. App. LEXIS 23564 *16.  Even overlooking the space problems at VAMC and the efforts of Dr. Schwartz to find her a quiet place to work, Dr. Connors cannot explain how having her own office in 2007 would have prevented the acts that caused VAMC to order her to stop seeing patients in 2007 (*i.e.*, falsifying a record and failing to examine a patient in a timely manner), let alone explain how her lack of an office in 2007 caused her performance problems in late 2008.  Moreover, even if certain "performance deficits" like not "coming in on time" to see patients or not "writing notes [promptly] after see[ing] a patient" may be related to Dr. Connors' ADHD, they "just can't be accommodated." Dr. Benjamin Dep. at 56-57.  *See* Exhibit F at 3; Dr. Green Dep. at 58.  *See also Robertson*, 983 F. Supp. at 674 (the "ADA does not … require an employer to relieve [an] employee of any essential functions of the job"); *Mancini*, 820 F. Supp. at 147 ("employees must be on-time and at work in order to perform the essential functions of their jobs").

In the end, Dr. Connors is really asserting that her mistakes and misconduct should be excused because she has ADHD.  However, this "is not the kind of accommodation contemplated" by FEPA.  *See McElwee*, 2012 U.S. App. LEXIS 23564 at *26 (*citing K.H. ex rel. K.C. v. Vincent Smith School*, 2006 U.S. Dist. LEXIS 22412 at *24 (E.D.N.Y. March 29, 2006) (request that officials needed to have more patience and tolerance with plaintiff was not a reasonable accommodation); *Hall v. Wal-Mart Assocs.*, 373 F.Supp.2d 1267, 1272 (M.D. Ala. 2005) (tolerance of dishonesty not the kind of accommodation previously recognized by the

---

[13]As noted, when she returned to VAMC in 2008 under the supervision of Dr. Lambert, Dr. Connors was assigned an office after she had requested the same.

court)).  Simply stated, a resident with a disability must be able to meet the standards of
performance expected of all residents.  Dr. Beck Dep. at 24; 103-104.  *See Bhatt*, 184 Vt. at 205
(VPAA does not require that a medical student be held to "a lesser standard of conduct" than
other medical students).  Dr. Connors could not do so with or without reasonable
accommodation.  For all these reasons, summary judgment should be granted in favor of
defendants with respect to Dr. Connors' failure to accommodate claim.

    d.    *Dr. Connors' Discriminatory Discharge And Retaliation Claims Fail*

    Summary judgment also should be granted in favor of defendants with respect to Dr.
Connors' discriminatory discharge claim because she cannot offer sufficient evidence (whether
as part of her prima facie case or to establish that the articulated legitimate, non-discriminatory
reasons for her dismissal from the program were a mere pretext for unlawful discrimination)
upon which a jury could conclude that her contract was not renewed because of any disability.
*See Boulton v. CLD Consulting Engineers, Inc.*, 175 Vt. 413, 421, 834 A.2d 37, 44 (2003)
(applying the *McDonnell Douglas* "three-step burden-shifting analysis … to FEPA claims");
*Wega v. Center for Disability Rights Inc.*, 2010 U.S. App. LEXIS 20948 at **5-6 (2d Cir.
October 8, 2010) (*citing Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998)).  In the
present case, there is not a scintilla of evidence that either Dr. Green's decision not to renew her
Resident Agreement in early 2009 or the Committee's decision to uphold Dr. Green's
determination was improperly motivated by the fact that Dr. Connors had ADHD.  To the
contrary, the record establishes that Dr. Green took action in 2007 and 2008 based on reports
from Dr. Connors' supervisors at VAMC regarding her performance and that the Committee
based its determination on the evidence presented to it concerning the same.  *See also* 21 V.S.A.
§ 495(b) (section 495 "shall not be construed to limit the rights of employer to discharge

employees for good cause shown").  There is also no evidence that Dr. Connors was held to a "higher standard of performance" than other residents because she had ADHD.

For the same reasons, Dr. Connors cannot even establish a prima facie case of retaliation under FEPA because she cannot show that there was a causal connection between her claimed protected activity (*i.e.*, complaining about a denied request for accommodation) and any adverse employment actions.[14]  *See Gallipo v. City of Rutland*, 178 Vt. 244, 250, 882 A.2d 1177, 1182 (2005) (setting forth elements of claim for retaliatory discrimination); *Robertson v. Mylan Labs., Inc.*, 176 Vt. 356, 376, 848 A.2d 310, 327-38 (2004) (same).  Even if she was able to do so, defendants, as noted herein, have proffered a legitimate, non-discriminatory rationale for their actions, and Dr. Connors cannot show that their stated rationale is a mere pretext for unlawful retaliation.  *See Id.*  For all of these reasons, summary judgment should be granted in favor of defendants with respect to Dr. Connors' discriminatory discharge and retaliation claims.

e.     *Dr. Connors' Claim For Non-Economic Damages Must Be Dismissed*

To the extent any of Dr. Connors' FEPA claims survive summary judgment as to any defendants, her claims for "emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other [non-economic] intangible injuries" (Complaint in *Connors II*, ¶¶ 32 and 42) must be dismissed as time-barred because the Court has already determined that Dr. Connors' cause of action accrued on January 28, 2009, and this action was commenced no earlier than March 7, 2012 (the date the Complaint in *Connors II* was signed). Findings at 17-18 (Dr. Connors "was clearly, definitely and unambiguously notified, orally and in writing, that that she was being dismissed from her residency" on January 28, 2009, and, accordingly, the clock started with respect to the filing of her discrimination claims on that date).

