## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

| | |
|---|---|
| **JENNIFER A. CONNORS,** | |
| | |
| **PLAINTIFF** | |
| v. | Case: 2:10-cv-94-wks |
| | Case: 2:12-cv-51 |
| **DARTMOUTH HITCHCOCK MEDICAL** | |
| **CENTER, DARTMOUTH MEDICAL SCHOOL,** | |
| **MARY HITCHCOCK MEMORIAL HOSPITAL,** | |
| **DARTMOUTH-HITCHCOCK CLINIC and** | |
| **TRUSTEES OF DARTMOUTH COLLEGE,** | |
| | |
| **DEFENDANTS** | |

### *PLAINTIFF'S OPPOSITION MEMORANDUM*
### *TO MOTION FOR SUMMARY JUDGMENT*

Defendant's motion for summary dismissal of plaintiff's claims should be denied for the following reasons:

## Background Facts

Defendants acknowledged that Dr. Connors is a individual with a disability known as ADHD.  Dr. David McKay, a psychiatrist at the University of Vermont, diagnosed her in 2003.  Dr. Paul Whitehead reaffirmed in 2006. (Plaintiff's Statement of Disputed Material Facts for Trial ("SDMF") ¶ 172).  Plaintiff demonstrated academic and professional success when provided with reasonable accommodations for the disability.  At Utah, for example, she sought and was granted appropriate treatment with psychotherapy and medication. (SDMF ¶ 173).

Dr. Connors graduated from medical school in 2003.  She then completed a pediatric residency at the University of Utah Medical School where she was employed from 2003-2006.  (SDMF ¶ 174).

Dr. Connors entered a second residency program in psychiatry at DHMC where defendant employed her from June 2006 until July 2009.  (SDMF ¶ 175).  She intended to become a triple-boarded physician in Pediatrics, General and Child/Adolescent Psychiatry. (SDMF ¶ 176).

General psychiatry residency is a four-year training program.  By the time she completed  her training at DHMC, she had met the ACGME and ABPN requirements for board eligibility.  (SDMF ¶ 177).

Defendants include Mary Hitchcock Memorial Hospital ("MHMH"), Dartmouth-Hitchcock Medical Center ("DHMC"), Dartmouth-Hitchcock Clinic ("DHC") and Dartmouth Medical School/College, now called "The Geisel School of Medicine at Dartmouth" ("GSMD").

In 2009, defendants dismissed Dr. Connors from their psychiatry residency program, claiming that she engaged in "irresponsible and unprofessional behavior." (SDMF ¶ 178).   Despite the allegation, the psychiatry program director, Dr. Ronald Green later wrote a letter of recommendation for plaintiff to complete her psychiatry residency at another institution and for licensure as a physician. He averred:

> As for Dr. Connors' attributes, I worked with her, one to one, for several months (During her PGY3) in our psychopharmacology clinic.  I find her to be a bright, caring and dedicated physician with a strong work ethic.  She is as well an eager learner.  She showed improvement in her time management skills during the time in my clinic and throughout her residency.  She responded appropriately to my feedback and overall Dr. Connors is committed to providing her patients with excellent care.  She cares for and about her patients.  She tailored to their needs.  One example was a patient with definite ADHD who was however resistant to pharmacologic treatment.  She approached him with great patience, educating him about ADHD and its treatment and providing recommended reading.  He eventually agreed to a stimulant trial and was very pleased, as were we, with his excellent response.  I  support her

licensure to practice in Vermont.

(SDMF ¶ 179).

Dr. Green attached a note to the letter of recommendation in which he reviewed plaintiff's history with defendants, asserted that there were negative reports about her but that "There were no academic issues raised at anytime." (SDMF ¶ 180). (The "negative reports" are discussed below, at 6-7, 11).

Defendants dismissed plaintiff from the residency program. Dr. Connors sued defendants, asserting claims for disability discrimination, breach of implied employment contract and breach of the covenant of good faith and fair dealing. The Court consolidated Dr. Connors' state and federal claims, after dismissing the federal statutory discrimination claim on procedural grounds.

Dr. Connors completed her general psychiatry residency at the University of Vermont Fletcher Allen Medical Center in 2011.  The Vermont Board of Medical Practice concurrently issued her a training license and a full, unrestricted physician license to practice medicine in Vermont.  Subsequently, she has served as a licensed psychiatrist for the state of Vermont as well as private health care providers, treating patients with severe and persistent mental illness throughout Vermont.  (SDMF ¶ 181).

Throughout this memorandum, plaintiff will refer to the opinion of Dr. James C. Beck, an experienced and respected psychiatrist and professor of psychiatry at Harvard Medical School. The American Board of Forensic Psychiatry, the state of Massachusetts and the American Board of Psychiatry & Neurology license Dr. Beck.  He has over 35 years of experience as a clinical,  teaching and forensic psychiatrist in Harvard psychiatry teaching programs at Cambridge Hospital, Massachusetts Mental Health Center, including its

affiliates and Massachusetts General Hospital.  As a faculty member, he evaluated over 100 residents in a wide variety of academic settings.  (SDMF ¶ 182).

## 1.    Medical Residents are Their Institutions' Employees

Defendants claim that, as a psychiatry resident in training, plaintiff was not their employee because she was paid only a "stipend."  Defendants' assertion is wrong – for at least two reasons.

First, defendants' contention directly contradicts their own state filings in connection with plaintiff's petition for unemployment compensation.  Defendant's insurance carrier filed with the New Hampshire Employment Security Department, pursuant to that state's law, a notice of  "irrevocable waiver" of its right to oppose plaintiff's claim for unemployment.  The notice  specified – without any conditions – that plaintiff was their employee from June, 2006 until June, 2009, and that defendant Mary Hitchcock Memorial Hospital Inc. was her employer.  (SDMF ¶ 183).

Second, the case decisions that defendants rely on do not support their contention. For example, defendants assert that a U. S. Court of Appeals in Florida established that medical residents are not "employees" of the institution where they train.  Actually, the court's holding was the exact opposite.   The court reversed the district courts' ruling that medical residents were not eligible for the FICA student exemption from taxation.  *U. S. A. v. Mt. Sinai Medical Center of Florida, Inc.*, (No. 06-11693, USCA CIR 11, 5/18/2007).  On remand, the district court held that the medical residents are employed under the federal tax statutes.  *U. S. A. V. Mt. Sinai Medical Center of Florida, Inc.* (No. 02-22715-CIV ASG, 7282008).  The court ruled that the services that medical residents perform do not render the residents ineligible for a FICA taxation exemption.

The clear conclusion is that plaintiff, here, was defendant's employee. At minimum, there is a factual dispute that precludes summary dismissal on this point.

## 2.    Defendants Fail to Accommodate Plaintiff's Disability

During plaintiff's residency training, defendants were aware of her disability. But they frequently failed to provide reasonable accommodations for her condition. As they assert, they occasionally provided her with extended times for examinations, a private office and time off for therapy and obtaining medication. (D's Memo p.6).

But for a significant period of time during her residency, defendants' failed to reasonably accommodate plaintiff's disability. Most notably, she endured random facilities, including use of a common computer room with coffee machine for all staff to use, for four months in 2008. (SDMF ¶ 184). [1]/ At other times, their attempts at accommodation were feeble, at best, and counter-productive and violative of the law at worst. Nor did defendants provide adequate supervision under the program training guidelines. (Defendants' failed supervision is discussed further below).

