# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

| | |
|---|---|
| **JENNIFER A. CONNORS,** | &#124; |
| | &#124; |
| **PLAINTIFF** | &#124; |
| **v.** | &#124; **Case: 2:10-cv-94-wks** |
| | &#124; **Case: 2:12-cv-51** |
| **DARTMOUTH HITCHCOCK MEDICAL** | &#124; |
| **CENTER, DARTMOUTH MEDICAL SCHOOL,** | &#124; |
| **MARY HITCHCOCK MEMORIAL HOSPITAL,** | &#124; |
| **DARTMOUTH-HITCHCOCK CLINIC and** | &#124; |
| **TRUSTEES OF DARTMOUTH COLLEGE,** | &#124; |
| | &#124; |
| **DEFENDANTS** | &#124; |

### _PLAINTIFF'S STATEMENT OF GENUINE DISPUTED MATERIAL FACTS FOR TRIAL_

[PLEASE NOTE: Plaintiff first responds to Defendants' Statement of Undisputed Material Facts, in sequential order, followed by plaintiff's additional genuine issues of material facts for trial.]

1. Admit.

2. Admit.

3. Calls for legal conclusion and does not require a factual response.

4. Admit the paragraph accurately quotes the exhibit.

5. Admit.

6. Admit the paragraph accurately quotes the exhibit.

7. Calls for legal conclusion and does not require a factual response.

8. Admit the paragraph accurately quotes the exhibit.

9. Calls for legal conclusion and does not require a factual response.

10. Admit the paragraph accurately quotes the exhibit.

11. Calls for legal conclusion and does not require a factual response.

12. Admit Mary Hitchcock Memorial Hospital is a teaching hospital but to the extent the

paragraph attempts to limit liability of other defendants the paragraph is denied. Please refer to ¶¶ 281-284 below.

13.   Admit.

14.   Admit.

15.   Admit, but to the extend the paragraph attempts to limit liability of itself and/or other defendants the paragraph is denied.  Please refer to ¶¶ 281-284 below.

16.   Admit, but to the extend the paragraph attempts to limit liability of itself and/or other defendants the paragraph is denied.  Please refer to ¶¶ 281-284 below.

17.   Admit, but to the extend the paragraph attempts to limit liability of itself and/or other defendants the paragraph is denied.  Please refer to ¶¶ 281-284 below.

18.   Denied.  Please refer to ¶¶ 281-284 below.

19.   Admit, but to the extend the paragraph attempts to limit liability of itself and/or other defendants the paragraph is denied.  Please refer to ¶¶ 281-284 below.

20.   Denied as characterized.  Please refer to ¶¶ 281-284 below.

21.   Denied as characterized.  Please refer to ¶¶ 281-284 below.

22.   Calls for legal conclusion and does not require a factual response.

23.   Calls for legal conclusion and does not require a factual response.

24.   Calls for a legal conclusion and does not require a factual response.

25.   Calls for a legal conclusion and does not require a factual response.

26.   Calls for a legal conclusion and does not require a factual response.

27.   Admit.

28.   Calls for a legal conclusion and does not require a factual response.

29.   Admit, but to the extend the paragraph attempts to limit liability of itself and/or other defendants the paragraph is denied.  Please refer to ¶¶ 281-284 below.

30.   Admit.

31.   Admit, but to the extend the paragraph attempts to limit liability of itself and/or other defendants the paragraph is denied.  Please refer to ¶¶ 281-284 below.

32.   Admit .

33.   Admit.

34.   The characterization of "yearly" is denied; otherwise admit plaintiff signed multiple residency agreements during her tenure with defendants.

35.   Admit the paragraph accurately quotes the exhibit.

36.   Admit.

37.   Admit plaintiff requested testing accommodations; denied it is the only accommodation she requested.  Please refer to ¶¶ 172-173, 186 below.

38.   Admit.

39.   Admit.

40.   Admit.

41.   Admit.

42.   Admit.

43.   Admit the paragraph accurately quotes the exhibit.

44.   Admit.

45.   Admit.

46.   Admit.

47.   Denied as characterized.

48.   Admit the paragraph accurately quotes the exhibit.

49.   Admit.

50.   Admit exhibit includes a written notice provision; denied defendants' complied with

the provision.

51.     Admit the paragraph accurately quotes the exhibits.

52.     Admit.

53.     Admit.

54.     Admit the paragraph accurately quotes the exhibit.  Denied defendants provided supervision as contemplated by the exhibit, the case law quoted and ACGME requirements.  Please refer to ¶¶ 190, 200 and 217 below.

55.     Admit the paragraph accurately quotes the testimony but characterization is denied. Please refer to ¶ 248 below.

56.     Admit.

57.     Denied.  Please refer to plaintiff's additional statements of fact below.

58.     Denied as characterized.  Please refer to plaintiff's additional statements of fact below.

59.     Admit the paragraph accurately identifies the exhibit and attachments as listed; the accuracy of the information and characterizations in the documents is denied. Please refer to plaintiff's additional statements of fact below.

60.     Admit.

61.     Admit the paragraph accurately identifies the exhibit.

62.     Admit plaintiff was assigned to training at the facility identified during "early 2007."

63.     Admit.

64.     Admit.

65.     Admit the paragraph accurately identifies the exhibit.  The accuracy of the information and characterizations in the document is denied.  Please refer to plaintiff's additional statements of fact below.

66.  Admit the paragraph accurately identifies one of plaintiff's assigned supervisors during the time period; the characterization of "supervised" is denied.  Please refer to plaintiff's additional statements of fact ¶ 217 below.

67.  Denied as characterized. Dr. Schwarz testified he was "never notified" of plaintiff's diagnosis and "did not perform any psychiatric evaluation that would lead [him] to that conclusion." He did not testify he was unaware.

