**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

JENNIFER A. CONNORS,                     :
                                         :
          Plaintiff,                     :
                                         :
     v.                                  :    Case No. 2:10-cv-94
                                         :              2:12-cv-51
DARTMOUTH HITCHCOCK MEDICAL CENTER,:
DARTMOUTH MEDICAL SCHOOL, MARY           :
HITCHCOCK MEMORIAL HOSPITAL,             :
DARTMOUTH-HITCHCOCK CLINIC and           :
TRUSTEES OF DARTMOUTH COLLEGE,           :
                                         :
          Defendants.                    :
                                         :

**OPINION and ORDER**

In this action arising from the dismissal of Plaintiff Dr.
Jennifer Connors from the Dartmouth Hitchcock Medical Center's
("DHMC") graduate residency program in psychiatry, the Defendants
have moved for summary judgment on her remaining claims of
disability discrimination and illegal retaliation under the
Vermont Fair Employment Practices Act ("VFEPA"), and her claims
of breach of contract and breach of an implied covenant of good
faith and fair dealing.  The motion, ECF No. 122, is **granted in
part and denied in part**.  Summary judgment is **granted** on all
counts of both complaints with respect to Defendants Dartmouth
Medical School ("Medical School"), Dartmouth-Hitchcock Clinic
("Clinic") and Trustees of Dartmouth College ("Trustees").  The
claims for noneconomic damages under VFEPA are dismissed.
Summary judgment is **granted in part and denied in part** with

respect to the remaining claims against Defendants DHMC and Mary Hitchcock Memorial Hospital ("MHMH"), as set forth below.

## I.   Factual and Procedural Background

This Court has previously issued Findings of Fact in connection with two issues tried to the Court on February 3, 2012.  *See* Findings of Fact & Conclusions of Law, ECF No. 105. The following material facts with respect to the pending motion for summary judgment constitute the law of the case, or are undisputed, or have been taken in the light most favorable to Dr. Connors as the non-moving party.

Dr. Connors graduated from medical school in 2003.  She completed a pediatric residency at the University of Utah Medical School in 2006.  In July 2005 Dr. Connors submitted an "application for residency training in the Department of Psychiatry at [DHMC]" to Dr. Ronald Green, at the time the psychiatry residency program director.  DHMC is a non-profit corporation organized under the laws of New Hampshire, with its principal place of business in New Hampshire.[1]

In response to her application, Dr. Green on behalf of DHMC extended an offer to Dr. Connors to join the program "as a PGY[2] 2

---

[1]  Defendant MHMH is located in Lebanon, New Hampshire.  Defendant Clinic is a New Hampshire non-profit corporation with its principal place of business in Lebanon, New Hampshire.  Dartmouth College is a New Hampshire non-profit institution located in Hanover, New Hampshire.  Defendant Medical School (renamed the Geisel School of Medicine at Dartmouth) is a trade name registered in New Hampshire by Dartmouth College.

[2]  PGY stands for "post graduate year."

resident in psychiatry to begin on June 26, 2006." Green letter, ECF No. 122, Ex. C. Dr. Green advised Dr. Connors that her "stipend as a PGY 2 resident will be $45,350.00. *Id.* Dr. Connors accepted the offer in November 2005.

In April 2006 Dr. Connors and Defendant MHMH, the teaching hospital for DHMC, entered into a Resident/Fellow Agreement of Appointment for graduate training as a psychiatry resident from June 26, 2006, through June 25, 2007. The expected duration of her training was three years.

According to her Second Amended Complaint ("SAC") in docket no. 2:10-cv-94-wks, at the time of her initial appointment Dr. Connors advised DHMC that she has a learning disability, Attention Deficit Hyperactivity Disorder ("ADHD"). She requested reasonable accommodation for her condition, and DHMC agreed to provide reasonable accommodation. SAC ¶¶ 17-18, ECF No. 50. Specifically, Dr. Connors requested and received extra time for testing, a quiet place to work and access to a psychiatrist.

Dr. Connors entered DHMC's residency program in psychiatry in June 2006. Early evaluations of her progress were generally positive, although Dr. Green noted problems with completing paperwork, conflicts with staff and chronic lateness, in all of which he noted improvement or commitment to improvement. Green Memo. Oct. 16, 2006, Pl.'s Opp'n Memo. Ex. 14, ECF No. 129-15.

In early 2007, Dr. Connors was assigned to an inpatient

psychiatry rotation at the Veterans Affairs Medical Center ("VAMC") in White River Junction, Vermont, one of the psychiatry residency program's affiliated sites.  Dr. Connors avers that Defendants failed to make reasonable accommodations for her disability during that winter, among other things that her VAMC supervisor ordered her not to leave the VAMC campus in order to acquire medication or undergo any therapy.  As a result, she states, her symptoms emerged, including difficulty organizing her time and assignments, distractability, diminished listening skills, difficulty with time management and difficulty starting and prioritizing tasks.  Connors Aff., Pl.'s Opp'n Memo. Ex. 4, ECF No. 129-5.

