## UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF VERMONT

```
JENNIFER A. CONNORS,                :
                                    :
          Plaintiff,                :
                                    :
     v.                             :   Case No. 2:10-cv-94
                                    :            2:12-cv-51
DARTMOUTH HITCHCOCK MEDICAL CENTER, :
DARTMOUTH MEDICAL SCHOOL, MARY      :
HITCHCOCK MEMORIAL HOSPITAL,        :
DARTMOUTH-HITCHCOCK CLINIC and      :
TRUSTEES OF DARTMOUTH COLLEGE,      :
                                    :
          Defendants.               :
                                    :
```

### MEMORANDUM and ORDER Re:  Damages

At a final pretrial conference on September 16, 2013, the Court set a deadline of October 7 for motions in limine, requests to charge and proposed voir dire, and scheduled a jury draw for November 5, with trial to begin November 18.

On October 7, 2013, Defendants Dartmouth Hitchcock Medical Center and Mary Hitchcock Memorial Hospital (collectively "Defendants" or "DHMC") moved in limine to preclude Plaintiff Dr. Jennifer Connors from offering evidence of noneconomic and economic damages.  ECF No. 146.  As grounds, they asserted that her claims for noneconomic damages were time-barred, that she failed to supplement her economic damages disclosures, and that her claim for future lost income was inadmissibly speculative.

Dr. Connors filed opposition to the motion on October 28. In an affidavit accompanying her brief she stated that copies of her joint tax federal and state tax returns for 2009, 2010, 2011

and 2012 had been produced in discovery, minus some schedules, along with her W-2s and 1099s.  She stated that her husband earned $70,641.43 in wages in 2009; $80,740.64 in wages in 2010; 80,768.26 in wages in 2011; and $83,009.94 in wages in 2012, although she apparently did not provide support for these figures.  She stated that she earned all other income reflected on the joint returns.  She stated that she would supplement her expert's report by November 4, to provide the latest and most accurate income information and projections, based on the current prevailing interest rate.

Dr. Connors argued that her future lost income projections were not impermissibly speculative.  Specifically she stated that she had intended to become board-certified in child and adolescent psychiatry and that "Defendant's dismissal of her eliminated the pursuit of board eligibility in child/adolescent psychiatry."  Pl.'s Opp'n 3, ECF No. 155; see also Connors Aff. ¶ 13 ("Defendants' dismissal of me eliminated my pursuit of board eligibility in child/adolescent psychiatry."), ECF No. 155-1.

Plaintiff's expert, Dr. Robert Bancroft, had provided a report dated December 10, 2010, in which he identified three components to Dr. Connors' losses:  one, her inability to pursue outside employment during her DHMC residency; two, the delay in completion of her psychiatry residency; three, her lower expected future earnings due to the loss in her opportunity to practice

child/adolescent psychiatry.  Dec. 10, 2010 report 1, ECF No. 146-4.  His report presented information provided to him by Dr. Connors:  that had she completed her DHMC residency in June 2010 she would have become board-certified in child and adolescent psychiatry, general psychiatry and pediatrics, and would have pursued a career in child psychiatry.  Instead, she entered a residency program at Fletcher Allen Health Care ("FAHC") from which she expected to graduate in June 2011 and to pursue employment in general psychiatry.  *Id.*  Based on the information provided him, he calculated past and expected future income based on the average compensation of a child/adolescent psychiatrist and based on the average compensation of a general psychiatrist, using data from a recent report on physician compensation from the Medical Group Management Association ("MGMA").  *Id.* at 4 n.3, 7.  These figures were adjusted for inflation and present value.  This report was provided in discovery to Defendants, and provided the basis for their motion to exclude.

This Court issued a decision on October 31, 2013, excluding Dr. Bancroft's lost income projections as not passing the tests of causation, certainty or foreseeability required for contract damages, and finding that Dr. Connors' lost future income claim under FEPA was likewise based on the unsupported assumption that she would have become triple board-certified.  ECF No. 156.  The Court scheduled a hearing for November 4 to resolve outstanding

discovery issues, specifically to discuss whether damages discovery was complete and whether additional damages evidence should be precluded.