Law Offices of
Sulloway & Hollis, PLLC.
Concord, N.H. 03302

---

[14]This is apart from the fact that there is no evidence that Dr. Connors formally complained about any denial of any request for a particular accommodation.

*See Egri v. U.S. Airways, Inc.*, 174 Vt. 443, 804 A.2d 766 (2002) (claims for non-economic

damages, including claims for damages for emotional distress, under FEPA fall within the scope

of "injuries to the person" and therefore are governed by the three-year statute of limitations of

12 V.S.A. § 521(4)).

> 3.   Summary Judgment Should Be Granted In Defendants' Favor With Respect To
> Dr. Connors' Contract Claims[15]

> a.   *There Was No Contractual Relationship Between Dr. Connors And DHC,
> Dartmouth College Or Dartmouth Medical School*

Because, as noted, Dr. Connors alleges (and the Court has found) that only MHMH (and

perhaps DHMC) entered into a contract with her concerning her graduate training as a psychiatry

residency, her contractual claims against all other defendants must be dismissed.  Findings at 1.

*See Global Recycling Solutions, LLC v. Greenstar New Jersey*, 2011 U.S. Dist. LEXIS 110477

*14 (D. Del. September 28, 2011) (it is a general principle of contract law that only a party to a

contract may be sued for breach of the contract); *The FCM Group, Inc. v. Miller*, 300 Conn. 774,

796, 17 A.3d 40, 54 (2011) (same).

> b.   *Dr. Connors' Contract Claims Fail*

In essence, Dr. Connors' claims that defendants were contractually obligated to renew her

Resident Agreement unless there was "just cause" not to do so, and that the Court or a jury may

determine whether "just cause" existed.  Both of these assertions are incorrect as a matter of law.

First, like the Resident Agreement in *Schaefer v. Brookdale University Hospital and*

*Medical Center*, 2008 N.Y. Misc. LEXIS 848 (Sup. Ct., Kings County March 3, 2008), *aff'd*

2009 N.Y. App. Div. LEXIS 7699 (N.Y. App. Div. 2d Dept. October 27, 2009), the 2008

Resident Agreement "expressly provided that it was for a one-year term, renewable only by

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

---

[15]For purposes of this motion only, defendants assume that there is no material difference
between New Hampshire law and Vermont law as to Dr. Connors' contract claims.

mutual agreement and execution of another one-year written Resident Agreement for PGY-[4]." *Id.* at *8. *See* Exhibit H. In such case, "[d]efendants were under no contractual obligation to renew plaintiff's Resident Agreement." *Schaefer*, 2008 N.Y. Misc. LEXIS at *8 (*citing Amadasu v. Bronx Lebanon Hospital Center, Inc.*, 2004 N.Y. App. Div. LEXIS 11023 (N.Y. App. Div. 1st Dept. September 28, 2004)).

Moreover, nothing in Dr. Connors' Resident Agreement obligated defendants to "provide Dr. Connors training for her PGY-4" unless they had "just cause" not to do so. Even if there was some for cause element in her Resident Agreement, allowing a jury to assess whether defendants had "just cause" not to renew the same would improperly interfere with their right to make academic judgments about their residents, including the right "to pass or fail a [resident] for failure to meet academic [and medical] requirements." *Hernandez*, 692 A.2d at 975. *See Bhatt*, 184 Vt. at 205; *Schaefer*, 2008 N.Y. Misc. LEXIS 848 at *7 (the "fact that a medical residency is terminated due to continuing deficiencies in performance after the resident had continue to be promoted to the PGY-5 position, has been held not to constitute a basis for the court's intervention in what is basically the medical school's substantive evaluation of a student doctor's academic performance"). *See also* Exhibit B (Red Book) at 43 (the "decision of the committee is final").

At best, any such contract claim would be limited to whether Dr. Connors received whatever "due process" the Red Book afforded her with respect to her "non-renewal … due to academic deficiency, non-academic deficiency or behavior incompatible with the role of a physician, or, for other reasons that, if not resolved, could significantly threaten [her] intended career development." Exhibit B (Red Book) at 41. Dr. Connors does not (and cannot) claim that she was denied due process. In fact, it appears that Dr. Connors received more due process than

may have been required.  *See Lucas v. Hahn*, 162 Vt. 456, 459, 648 A.2d 839, 842 (1994)

(plaintiff need only be given notice and an opportunity to be heard; a formal hearing is not

required).  *See also Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78

(1978); *Hernandez*, 692 A.2d at 977.