Dr. Beck opined that:

> "Dr. Connors was not provided with sufficient accommodations for her ADD in that she was not always provided with an office of her own during rotations at the Veterans Administration Hospital and at Dartmouth-Hitchcock. She was required to sit in an alcove with a small desk and a coffee pot and a refrigerator that were used by VA staff. At Dartmouth-Hitchcock, she was also relegated to common staff kitchen areas. Once assigned an office, Dr. Connors' work at Dartmouth was further affected by frequent office reassignments (an moves), and her performance at both sites would be disrupted by the program's delay of her office key, telephone, voice mail, computer, security, etc. These failures, in my opinion, rise to the level of deliberate indifference to this resident's acknowledged need for accommodations."

---

[1]/       In their memorandum (p. 14) defendants falsely claim that they assigned her a private office "shortly after they re-assigned her to the VAH in 2007." The chronology is described in a series of emails. (SDMF ¶ 184, FN 1).

(SDMF ¶ 185).

The accommodations that plaintiff requested were:

*        extended time for taking examinations;

*        a quiet area in which to prepare clinical notes and interview/treat patients; and

*        the access to aquire medication and treatment for her disability.

 (SDMF ¶ 186).

With accommodations, plaintiff improved on note completion.  (SDMF ¶ 187).  Dr. Green "found her to be an excellent psychiatry resident" in his direct observation of her work.   (SDMF ¶188).    He acknowledged that she "worked hard and successfully to overcome some of the stresses involved.... I look forward to her continued success and am delighted she is in our program."  (SDMF ¶ 189).

During several periods of plaintiff's training, defendants failed and/or refused to provide the accommodations.  For example, in the winter of 2006, Dr. Schwartz, her supervisor at the VAH ordered plaintiff not to leave the VA campus in order to acquire medication or undergo any therapy.  Her medication supply became exhausted.   She was forced to continue training without the medication for managing her symptoms. The result was that the ADHD symptoms emerged, including:

*        difficulty organizing her time and assignments;

*        distractibility,

*        diminished listening skills;

*        difficulty with time management;

*        difficulty starting and prioritizing tasks.

 (SDMF ¶ 190).

When several faculty members reported that plaintiff exhibited the symptoms, defendants removed plaintiff from the program for seven months, from March until September 2007.  (Discussed at p. 21).

During the leave period, plaintiff received no training.   The parties met about a "remediation plan" that would define the conditions of plaintiff's return to the program. Plaintiff requested that the plan reflect the fact that she has a disability and the potential impact without accommodations.    That is, the plan "will reflect appropriately the willingness to acknowledge educate, communicate and accommodate Dr. Connors learning differences toward her success."   The point was to "enhance the environment of medical education and training for Dr. Connors, and the whole of DHMC."  Further:

"If either Dr. Connors or DHMC Program and Graduate Medical Education Administrators fail to make a 'Good Faith Effort,' accept/provide reasonable accommodations under the ADA  or abide/achieve goals by the Remediation Plan, the consequence of such may result in Formal Probation, Grievance/Arbitration, Notification of the NH Medical Board and possible Dismissal, or Voluntary yet Permanent Leave."
 (SDMF ¶ 191).

Plaintiff's proposal also enumerated performance issues and areas of concern that defendants raised. It would establish objectives and benchmarks for measuring plaintiff's progress and helping her to maintain consistent performance that benefits patients and advances her towards her medical education/training objectives.  It was also important to establish measurements of plaintiff's performance in relation to defendants' expectations, policies and standards –  denied to her previously.

Defendants rejected plaintiff's proposal in favor of their plan.  "The rules need to be

followed at once" was defendants' mantra for the remediation period.  They exhibited no compassion or recognition of plaintiff's disability.  (SDMF ¶ 192). They refused to declare the rules and expectations other than to hold her to a "higher standard that other residents. (SDMF ¶ 193).

During the "negotiations" defendants insisted that plaintiff "admit her culpability" in her alleged clinical performance and conduct deficiencies.  (SDMF ¶ 194).

Plaintiff was forced to engage legal counsel. Although defendants permitted plaintiff to continue under their dictated terms, the plan defined no accommodations for her. Green's view was that her alleged deficiencies were "irresponsibility, not illness" even though he acknowledged that ADHD is an illness.  (SDMF ¶ 195).  She was forced to continue the program with no warrantees that accommodations would be provided.

In September 2007, plaintiff returned to the program to complete her training, defendants assigned her to the New Hampshire State Hospital. There, her supervisor accommodated her disability needs in the form of a quiet area in which to prepare clinical notes and interview/treat patients and the ability to acquire medication and treatment for her disability.  As a result, plaintiff's symptoms and her difficulties with the program diminished.  She satisfied the Core Competencies to advance from the second year of residency to the third.  (SDMF ¶ 196).

Plaintiff's performed well at NHH.  There were no performance issues.  (SDMF ¶ 197).  In contrast with her reception at NHH, in the wake of her success, Green described her as a "completely negative package" and demanded that upon her return to VAH  in January 2008, she apologize to the other residents and select faculty for causing "disruption" in the program. He accused her for not "taking responsibility" for her actions.

(JC affid).  (SDMF ¶ 198).  He reassigned plaintiff to the VAH with a threat that should her "irresponsible behavior" recur, she would be immediately terminated.   (SDMF ¶ 199). Assigning her to VAH was like a dagger hanging over plaintiff's head.

Unfortunately, defendants failed to accommodate her disability.   They did not provide plaintiff with a quiet area in which to prepare clinical notes and interview/treat patients – for five months.   Plaintiff struggled with her disability and the barriers defendants created.  She was forced to work longer and harder to prioritize and organize her work and to keep pace with clinical duties and to do so at a "higher standard." She managed to do so despite the fact that defendants refused and/or failed to provide the key accommodation that enabled plaintiff to operate normally – a quiet area in which to prepare clinical notes and interview/treat patients.

Defendants had assigned plaintiff to a semi-public social/work area that included a coffee machine and a staff computer.  Defendants again claimed that plaintiff became tardy in submitting clinical notes. (SDMF ¶ 200). The report was transmitted in November 2008 – about alleged tardiness during the previous spring.

Dr. James Beck noted that "the difficulties the Department [of psychiatry] complained about with respect to Dr. Connors occurred in the context of some fundamental failures on their part to provide a reasonable training experience on the one hand and appropriate accommodations for a resident with ADD on the other hand." (SDMF ¶ 201).

Defendants' failure to accommodate plaintiff's disability created extreme difficulty for her.  But she endured it.  She earned positive evaluations from her supervisors – including the program director, Dr. Green.   (SDMF ¶ 202).

The tardiness report conforms to a pattern that defendants engaged in – circulating

complaints about plaintiff's performance or conduct considerably after the alleged events – without notifying plaintiff about the allegations.  Plaintiff was, thus, denied the opportunity to either correct her conduct (if the allegations were true) or rebut the claims.  Had she been provided the opportunity to rebut the claims, she would have done so – with documentation supporting her position.  The documentation demonstrates that plaintiff's clinical notes were not tardy at any time that defendants accommodated her disability and that she met VAH guidelines.  (SDMF ¶ 203).

Defendants finally provided plaintiff with an office at the VAH – in May, 2008 although she did not receive her own key to the office until June.  But, prior to that, Green and Watts ambushed plaintiff with an exaggerated complaint concerning her participation in supervision.  Green promised documentation, but produced none.  (SDMF ¶ 204).  From May until November, her evaluations were positive.  Green acknowledged her success, but his intent to dismiss plaintiff had re-emerged.  (SDMF ¶ 205).