68.  Denied as characterized. Please refer to ¶¶ 226-228 below.

69.  Denied as characterized.  Please refer to ¶¶ 226-228 below.

70.  Admit.

71.  Admit the paragraph accurately quotes witness testimony.

72.  Denied as characterized.  Please refer to ¶¶ 236-239 below.

73.  Admit.

74.  Denied.  Please refer to ¶¶ 243-248 below.

75.  Admit.

76.  Denied as characterized. Dr. Schwartz did not testify "the patient told him" personally; he provided an interpretation of his email.   Please refer to ¶¶ 243-248 below.

77.  Denied as characterized.  Please refer to ¶¶ 243-248 below.

78.  Denied as characterized.  Please refer to ¶¶ 243-248 below.

79.  Denied as characterized.  Please refer to ¶¶ 243-248 below.

80.  Admit.

81.  Denied as characterized.  Please refer to ¶¶ 245 and 248 below.

82.  Denied as characterized.  Please refer to ¶¶ 243-248 below.

83.  Admit the paragraph accurately quotes witness testimony.  The characterization is

denied.

84. Denied as characterized.  Please refer to ¶¶ 243-248 below.

85. Admit the paragraph accurately quotes witness testimony.  The accuracy of the statement is denied.  Please refer to ¶¶ 243-248 below.

86. Admit.

87. Admit the paragraph accurately quotes witness testimony.  The accuracy of the statement is denied.  Please refer to ¶¶ 243-248 below.

88. Admit.

89. To the extend the paragraph attributes the quotation to Mr. Kelliher, the paragraph and the characterization is denied.  The full quotation is contained in the cited Exhibit K, a memorandum drafted by Dr. Green.  Dr. Green referenced the "mounting incidents" and went on to say "[he] elected to suspend."

90. The characterization and citation of "raise concerns for him" is denied; the rest of the paragraph is admitted.

91. Denied as characterized.

92. Admit the document was one of several drafts of a remediation plan.

93. Admit.

94. Denied as characterized.

95. Denied as characterized.  The paragraph misquotes the testimony and intermingles sections of testimony.

96. The characterization is denied.

97. Admit the paragraph accurately reflects the statement; the truth of the statement is denied.  Please refer to ¶¶ 252-253 below.

98. Admit.

99.     The characterization is denied.

100.    Admit.

101.    Admit.

102.    Admit the paragraph accurately quotes the document.

103.    Admit the paragraph accurately quotes the document.

104.    Admit.

105.    Admit the paragraph accurately quotes the document.

106.    Admit the paragraph accurately quotes the document.

107.    Admit the paragraph accurately quotes the document.

108.    Admit.

109.    Admit.

110.    Admit the paragraph accurately quotes portions of the document.

111.    Admit.

112.    Admit.

113.    Admit.

114.    Denied as characterized.

115.    Denied.  Please refer to ¶¶ 200 and 204 below.

116.    Denied as characterized.  Please refer to ¶¶ 204, 255-265.

117.    Denied as characterized.  Please refer to ¶¶ 256-258 below.

118.    Admit the paragraph accurately reflects the testimony.

119.    Denied as characterized.  Please refer to ¶¶ 256-258 below.

120.    The characterization is denied.

121.    Admit the paragraph accurately quotes the testimony.  But please refer to ¶ 256 below.

122.   Denied as characterized.  Please refer to ¶¶ 263-268 below.

123.   Denied as characterized.

124.   Denied.  Please refer to ¶¶ 255, 258 below.

125.   Admit.

126.   Denied.  Please refer to ¶ 258 below.

127.   Admit

128.   Admit the paragraph accurately reflects content of exhibit.  Otherwise denied.

129.   Admit the paragraph accurately reflects testimony.  Otherwise denied.

130.   The characterization is denied.  Please refer to ¶¶ 204-206 below.

131.   The characterization is denied.  Please refer to ¶¶ 263-265 below.

132.   Denied.  Please refer to ¶ 265 below.

133.   Denied. Please refer to  ¶ 266 below.

134.   Admit the paragraph accurately reflects language of exhibit.  Otherwise denied.

135.   Denied.  Please refer to ¶¶ 529-262 below.

136.   The characterization is denied.

137.   Admit the paragraph accurately reflects testimony.  Otherwise denied.  Please refer
       to ¶¶ 261-262 below.

138.   The accuracy of the statement attributed to plaintiff is denied.  Please refer to ¶ 261
       below.

139.   Admit.

140.   Admit the paragraph accurately quotes the testimony.  Otherwise denied.

141.   Admit the paragraph accurately reflects content of email.  But please see ¶ 272
       below.

142.   Admit the paragraph accurately reflects testimony.  Otherwise denied.

143.  Admit the three met.  To the extent the paragraph asserts plaintiff received documentation of any complaints, including a copy of the exhibit on that date, denied. She did not receive a copy of the exhibit until January 28, 2009 when she again met with Dr. Green.

144.  Admit Dr. Green and/or Dr. Watts read plaintiff purported emails during meeting.

145.  Denied as characterized.

146.  Denied as characterized.  Please refer to ¶ 272 below.

147.  Admit they were reasons given for dismissal; denied they were the true reasons.

148.  Admit.

149.  Admit.

150.  Admit.

151.  The characterization is denied.

152.  Plaintiff lacks sufficient knowledge to admit or deny.

153.  Admit the paragraph accurately reflects testimony.  Otherwise denied.

154.  Admit.

155.  Admit.

156.  Admit.

157.  Admit accurately reflects language in document.  Otherwise denied.

158.  Admit accurately reflects language in documents.  Otherwise denied.

159.  Admit accurately reflect language in documents.  Otherwise denied.

160.  Admit.

161.  Admit plaintiff's last working day was in April 2009.

162.  Admit.

163.  Admit.

164.    Admit.

165.    Admit.

166.    Admit.

167.    Admit.

168.    Admit.

169.    Admit.

170.    Admit.

171.    Denied.  Please refer to ¶¶ 184-187, 190-195, 200-201, 204, 212-215, 224, 239, 249-254, 269, 275-276, and 279-280.