Beginning in March 2007, Dr. Connors was placed on administrative leave as a result of DHMC's concerns regarding her performance as a psychiatry resident.  She returned to the program in September 2007, having agreed to a remediation plan that included regular clinical supervision and a faculty mentor. Dr. Connors was responsible for, among other things, being on time, not being argumentative in supervision, following documentation rules, performing physical examinations on patients when required to do so, and not signing off on physical examinations that she had not conducted.  DHMC Remediation Plan, Pl.'s Opp'n Memo. Ex. 16, ECF No. 129-17.  She was accorded release from clinical duties one afternoon per week to meet with

her health care providers.  *Id.*

Dr. Connors and MHMH entered into a second Resident/Fellow Agreement of Appointment for her graduate training as a resident in psychiatry at the PGY-2 level from September 17, 2007, to January 6, 2008 with a stipend of $47,410.  Dr. Connors completed her remedial program and her PGY-2 year successfully at another DHMC affiliate, New Hampshire Hospital, in a "very structured and highly supervised inpatient rotation".  Green Letter Jan. 1, 2008, Mot. for Summ. J. Ex. R, ECF No. 122-19.  Nevertheless, Dr. Green sought advice about not renewing her contract, feeling that Dr. Connors had created enmity among the other residents and believing that her difficulties were caused by irresponsibility, not illness.  Green Email Nov. 20, 2007, Pl.'s Opp'n Memo. Ex. 18, ECF No. 129-19.

Despite Dr. Green's concerns, Dr. Connors and MHMH entered into a Resident/Fellow Agreement of Appointment for her PGY-3 year from January 7, 2008 to January 6, 2009 with a stipend of $50,070.  The 2008 Agreement states that Dr. Connors would be notified in writing if "renewal of this Agreement for a subsequent year of residency/fellowship will not be made."  Feb. 3, 2012 Hearing, Defs.' Ex. C.  All of her appointments stated that reappointment would be "dependent upon satisfactory evaluations and fulfillment of program and institutional requirements."  *Id.*; *see also id.*, Defs.' Ex. A, B.

5

For her PGY-3 year, Dr. Connors was again assigned to the VAMC, and Dr. Green warned that should a "pattern of irresponsible behavior" recur she would not be able to continue her training.  Green Memo. Dec. 21, 2007, Pl.'s Opp'n Memo. Ex. 21, ECF No.22.  Dr. Connors avers that for four months in 2008 DHMC failed to reasonably accommodate her disability, in that while at the VAMC she "endured random facilities, including use of a common computer room with coffee machine for all staff to use."  Connors Aff., Pl.'s Opp'n Memo. Ex. 4.  She received her own office at VAMC in May 2008.

In March 2008 Dr. Connors was meeting the program's clinical and administrative expectations.  Green Evaluation Mar. 6, 2008, Pl.'s Opp'n Memo. Ex. 28, ECF No. 129-29.  For example, during the first half of 2008 Dr. Connors received average or above average ratings in an evaluation of her psychopharmacology clinic training.  Green Evaluation July 27, 2008, Pl.'s Opp'n Memo. Ex. 27, ECF No. 129-28.

On November 20, 2008, Dr. Green and Dr. Watts, the associate director of the psychiatry residency program, met with Dr. Connors to discuss the concerns of several of her clinical supervisors at VAMC about her behavior and judgment.  The concerns included:  forgetting to call a social service agency to report a child endangerment situation; misdiagnosing a patient and failing to discuss the diagnosis during supervision;

disputing her supervisors' recommendations; lack of receptiveness
to feedback; lateness submitting clinical notes; and unusual
patient interactions, including an incident with a patient in
which Dr. Connors began playing cards during a therapy session.
VAMC faculty were concerned that emotional or mental illness
might be causing her erratic behavior, and Dr. Connors agreed to
undergo a fitness for duty evaluation conducted by DHMC's
Employee Health Division.  The evaluation revealed no ill health.
The director for psychiatric training at VAMC however informed
Dr. Green in December 2008 that the VAMC was unwilling for Dr.
Connors to continue her training there.  Green Note Jan. 2, 2009,
Mot. for Summ. J. Ex. S, ECF No. 122-20.

        At a meeting on January 28, 2009, Dr. Green gave Dr. Connors
a letter, advising her that, although she would be allowed to
finish her current rotation to enable her to enter a fourth year
of training elsewhere, she was dismissed from the program.  The
letter referenced her having successfully passed a four month
remediation period, but stated that she had two subsequent
periods of "irresponsible and unprofessional behavior" as
detailed in the November 2008 meeting and documented in her file.
Dr. Connors read the letter and confirmed with Dr. Green that he
was dismissing her from the program.  Connors Dep. 52:1-4, Nov.
3, 2010, ECF No. 57-11.  Dr. Connors' last day in the program was
April 12, 2009.  Opp'n to Defs.' Mot. for Summ. J. Ex. 1 at 5,

7

ECF No. 64-2.