On November 4, 2013, Plaintiff moved to reconsider the Court's damages ruling. ECF No. 161. She asserted that Dr. Bancroft's lost income projections were not based upon the assumption that Dr. Connors would obtain board-certifications. She also asserted, in apparent contradiction[1] to her sworn affidavit, that board certifications are irrelevant to her current psychiatry practice or her earnings losses, and that she now practices in the fields she originally intended. Pl.'s Mot. 2. In other words, Dr. Connors intended to complete a residency program at DHMC in order to provide adult, child and adolescent psychiatric services; she completed a residency program at FAHC in order to provide adult, child and adolescent psychiatric services; she now provides adult, child and adolescent psychiatric services.

At the November 4 hearing, Dr. Connors presented a

---

[1]  The Court will allow Dr. Connors and her counsel the benefit of the doubt.  Telling the Court on October 28 that Defendants' termination of her residency eliminated her pursuit of board-eligibility in child and adolescent psychology does not directly contradict a statement on November 4 that board certification is irrelevant to her losses.  Nevertheless, her expert's theory of lost income in December 2010 and continuing through October 2013 was predicated on Dr. Connors having lost the opportunity to practice in her chosen field of child and adolescent psychiatry.  *Compare* Dec. 10, 2010 report 4 n. 3 ("The income projections [if residency at DHMC had been completed] are based on the average compensation of child/adolescent psychiatrist . . . .") *with id.* n.7 ("The income projections [upon completion of FAHC residency] are based on the average compensation of general psychiatrist . . .").

completely revised projection of her lost earnings, now based on
one year of delay in completing her residency training.  Nov. 4,
2013 Hr'g Tr. 4-5.  She jettisoned the MGMA average figures,
which showed an income differential based on a difference between
the expected earnings of a psychiatrist practicing in the field
of general psychiatry compared with a psychiatrist specializing
in child and adolescent psychiatry.  Her expert's revised report
projected income based on what Dr. Connors actually earned, and
assumed that she would have received this income one year earlier
had she completed her residency at DHMC in June 2010.  Taking her
actual annual gross earnings figure, Dr. Bancroft reduced the
figure by 1.5% to account for inflation and placed that figure in
the previous year as her expected annual gross income.  For
example, Dr. Bancroft's chart showed $115,437 as Dr. Connors'
actual gross earnings in 2012.  Dividing that figure by 1.015
produced an expected gross earning in 2011 of $113,731.  The
chart showed $316,039 as Dr. Connors' actual gross earnings in
2013.[2]  Dividing that figure by 1.015 produced an expected gross
earning in 2012 of $311,368.  (By contrast, the MGMA-derived
figure from the 2010 report projected an annual expected gross of
$211,439 in 2012 for a psychiatrist practicing in the field of
child and adolescent psychiatry.)  Dr. Bancroft projected a 4%

---

[2]  Dr. Bancroft testified that this figure was based in part on unpaid
invoices and paycheck records.

annual inflator in income through the year 2023.


Dr. Bancroft's table of projected lost earnings contained anomalous entries that did not appear to be supported by the discovery that had been provided to date.  Concerned about the late and incomplete disclosure of underlying data, the plaintiff's about-face on her damages theory on the eve of trial, and the apparent illogic of the numbers, the Court canceled the trial and scheduled a hearing to determine whether the newly proposed testimony concerning projected lost earnings would be admissible under Federal Rule of Evidence 702, and the degree to which DHMC was prejudiced by late and incomplete discovery and the last-minute switch in theory.

On November 13, 2013, the Court heard from Plaintiff's expert Dr. Bancroft.  Terming this an unusual case, Dr. Bancroft was able to recall perhaps one other time in his career when he was called upon to perform such calculations to obtain a figure for lost future earnings.  He did not indicate whether his reverse projected income calculation had ever been offered or accepted in a legal proceeding.

Because the Court's October 31 decision excluding future lost earnings was based on Dr. Connors' premise that she was denied the opportunity to become triple board-certified, and this was error, the standard for reconsideration has been met.  *See,*

e.g., *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013) ("A motion for reconsideration should be granted only when the [movant] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.") (internal quotation marks omitted). The Court however adheres to its original conclusion that Dr. Bancroft's lost earnings projections will be excluded, for the reasons set forth below.