   Finally, Dr. Connors' effort to recast her disability discrimination claims as contract

claims (including defendants' alleged failure to reasonably accommodate her disability in

contravention of their anti-harassment policies) likewise fails.  *See Nanos v. City of Stamford*,

609 F.Supp. 2d 260, 268 (D. Conn. 2009) (claim alleging wrongful termination due to disability

under state law precluded because plaintiff had a statutory remedy under the ADA, even where

the court found that plaintiff's ADA claim failed as a matter of law because a "common-law

discharge claim is not a valid theory of recovery that plaintiff could fall back on should her ADA

claim fail"); *Mueller v. Rutland Mental Health Services, Inc.*, 2006 U.S. Dist. LEXIS 58004 at

*14 (D. Vt. August 17, 2006) ("… because state and federal schemes provide rights of actions to

remedy disability discrimination, a plaintiff's claim for breach of implied covenant of good faith

based on the same facts must be dismissed"); *Peralta v. Cendant Corp.*, 123 F. Supp. 2d 65, 83-

84 (D. Conn. 2000) ("The language of the anti-harassment policy that plaintiff urges as the basis

of his implied contract claim does not indicate that defendant is undertaking any contractual

obligations towards the plaintiff; rather, it obliges Cendant to comply with federal and state anti-

discrimination laws ….  Cendant is required to publicize its equal opportunity and anti-

harassment policy … in order to guard against liability under the discrimination laws.  As any

promises in the policy are general statements of adherence to the anti-discrimination laws,

standing alone they do not create a separate and independent contractual obligation"); *Mutua v.

Texas Roadhouse Mgmt. Corp.*, 753 F. Supp. 2d 954 (D.S.D. 2010) (granting summary judgment

on a breach of contract claim seeking to enforce the anti-discrimination provisions in the employer's employee handbook because the employer already must abide by Title VII and a promise to perform a legal duty is not consideration for a return promise); *Byra-Grzegorczyk v. Bristol-Myers Squibb Co.*, 572 F. Supp. 2d 233, 254 (D. Conn. 2008) (recognizing that an "antidiscrimination policy" does not indicate that an employer is undertaking any contractual obligations towards the employee; rather, it requires the employer "to comply with federal and state antidiscrimination laws"); *Gally v. Columbia University*, 22 F. Supp. 2d 199, 208 (S.D.N.Y. 1998) (stating that a provision in the code of conduct requiring that all students receive fair and equal treatment is "merely a general statement of adherence by [the defendant] to existing anti-discrimination laws[;] [i]t does not create a separate and independent contractual obligation") (citation omitted). *See also Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 429 (1st Cir. 1996) (plaintiff may not pursue a common law remedy where the legislature intended to replace it with a statutory cause of action).[16] For all of these reasons, summary judgment should be granted in favor of defendants with respect to Dr. Connors' contract claims.

## CONCLUSION

For the reasons set forth herein, summary judgment should be granted in favor of defendants with respect to plaintiff's claims.

---

[16]Count Four is also subject to dismissal because it does not identify any conduct distinct from that alleged Dr. Connors' her breach of contract claim. *Monahan v. GMAC Mortg. Corp.*, 179 Vt. 167, 187 n.5 (2005) ("we will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when the plaintiff also pleads a breach of contract *based upon the same conduct*") (emphasis in original). *See Ferriburgh Realty Investors v. Schumacher*, 187 Vt. 309, 322 (2010) ("A breach for violation of the implied covenant may form a separate cause of action than for breach of contract, as long as the counts are based on different conduct"). *See also District Lodge 26, International Association of Machinists & Aerospace Workers, AFL-CIO v. United Technologies Corp.*, 610 F.3d 44, 54-55 (2d Cir. 2010).

Respectfully submitted,

DARTMOUTH HITCHCOCK MEDICAL
CENTER, DARTMOUTH MEDICAL SCHOOL,
MARY HITCHCOCK MEMORIAL HOSPITAL,
DARTMOUTH-HITCHCOCK CLINIC AND
TRUSTEES OF DARTMOUTH COLLEGE

By Their Attorneys,
SULLOWAY & HOLLIS, P.L.L.C.

DATED:  December 3, 2012        By:___/s/ William D. Pandolph, Esq._____
                                Edward M. Kaplan, Esq.
                                William D. Pandolph, Esq.
                                9 Capitol Street
                                P.O. Box 1256
                                Concord, NH 03302-1256
                                (603)224-2341
                                e-mail:  wpandolph@sulloway.com

## CERTIFICATE OF SERVICE

I hereby certify that this pleading was served on the following persons on this date and in the manner specified herein:  Electronically Served Through ECF:  Norman E. Watts, Esq.

DATED:  December 3, 2012        By:___/s/ William D. Pandolph, Esq._____
                                William D. Pandolph, Esq.