In November 2008, Green solicited reports.  Green and Watts ambushed plaintiff again with the exaggerated supervision issue, read her the solicited email responses and forced her to submit to another Fitness for Duty evaluation.  (SDMF ¶ 206).

During January-June, 2008, Dr. Green directly supervised plaintiff in his psychopharmacology clinic.  He found that plaintiff's performance met the program's expectations, particularly praising her for excellent patient care.  He noted that she responded well to feedback concerning time efficiency.   (SDMF ¶ 207).

In his "semi-annual evaluation", in March 2008, Dr. Green found that plaintiff's conduct was "in a fully professional manner" and that she was meeting the program's "clinical and administrative expectations."   (SDMF ¶ 208).  Despite his wish to dismiss

plaintiff, in November 2008, Dr. Green expressed further reassurances to plaintiff and support for her license and a child psychiatry fellowship – "just like any other resident." (SDMF ¶ 209).    But he refused to advance the licensing and fellowship application processes.

Green informed plaintiff that some faculty members had complained about her conduct – events that had occurred previously.  (SDMF ¶ 210).  He contended that plaintiff engaged in "inappropriate behavior and judgment" and suggested that she might be "psychiatrically ill."  He ordered her to undergo a "fitness for duty" evaluation.  He also ordered her to remain on full duty, treating patients.  He averred that she was not a risk to patients.  Plaintiff passed the evaluation.  (SDMF ¶ 211).  (Discussion of the accusations below, at 22).

Not only did defendants fail to reasonably accommodate plaintiff's disability, their misleading, unsubstantiated and exaggerated criticisms aggravated it.  (SDMF ¶ 212).  Dr. Green was fully aware of plaintiff's disability.   (SDMF ¶ 213).  But Green disregarded plaintiff's disability.  He thought so little of plaintiff's disability and its impact on her abilities when untreated and not medicated that he failed to communicate her status or to urge accommodations – principally medication, treatment and a quiet place to work – to his lieutenants, plaintiff's supervisors.  Green failed to recognize that when plaintiff was accommodated, she performed well; when she was not accommodated, questions were raised, rightly or wrongly, about her performance.   (SDMF ¶ 214).  The result was that there were many months when she was denied those basic accommodations to enable her to succeed.   "Serious underlying problems ha[d] also inhibited her success" because of defendants bias against plaintiff.   (SDMF ¶ 215).

**3.**      **Defendants Fail to Properly Supervise/Teach Plaintiff**

Beyond defendants' failure to accommodate plaintiff's disability, they also neglected to adequately supervise her training course. The failure to supervise effectively sabotaged plaintiff's residency.

The American Council for Graduate Medical Education ("ACGME") governs medical residency programs. It maintains guidelines to which teaching institutions must comply. Defendants' Graduate Medical Education office ("GME") implements the guidelines for their residency programs.

Defendants' Residency Training Program implements the guidelines and defines the training structure in which "faculty and residents [are] working in tandem on every service … [so that] both the patient and the educational process is better served because residents are able to model themselves after examples set by experienced faculty clinicians." (SDMF ¶ 216).

The chair of the psychiatry department affirmed that "Our faculty is distinguished and, most important, is accessible to our trainees. This closeness forms the core of the Dartmouth education."

The guidelines specify the following categories of training supervision:

*        In-House Supervision.    "On all rotations each resident has a staff psychiatrist clinical supervisor" on a daily basis and meets with the resident weekly for one hour of one-on-one formal supervision – for every residency year.

Plaintiff's Training:    No supervisor was assigned to Dr. Connors VAH-Addiction rotation, 11/14-12/11/06. From 12/06-1/08 and 2/07-3/07, defendants failed to provide the prescribed supervision during plaintiff's inpatient blocks at VAH. For example,

Schwartz never provided one-hour per week supervision at this level for plaintiff during the spring of 2007.

\*      <u>Interviewing Mentor</u>.  Patient evaluations prescribed for two hours every-other-week.

<u>Plaintiff's Training</u>:  Defendants never provided the prescribed supervision for plaintiff.

\*      <u>Psychodynamic Psychotherapy Supervision</u>.  For PGY2, 3, 4 residents - a weekly one-to-one hour meetings in subjects.

<u>Plaintiff's Training</u>:  Defendants provided only one such supervisor during plaintiff's residency - David Lord, PdD - during 4/4/08 - 2/24/09 at the VAH.  Dr. Lambert was plaintiff's administrative supervisor at the VAH and her clinical supervisor for psychopharmacology patients only.

\*      <u>Psychopharmacology Clinic Supervision</u>.  For PGY 2,3,4 residents in several clinics perform evaluations for psychopharmacologic treatment <u>in</u> <u>concert</u> <u>with</u> a psychiatrist supervisor including weekly lectures on the subject.

<u>Plaintiff's Training</u>:   At VAH, Dr. Watts supervised plaintiff sporadically during 6/06 - 3/07.  As the attached chart, "J. Connor's Psychopharm Clinic" demonstrates, there were many times when plaintiff was assigned no patients and received no supervision.  The second attached  chart "Psychopharmacology New Evaluations (Intake) Slot," - marked "Exhibit 10" demonstrates while supervising plaintiff during 1/7/08 - 1/7/09, Lambert was not present for 1 out of 4 arrived new intake evaluations. During 1/77/08 - 2/24/09 defendants provided various supervisors for plaintiff, at plaintiff's urging, fulfilling the program supervision requirement.

\*      <u>Child & Adolescent Psychiatry Supervision</u>.  For PGY 3 residents - Weekly one-hour supervision.

<u>Plaintiff's Training</u>: From 1/08 through 2/27/09, defendants provided two different supervisors who met weekly for group clinical supervision with plaintiff and other residents to fulfill the supervision requirement.

\*      <u>Cognitive Behavioral Psychotherapy Supervision</u>. For PGY 3 & 4 residents - "Hands-on" training - supervision not specifically defined.

Kutter - Monday/Friday issue.  "Hands on ...."  See training booklet

<u>Plaintiff's Training</u>: During the training period, defendants provided a supervisor who was available to plaintiff half of the time.

\*      <u>Administrative Supervision</u> - The training director must provide biennial reviews twice per year. "The program must provide each resident with documented semiannual evaluation of performance and feedback."

<u>Plaintiff's Training</u>: Defendants failed to provide plaintiff the required semiannual and documented reviews.

The purpose is to formalize promotion and achievement of core competencies according to ACGME requirements.    (SDMF ¶ 217).

The record demonstrates a gross deficiency in supervision time devoted to plaintiff's training program.  Defendants provide no explanation for the deficiency and their lack of administrative response.   It could reasonably be interpreted as purposeful.  Once plaintiff complained that they were not providing adequate and reasonable accommodations, defendants began retaliating against her in a number of ways, described here, including the failing to provide supervision and exaggerating criticisms against her to scuttle her

residency.

Treating patients under supervision is a key element of a resident's training. Yet, there were significant blocks of time when defendants failed to assign patients to plaintiff.

As indicated, although Dr. Green promised reasonable accommodations and the law and defendant's written policies warrantee them, defendants failed to provide them.  In the wake, defendants discharged plaintiff for the exaggerated performance and conduct claims.