### *Plaintiff's Additional Statements of Genuine Disputed Material Facts for Trial*

172.    Defendants acknowledged that Dr. Connors is a individual with a disability known as ADHD.  Dr. David McKay, a psychiatrist at the University of Vermont, diagnosed her in 2003.   Dr. Paul Whitehead reaffirmed in 2006.  (Exhibit 1, 3/16/06 Whitehead Correspondence, Bates 1922-1923).

173.    Plaintiff demonstrated academic and professional success when provided with reasonable accommodations for the disability.  At Utah, for example, she sought and was granted appropriate treatment with psychotherapy and medication.  *Id.*

174.    Dr. Connors graduated from medical school in 2003.  She then completed a pediatric residency at the University of Utah Medical School where she was employed from 2003-2006. (Exhibit 2, UVM Diploma, Bates 137 and Utah Residency Certificate, Bates 160).

175.    Dr. Connors entered a second residency program in psychiatry at DHMC where defendant employed her from June 2006 until July 2009. (Exhibit 3, NHES CONNORS 000053).

176. She intended to become a triple-boarded physician in Pediatrics, General and Child/Adolescent Psychiatry. (Exhibit 4, Connors Affidavit ¶ 3; Exhibit 5, Connors Deposition, p. 12).

177. General psychiatry residency is a four-year training program. By the time she completed her training at DHMC, she had met the ACGME and ABPN requirements for board eligibility. (Exhibit 6, Green Certifications/Recommendations, Bates Connors 000103-05 and 000335-37).

178. In 2009, defendants dismissed Dr. Connors from their psychiatry residency program, claiming that she engaged in "irresponsible and unprofessional behavior." (Exhibit 7, 1/28/09 Correspondence).

179. Despite the allegation, the psychiatry program director, Dr. Ronald Green later wrote a letter of recommendation for plaintiff to complete her psychiatry residency at another institution and for licensure as a physician. He averred:

> As for Dr. Connors' attributes, I worked with her, one to one, for several months (During her PGY3) in our psychopharmacology clinic. I find her to be a bright, caring and dedicated physician with a strong work ethic. She is as well an eager learner. She showed improvement in her time management skills during the time in my clinic and throughout her residency. She responded appropriately to my feedback and overall Dr. Connors is committed to providing her patients with excellent care. She cares for and about her patients. She tailored to their needs. One example was a patient with definite ADHD who was however resistant to pharmacologic treatment. She approached him with great patience, educating him about ADHD and its treatment and providing recommended reading. He eventually agreed to a stimulant trial and was very pleased, as were we, with his excellent response. I support her licensure to practice in Vermont.

(Exhibit 6 @ Connors 000335).

180. Dr. Green attached a note to the letter of recommendation in which he reviewed plaintiff's history with defendants, asserted that there were negative reports about

her but that "There were no academic issues raised at anytime." (Exhibit 6).

181.  Dr. Connors completed her general psychiatry residency at the University of Vermont Fletcher Allen Medical Center in 2011.   The Vermont Board of Medical Practice concurrently issued her a training license and a full, unrestricted physician license to practice medicine in Vermont.  Subsequently, she has served as a licensed psychiatrist for the state of Vermont as well as private health care providers, treating patients with severe and persistent mental illness throughout Vermont. (Exhibit 8, 3/22/11 Bahtra Correspondence; Exhibit 4, ¶ 4).

182.  Dr. James C. Beck is an experienced and respected psychiatrist and professor of psychiatry at Harvard Medical School.  The American Board of Forensic Psychiatry, the state of Massachusetts and the American Board of Psychiatry & Neurology license Dr. Beck.  He has over 35 years of experience as a clinical,  teaching and forensic psychiatrist in Harvard psychiatry teaching programs at Cambridge Hospital, Massachusetts Mental Health Center, including its affiliates and Massachusetts General Hospital.  As a faculty member, he evaluated over 100 residents in a wide variety of academic settings.  His *curriculum vitae* is attached as Exhibit 9.

183.  Defendant's insurance carrier filed with the New Hampshire Employment Security Department, pursuant to that state's law, a notice of "irrevocable waiver" of its right to oppose plaintiff's claim for unemployment.  The notice  specified – without any conditions – that plaintiff was their employee from June, 2006 until June, 2009, and that defendant Mary Hitchcock Memorial Hospital Inc. was her employer. (Exhibit 3).

184.  But for a significant period of time during her residency, defendants' failed to

reasonably accommodate plaintiff's disability. Most notably, she endured random

facilities, including use of a common computer room with coffee machine for all staff

to use, for four months in 2008. (Exhibit 4, ¶ 5). [1]

185.   Dr. Beck opined that:

> "Dr. Connors was not provided with sufficient accommodations for her ADD in that she was not always provided with an office of her own during rotations at the Veterans Administration Hospital and at Dartmouth-Hitchcock.  She was required to sit in an alcove with a small desk and a coffee pot and a refrigerator that were used by VA staff.  At Dartmouth-Hitchcock, she was also relegated to common staff kitchen areas.  Once assigned an office, Dr. Connors' work at Dartmouth was further affected by frequent office reassignments (an moves), and her performance at both sites would be disrupted by the program's delay of her office key, telephone, voice mail, computer, security, etc.  These failures, in my opinion, rise to the level of deliberate indifference to this resident's acknowledged need for accommodations."
> (Exhibit 11, Beck report p. 2).