At the January 28, 2009, meeting, Dr. Green provided Dr. Connors with a copy of the Graduate Medical Education ("GME") Fair Hearing Policy.  According to the Policy, its purpose is to set forth procedures to "assure due process to Residents who . . . are recommended for non-renewal or dismissal from a program . . . ."  GME Fair Hearing Policy at I, Feb. 3, 2012 Hearing, Pl.'s Ex. 1.  Policy procedures include notification "in writing of the documented deficiencies or allegations and of the recommendation for non-renewal, dismissal or remedial training in a private meeting with the Program Director or a duly appointed representative," at which the resident is provided with a copy of the Policy.  GME Fair Hearing Policy at II.D.1.  If a resident requests a Fair Hearing, a committee is formed, chaired by the Director of Graduate Medical Education or a designee.  The Committee conducts a hearing at which participants have an opportunity to present oral and documentary evidence.  *See id.* at III.A.1-14.  Following the hearing the Committee deliberates in closed session and reaches a decision which is communicated in writing to the resident and the Program Director.  *Id.* at III.B.1-2.  If the Committee does not agree with the Program Director's recommendation for dismissal, the Program Director may be asked to accept the resident back into the program for an additional remedial period.  *Id.* at III.B.3.  The decision of the

Committee is final.  *Id.* at III.B.4.

Dr. Connors requested a Fair Hearing.  The Fair Hearing Committee heard her case on June 1 and 16, 2009.  Dr. Connors contended among other things that Dr. Green was intolerant of ADHD stereotypes, that he had acted out of bias in his dealings with her, and that his goal was to see her fail.  Feb. 3, 2012 Hearing Defs.' Ex. Q.  In concluding that "that Dr. Green's decision not to renew Dr. Connors for her fourth year should stand," Defs.' Ex. R at 4, the Committee rejected Dr. Connors's allegations of bias, noting that Dr. Green's documentation of her performance reflected both positive and negative evaluations, and that Dr. Connors was given extra time for testing and time to attend to her medical needs.  *Id.* at 3.  With respect to the lack of an office at the VAMC, the Committee credited information from the coordinator of resident training at the facility, who stated that space at the VAMC is a problem, that she made sure that Dr. Connors had access to an office, and that eventually Dr. Connors was provided with her own office.  *Id.*

Despite her dismissal from DHMC's residency program, Dr. Connors was permitted to complete the rotations she needed to be eligible for a PGY-4 year elsewhere.  Defs.' Mot. for Summ. J. Ex. F, ECF No. 122-7.  In addition, Dr. Green supplied Dr. Connors with a recommendation to another institution to complete her residency training.  He found "her to be a bright, caring and

dedicated physician with a strong work ethic," "an eager learner," who "showed improvement in her time management skills" and "responded appropriately to . . . feedback," and "is committed to providing her patients with excellent care."  Pl.'s Opp'n Memo Ex. 6, ECF No. 129-7.  Dr. Connors completed her general psychiatry residency at another institution, received her license to practice medicine and became a licensed psychiatrist in the state of Vermont.  Connors Aff. ¶ 4, Pl.'s Opp'n Memo. Ex. 4, ECF No. 129-5; Vermont State Hospital Letter, Mar. 22, 2011, Pl.'s Opp'n Memo. Ex. 8, ECF No. 129-9.

Dr. Connors filed a complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 7, 2009.  The EEOC issued a right-to-sue letter on March 9, 2010. Dr. Connors filed suit in this Court on April 19, 2010, alleging disability discrimination and illegal retaliation under the Americans with Disabilities Act ("ADA"), breach of contract, and breach of a covenant of good faith and fair dealing.  She amended her complaint once on June 4, 2010, and again on January 28, 2011.  Following the dismissal of her ADA claims as untimely on February 14, 2012, Dr. Connors commenced an action in the Windsor Unit of the Vermont Superior Court against the same defendants under the VFEPA.  The Defendants removed the suit to this Court, and the two cases were consolidated on September 17, 2012.

The Defendants seek summary judgment on Dr. Connors's

10

remaining claims:  disability discrimination under VFEPA (Count I, docket no. 2:12-cv-51-wks), illegal retaliation under VFEPA (Count II, docket no. 2:12-cv-51-wks), breach of contract (Count III, docket nos. 2:12-cv-51-wks; 2:10-cv-94-wks) and breach of an implied covenant of good faith and fair dealing (Count IV, docket nos. 2:12-cv-51-wks, 2:10-cv-94-wks).

## II.  Summary Judgment Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see, e.g.*, *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995).  "[I]n assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought."  *Id.*  Those inferences "must be viewed in the light most favorable to the party opposing the motion."  *Id.*  "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  *Donnelly v. Greenburgh Cent. Sch. Dist. No.* 7, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Courts must be cautious "about granting summary judgment to an employer in a discrimination case where . . . the merits turn on

a dispute as to the employer's intent." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010).