1. **Damages consisting of future lost earnings extending through 2023 based on a one-year delay in completing residency training was not reasonably foreseeable, nor did the delay proximately cause such damages.**

Dr. Connors does not dispute that contract damages must be reasonably certain and foreseeable and reasonably within the contemplation of the parties at the time they entered into the contract. *See, e.g.*, *Gettis v. Green Mt. Econ. Dev.*, 2005 VT 117, ¶ 33, 892 A.2d 162, 172. This may include the loss of identifiable professional opportunities. *See Herrera v. Union No. 39 Sch. Dist.*, 2006 VT 83, ¶ 23, 917 A.2d 923, 933. Dr. Connors contends that her claim for future lost earnings was reasonably foreseeable because DHMC knew or should have known that her career might be ended or at least stalled before she could reach her career goal of providing psychiatric services to adult, child and adolescent patients. She has identified no lost

professional opportunities due to a one-year delay in completing her residency.

It is undisputed that after notifying Dr. Connors of her termination on January 28, 2009, DHMC allowed her to complete the program requirements in order to be eligible for a PGY-4 year elsewhere.  She completed those requirements by April 2009.  It is also undisputed that DHMC was willing to recommend Dr. Connors' candidacy if she wished to apply to a different psychiatry residency program for her PGY-4 year, and that Dr. Connors was aware of this within two weeks of her termination. *See, e.g.*, Landon email dated Feb. 11, 2009, ECF No. 67-4; Connors letter dated Feb. 13, 2009, ECF No. 67-5.

Given that Dr. Connors had already taken three years to complete two years of her residency, and that DHMC was willing to facilitate the completion of her residency training at another institution, it was not reasonably foreseeable that the act of not renewing her contract for her PGY-4 year would end her career or stall it before she could engage in the provision of psychiatric services to adults, children and adolescents.  It is undisputed that with supervision she could provide psychiatric services to patients before she completed her residency training. It is undisputed that she was able to complete her residency training and become licensed.  It is undisputed that she is currently practicing her chosen profession.  Moreover, if

8

Defendants' discriminatory conduct arguably caused a one-year delay in the commencement of her psychiatry practice, Dr. Connors has not provided credible evidence that such delay has proximately caused an earnings shortfall extending to the year 2023.

**2.   Plaintiff reconstructed the major portion of her damages theory without notice to Defendants, nearly three years after she initially disclosed her expert's report, more than two years after the trial-ready date, after Defendants had successfully challenged the viability of her original theory, and one day before a jury draw.**

If a party fails to provide information or to supplement its required disclosures as required by Rule 26(a) or (e) of the Federal Rules of Civil Procedure, the party may not use that information "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). Rule 26(a)(2) governs disclosure of expert testimony, and requires parties to supplement their disclosures when required under Rule 26(e). Fed. R. Civ. P. 26(a)(2)(E). Rule 26(e) governs supplementation of disclosures, and provides that a party must supplement or correct a required disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). With respect to an expert, "additions or

changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  Fed. R. Civ. P. 26(e)(2); *see* Fed. R. Civ. P. 26(a)(3)(B).

Without question the "supplementation" or "correction" of Dr. Connors' expert report was not timely.  The Court also finds that the failure was neither substantially justified nor harmless.

At the November 4 hearing, counsel for Dr. Connors stated that he had been mistaken about the basis for his expert's opinions, stressing that board certification had not played a part in Dr. Bancroft's calculations.  In effect, Dr. Connors' position is that "we were all confused," but that all her expert did was replace estimated income figures with actual figures, which should simplify the analysis of her lost income.  Nov. 4, 2013 Hr'g Tr. 5.  Examination of Dr. Bancroft's "assumptions" for the two reports makes clear that he did more than replace estimates of income with actual figures.  He abandoned the original theory that DHMC deprived Dr. Connors of the opportunity to practice in her chosen field of child and adolescent psychiatry.  *See* Bancroft Report 4 n.3,7.  Confronting the reality that Dr. Connors currently has a thriving practice treating adults, children and adolescents, he took her net income figures for 2011 and 2012, plus an estimated income figure for

2013 and calculated a projected 4% annual increase.  He assumed
that she would have earned this income (minus a 1.5% deflator)
one year earlier, and would have continued to suffer reduced
income through the year 2023 for a cumulative total at present
value of $281,313.  Dr. Connors' future loss theory is now
predicated on the assumption that a one-year delay in completing
her residency training has a negative effect on her ability to
earn a living in her chosen profession that extends twelve years
beyond the completion of her training.