The supervisory deficiency contributed to what Dr. Green described as occasional "lapses" in plaintiff's performance.   (SDMF ¶ 218).

**4.** **Defendant's Criticisms Exaggerated and/or Not Warranted**

Examples of allegations against plaintiff that were caused either by defendants' failed accommodations or their lack of supervision – or both:

Dispute Concerning Plaintiff's Acceptance of Supervision

It is ironic that plaintiff would be criticized for not accepting supervision because not much of her training time lacked supervision and so many of her supervisors praised her for seeking out and accepting supervision.

Dr. Green complained that plaintiff did not accept supervision well, arguing with supervisors.   His comments contradicted his own evaluations of plaintiff and direct observations as well as those of plaintiff's other supervisors.

Dr. West, who supervised plaintiff at DHMC, noted that she "benefitted from having a quiet place to work without distractions."   (SDMF ¶ 219).  Dr. Green also noted that, under those circumstances, plaintiff was "an excellent psychiatry resident" and noted that "she is making progress" and "great strides." (SDMF ¶ 220).

Dr. West also noted that plaintiff "accepts supervision well and seeks it out."  (SDMF

¶ 221).  Dr. Coursin commented that plaintiff was "open to feedback and learning."  (SDMF ¶ 222).  Dr. Lambert observed that plaintiff "readily accepts supervision," "frequently seeks feedback on ways to improve" and continues to respond well to feedback."  (SDMF ¶ 223).

Clinical Notes Dispute

During the two episodes where supervisors criticized plaintiff for late note submissions, spring of 2006 and 2007, plaintiff had no ADHD medications or therapy and/or no quiet place to work without distractions – both occurring at the VAH.  (SDMF ¶ 224).  On the contrary, when she was accommodated and experienced adequate supervision and solid teaching, she "improved greatly in ability to keep up with paperwork and have things done on time without being overwhelmed."  (SDMF ¶ 225).

Defendants' memorandum (p.9) asserts that one of plaintiff's occasional supervisors, Dr. Schwartz, expressed concerns about plaintiff's performance and provided a list to plaintiff in the spring of 2007.  But Dr. Schwartz, in deposition testimony, disavowed most of the items on the two "lists" that were presented to him.   He testified that most of the items on the first list were added by someone else.  He refused to verify that either document was his creation, noting that neither was signed by anyone.  He believed he expressed concerns to plaintiff but could not recall the situation.  (SDMF ¶ 226).

Dr. Schwartz testified that the documents outlined "things that need to happen on the inpatient unit and things that shouldn't happen on the inpatient unit."  (SDMF ¶ 227).  Regarding untimely clinical notes, Schwartz had no recall of occasion when JC exceeded time limitation for completing notes.  (SDMF ¶ 228).  The same is true of suggestions that presentations must be concise and focused, listening to one's supervisor is important, patient examinations must be focused or that plaintiff was unavailable when she was on-

call.  In other words, he was unaware that the list of suggestions concerned the plaintiff in any regard.

In sum, if there was an issue concerning tardy notes, the episodes, if they occurred, were commonplace among residents or so unimportant that nobody recalls the specific events or infractions.  Obviously, the accusation does not justify dismissal.  But there is a factual dispute that, ultimately, the jury must resolve.

Dr. Green asserted that he documented additional VAH complaints against plaintiff in a 12/28/06 memorandum.  No such memorandum is in the record.   (SDMF ¶ 229).

Actually, plaintiff's overall record of timeliness was recorded in defendants' "Clinician Baseline Clinical Hours" record.  During the 2008-2009 term, plaintiff's clinical note completion was 100%.  (SDMF ¶ 230).  During the same period, other residents were frequently late in submitting clinical notes.   (SDMF ¶ 231).  None of the residents in the record were dismissed from the program.   (SDMF ¶ 232).

When Dr. Lambert,  plaintiff's VAH administrative supervisor, reported to Dr. Green that plaintiff's notes were "getting later and later," Dr. Corson denied the allegation. (SDMF ¶ 233).  And, the record demonstrates that plaintiff's notes were not late - 93% were submitted on the same day as the patient event; 75% within the hour of the event.  (SDMF ¶ 234).  The Acting Chief of the Health Information Management certified that <u>all</u> of plaintiff's notes were completed within VAH guidelines from 6/26/06 to 4/10/09, virtually her entire training period.   (SDMF ¶ 235).

<u>Argumentative</u>

Dr. Brooks complained that plaintiff argued with her about a diagnosis and prepared a patient's treatment plan without consulting her.   She reported her "feeling" that plaintiff

argued with her to Dr. Green but failed to discuss the matters with plaintiff.  Dr. Brooks either failed to recognize a teaching moment or dismissed the events as unimportant – until Dr. Green inquired about issues concerning plaintiff.  (SDMF ¶ 236).

The Brooks allegations were false.  Plaintiff complied with Brooks' request that her treatment plan be implemented.   Brooks also criticized plaintiff for verifying a Brooks treatment plan with the medicine department.  Later, for a different patient, Brooks suggested that plaintiff verify a medication with the medicine department.  (SDMF ¶ 237).

Concerning the complaint that plaintiff was argumentative, previous training supervisors had encouraged her to be an "aggressive learner by challenging her preceptors" of diagnoses, presentations and therapies.   (SDMF ¶ 238).

It should be noted, again, that plaintiff's alleged negative conduct is attributable to her disability.  Unfortunately, Dr. Green disagreed.  On one occasion when plaintiff requested accommodations, he informed her that he held her to a "higher standard" than other residents in the matter of timeliness of clinical notes and accused her of seeking the accommodation of being perpetually late.  (SDMF ¶ 239).  There is no documentation that plaintiff sought such an accommodation.  It is false.

Defendants alleged that plaintiff was not available on call at the VAH.  They also claimed that she did not attend supervision or clinic and failed to cross-cover on the inpatient unit.

Defendants' allegation about plaintiff not being available on call is based on her first "pager call" duty (as distinguished from "in-house call").  She had not received orientation in the inpatient unit and was not familiar with the call duty expectations.  She was not yet incorporated into the VAH call system.  She previously notified her supervisors that she

may not be immediately available to respond to pages because she resided in an area lacking cellular telephone service.  Her supervisor at the time indicated that it would not be a problem. (SDMF ¶ 240).  There is no requirement that a resident be immediately available on "pager call."  (SDMF ¶ 241).

Patient Examination/Clinical Note Dispute

One of the reasons that defendants use to justify plaintiff's dismissal occurred n March, 2007.  Defendants alleged that plaintiff entered physical examination findings on a patient's chart before she examined him and failed to examine him for 24 hours.

Regarding the timing issue, Dr. Schwartz testified in deposition that he was unaware of a time limit for completing clinical notes.   (SDMF ¶ 242).

Concerning the physical examination issue, another resident admitted the patient and did not note a diagnosis or possible diagnosis of thrombophlebitis; the reason for admission was unclear.  Plaintiff and Dr. Schwartz examined the patient the next morning. (SDMF ¶ 243).  Among other things, the patient presented with a superficial leg issue. Schwartz instructed plaintiff to examine the leg – not at that time but later.  It appeared that the leg complaint  was not urgent.  Later, Schwartz decided that it would be most appropriate for the medical team to address the leg issue - that is, whether the patient had thrombophlebitis. (SDMF ¶ 244).