186.   The accommodations that plaintiff requested were:

   *      extended time for taking examinations;
   *      a quiet area in which to prepare clinical notes and interview/treat
          patients; and
   *      the ability to acquire medication and treatment for her disability.

   (Exhibit 12, Sateia Email)

187.   With accommodations, plaintiff improved on note completion.  (Exhibit 13, West

Evaluation, Bates 218-220).

188.    Dr. Green "found her to be an excellent psychiatry resident" in his direct observation

of her work.  (Exhibit 14, Bates 683-684).

189.   He acknowledged that she "worked hard and successfully to overcome some of the

---

[1]        In their memorandum (p. 14) defendants falsely claim that they assigned her a private office "shortly after they re-assigned her to the VAH in 2007."  The chronology is described in a series of emails.  (Exhibit 10).

stresses involved.... I look forward to her continued success and am delighted she is in our program." *Id.*

190.    During several periods of plaintiff's training, defendants failed and/or refused to provide the accommodations.  For example, in the winter of 2006, Dr. Schwartz, her supervisor at the VAH ordered plaintiff not to leave the VA campus in order to acquire medication or undergo any therapy.   Her medication supply became exhausted.    She was forced to continue training without the medication for managing her symptoms.   The result was that the ADHD symptoms emerged, including:

*         difficulty organizing her time and assignments;

*         distractibility,

*         diminished listening skills;

*         difficulty with time management;

*         difficulty starting and prioritizing tasks.

(Exhibit 4, ¶ 6).

191.    During the leave period, plaintiff received no training.   The parties met about a "remediation plan" that would define the conditions of plaintiff's return to the program. Plaintiff requested that the plan reflect the fact that she has a disability and the potential impact without accommodations.    That is, the plan "will reflect appropriately the willingness to acknowledge educate, communicate and accommodate Dr. Connors learning differences toward her success." The point was to "enhance the environment of medical education and training for Dr. Connors, and the whole of DHMC."  Further:

> If either Dr. Connors or DHMC Program and Graduate

> Medical Education Administrators fail to make a 'Good Faith Effort,' accept/provide reasonable accommodations under the ADA or abide/achieve goals by the Remediation Plan, the consequence of such may result in Formal Probation, Grievance/Arbitration, Notification of the NH Medical Board and possible Dismissal, or Voluntary yet Permanent Leave.

(Exhibit 15, Bates 296-302).

192.  Defendants rejected plaintiff's proposal in favor of their plan. "The rules need to be followed at once" was defendants' mantra for the remediation period. They exhibited no compassion or recognition of plaintiff's disability. (Exhibit 16, Bates 727-28, Connors 000234-000235).

193.  They refused to declare the rules and expectations other than to hold her to a "higher standard that other residents." (Exhibit 4, ¶ 7).

194.  During the "negotiations" defendants insisted that plaintiff "admit her culpability" in her alleged clinical performance and conduct deficiencies. (Exhibit 17). [2]/

195.  Although defendants permitted plaintiff to continue under their dictated terms, the plan defined no accommodations for her. Green's view was that her alleged deficiencies were "irresponsibility, not illness" even though he acknowledged that ADHD is an illness. (Exhibit 18, Connors 000101; Exhibit 19, Green Deposition @ 97:14).

196.  In September 2007, plaintiff returned to the program to complete her training, defendants assigned her to the New Hampshire State Hospital. There, her supervisor accommodated her disability needs in the form of a quiet area in which to prepare clinical notes and interview/treat patients and the ability to acquire medication and

---

[2]/      Exhibit 17 purports to be a note to plaintiff's file, dated September 8, 2008. Plaintiff disputes the accuracy of the date and believes it is labeled with the year "2008" inaccurately. The memo also incorrectly identifies plaintiff's "reentry" into program on September 17, 2008. Plaintiff believes both dates should be 2007 and are meant to reflect Dr. Green's interpretation of her "reentry" to the program at NHH which occurred in September 2007.

treatment for her disability.  As a result, plaintiff's symptoms and her difficulties with the program diminished. She satisfied the "Core Competencies to advance from the second year of residency to the third.  (Exhibit 6)

197.    Plaintiff performed well at NHH.  There were no performance issues.  (Exhibit 20, Bates 785, 787-788).

198.    In contrast with her reception at NHH, in the wake of her success, Green described her as a "completely negative package" and demanded that upon her return to VAH in January 2008, she apologize to the other residents and select faculty for causing "disruption" in the program.  He accused her for not "taking responsibility" for her actions.  (Exhibit 4, ¶ 8; Exhibit 21, Bates 000913).

199.    He reassigned plaintiff to the VAH with a threat that should her "irresponsible behavior" recur, she would be immediately terminated.  *Id.*

200.    Defendants had assigned plaintiff to a semi-public social/work area that included a coffee machine and a staff computer.  Defendants again claimed that plaintiff became tardy in submitting clinical notes. (Exhibit 22, Compiled Emails @ Bates 817).

201.    Dr. James Beck noted that "the difficulties the Department [of psychiatry] complained about with respect to Dr. Connors occurred in the context of some fundamental failures on their part to provide a reasonable training experience on the one hand and appropriate accommodations for a resident with ADD on the other hand." (Exhibit 11, p. 11)

202.    She earned positive evaluations from her supervisors – including the program director, Dr. Green.  (Exhibit 11, P. 2)

203.    The documentation demonstrates that plaintiff's clinical notes were not tardy at any

time that defendants accommodated her disability and that she met VAH guidelines. (Exhibit 23, Bates 1304).

204.  Defendants finally provided plaintiff with an office at the VAH – in May, 2008 although she did not receive her own key to the office until June. But, prior to that, Green and Watts ambushed plaintiff with an exaggerated complaint concerning her participation in supervision.  Green promised documentation, but produced none. (Exhibit 10 @ 1337; Exhibit 4, ¶ 10; Exhibit 24, Connors 000167).  512-000513).