## III. Discussion

### A. VFEPA Claims

VFEPA makes it unlawful for any employer to discriminate against a qualified disabled individual. Vt. Stat. Ann. tit. 21, § 495(a)(1); *see Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 9, 955 A.2d 1082, 1088. It likewise forbids any employer from discharging or discriminating against an employee because the employee has lodged a complaint of discriminatory acts or practices, or is about to lodge a complaint, or because the employer believes that the employee may lodge a complaint. § 495(a)(5). The disability provisions of VFEPA are modeled on Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and federal case law provides guidance in construing them. *State v. G.S. Blodgett Co.*, 656 A.2d 984, 988 (Vt. 1995).

The Defendants argue that they are entitled to summary judgment on the VFEPA claims on several grounds: 1) Dr. Connors was not an employee of any defendant; 2) VFEPA does not apply to a New Hampshire medical resident and a New Hampshire teaching hospital; 3) a teaching hospital's decision to terminate a resident's program is entitled to deference; 4) Dr. Connors was not a qualified disabled individual, and thus cannot maintain a claim; 5) Dr. Connors cannot show that the termination of her

12

residency program was improperly motivated; and 6) any claims for non-economic damages are time-barred.

### 1. Dr. Connors may sue DHMC and MHMH under VFEPA for the conduct alleged in her complaint.

At the outset, Defendants contend that a medical resident cannot assert a VFEPA claim against them because they do not employ medical residents.  An employment relationship exists for VFEPA purposes if the alleged employee receives more than minimal financial benefit from the alleged employer.  *See Colby*, 2008 VT 20, ¶ 9, 955 A.2d at 1088 (citing *York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122, 125-26 (2d Cir. 2002)).  Regardless of whether Dr. Connors's remuneration for her services was characterized as a stipend or as wages, and regardless of whether residents are considered students rather than employees in certain contexts, a medical resident who receives more than minimal compensation for her services while completing her training falls within the definition of employee under VFEPA.

It is undisputed that DHMC extended an offer to Dr. Connors that included more than minimal remuneration, and that MHMH entered into agreements with Dr. Connors that involved more than minimal remuneration for her services.  Summary judgment on this ground is therefore **denied** with respect to Defendants DHMC and MHMH.  Dr. Connors has not offered any facts to support her claim that Defendants Medical School, Clinic and Trustees had an employer-employee relationship with Dr. Connors.  Summary

judgment is therefore **granted** with respect to these defendants, and Counts I and II are dismissed as against them.

Defendants also argue that VFEPA does not apply to them because they are New Hampshire entities running a New Hampshire residency program at a New Hampshire teaching hospital. VFEPA prohibits unlawful employment practices. *See* § 495(a). Dr. Connors' SAC and her affidavit in opposition to DHMC's motion for summary judgment complain of discriminatory conditions occurring at the VAMC, located in Vermont. She also has complained of discriminatory conduct on the part of Dr. Green and others that affected her ability to work at the VAMC. If an employee working in Vermont has been subjected to unlawful employment practices, or has suffered the effects of unlawful discrimination here, then she may bring a claim under the statute. There may be situations where a Vermont nexus is so attenuated that the alleged discriminatory practices are beyond VFEPA's reach; that is not the case before the Court. The Defendants' choice-of-law analysis may be relevant to the determination of whether New Hampshire law applies to Dr. Connors' contract claims, but it has no bearing on the determination of VFEPA's scope. Summary judgment on this ground is therefore **denied** as well with respect to Defendants DHMC and MHMH.

### 2. Academic institutions are not entitled to deference for discriminatory decisions.

Defendants argue that Dr. Connors' VFEPA claims should

14

receive closer scrutiny because decisions of academic institutions are entitled to deference.  Although courts accord deference to the decisions of academic institutions about the ethical and academic standards applicable to their students, *see Bhatt v. Univ. of Vt.*, 2008 VT 76, ¶ 15, 958 A.2d 637, 642, there is no evidence that the dismissal of Dr. Connors from her residency had anything to do with ethical lapses or academic deficiencies.  To the contrary, Dr. Connors's supervisors, including Dr. Green, consistently extolled her academic ability.  Dr. Green considered the incidents that led to the November 2008 meeting and his January 2009 dismissal letter examples of irresponsible and unprofessional behavior, not unethical behavior.  More to the point, although a medical residency program may have discretion to make decisions regarding the renewal or termination of a resident's training, its discretion does not extend to engaging in discrimination, on the basis of disability or any other protected class.  *See Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 135 (2d Cir. 1995).  Summary judgment is therefore **denied** on this ground.

### 3.   Dr. Connors' claims of disability discrimination and retaliation against DHMC and MHMH survive summary judgment.