The Court accepts that Plaintiff may not have known that her
expert was going to revamp not only her projected lost earnings
but the basis for the calculation.  However, she was well aware
from 2011 forward that the basis for the projections had changed,
because she had in fact been able to provide child and adolescent
psychiatric services as she had originally intended.  As of
October 28, 2013 she continued to maintain that DHMC had deprived
her of board eligibility and by implication reduced her earning
capacity as a result.  Dr. Bancroft testified that he had
informed Plaintiff's counsel a month or so prior to the hearing
that his lost future income calculations were not predicated on
board certification.  The Court can see no reason to conclude
that Plaintiff was substantially justified in the perpetuation of
this mistake and the failure to supplement her expert's report
until the eve of trial.

11

As of August 2013 DHMC was actively seeking updated discovery concerning Dr. Connors' employment and any supplements or amendments to her expert's December 2010 report.  DHMC argued in limine and was prepared to argue at trial if need be that Dr. Connors' lost earnings theory was not viable.  The Court agreed, granting the motion in limine on that ground.  Dr. Connors then switched her theory.  DHMC, having committed time and resources to address one damage theory, was now faced with a new theory of projected lost earnings, apparently the most significant component of Dr. Connors' damages claim, without notice and on the eve of trial.  This failure to supplement or disclose was by no means harmless.

Dr. Bancroft's projected lost earnings calculations will therefore be excluded on the additional ground that Plaintiff failed to comply with mandatory discovery disclosure requirements without justification and to the Defendants' substantial prejudice.  *See* Fed. R. Civ. P. 37(c)(1).

**3.   Certain of Dr. Bandroft's opinions are inadmissible as speculative under Federal Rule of Evidence 702.**

Under the Federal Rules of Evidence, a trial judge must ensure that scientific, technical or other specialized evidence is both relevant and reliable.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  Although a court must focus on an expert's principles and methodology, not on the conclusions they generate, *id.*, at 595, it is not required

12

"to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

In this case, Dr. Bancroft's November 2013 report posited that Dr. Connors' actual earnings would have been realized one year earlier had DHMC not terminated her residency, and that with an additional year of experience her productivity, and consequently her income, would continue to show a differential until the year 2023.  Dr. Bancroft acknowledged that his approach was novel.  That an approach is novel does not necessarily mean that it is inadmissible, but this is a case in which the gap between the data and the opinion is "simply too great."  *Id.*

First, there is simply no evidence beyond speculation that taking an additional year to complete a residency produces an income shortfall that stretches twelve years into the resident's future.  Second, there is no evidence that Dr. Connors' actual current income, upon which her expert based his projections, has any particular connection with her productivity.  Dr. Connors' 2011 and 2012 income derived from her medical practice.  She currently holds a salaried position with Health Care and Rehabilitation Services of Southeastern Vermont.  Dr. Bancroft's projections for 2014 and beyond are based upon applying a 4%

13

annual inflator to this salary, based in part on an MGMA study
showing that increased productivity increases income.

Dr. Bancroft's projected lost earnings are no longer based
upon MGMA studies of average compensations and an appropriate
inflator, but on Dr. Connors' actual "track record" of income.
Having that track record, however, Dr. Bancroft continued to
apply the inflator based upon nationally derived MGMA data.  The
appropriateness of this calculation as applied to Dr. Connors'
actual income is connected only by Dr. Bancroft's *ipse dixit*.

The analytical gap between one year of lost income and
twelve years of lost future earnings is simply too great.

The reserved portion of Defendants' Motion in Limine
Regarding Plaintiff's Damage Claims, ECF No. 146 is therefore
**granted.**  Plaintiff's expert is precluded from testifying
concerning her projected lost earnings.  Plaintiff's Motion for
Reconsideration Concerning her Damages Claims, ECF No. 161 is
**granted.**  Upon reconsideration, the Court excludes her expert's
testimony on future lost earnings for the reasons stated above.

Plaintiff is not currently precluded from offering evidence
of her inability to pursue outside employment activities during
her residency at DHMC, or of lost income during the additional
year it took to complete her residency training.


Dated at Burlington, in the District of Vermont, this 18th

day of November, 2013.

                                    /s/ William K. Sessions III
                                    William K. Sessions III
                                    District Court Judge