Schwartz subsequently permitted plaintiff to write orders and start the history and a physical examination.  Plaintiff entered a scripted evaluation and completed the clinical note to the assessment/plan sections and completed a partial physical examination, except for the heart and lungs.  Early the next morning, plaintiff electronically, by mistake, clicked and signed the note before completing the examination.   En route to complete the

examination, she informed Schwartz, indicating that she would complete the examination before he could co-sign the note.  (SDMF ¶ 245).  The attending physician's co-signature establishes that the note is "official."

Plaintiff completed the physical examination; her findings were within the normal, as she had entered the previous day.   (SDMF ¶ 246).

Defendants' version of the event gives the appearance that plaintiff lied about her physical examination and her intentions.  It is a substantial distortion of the actual events. After she mistakenly entered the information in the note, she informed her supervisor to prevent him from approving the note before her actual examination and findings.  [2]/

It should be noted that at the time of these events, defendants had prevented from retrieving  her disability medication until very recently; she had just restarted it. Dr. Beck faulted plaintiff for entering the note before the examination but concluded, as did the VAH Chief of Behavioral Medicine, that the events caused no injury to the patient; rather it exemplified the point that defendants failed to properly accommodate plaintiff's disability. (SDMF ¶ 247).

Dr. Torrey, one of plaintiff's supervisors, commented that "residents know that when they sign [a medical] note,  they are attesting to the veracity of what's in the note and also taking professional responsibility for the findings." (Defendant's Memorandum, p.11).  He neglected to mention that, in a teaching institution, resident clinical notes are preliminary – not final –  until the attending/supervising physician approves and signs them.  (SDMF ¶ 248).

---

[2]/    Defendants' memorandum considerably distorts the facts by separately presenting events involving the same patient as if there were episodes with two patients, promoting the notion that plaintiff made two serious mistakes, when, actually, her only mistake, entering the note without a full examination, was not serious – for the reasons indicated above.

There are clear factual disputes about these and the other complaints that defendants used to justify their dismissal of plaintiff. Those disputes amount to genuine issues of fact going to the heart of the case – whether defendants' reasons were pretext for retaliation and/or discrimination.

Administrative Leave/Remediation Plan

These events occurred prior to Dr. Green placing plaintiff on administrative leave. She remained in administrative limbo for six and a half months. In the interim, Dr. Green blocked her return until she would "accept responsibility for her actions." (SDMF ¶ 249). Dr. Green denied that plaintiff's disability influenced her actions in any way even though he acknowledged the she had the disability. (SDMF ¶ 250). He asserted that her alleged deficiencies were "irresponsibility, not of illness." (SDMF ¶ 251). He vowed not to "accommodate lateness." (SDMF ¶ 252). Plaintiff did not make such a request. (SDMF ¶ 253). And, he expressed a bias against plaintiff continuing at all, suggesting that GME not renew her training. Nevertheless, he permitted her to continue.

Finally, in order to return to the program, plaintiff acceded to defendants' demand that she continue the program with no warrantees that accommodations would be provided. In September 2007, plaintiff returned to training, assigned to the New Hampshire State Hospital. (SDMF ¶ 254).

After Remediation

From November 2007 until November 2008, no complaints were brought to her attention so that she might correct them. Needless to say, a training program provides opportunities for residents to learn the best practices for the profession. Defendants, again, denied plaintiff the opportunity to deal with complaints they may have had in order to

correct her approach to the training course.

In November 2008, defendants accused plaintiff of failing to properly organize and submit her clinical notes in a timely manner, treating patients without supervision, a disorganized presentation, patient complaints, inconsistent performance and failure to contact the state Department for Children and Families ("DCYF").  The accusations related to events that occurred – or did not occur – over the course of several months.   (SDMF ¶ 255).

There are genuine issues of fact concerning these allegations – whether they actually occurred; whether they occurred in the manner that defendants claim; if they occurred did they result from defendants' failure to accommodate plaintiff's disability or their failure to properly supervise plaintiff as a resident; and, finally, if they did occur, did they justify dismissal?

Concerning plaintiff's clinical notes, plaintiff cites the above record (at p. 17) for the proposition that her notes were not becoming disorganized and late.  The incidents did not occur.

Concerning the accusation that she treated patients without an attending physician present, there was an incident in April 2008, where a patient presented in need of mental health assistance but plaintiff's supervisor was not available.

Plaintiff, who had treated many patients in her three years as a resident, perceived that the patient was a serious risk for suicide. He telephoned the VAH and plaintiff spoke with him as the physician on-call.  She repeatedly offered clinic appointment times (when attending physicians would be present) but he refused.   Because of the patient's desperation, she offered him an appointment during her clinic time in order to convince

him to come to the hospital and avoid a tragedy.  He agreed.  Plaintiff informed her supervisor who was unable to supervise at the appointed time.  (SDMF ¶ 256).

The supervisor, Dr. Lambert, reported to Dr. Green that plaintiff used "poor judgment" in setting up the appointment.  Dr. Beck "vigorously" disagreed with Lambert's report concerning plaintiff's conduct.  He opined that plaintiff "deserves praise rather than censure for making every effort to engage this patient who appeared to be at serious risk of killing himself."  (SDMF ¶ 257).

The incident did not occur in the manner that defendants claim.

Defendants alleged that plaintiff failed to contact DCYF regarding a patient in a timely manner.  The patient presented with post-traumatic stress disorder and psychotic-like symptoms.  He had homicidal and suicidal fantasies, binge drinking, a history of violence and possible abuse of children under age seven in his care. Plaintiff admitted the patient, contacted the inpatient resident and the charge nurse to inform them that the patient was high-risk for violence.  She also contacted DCYF but was unable to reach a live staff person.  She may or may not have left a message.  Two days later, plaintiff's administrative supervision day, she reported the event to her supervisor, Dr. Lambert, and learned that the patient had been discharged.  She also reached DCYF that day.  Dr. Lambert informed plaintiff that she handled the matter appropriately.

Defendants alleged that she failed to report the patient to DCYF within 48 hours of the admission.  Dr. Beck observed that plaintiff's conduct was "more than reasonable" especially since she followed up with DCYF even after his hospitalization when responsibility shifted to the inpatient team assuming care.  (SDMF ¶ 258).

Furthermore, there is no evidence that the inpatient resident or the charge nurse

contacted DCYF or that they were sanctioned for not doing so.  Only plaintiff was criticized for her actions.  The criticisms were inaccurate or misleading and the sanction, dismissal, was ill-deserved.

Defendants allege that "patients" complained about plaintiff.  Actually, there is only one patient complaint in the record.  The incident in question allegedly involved a patient complaint that plaintiff's psychiatric treatment of him consisted of merely playing cards with him.  Allegedly, he complained to another patient who reported it to a VAH psychologist, who reported it to plaintiff's supervisor, who reported it to Drs. Watts and Green.  (SDMF ¶ 259).

Nobody in the reporting chain verified the episode.  Nevertheless, they ordered her for a "fitness for duty" examination and it was an incident that contributed to their decision to dismiss her.  (SDMF ¶ 260).

Plaintiff had been treating the patient for eight months.  He was a somewhat primitive person.  He repeatedly lost control, raising his voice to the extent that staff were frightened and called the police.  At the time of the incident, the patient lost control again.  In order to distract him from his rage, plaintiff began playing card solitaire in his presence.  She wanted to avoid him being humiliated with an exit escort by the police.  (SDMF ¶ 261).