205.  From May until November, her evaluations were positive.  Green acknowledged her success, but his intent to dismiss plaintiff had re-emerged.  (Exhibit 24; Exhibit 25, Bates 3119).

206.  In November 2008, Green solicited reports. Green and Watts ambushed plaintiff again with the exaggerated supervision issue, read her the solicited email responses and forced her to submit to another Fitness for Duty evaluation.  (Exhibit 24; Exhibit 25, Bates 3119; Exhibit 26, Connors 000441-000442, 000512-000513, Bates 824).

207.  During January-June, 2008, Dr. Green directly supervised plaintiff in his psychopharmacology clinic.   He found that plaintiff's performance met the program's expectations, particularly praising her for excellent patient care.  He noted that she responded well to feedback concerning time efficiency.  (Exhibit 27, Bates 349-353 @ 353).

208.  In his "semi-annual evaluation", in March 2008, Dr. Green found that plaintiff's conduct was "in a fully professional manner" and that she was meeting the program's "clinical and administrative expectations."  (Exhibit 28, Bates 284).

209.  Despite his wish to dismiss plaintiff, in November 2008, Dr. Green expressed further reassurances to plaintiff and support for her license and a child psychiatry fellowship

– "just like any other resident." (Exhibit 29, Bates 813).

210.   Green informed plaintiff that some faculty members had complained about her conduct – events that had occurred previously.  (Exhibit 26).

211.   He contended that plaintiff engaged in "inappropriate behavior and judgment" and suggested that she might be "psychiatrically ill."  (Exhibit 26 @ 442).  He ordered her to undergo a "fitness for duty" evaluation.  He also ordered her to remain on full duty, treating patients.  He averred that she was not a risk to patients.  (Exhibit 26 @ Connors 000442 and Bates 824).  Plaintiff passed the evaluation. (Exhibit 30, Connors 000516-000517.)

212.   Not only did defendants fail to reasonably accommodate plaintiff's disability, their misleading, unsubstantiated and exaggerated criticisms aggravated it.  (Exhibit 4, ¶ 11).

213.   Dr. Green was fully aware of plaintiff's disability.  (Exhibit 19 @ 55:22-56:2; 58:25-59:13).

214.   But Green disregarded plaintiff's disability.  He thought so little of plaintiff's disability and its impact on her abilities when untreated and not medicated that he failed to communicate her status or to urge accommodations – principally medication, treatment and a quiet place to work – to his lieutenants, plaintiff's supervisors.  Green failed to recognize that when plaintiff was accommodated, she performed well; when she was not accommodated, questions were raised, rightly or wrongly, about her performance.  (*Id.* @ 107:4-8).

215.   The result was that there were many months when she was denied those basic accommodations to enable her to succeed.  "Serious underlying problems ha[d] also inhibited her success" because of defendants bias against plaintiff. (Exhibit 31, Bates

1937-1940 @ 1940).

216.  Defendants' Residency Training Program implements the guidelines and defines the training structure in which "faculty and residents [are] working in tandem on every service ... [so that] both the patient and the educational process is better served because residents are able to model themselves after examples set by experienced faculty clinicians." (Exhibit 32, Residency Training Program in Adult Psychiatry, - pp. 3-4).

217.  The chair of the psychiatry department affirmed that "Our faculty is distinguished and, most important, is accessible to our trainees.  This closeness forms the core of the Dartmouth education." (*Id.* @ 4).

The guidelines specify the following categories of training supervision:

*      In-House Supervision.   "On all rotations each resident has a staff psychiatrist clinical supervisor" on a daily basis and meets with the resident weekly for one hour of one-on-one formal supervision – for every residency year.

Plaintiff's Training:   No supervisor was assigned to Dr. Connors VAH-Addiction rotation, 11/14-12/11/06. (Exhibit 33, Block Schedules and Clinical Activities by PGY @  2180). From  12/06-1/08 and 2/07-3/07, defendants failed to provide the prescribed supervision during plaintiff's inpatient blocks at VAH.  For example, Schwartz never provided one-hour per week supervision at this level for plaintiff during the spring of 2007.

*      Interviewing Mentor.  Patient evaluations prescribed for two hours every-other-week.

Plaintiff's Training:  Defendants never provided the prescribed supervision for plaintiff.

\* <u>Psychodynamic Psychotherapy Supervision</u>. For PGY2, 3, 4 residents - a weekly one-to-one hour meetings in subjects.

<u>Plaintiff's Training</u>: Defendants provided only one such supervisor during plaintiff's residency - David Lord, PdD - during 4/4/08 - 2/24/09 at the VAH. Dr. Lambert was plaintiff's administrative supervisor at the VAH and her clinical supervisor for psychopharmacology patients only.

\* <u>Psychopharmacology Clinic Supervision</u>. For PGY 2,3,4 residents in several clinics perform evaluations for psychopharmacologic treatment <u>in</u> <u>concert</u> <u>with</u> a psychiatrist supervisor including weekly lectures on the subject.

<u>Plaintiff's Training</u>: At VAH, Dr. Watts supervised plaintiff sporadically during 6/06 - 3/07. As attached chart (Exhibit 34, Bates 2326 "J. Connor's Psychopharm Clinic,") demonstrates, there were many times when plaintiff was assigned no patients and received no supervision. The second attached chart (Exhibit 35, Bates 2327, "Psychopharmacology New Evaluations (Intake) Slot,") demonstrates that while supervising plaintiff, 1/7/08 - 1/7/09, Lambert was not present for 1 out of 4 arrived new intake evaluations. During 1/77/08 - 2/24/09 defendants provided various supervisors for plaintiff, at plaintiff's urging, fulfilling the program supervision requirement.