Disability discrimination claims under VFEPA are subject to the burden-shifting analysis established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973).  *See Beckmann v. Edson Hill Manor, Inc.*, 764 A.2d 1220, 1222 (Vt. 2000) (entry order).  To establish a prima facie case of discrimination disability a plaintiff must show that she is a qualified disabled individual, she was discharged from her employment or otherwise suffered an adverse employment action, and the action occurred under circumstances giving rise to an inference of discrimination.  *Kennedy v. Dep't of Pub. Safety*, 719 A.2d 405, 406 (Vt. 1998).  The issue is not whether the decision to terminate Dr. Connors's residency was correct, but whether the termination raised an inference of discrimination.  *See id.*

The Defendants apparently do not dispute that Dr. Connors has ADHD and that she is an individual with a disability under the statute.[3]  They contend that Dr. Connors has failed to show that she is a qualified disabled individual.  A qualified disabled individual is "[a]n individual with a disability who is capable of performing the essential functions of [her] job . . . with reasonable accommodation to the disability."  Vt. Stat. Ann. tit. 21, § 495d(6).

Determining whether Dr. Connors was capable of performing the essential functions of her job with reasonable accommodation

---

[3]  VFEPA defines "individual with a disability" as "any natural person who . . . has a physical or mental impairment which substantially limits one or more major life activities; . . . has a history or record of such an impairment; or . . . is regarded as having such an impairment."  Vt. Stat. Ann. tit. 21, § 495d(5).

to her disability requires "two distinct determinations:  what constitutes the essential functions of the job and what constitutes reasonable accommodation." *Blodgett*, 656 A.2d at 989.  "The essential functions of a job are those that are legitimate and necessary to accomplish the goals of the position." *Id.*

Dr. Connors has proffered evidence that she was and is capable of performing the essential functions of her residency. Although DHMC proffered numerous comments from Dr. Green and other supervisors expressing concern over Dr. Connors's performance and behavior at various times, the record also reflects that at other times Dr. Green and other supervisors commended her academic ability, her dedication, her commitment, her hard work, and the improvement in her skills.  At times they found that she was meeting the program's clinical and administrative expectations, and they looked forward to her continued success.

Dr. Connors has also proffered evidence that she requested reasonable accommodation for her disability.  Specifically she requested extended time for taking examinations; a quiet area in which to prepare clinical notes and interview/treat patients; and the ability to acquire medication and treatment for her disability.  The Defendants do not argue that these accommodations are unreasonable or constitute an undue hardship,

17

and they assert that DHMC did in fact provide the accommodations
Dr. Connors requested.  (Dr. Connors disputes this, contending
that at times during her residency Defendants failed to
accommodate her condition; specifically for four months in early
2008 she had to use a common computer room, and in the winter of
2006-2007 her supervisor ordered her not to leave the VAMC
campus, with the result that she exhausted her medication supply
and did not obtain medical treatment.)

At this summary judgment stage, Dr. Connors has satisfied
her initial burden of showing that she is a qualified disabled
individual, an individual with a disability who can perform the
essential functions of her job with reasonable accommodation.
There is no dispute that she suffered an adverse employment
action.  Viewing the facts in the light most favorable to Dr.
Connors, she has made a prima facie showing that the
circumstances of her dismissal give rise to an inference of
discrimination.  *See, e.g.*, *Robertson v. Mylan Labs., Inc.*, 2004
VT 15, ¶¶ 29, 30, 848 A.2d 310, 322 (emphasizing that at the
prima facie case stage a plaintiff's burden is light).

The Defendants have also proffered a legitimate non-
discriminatory reason for the dismissal:  numerous complaints of
not following the rules for appropriate supervision, resisting
her supervisors' recommendations, being late to clinical
activities, untimely completion of clinical notes,

disorganization, not sharing workload appropriately and
unprofessional behavior. *See* Feb. 3, 2012 Hearing Defs.' Ex. D,
F.  Having articulated such a reason, the burden shifts to Dr.
Connors to provide evidence that the proffered non-discriminatory
reason is a mere pretext for actual discrimination. *See, e.g.*,
*Robertson*, 2004 VT 15, ¶ 27, 848 A.2d at 321.  Accordingly, to
survive summary judgment Dr. Connors must "demonstrat[e] that
there is an issue of material fact underlying the question of
whether the employer's reason for its action was pretextual."
*Id.* ¶ 34.

    The facts, taken in the light most favorable to Dr. Connors,
show that there is a triable issue as to whether a reasonable
jury could conclude that DHMC terminated her residency because of
her ADHD.  There is certainly ample evidence that Dr. Connors's
supervisors had concerns with her performance in the program and
communicated them to her.  In early 2007, her supervisor at VAMC
gave her a list of concerns, *see, e.g.*, Defs.' Mot. for Summ. J.
Ex. N, ECF No. 122-15, and mounting incidents led to her being
placed on administrative leave.  After she returned to the VAMC,
she had episodes of problems in May 2008 and October/November
2008 that culminated in the director of psychiatric training
advising Dr. Green that she was unwilling for Dr. Connors to
continue training there.  *See id.* Ex. S, T, ECF No. 122-20, 21;
*see also id.* Ex. I, ECF No. 122-10.  Her supervisors observed

19

disorganization, lack of focus, lateness and odd behavior and
reactions.  Dr. Green informed Dr. Connors of the VAMC
supervisors' concerns in their meeting on November 20, 2008.