Her strategy worked and the patient calmed down sufficiently for the psychiatric session to continue.  Plaintiff discussed the patient and the solitaire incident with her supervisor, Dr. Lambert, who praised plaintiff for the manner in which she treated the difficult patient.  (SDMF ¶ 262).

It was not until November 2008, that Drs. Watts and Green informed her that they considered her approach to be unprofessional and contributed to their order that she

undergo a fitness for duty examination.  They also cited it as one of the excuses for dismissing her from the program.  As indicated, plaintiff passed the examination.

But it was another example of defendants retaliation against plaintiff for her requests for accommodations for her disability.  With the slightest excuse, even an undocumented and unreliable one, defendants sanctioned plaintiff. The criticisms were inaccurate or misleading and the ultimate sanction, dismissal was ill-deserved.  [3/]

Defendants also accused plaintiff of expressing a "paranoid response" to a November 2008 inquiry about her conduct.  In the incident, Dr. Lambert suggested to plaintiff that several people expressed concern about her.  Plaintiff replied that the inquiries must be related to her licensure application.  (SDMF ¶ 263).

Lambert may have described it as "paranoid" but it is not unreasonable that plaintiff thought the inquiries pertained to her application for medical licenses and a fellowship. (SDMF ¶ 264).  Lambert's observation was inconsistent with her conclusion that plaintiff "generally took feedback very well and applied it."  (SDMF ¶ 265).

Lambert alleged that she submitted "bizarre" clinical notes and demonstrated "inconsistent performance."  There is no evidence supporting either accusation except Lambert's report.  She never discussed with plaintiff any of the issues she raised – beyond the expressions of concern.  And she was plaintiff's supervisor!  (SDMF ¶ 266).

Dr. Green previously requested that Lambert collect complaints against plaintiff.  To comply, she sent emails to several of plaintiff's supervisors and reported the responses to Green.  (SDMF ¶ 267).  As indicated earlier, Green neither spoke to any of the respondents

---

[3/]       It is noteworthy that defendants' memorandum refers to "occurrences" of inappropriate behavior that Dr. Summerall reported concerning the DCYF incident and patient "complaints" in the context of the difficult patient/solitaire episode.  Actually there was only one incident regarding DCYF and one regarding solitaire.  And defendants misconstrued both of them.

nor verified the complaints in any manner.

In deposition, Lambert modified her report to Green from "many" supervisors to "several." (SDMF ¶ 268). But, naturally, Green had already used the report as partial basis for plaintiff's dismissal.

The point is that the accusations that led to plaintiff's dismissal were never verified or evaluated with the source and many exaggerations were left in the record to destroy plaintiff's residency. Nor did Green or any other faculty complainer recognize at the time that incidents such as those that were reported are "teaching opportunities" for faculty, despite Green's admission that they are such opportunities. Not only was there a failure to accommodate plaintiff's disability but rather, defendants used them to destroy plaintiff's training career with defendants.

Dr. Beck reviewed the record and concluded that defendants failed to accommodate plaintiff's disability. He further concluded that defendants engaged in "deliberate indifference to this resident's acknowledged need for accommodations." (SDMF ¶ 269). And, finally, Dr. Beck opined that plaintiff's difficulties in the training program "occurred in the context of some fundamental failures on their part to provide a reasonable training experience on the one hand and appropriate accommodations for a resident with ADD on the other hand." (SDMF ¶ 270).

At minimum, there are serious, genuine disputes about the basis for plaintiff's dismissal. There is no justification for dismissing her claims summarily.

### Dismissal

The dismissal was based partially on the premise that the VAH staff did not want her back at that facility. (SDMF ¶ 271). As with defendants' other excuses for dismissing

plaintiff, the premise was wrong.  To the contrary, Dr. Lambert testified that plaintiff was welcome to return to the VAH for further training.   (SDMF ¶ 272).

Nevertheless, defendants dismissed plaintiff and preluded her from completing her residency training at their institutions.

Dr. Beck observed that the program defendants provided for plaintiff was "profoundly unsatisfactory as a training experience" (SDMF ¶ 273).  There were significant blocks of time when defendants failed to supervisor her properly.  There were significant blocks of time when defendants failed to assign patients to her – only five patients during one eight-month period.   (SDMF ¶ 274).  He cited defendants for, *inter alia*, failing to accommodate and supervise her properly.

Defendants provided almost no clinical experience during the eight-month period.  As Dr. Beck observed, she was frequently placed in a physical setting "that would have been difficult for anyone  but especially difficult for a person with ADD."   (SDMF ¶ 275).  Defendants failed to provide a quiet place for plaintiff to work for four months during 2008.  This condition was a prelude to the events that defendants construed to justify dismissing her.

Again, as Dr. Beck observed, defendants' claims concerning plaintiff's difficulties during training occurred "in the context of their failure to provide a reasonable training experience on the one hand and appropriate accommodations for a resident with ADD on the other hand." (SDMF ¶ 276).

Green claimed that the members of defendants' psychiatry department "are very much cued into the symptoms of various – all kinds of psychiatric illnesses."  He further averred that "If anything, there's a special sensitivity because of what we do for everybody

to be very familiar with these things."  (SDMF ¶ 277).

He offered no excuse for ignoring plaintiff's frequent requests for accommodations – or his lieutenants' failure to recognize plaintiff's disability and the need to accommodate her.

Another excuse for plaintiff's termination was that her conduct endangered patients. The claim is belied by the fact that defendants immediately ordered her to submit to a third Fitness for Duty evaluation.  This time, they permitted her to continue her duties and authorized plaintiff to treat patients after November 2008, when they apparently decided to dismiss her.  She was authorized to treat patients for an additional six months.

After thorough review of the record, Dr. Beck concluded that the termination was not justified:

"Dr. Connors formal evaluations were all satisfactory or better at every training site. The record reveals two unsatisfactory scores over the course of her psychiatry training and criticisms within some emails generated at the VA.  These are subject to substantial dispute as to what occurred and the significance of those complaints made against her."
 (SDMF ¶ 278).

## **LEGAL ANALYSIS**

Vermont's Fair Employment Practices Act

Defendants claim that plaintiff lacks standing to sue under VFEPA because she was not their employee.  It asserts that the statute governs only discrimination in employment.

While defendants are correct regarding the statute's coverage, they are wrong that it does not apply to the relationship between themselves and plaintiff.

As delineated above (p. 2), defendants' admission that plaintiff was their employee

constitutes a waiver that she lacks standing.  The key case decision held that medical residents are not exempt from employment withholding.  *U. S. A. V. Mt. Sinai Medical Center of Florida, Inc.* (No. 02-22715-CIV ASG, 7282008).

Defendants also assert that the statute does not specify that it encompasses the employment relationship between plaintiff; hence, the statue does not apply to forbid disability discrimination.

The U. S. District Court for Vermont held that the whistleblower statute specifically encompassed only Vermont-licensed institutions because it so specified.  Here, there is no limiting language.  The statute specifies only "employers" and "employees."  *Dubeau v. Dartmouth Hitchcock Medical Center*, 1:11-cv-255 U.S. D.C.Vt. 5/25/12.

Furthermore, the VAH, located in White River Junction, Vermont, is "one of our training facilities."  Most of the physicians that compose its training staff are licensed in Vermont.  Most of plaintiff's training experience occurred in Vermont.  And, most of the episodes that are integral to this proceeding occurred in Vermont.