\* <u>Child & Adolescent Psychiatry Supervision</u>. For PGY 3 residents - Weekly one-hour supervision.

<u>Plaintiff's Training</u>: From 1/08 through 2/27/09, defendants provided two different supervisors who met weekly for group clinical supervision with plaintiff and other residents to fulfill the supervision requirement.

\* <u>Cognitive Behavioral Psychotherapy Supervision</u>. For PGY 3 & 4 residents - "Hands-

on" training - supervision not specifically defined.

Plaintiff's Training: During the training period, defendants provided a supervisor who was available to plaintiff half of the time.

\*     Administrative Supervision - The training director must provide biennial reviews twice per year. "The program must provide each resident with documented semiannual evaluation of performance and feedback." (Exhibit 36, ACGME Program Requirements, pg. 27).

Plaintiff's Training: Defendants failed to provide plaintiff the required semiannual and documented reviews.

The purpose is to formalize promotion and achievement of core competencies according to ACGME requirements.  (Exhibit 32,  pp. 52-3).

218.     The supervisory deficiency contributed to what Dr. Green described as occasional "lapses" in plaintiff's performance.  (Exhibit 19 @ 113:16-18, 114: 2).

219.     Dr. West, who supervised plaintiff at DHMC noted that she "benefitted from having a quiet place to work without distractions."  (Exhibit 13 @ Bates 212).

220.     Dr. Green also noted that, under those circumstances, plaintiff was "an excellent psychiatry resident" and noted that "she is making progress" and "great strides."(Exhibit 14 @ Bates 683).

221.     Dr. West also noted that plaintiff "accepts supervision well and seeks it out." (Exhibit 13 @ Bates 231).

222.     Dr. Coursin commented that plaintiff was "open to feedback and learning." ( Exhibit 37, Bates 262).

223.     Dr. Lambert observed that plaintiff "readily accepts supervision," "frequently seeks feedback on ways to improve" and continues to respond well to feedback." (Exhibit

38, Lambert Evaluations@ Bates  276, 279, 288).

224.    During the two episodes where supervisors criticized plaintiff for late note submissions, spring of 2006 and 2007, plaintiff had no ADHD medications or therapy and/or no quiet place to work without distractions – both occurring at the VAH.  (Exhibit 4, ¶ 12).

225.    On the contrary, when she was accommodated and experienced adequate supervision and solid teaching, she "improved greatly in ability to keep up with paperwork and have things done on time without being overwhelmed." (Exhibit 13 @ Bates 220).

226.    Defendants' memorandum (p.9) asserts that one of plaintiff's occasional supervisors, Dr. Schwartz, expressed concerns about plaintiff's performance and provided a list to plaintiff in the spring of 2007.  But Dr. Schwartz, in deposition testimony, disavowed most of the items on the two "lists" that were presented to him.   He testified that most of the items on the first list were added by someone else.  He refused to verify that either document was his creation, noting that neither was signed by anyone.  He believed he expressed concerns to plaintiff but could not recall the situation.  (Exhibit 39, Schwartz Deposition @  12-13, citing the deposition exhibit 1).

227.    Dr. Schwartz testified that the documents outlined "things that need to happen on the inpatient unit and things that shouldn't happen on the inpatient unit." (Exhibit 39 @ p. 17).

228.    Regarding untimely clinical notes, Schwartz had no recall of occasion when JC exceeded time limitation for completing notes. *Id*.

229.    Dr. Green asserted that he documented additional VAH complaints against plaintiff

in a 12/28/06 memorandum.  No such memorandum is in the record.  (Exhibit 40, Green 3/10/07).

230. Actually, plaintiff's overall record of timeliness was recorded in defendants' "Clinician Baseline Clinical Hours" record.  During the 2008-2009 term, plaintiff's clinical note completion was 100%.  (Exhibit 41, Bates 1276).

231. During the same period, other residents were frequently late in submitting clinical notes.  (Exhibit 42, Bates 1153- 1154).

232. None of the residents in the record were dismissed from the program.  (Exhibit 4, ¶ 13).

233. When Dr. Lambert, plaintiff's VAH administrative supervisor, reported to Dr. Green that plaintiff's notes were "getting later and later," Dr. Corson denied the allegation. (Exhibit 22 @ Bates 819).

234. And, the record demonstrates that plaintiff's notes were not late - 93% were submitted on the same day as the patient event; 75% within the hour of the event. (Exhibit 41).

235. The Acting Chief of the Health Information Management certified that all of plaintiff's notes were completed within VAH guidelines from 6/26/06 to 4/10/09, virtually her entire training period.  (Exhibit 23).

236. Dr. Brooks complained that plaintiff argued with her about a diagnosis and prepared a patient's treatment plan without consulting her.  (Exhibit 43, Bates 1048-1049). She reported her "feeling" that plaintiff argued with her to Dr. Green but failed to discuss the matters with plaintiff.  Dr. Brooks either failed to recognize a teaching moment or dismissed the events as unimportant – until Dr. Green inquired about issues concerning plaintiff.

237.  The Brooks allegations were false.  Plaintiff complied with Brooks' request that her treatment plan be implemented.   Brooks also criticized plaintiff for verifying a Brooks treatment plan with the medicine department.  Later, for a different patient, Brooks suggested that plaintiff verify a medication with the medicine department. (Exhibit 4, ¶ 14).

238.  Concerning the complaint that plaintiff was argumentative, previous training supervisors had encouraged her to be an "aggressive learner by challenging her preceptors" of diagnoses, presentations and therapies.  (Exhibit 44 @ Bates 495).

239.  On one occasion when plaintiff requested accommodations, he informed her that he held her to a "higher standard" than other residents in the matter of timeliness of clinical notes and accused her of seeking the accommodation of being perpetually late.  (Exhibit 4, ¶ 15).