There is also some evidence however that Dr. Connors'
difficulty in complying with her supervisors' expectations
coincided with periods in which her ADHD symptoms were not well
managed.  *See* Connors Aff., Pl.'s Opp'n Memo. Ex. 4, ECF No. 129-
5.  At other times and in other settings Dr. Connors's
performance was acknowledged to be satisfactory.  *See, e.g.*,
Feedback Email Oct. 8, 2007, Pl.'s Opp'n Memo. Ex. 20, ECF No.
129-21.  The parties dispute whether Defendants made reasonable
accommodations that could not consistently alleviate the
performance concerns or whether they merely made token
accommodation efforts and set her up for failure.  Whether
Defendants' reasons for terminating her residency were a pretext
for discrimination on the basis of disability cannot be resolved
at summary judgment.

Dr. Connors also claims that Defendants retaliated against
her for complaining about their failure to accommodate her
disability by terminating her residency.  "A prima facie case for
retaliatory discrimination requires [a] plaintiff to show that
(1) [she] was engaged in protected activity, (2) [her] employer
was aware of that activity, (3) [she] suffered adverse employment
decisions, and (4) there was a causal connection between the

protected activity and the adverse employment action." *Gallipo v. City of Rutland*, 656 A.2d 635, 642 (Vt. 1994); *accord Mellin v. Flood Brook Union Sch. Dist.*, 790 A.2d 408, 417-18 (Vt. 2001). Dr. Connors has proffered evidence that she was engaged in protected activity, specifically that she had complained about DHMC's failure to make reasonable accommodations for her disability.  DHMC was aware of her complaints.  Dr. Connors suffered an adverse employment action in the termination of her residency.

The Defendants argue that Dr. Connors cannot demonstrate a causal connection between her complaints and the termination of her residency.  A causal connection can be established indirectly, for example by showing that the adverse employment action closely followed the protected activity.  *See, e.g.*, *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 131 (2d Cir. 2012).  It may also be established directly, "through evidence of retaliatory animus."  *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987).  For purposes of a prima facie case, Dr. Connors has offered at least minimal evidence of a causal connection in Dr. Green's stated desire to end Dr. Connors's residency and his hostility toward her claim of disability.

If a plaintiff establishes a prima facie case of retaliation defendants must proffer a legitimate, nondiscriminatory reason

for their actions.  *Mellin*, 790 A.2d at 211.  The plaintiff then
must prove by a preponderance of the evidence that the employer's
reasons for its actions are a pretext for discrimination.  *Id.*
As in Dr. Connors's disability discrimination claim, whether
DHMC's reasons for terminating her residency were a pretext for
retaliating against her for her complaints of failure to
accommodate her disability cannot be resolved at summary
judgment.

### 4.   Dr. Connors' claims for noneconomic damages under VFEPA are time-barred.

The Defendants argue that Dr. Connors' VFEPA claims for
"emotional pain and suffering, mental anguish, humiliation,
embarrassment, person indignity and other intangible injuries"
must be dismissed as time-barred.  This Court has previously
ruled that Dr. Connors's cause of action accrued at the latest on
January 28, 2009, the date on which she received her letter from
Dr. Green notifying her that she was being dismissed from the
residency program.  Findings & Conclusions 17, ECF No. 105.
Vermont's three-year statute of limitations, Vt. Stat. Ann. tit.
12, § 512(4), applies to VFEPA claims for emotional distress and
the like.  *Egri v. U.S. Airways, Inc.*, 804 A.2d 766, 766 (Vt.
2002) (entry order); *see also Fitzgerald v. Congleton*, 583 A.2d
595, 599-600 (Vt. 1990) (holding that claims for damages
resulting from mental anguish, emotional distress, and personal
humiliation are injuries to the person within the meaning of

section 512(4)); *accord Gettis v. Green Mt. Econ. Dev. Corp.*, 2005 VT 117, ¶ 21, 892 A.2d 162, 168.

Dr. Connors filed her VFEPA claims in state court on March 7, 2012, more than three years after her cause of action accrued. Nevertheless, she argues that her claims for noneconomic damages under VFEPA are timely because she filed an amended complaint of disability discrimination and illegal retaliation on May 12, 2010 in docket no. 2:10-cv-94 in this Court, within the applicable three-year limit.  The argument suffers from two fatal deficiencies.

One, Dr. Connors asserted claims in docket no. 2:10-cv-94 under the ADA, not VFEPA.  VFEPA is not mentioned in either Count I, entitled "Disability Discrimination (Americans with Disabilities Act)", or in Count II, entitled "Illegal Retaliation," or in any other portion of her amended complaint. Apparently, Dr. Connors deems that her failure to specify the ADA in Count II's claim of illegal retaliation can be construed as an assertion of a claim of illegal retaliation under VFEPA. However, she incorporated the allegations contained in Count I into Count II, which clearly states her claim that the defendants' adverse employment actions violated the ADA.  Am. Compl. ¶ 34.  There is no conceivable basis for an assertion that the amended complaint filed on May 12, 2010 stated any claims under VFEPA.