The decisions that defendant cites in support are unavailing since they are pure contract claims.  [4]  Defendants propose that plaintiff's filing of a discrimination claim in New Hampshire precludes her from filing a discrimination claim in Vermont.   As defendants cite no authority for the proposal – and there is none – the suggestion  should be discounted.

Defendants' citations to New Hampshire contract law are inapplicable to this

---

[4]       The only decision that referenced a statute was *Sprayregen v. Bank of America* (No. 2:11-cv-00115, USDCVt 7/23/12, Sessions, J.).  The case concerned a common law mortgage contract that contained a choice-of-law provision.  The statutory claim was, ultimately, stricken and not part of the case or the decision.

statutory claim. [5/]

Defendants also suggest that Vermont's decisions establish deference towards academic institutions in matters of academic performance, citing *Bhat, supra*. which, in turn, cites for amplification, *Falcone v. University of Minn.*, 388 F.3d 656 (CIR 8, 2004). In *Falcone* "academic standing" pertains to the students passing or failing specific medical school courses.  He failed numerous course despite the institution's numerous and exhaustive attempts to accommodate his learning ability.  [6/]

Here, there is no issue concerning plaintiff's academic performance.  The decisions that defendants cite have no application to this proceeding.

Moreover, the statute is intended to remedy disability discrimination in the work place.  As a remedial statute it should be applied liberally, especially when no limitations are expressed.  *Cyr v. McDermott's, Inc.* 2010 VT 19 (Vt. 2010).

Accordingly, VFEPA controls and does not render the statutory claim subject to summary dismissal.

Defendants propose that plaintiff's failure-to-accommodate discrimination claim should be summarily dismissed because she was not otherwise qualified to perform as a resident physician.  They also claim that the claim fails because she did not request a reasonable accommodation for her disability.  In support, defendants cite the accusations that some of its faculty leveled against plaintiff during her residency training.  Defendants cite *Robertson v. Neuromedical Center*, 983 F.Supp 669 674 (MDLa 1997).

---

[5/]        Indeed, New Hampshire law may apply to the contract claims.  There is no difference between the decisions of the two states that control employment contract interpretation.  *Havill v. Woodstock Soapstone,* 172 Vt. 165 (2001)**.**

[6/]        In contrast to defendants' failures, here, the University's accommodations in *Falcone* were extensive.  Unfortunately, the student still failed.

Defendants' suggestions fail for three reasons.

First, *Robertson* held that discrimination statutes do not require employers to accommodate employees whose acts post a direct threat to the patient safety. Here, there is no incident in which plaintiff's conduct can reasonably be construed as a direct threat to patient safety.

Second, the record clearly reflects that plaintiff requested reasonable accommodations for her disability.

Third, there is no question that plaintiff can perform the essential functions of the residency and the profession. Dr. Green certified her for advancement to PGY3 and for medical licensure. Plaintiff met the appropriate standards; principally the "core competencies" that ACGME requires. Plaintiff achieved the status substantially without reasonable accommodations.

Since graduating from PGY2 in defendants' institutions, she has succeeded as a licensed psychiatrist throughout Vermont. [7/]

Defendants next propose that there is insufficient evidence to support plaintiff's disability discrimination and retaliation claims. In support, they suggest that plaintiff's dismissal was grounded in Dr. Green's findings during 2007 and 2008. As analyzed above, there is substantial, genuine dispute concerning defendant's allegations against plaintiff. Should the trier-of-fact determine that defendants' rationale is suspect or incredible, the allegations would not be considered and/or would not be persuasive in the triers' determination. In that event, there is no other reasonable explanation for dismissal of a

---

[7/]   Defendants assert that plaintiff seeks forbearance for alleged mistakes because of her disability. A false claim or, at least, a Red Herring. Plaintiff's claim is that defendants failed to reasonably accommodate her disability, causing the incidents that they claim support her dismissal.

resident who achieved almost perfect evaluations, including fulfilling the "core competencies" and that defendants certified as graduated for advancement and licensure in the psychiatry profession.

In other words, there is substantial evidence that plaintiff succeeded despite defendants' failure to accommodate and properly supervise her training.  Despite her achievements in adverse circumstances, defendants dismissed her from the program. Actually, Dr. Green clearly rejected plaintiff's disability and his failure to reasonably accommodate it when he proclaimed that her conduct was unrelated to an illness, in spite of his belief that ADHD is an illness.  Their allegations were mere pretext for disability discrimination.

This same analysis applies to the retaliation claim.  Dr. Green was obviously annoyed, if not angered, by plaintiff's repeated requests for accommodations.  The evidence is found in his exclamation that plaintiff's conduct during periods when defendants failed to accommodate her disability were not related to an illness.

The motivation of the employer pertains to both claims.  *Solomon v. Southampton Union Free School District* (08-cv-4822, U.S.D.C.E.D.N.Y.9/1/11). *O'Diah v. Fischer*, 08-CV-941, U.S.D.C. (Cir 2 2/28/12).  Where an actor's motivation is at issue, the claims are not proper for summary disposition because in implies the actor's state of mind and his credibility.  This is especially true in employment discrimination actions.  *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 101 (CIR 2 2010).  Hence, summary judgment is used "sparingly" and "seldom granted in such cases." *Id.*

Here, defendants' motivation was spite.  In essence, Dr. Green was not inclined to accommodate plaintiff's disability because he was convinced that her disability was

unrelated to her conduct when defendants were not providing accommodations for her disability. He failed to communicate the existence of her ability to his lieutenants who were responsible for her training or to instruct them about the accommodations she requested. (SDMF ¶ 279).

Based on the evidence presented here, there is no justification for summary dismissal of the discrimination or retaliation claims.

Defendants argue that there is no evidence that plaintiff fulfilled her *prima facie* case of disability discrimination or retaliation.

A plaintiff alleging employment discrimination under the ADA or VFEPA bears the initial burden of establishing a *prima facie* case. *Albertelli v. Monroe County,* 09-CV-6039 U.S.D.C.W.D.N.Y, 5/22/12). (citations omitted). Plaintiff's disability claim is of the "failure to reasonably accommodate" variety, which requires that she demonstrate the following elements: (1) her employer is subject to the ADA; (2) she is an individual with a disability within the meaning of the ADA; (3) with or without reasonable accommodation, she could perform the essential functions of the job; and (4) the employer had notice of the employee's disability and failed to provide such accommodation. Once plaintiff establishes the elements of her *prima facie* case, the burden shifts to the defendants to prove that they dismissed plaintiff for legitimate, non-discriminatory reasons. If defendants surmount that requirement, the burden shifts back to plaintiff to establish that defendants rational was pretext for illegal discrimination. *Id.*

Here, defendants claim that there is no evidence of improper motivation in their dismissal of plaintiff. As noted above, defendants failed to accommodate plaintiff's disability for  lengthy periods during her training course. The failures to accommodate

caused plaintiff to experience difficulties that defendants interpreted as "irresponsible conduct." They purposefully ignored and/or rejected her accommodation requests. They claim they dismissed plaintiff for good cause. Actually, as the evidence demonstrates, they created the circumstances that permitted them to justify dismissal.

As Dr. Beck observed, defendants established a disruptive, deficient environment for plaintiff. "These failures, in my opinion, rise to the level of deliberate indifference to this resident's acknowledged need for accommodations." Dr. Green's assertion that he was holding plaintiff to a "higher standard" and his rejection of plaintiff's request for accommodations, also demonstrate his negative attitude in scuttling plaintiff's training experience. (SDMF ¶ 280).