240.  Defendants' allegation about plaintiff not being available on call is based on her first "pager call" duty (as distinguished from "in-house call").  She had not received orientation in the inpatient unit and was not familiar with the call duty expectations. She was not yet incorporated into the VAH call system.  She previously notified her supervisors that she may not be immediately available to respond to pages because she resided in an area lacking cellular telephone service.  Her supervisor at the time indicated that it would not be a problem. (Exhibit 4, ¶ 16).

241.  There is no requirement that a resident be immediately available on "pager call." (Exhibit 36 @ p. 32).

242.  Regarding the timing issue, Dr. Schwartz testified in deposition that he was unaware of a time limit for completing clinical notes.  (Exhibit 39 @ pp.  18 & 23).

243.  Concerning the physical examination issue, another resident admitted the patient

and did not note a diagnosis or possible diagnosis of thrombophlebitis; the reason for admission was unclear. Plaintiff and Dr. Schwartz examined the patient the next morning. (Exhibit 4, ¶ 17).

244. Among other things, the patient presented with a superficial leg issue. Schwartz instructed plaintiff to examine the leg – not at that time but later. It appeared that the leg complaint was not urgent. Later, Schwartz decided that it would be most appropriate for the medical team to address the leg issue - that is, whether the patient had thrombophlebitis. (Exhibit 5 @ 206).

245. Schwartz subsequently permitted plaintiff to write orders and start the history and a physical examination. Plaintiff entered a scripted evaluation and completed the clinical note to the assessment/plan sections and completed a partial physical examination, except for the heart and lungs. Early the next morning, plaintiff electronically, by mistake, clicked and signed the note before completing the examination. En route to complete the examination, she informed Schwartz, indicating that she would complete the examination before he could co-sign the note. (*Id.* @ 192:15-20).

246. Plaintiff completed the physical examination; her findings were within the normal, as she had entered the previous day. (*Id.*).

247. It should be noted that at the time of these events, defendants had prevented plaintiff from retrieving her disability medication until very recently; she had just restarted it. Dr. Beck faulted plaintiff for entering the note before the examination but concluded, as did the VAH Chief of Behavioral Medicine, that the events caused no injury to the patient; rather it exemplified the point that defendants failed to properly accommodate plaintiff's disability. (Exhibit 4, ¶ 18)

248.   Dr. Torrey neglected to mention that, in a teaching institution, resident clinical notes are preliminary – not final – until the attending/supervising physician approves and signs them.  (Exhibit 5 @ 179:8-10, 180:14-16).

249.   These events occurred prior to Dr. Green placing plaintiff on administrative leave. She remained in administrative limbo for six and a half months.  In the interim, Dr. Green blocked her return until she would "accept responsibility for her actions." (Exhibit 7 @ 398).

250.   Dr. Green denied that plaintiff's disability influenced her actions in any way even though he acknowledged the she had the disability.  (*Id.*).

251.   He asserted that her alleged deficiencies were "irresponsibility, not of illness." (Exhibit 18).

252.   He vowed not to "accommodate lateness."  (Exhibit 4, ¶ 19).

253.   Plaintiff did not make such a request.  (Exhibit 4, ¶ 20).

254.   Finally, in order to return to the program, plaintiff acceded to defendants' demand that she continue the program with no warrantees that accommodations would be provided.  In September 2007, plaintiff returned to training, assigned to the New Hampshire State Hospital. (Exhibit 16).

255.   In November 2008, defendants accused plaintiff of failing to properly organize and submit her clinical notes in a timely manner, treating patients without supervision, a disorganized presentation, patient complaints, inconsistent performance and failure to contact the state Department for Children and Families ("DCYF").   The accusations related to events that occurred – or did not occur – over the course of several months.  (Exhibit 26 @ Bates 824).

256.   Plaintiff, who had treated many patients in her  three years as a resident, perceived

that the patient was a serious risk for suicide. He telephoned the VAH and plaintiff spoke with him as the physician on-call. She repeatedly offered clinic appointment times (when attending physicians would be present) but he refused. Because of the patient's desperation, she offered him an appointment during her clinic time in order to convince him to come to the hospital and avoid a tragedy. He agreed. Plaintiff informed her supervisor who was unable to supervise at the appointed time. (Exhibit 4, ¶ 21).

257. The supervisor, Dr. Lambert, reported to Dr. Green that plaintiff used "poor judgment" in setting up the appointment. Dr. Beck "vigorously" disagreed with Lambert's report concerning plaintiff's conduct. He opined that plaintiff "deserves praise rather than censure for making every effort to engage this patient who appeared to be at serious risk of killing himself." (Exhibit 11, pp 8-9).

258. Dr. Beck observed that plaintiff's conduct was "more than reasonable" especially since she followed up with DCYF even after his hospitalization when responsibility shifted to the inpatient team assuming care. (Exhibit 11, p.9).

259. Defendants allege that "patients" complained about plaintiff. Actually, there is only one patient complaint in the record. The incident in question allegedly involved a patient complaint that plaintiff's psychiatric treatment of him consisted of merely playing cards with him. Allegedly, he complained to another patient who reported it to a VAH psychologist, who reported it to plaintiff's supervisor, who reported it to Drs. Watts and Green. (Exhibit 11, p. 10).

260. Nobody in the reporting chain verified the episode. Nevertheless, they ordered her for a "fitness for duty" examination and it was an incident that contributed to their decision to dismiss her. (Exhibit 4, ¶ 22).

261. Plaintiff had been treating the patient for eight months.  He was a somewhat primitive person.  He repeatedly lost control, raising his voice to the extent that staff were frightened and called the police.  At the time of the incident, the patient lost control again.  In order to distract him from his rage, plaintiff began playing card solitaire in his presence.  She wanted to avoid him being humiliated with an exit escort by the police. (Exhibit 4, ¶ 23).