23

Two, this Court entered judgment for Defendants in docket no. 2:10-cv-94 on Counts I and II on February 14, 2012 for failure to timely file these discrimination claims with the EEOC before filing them in federal court. Dr. Connors has not shown how these terminated claims remain alive for purposes of relieving her from the necessity of filing VFEPA claims for noneconomic damages within three years of their accrual.

Dr. Connors's claims for noneconomic damages under the VFEPA are therefore **dismissed** as time-barred.

### B.   Claims for Breach of Contract and Breach of an Implied Covenant of Good Faith and Fair Dealing[4]

In Count Three of her complaints Dr. Connors asserts breach of an express or implied contract. Dr. Connors' last Resident/Fellow Agreement of Appointment was in effect from January 7, 2008 through January 6, 2009. The Agreement provided that "[r]eappointment will be dependent upon satisfactory evaluations and fulfillment of program and institutional requirements." Feb. 13, 2012 Hearing, Defs.' Ex. C. MHMH agreed to provide, among other things, "[a]n accredited educational program that provides for the educational needs of the resident/fellow," "[a]ppropriate, readily available supervision," and "counseling services." *Id.* MHMH also agreed to "use its

---

[4]   The Defendants have assumed, for purposes of their motion for summary judgment on the common law claims, that applying either New Hampshire or Vermont law would produce the same outcome.

best efforts" to provide written notice of nonrenewal of the
agreement no less than one hundred twenty days prior to the
expiration of the agreement, unless the reason or reasons for
nonrenewal occurred within that time period.  *Id.*

> 1. **Defendants Medical School, Clinic and Trustees are
>    entitled to summary judgment on the contract
>    claims.**

Defendants Medical School, Clinic and Trustees seek summary
judgment on the contract claims on the ground that they were not
parties to any contract with Dr. Connors.  Dr. Connors asserts
that these entities are "partners in 'Dartmouth-Hitchcock'" that
the Clinic and the Medical School "are branches of MHMH and/or
DHMC," and that they "act[] in partnership with MHMH and DHMC."
In support of these assertions, she relies on undated,
unauthenticated screen shots from a web page with the title
"Dartmouth-Hitchcock" that advertises a collaborative
relationship among DHMC, MHMH, the Clinic, and the Medical
School, among other entities.  Apart from whether this document
could constitute admissible evidence, *see* Fed. R. Civ. P.
56(c)(2), it does not establish that the Medical School, the
Clinic or the Trustees of Dartmouth College were parties to any
contract between Dr. Connors and DHMC and/or MHMH.  In addition,
Dr. Connors offers a copy of her business card, which references
the Medical School as well as DHMC.  From these documents, Dr.
Connors argues that each institution acted as agent of the other

25

institutions in operating the residency program, and that as agents their actions may be attributable to DHMC and/or MHMH.

Assuming that these entities enjoy a collaborative relationship, and collectively make up an entity that holds itself out as "Dartmouth-Hitchcock," Dr. Connors has offered no facts or law to support her agency theory in a breach of contract claim. She has offered no evidence that the Medical School, the Clinic or the Trustees made any promises or agreed to enter into any contracts with her. *See, e.g.*, *Specht v. Netscape Comm'ns Corp.*, 306 F.3d 17, 28 (2d Cir. 2002) ("A transaction, in order to be a contract, requires a manifestation of agreement between the parties.") (citing Restatement (Second) of Contracts § 19(2)). Dr. Connors has likewise offered no reason to depart from the general principle of contract law that only a party to a contract may be sued for breach of that contract. *See, e.g.*, *Crabtree v. Tristar Auto. Grp., Inc.*, 776 F. Supp. 155, 166 (S.D.N.Y. 1991) ("It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract."). Accordingly, Defendants Medical School, Clinic, and Trustees are entitled to summary judgment on the contract claims.[5]

---

[5]  Because "[a] cause of action for breach of the covenant of good faith can arise only upon a showing that there is an underlying contractual relationship between the parties," *Monahan v. GMAC Mortg. Corp.*, 2005 VT 110,

**2.    Certain of Dr. Connors' claims of breach of express or implied agreements survive summary judgment.**

Dr. Connors argues both that the Defendants breached their promises to provide adequate educational and training experiences and appropriate supervision and counseling, and that their dismissal of her from the program lacked just cause.  The Agreement of Appointment expressly provided that it was for a one-year term, and that reappointment would be "dependent upon satisfactory evaluations and fulfillment of program and institutional requirements."  Feb. 13, 2012 Hearing Defs.' Ex. C. The provisions of the GME Red Book's Fair Hearing Policy were incorporated into a resident's contract.  *See id.*  The Fair Hearing Policy provided a process by which an aggrieved resident could contest a decision not to renew her appointment, and provided that the decision of the Fair Hearing Committee would be final.  GME Fair Hearing Policy at III.B.4, Feb. 3, 2012 Hearing, Pl.'s Ex. 1.  Dr. Connors availed herself of this process, and the Fair Hearing Committee determined that the decision not to renew her appointment should stand.