The result was a violation of the anti-discrimination statute, VFEPA.

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *O'Diah, supra*. Defendants assert that there was no causal connection between plaintiff's disability and the dismissal.

To the contrary, the evidence demonstrates that the decision-maker, Ronald Green was so upset about plaintiff's requests for accommodations that he rejected her request for a written warranty of accommodations in her proposed remediation plan and he failed to communicate the need for accommodations for plaintiff to his lieutenants, her immediate supervisors. For example, Lambert testified that she was unaware of plaintiff's disability although she noted that plaintiff demonstrated a tendency to be disorganized. Even though Green was aware that plaintiff has ADHD, he denied it related in any way to her difficulties

with the training course.

Hence, the evidence demonstrates that plaintiff's disability was, at minimum, a substantial factor that caused Green to dismiss plaintiff. The result was a violation of anti-retaliation statute, VFEPA.

In sum, there is ample evidence that defendants' rationale for dismissing plaintiff was pretext for disability discrimination.

Defendant next argues that the statute of limitations precludes plaintiff's claim for non-economic damages. The assertion is based on the premise that plaintiff's action accrued in January, 2009 and that this action was filed on 3/7/12. Actually, plaintiff's first amended complaint containing a retaliation claim and assertions of non-economic damages was filed on 5/12/10, well within the three-year limitation.

Accordingly, there is no justification for summary dismissal of plaintiff's non-economic damages claim.

Defendants next assert that plaintiff's contract claims against Dartmouth-Hitchcock Clinic ("DHC") and Dartmouth Medical School/College ("DMS/C") because there was no contractual relationship between plaintiff and them.

The evidence demonstrates that these institutions are partners in "Dartmouth-Hitchcock:" DHC, MHMH, GSMD and DHMC.   Both DHC and GSMD are branches of MHMH and/or DHMC. Each of these entities acts in partnership with MHMH and DHMC. (SDMF ¶ 281).

As advertised, these institutions provides mutual personnel, faculty and administrative support for each other, acting in concert to provide medical and clinical education for medical students, residents and fellows. They actively support each other and

provide services to medical students, residents and fellows under the Graduate Medical Education office ("GME") at DHMC, including, formerly, to plaintiff. They hold themselves out as a cooperative partnership providing medical care for patients and training for medical students, residents and fellows.

DHMC and MHMH were parties to "The Resident/Fellow Agreement of Appointment" between them and plaintiff. (SDMF ¶ 282). MHMH supervisors issued DHC residency evaluations for plaintiff's training. Psychiatry residents' business cards include logos of Dartmouth College, the medical school and DHMC.   (SDMF ¶ 283).  The remediation plan was issued by Green in the name of DHMC.  The plan was incorporated into the agreement.  The Fair Hearing Committee that dismissed plaintiff was a DHMC entity located at MHMH.  (SDMF ¶ 284).

At minimum, each institution acted as agent of the other institutions in operating the residency program.   Employers are liable for the actions of their agents in an employment discrimination case.  *Kolstad v. American Dental Association*, 527 U.S. 526 (1999).

On the basis of the evidence, there is no justification for summarily dismissing DHC or GMD from this proceeding.  At minimum, there are ambiguities that warrant that the issue be decided by the trier- of- fact.  *Global Recycling Solutions, LLC v. Greenstar New Jersey, LLC* (No. 09-976-LPS, USDCDel, 9/28/11).

Defendant ask the Court to summarily dismiss the contract claims because they are based on term contracts containing no renewal provision or "just cause" requirement for non-renewal.

First, beyond doubt, defendants dismissed plaintiff from the residency for the causes

they expressed.  Where an employer dismisses an employee for cause it is the jury's responsibility to factually determine if cause actually existed.  *Gile v. JCPenney,* USDC VT, Case No. 5:09-cv-115.

Second, defendants' policies warrantee that they will not discriminate against employees with disabilities.  The policies also provide that defendants will reasonably accommodate employees with disabilities.  Those policies constitute implied employment contracts.  *Havill, supra.*  The evidence demonstrates that defendants breached the implied employment contract when they rejected plaintiff's requests for reasonable accommodations and failed to provide reasonable accommodations.

Finally, defendants seek summary dismissal of plaintiff's contract claim on the premise that the statutory anti-discrimination statute pre-empt common law discrimination claims and that they had a legal duty to comply with the statutes.

Defendants misconstrue plaintiff's breach of contract claim.  As described in her complaint, plaintiff's claim encompasses a broad range of defendants' failures to comply with the implied employment contract based on their written policies, agreements and promises, including failure to provide:

*        job security;

*        adequate educational and training experiences;

*        appropriate supervision and counseling;

*        reasonable accommodations to her disability;

*        a work environment conducive to performing as a resident physician; and

*        a safe, accommodating work environment free from harassment and unfair treatment.

These assertions are not contained in VFEPA.  Hence, there is no duplication of claims.  The statutory preemption of discrimination claims is unrelated to plaintiff's contract claim.

Terms of an institution's policies may become part of an implied contract between a student and the institution.  *Gally v. Columbia Univ.*, 22 F.Supp. 2d 199, 206-7.

Plaintiff alleges that defendants breached the implied employment contract based on defendants policies, procedures and discussions.  Even if the defendants had not misconstrued plaintiff's claim, the evidence supports the notion that there are genuine issues of material fact concerning the contract and defendants' breach of it.  Hence, the trier-of-fact must address the matter.

In a footnote, defendants assert that plaintiff's claim for breach of the implied covenant of good faith and fair dealing should be summarily dismissed because she failed to identify facts that are distinct from the contract claim to support the covenant claim.

Defendants' misconstrue plaintiff's claim.  Her complaint delineates assertions that are not contained in her breach of contract claim, to wit, falsely accusing her of:

*        conduct that endangered patient care;

*        unfairly loaded extra work on other resident physicians;

*        failing to fulfill her work obligations; and

*        misconduct and incompetence based on events that did not occur as defendant portrayed them.

There is no allegation that plaintiff lacks evidence of a breach of  the covenant and that defendants' actions violated the common standards of decency, fairness and reasonableness or the parties agreed-upon common purposes and justified expectations.

Defendants do not challenge the substance of these claims or the assertion of a breach of the covenant. As these accusations are distinct from those expressed in the contract claim, there is no justification for summarily dismissing the claim.

### Summary Judgment Standard

Summary judgment is proper only if the record shows "no genuine dispute as to any material fact" such that the moving party "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). *Dubeau, supra.* The moving party has the burden to demonstrate that there are no genuine issues of material fact. The Court must afford the non-moving party all reasonable doubts and inferences. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

Where an actor's motivation is at issue, the claims are not proper for summary disposition because it implies the actor's state of mind and his credibility. This is especially true in employment discrimination actions. *Gorzynski v. Jetblue Airways Corp.,* 596 F.3d 93, 101 (CIR 2 2010). Hence, summary judgment is used "sparingly" and "seldom granted in such cases. *Id.*

Ultimately, plaintiff satisfied all of the "core competencies" that the ACGME requires of residents to become a psychiatrist, including in defendants' program.

### Conclusion

For the foregoing reasons, plaintiff urges the Court to deny defendants' motion.

DATED:     January 15, 2013  .                    JENNIFER A. CONNORS


                                                  /s/Norman E. Watts
                                                 Norman E. Watts
                                                 Plaintiff's Counsel