262. Her strategy worked and the patient calmed down sufficiently for the psychiatric session to continue.  Plaintiff discussed the patient and the solitaire incident with her supervisor, Dr. Lambert, who praised plaintiff for the manner in which she treated the difficult patient.  (Exhibit 4, ¶ 24).

263. Defendants also accused plaintiff of expressing a "paranoid response" to a November 2008 inquiry about her conduct.  In the incident, Dr. Lambert suggested to plaintiff that several people expressed concern about her.  Plaintiff replied that the inquiries must be related to her licensure application. (Exhibit 22 @Bates 815).

264. Lambert may have described it as "paranoid" but it is not unreasonable that plaintiff thought the inquiries pertained to her application for medical licenses and a fellowship.  (Exhibit 4, ¶ 25).

265. Lambert's observation was inconsistent with her conclusion that plaintiff "generally took feedback very well and applied it."  (Exhibit 45, Lambert Deposition,  p. 70).

266. Lambert alleged that she submitted "bizarre" clinical notes and demonstrated "inconsistent performance."  There is no evidence supporting either accusation except Lambert's report.  She never discussed with plaintiff any of the issues she raised – beyond the expressions of concern.  And she was plaintiff's supervisor!

267. Dr. Green previously requested that Lambert collect complaints against plaintiff. To

comply, she sent emails to several of plaintiff's supervisors and reported the responses to Green.  (Exhibit 22; Exhibit 25).

268.   In deposition, Lambert modified her report to Green from "many" supervisors to "several."  (Exhibit 45, p. 71).

269.   Dr. Beck reviewed the record and concluded that defendants failed to accommodate plaintiff's disability.  He further concluded that defendants engaged in "deliberate indifference to this resident's acknowledged need for accommodations." (Exhibit 11, p.2).

270.   And, finally, Dr. Beck opined that plaintiff's difficulties in the training program "occurred in the context of some fundamental failures on their part to provide a reasonable training experience on the one hand and appropriate accommodations for a resident with ADD on the other hand."  (Exhibit 11, p. 11).

271.   The dismissal was based partially on the premise that the VAH staff did not want her back at that facility.  (Exhibit 7; Exhibit 46).

272.   As with defendants' other excuses for dismissing plaintiff, the premise was wrong. To the contrary, Dr. Lambert testified that plaintiff was welcome to return to the VAH for further training.  (Exhibit 45, p. 79).

273.   Dr. Beck observed that the program defendants provided for plaintiff was "profoundly unsatisfactory as a training experience" (Exhibit 11, p. 10).

274.   There were significant blocks of time when defendants failed to supervisor her properly.  There were significant blocks of time when defendants failed to assign patients to her – only five patients during one eight-month period. (Exhibit 4, ¶ 26).

275.   Defendants provided almost no clinical experience during the eight-month period. As Dr. Beck observed, she was frequently placed in a physical setting "that would

have been difficult for anyone  but especially difficult for a person with ADD."
(Exhibit 11, p. 11).

276.    Again, as Dr. Beck observed, defendants' claims concerning plaintiff's difficulties
during training occurred "in the context of their failure to provide a reasonable
training experience on the one hand and appropriate accommodations for a resident
with ADD on the other hand." *Id.*

277.    Green claimed that the members of defendants' psychiatry department "are very
much cued into the symptoms of various – all kinds of psychiatric illnesses."  He
further averred that "If anything, there's a special sensitivity because of what we do
for everybody to be very familiar with these things."   (Exhibit 19 @ 99:19-100:1).

278.    After thorough review of the record, Dr. Beck concluded that the termination was
not justified:

"Dr. Connors formal evaluations were all satisfactory or better at every training site.
The record reveals two unsatisfactory scores over the course of her psychiatry
training and criticisms within some emails generated at the VA.  These are subject
to substantial dispute as to what occurred and the significance of those complaints
made against her."

(Exhibit 11, p. 2).

279.    Here, defendants' motivation was spite.  In essence, Dr. Green was not inclined to
accommodate plaintiff's disability because he was convinced that her disability was
unrelated to her conduct when defendants were not providing accommodations for
her disability.   He failed to communicate the existence of her ability to his
lieutenants who were responsible for her training or to instruct them about the
accommodations she requested. (Exhibit 45 @ 101-102).

280.   As Dr. Beck observed, defendants established a disruptive, deficient environment for plaintiff.  "These failures, in my opinion, rise to the level of deliberate indifference to this resident's acknowledged need for accommodations."  Dr. Green's assertion that he was holding plaintiff to a "higher standard" and his rejection of plaintiff's request for accommodations,  also demonstrate his negative attitude in scuttling plaintiff's training experience. (Exhibit 11).

281.   The evidence demonstrates that these institutions are partners in "Dartmouth-Hitchcock:" DHC, MHMH, GSMD and DHMC.  (Exhibit 47).  Both DHC and GSMD are branches of MHMH and/or DHMC.  Each of these entities acts in partnership with MHMH and DHMC.

282.   DHMC and MHMH were parties to "The Resident/Fellow Agreement of Appointment" between them and plaintiff. (Exhibit 48).

283.   MHMH supervisors issued DHC residency evaluations for plaintiff's training. (Exhibits 13, 27 and 38) Psychiatry residents' business cards include logos of Dartmouth College, the medical school and DHMC.  (Exhibit 49).

284.   The remediation plan was issued by Green in the name of DHMC.  The plan was incorporated into the agreement.  The Fair Hearing Committee that dismissed plaintiff was a DHMC entity located at MHMH. (Exhibits 16 and 31).

DATED:    January 15, 2013  .                JENNIFER A. CONNORS

                                              __/s/Norman E. Watts_____
                                              Norman E. Watts
                                              Plaintiff's Counsel