In support of her claim that a jury should determine whether just cause existed for the nonrenewal of her appointment, Dr. Connors cites perfunctorily to an employment-at-will case in

---

¶ 54 n.5, 893 A.2d 298, 316, Count Four is dismissed against these Defendants as well.

which this Court denied an employer's motion for summary judgment on a former employee's wrongful termination claim, and concluded that whether just cause existed for firing the employee must be submitted to a jury. *See Gile v. J.C. Penney Corp.*, No. 5:09-cv-115-cr, slip op at 18 (D. Vt. May 28, 2010), ECF No. 68.  Unlike the situation in *Gile*, in which an employment-at-will relationship had been arguably modified to preclude discharge except for just cause, Dr. Connors' employment was governed by successive one-year contracts, each of which included provisions for the parties not to offer or seek renewal of the contract. Dr. Connors has offered no evidence that the Defendants were obligated to renew her appointment absent just cause for nonrenewal; accordingly this portion of her contract claims is **dismissed.**

Dr. Connors has also asserted implied contract claims alleging that Defendants breached promises of job security, adequate educational and training experience, appropriate supervision and counseling, reasonable accommodations to her disability and a work environment conducive to performing as a resident physician.  The Defendants characterize these claims as disability discrimination claims in disguise, which do not give rise to a contractual obligation, but the allegations reach beyond a failure to accommodate her disability.  Whether DHMC and MHMH intended to bind themselves to the terms of an implied

28

employment contract as Dr. Connors alleges—and what the terms of such a contract are—cannot be resolved at summary judgment; accordingly, this portion of Count Three of Dr. Connors' complaints will not be dismissed.

### 3.  Dr. Connors may have an opportunity to distinguish the conduct alleged in her breach of contract claims and her breach of an implied covenant claims.

In a footnote, Defendants suggest that Count Four, alleging breach of an implied covenant of good faith and fair dealing, must be dismissed because it does not identify any conduct distinct from her breach of contract claim, citing footnote 5 of *Monahan v. GMAC Mortgage Corp.*, 2005 VT 110, ¶ 54, 893 A.2d at 316.  Dr. Connors responds that her complaint includes assertions that are not contained in her breach of contract claim—specifically that Defendants made various false accusations concerning her conduct—but she has not provided the Court with any citations to her complaints in support of that argument. Count Four does not specifically allege that Defendants made false accusations against her.  Count Two of the complaint in docket no. 2:12-cv-51-wks, asserting illegal retaliation, alleges generally that Defendants falsely accused her of misconduct and incompetence.[6]  Compl. ¶ 38, No. 2:12-cv-51-wks, ECF No. 4.  This

---

[6]  Paragraph 38 of the Complaint states:  "Defendants accused plaintiff of misconduct and incompetence based on events that did not occur as defendant portrayed them.  Defendants[sic] accusations against plaintiff were false." Compl. ¶ 38, No. 2:12-cv-51-wks, ECF No. 4.

allegation, however, was incorporated into Count Three, for breach of contract, as well as Count Four.

To withstand summary judgment a party must support her argument by citing to particular parts of the record, *see* Fed. R. Civ. P. 56(c)(1)(A), and failure to do so may warrant considering the matter undisputed and/or granting summary judgment. *See* Fed. R. Civ. P. 56(e)(2),(3); *see also Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) ("[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion."). It appears that the conduct upon which Dr. Connors relies for her breach of the covenant of good faith claims has not been distinguished from the conduct upon which she relies for her breach of contract claims. It may be possible to do so. Accordingly, the Court affords Dr. Connors the opportunity to support her contention that the remaining portions of her breach of contract claims allege conduct that is distinct from the conduct alleged in her breach of an implied covenant of good faith and fair dealing claims. Failure to support or address the issue within thirty days will result in entry of summary judgment for Defendants on Count Four.

## Conclusion

The Defendants' motion for summary judgment is **granted in part and denied in part.** Defendants Dartmouth Medical School, Dartmouth-Hitchcock Clinic and Trustees of Dartmouth College are

**dismissed** from the case.  The claims for noneconomic damages under VFEPA are **dismissed.**  Summary judgment is **denied** on the VFEPA discrimination and illegal retaliation claims.  Summary judgment is **granted in part and denied** in part on the breach of contract claims, and Dr. Connors may have an opportunity to supplement her opposition to summary judgment on the breach of an implied covenant claims within thirty days.

Dated at Burlington, in the District of Vermont, this 11th day of July, 2013.

<u>/s/William K. Sessions III</u>
William K. Sessions III
U.S. District Court Judge