UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JENNIFER A. CONNORS,                  :
                                      :
          Plaintiff,                  :
                                      :
     v.                               :   Case No.  2:10-cv-94
                                      :             2:12-cv-51
DARTMOUTH HITCHCOCK MEDICAL           :
CENTER, MARY HITCHCOCK MEMORIAL       :
HOSPITAL,                             :
                                      :
          Defendants.                 :

**RULING ON MOTION FOR JUDGMENT AS A MATTER OF LAW**

Defendants Dartmouth Hitchcock Medical Center and Mary
Hitchcock Memorial Hospital have moved for judgment as a matter
of law on all of Plaintiff's claims, pursuant to Rule 50(a) of
the Federal Rules of Civil Procedure.  Defendants claim that
Plaintiff has not demonstrated that she is entitled to damages,
compensatory or punitive, nor has she presented evidence to
support her claims of (1) disability discrimination under the
Vermont Fair Employment Practices Act ("VFEPA"); (2) illegal
retaliation under the VFEPA; (3) breach of an implied contract;
and (4) breach of an implied covenant of good faith and fair
dealing.  For the reasons that follow, Defendants' motion is
granted, and the suit is dismissed.

**I. Background**

1

In April 2005, Plaintiff Dr. Jennifer Connors and Defendants Mary Hitchcock Memorial Hospital ("MHMH") of the Dartmouth Hitchcock Medical Center ("DHMC") entered into a Resident/Fellow Agreement of Appointment for graduate training as a psychiatry resident from June 26, 2006, through June 25, 2007.[1]  The Agreement provided that reappointment would be "dependent upon satisfactory evaluations [by the program director and/or departmental chair] and fulfillment of program and institutional requirements."  Pl.'s Ex. 14.  It further stated that "[i]n the event that it is determined by Responsible Person(s) that renewal of this Agreement for a subsequent year of residency/fellowship will not be made," written notice would be provided.  *Id.*

Around the time of her appointment, Dr. Connors notified the psychiatry residency program director, Dr. Ronald Green, that she had Attention Deficit Hyperactivity Disorder ("ADHD") for which she required additional time for testing.  DHMC agreed to provide this accommodation.  Dr. Connors did not assert at trial that this accommodation was not provided to her.  Shortly after Dr. Connors began at DHMC, her supervisors helped her find a psychiatrist at Dartmouth Hitchcock, Dr. Sateia, so that she could conveniently obtain prescriptions for her ADHD medication.

---

[1] Dr. Connors attended medical school at the University of Vermont from 1998 until 2003.  She then did a residency in pediatrics at the University of Utah in Salt Lake City, Utah, which she completed in 2006.

In early 2007, Dr. Connors was assigned to an inpatient psychiatry rotation at the Veterans Affairs Medical Center ("VAMC") in White River Junction, Vermont.  Dr. Connors testified that during this time, her supervisor did not allow her to leave the VAMC campus early to acquire medication.

Dr. Connors was placed on administrative leave in early March 2007 by Dr. Green following complaints regarding her performance.  These complaints included that she was not filing her notes on time and an incident during which she signed off on a physical examination that she had not completed.  She returned from leave in September 2007, after agreeing to a remediation plan.  The remediation plan accorded her release from her clinical duties one afternoon per week to allow her to meet with her health care providers.  Dr. Connors received her regular stipend and benefits under her contract throughout the duration of her administrative leave.

Dr. Connors and MHMH then entered into a Resident/Fellow Agreement of Appointment for graduate training as a psychiatry resident at the PGY-2[2] level from September 17, 2007, through January 6, 2008.  This Agreement was substantively the same as the prior agreement, other than a slightly increased stipend and the incorporation of the remediation plan.  Dr. Connors successfully completed a remediation period at New Hampshire

---

[2] "PGY" stands for "post-graduate year."

Hospital.  Following the completion of the remediation period,
Dr. Connors and MHMH entered into a Resident/Fellow Agreement of
Appointment for graduate training as a psychiatry resident at
the PGY-3 level, from January 7, 2008, through January 6, 2009.

    For her PGY-3 year, Dr. Connors was again assigned to the
VAMC two days per week,[3] where she avers she was not granted
reasonable accommodations for her disability.  Her chief
complaint during this time is that she was not given an office
in which to complete her notes, and instead was assigned to a
kitchenette area that housed a coffee pot, subjecting her to
distractions.  Dr. Connors was given an office at VAMC in May
2008, as soon as she began seeing patients.  It is undisputed
that Dr. Lambert, the residency director at the VAMC, was not
notified of Dr. Connors's disability until well after Dr.
Connors left the VAMC.  During Dr. Connors's PGY-3 rotation at
the VAMC, Dr. Lambert received frequent complaints from Dr.
Connors's other supervisors about her behavior and conduct, some
of which Dr. Lambert raised directly with Dr. Connors.

    On November 20, 2008, Dr. Green and Dr. Watts, the
associate director of the psychiatry residency program, met with
Dr. Connors to discuss the concerns of her supervisors,
including her failure to call a social service agency to report

---

[3] She also spent two days per week at Dartmouth Hitchcock, where she had easy
access to Dr. Sateia, and one day at a third location in Colchester, Vermont.

a child endangerment situation; misdiagnosing a patient and failing to discuss the diagnosis during supervision; disputing her supervisors' recommendations; lack of receptiveness to feedback; lateness submitting clinical notes; and unusual patient interactions.  VAMC faculty members were concerned that emotional or mental illness might be causing her behavior and asked Dr. Connors to undergo a fitness for duty evaluation, which revealed no ill health.

On January 28, 2009, Dr. Connors had another meeting with Dr. Green, during which Dr. Green notified Dr. Connors that she would not be renewed for her PGY-4 year of residency.  Dr. Connors's last training day took place April 12, and her stipend continued through June 30, 2009.  Dr. Connors left the program on April 12 having completed her PGY-3 training requirements. On April 14, she requested a Fair Hearing pursuant to DHMC's Policy & Procedure Manual for Residents and Fellows ("Red Book").  The Fair Hearing took place on June 1 and June 16, 2009.  On July 27, 2009, the Fair Hearing Committee concluded in a written decision that Dr. Green's decision not to renew Dr. Connors for her PGY-4 should stand.

Dr. Connors was permitted to complete the PGY-3 rotations she needed to be eligible for a PGY-4 year elsewhere, and was supplied with a recommendation to another institution to complete her residency training.  Dr. Connors completed her

residency training at another institution and received her medical license in Vermont, where she is currently a practicing psychiatrist.

After pre-trial dispositive motions, Dr. Connors had four surviving claims against Defendants: disability discrimination under the VFEPA (Count I); illegal retaliation under the VFEPA (Count II); breach of an implied contract (Count III); and breach of an implied covenant of good faith and fair dealing (Count IV). Dr. Connors also sought punitive damages. The parties commenced a jury trial on March 26, 2014. At the close of Plaintiff's case on day four of trial, March 31, 2014, Defendants moved under Rule 50 for judgment as a matter of law.

## II.  Standard of Law

Rule 50 provides that a motion for judgment as a matter of law may be granted if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "A court may grant judgment as a matter of law when the evidence, viewed in the light most favorable to the nonmoving parties, with every reasonable inference drawn in their favor, and without regard to its weight, yields but one conclusion as to the verdict that reasonable jurors can reach." *Vermont Mobile Home Owners' Ass'n, Inc. v. Lapierre*, 131 F. Supp. 2d 553, 555

6

(D. Vt. 2001) (Sessions, J.) (citing *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 120-21 (2d Cir. 1998)).

## III. Discussion

On their Rule 50 motion, Defendants claim that Plaintiff has not demonstrated that she is entitled to damages, compensatory or punitive, nor has she presented evidence to support her claims of (1) disability discrimination under the VFEPA; (2) illegal retaliation under the VFEPA; (3) breach of an implied contract; and (4) breach of an implied covenant of good faith and fair dealing. The Court finds that Plaintiff has not introduced evidence from which reasonable jurors could conclude that punitive or compensatory damages were appropriate, and the case must be dismissed on this basis. The Court further finds that Plaintiff has not introduced legally sufficient evidence to support her individual claims.

### A. Damages

Dr. Connors seeks compensatory and punitive damages. These are addressed separately below.

### i. Compensatory Damages

At trial, Dr. Connors put forth claims for compensatory damages based on the theory that Defendants' discriminatory acts denied her the opportunity to participate in "moonlighting," that is, accrue income from outside employment during her

residency.[4]  Dr. Connors failed to demonstrate compensatory

damages under either her VFEPA or contract claims.[5]

A person claiming a VFEPA violation may seek compensatory

damages, including restitution of wages or other benefits.  Vt.

Stat. Ann. tit. 21, § 495b(b).  Dr. Connors estimates her

damages at $50,000 based on the amount she could have made

"moonlighting" over the course of her residency at Dartmouth

Hitchcock.[6]  Dr. Connors states that she was not permitted to

moonlight during her residency because her program director, Dr.

Green, would not sign off on her licensure applications.

However, Dr. Connors did not link her lost moonlighting income

to any purported discrimination; in fact, she provided no

context at trial for Dr. Green's refusal to sign off on her

licensure application.[7]  Furthermore, and most crucially, Dr.

Connors's claim of lost moonlighting income is impermissibly

---

[4] Dr. Connors also sought to introduce evidence of damages on a second theory
– a future lost income claim based on the delay in the completion of her
residency.  Defendants objected to this testimony on the grounds that it
would be inadmissibly speculative and the Court sustained the objection, for
the same reasons that it granted a prior motion in limine to exclude expert
testimony on economic damages.  *See* Mem. Order Re: Damages, ECF No. 168.

[5] Though she was on the stand for nearly a full day, Dr. Connors did not
present *any* evidence of damages during her direct examination.  The Court in
its discretion granted Plaintiff's motion to recall Dr. Connors, ECF. No.
184, and allowed her to retake the stand to testify as to her damages.

[6] She calculated this amount as follows: a resident may earn $1,500 per
weekend moonlighting, and she believed she would have worked one weekend a
month starting in the summer of 2007 for total earnings of about $55,000.
She then subtracted the amount she earned moonlighting while completing her
PGY-4 to reach the $50,000 figure.

[7] The evidence at trial almost exclusively focused on the reasons Plaintiff
felt her non-renewal was unjust.  She never presented any evidence that she
had been denied attempts to moonlight while working at the VA.

speculative – Dr. Connors cannot demonstrate with any certainty that she would have moonlighted or how often.  She testified that her estimated moonlighting hours were based on her experience at her prior residency in Utah.  However, Dr. Connors herself made clear during the trial that she had a much easier time in the Utah program, and therefore it would not be reasonable for her to base her ability to work extra hours during her residency at Dartmouth Hitchcock on her previous residency experience.  Dr. Connors's proffered moonlighting damages are therefore too speculative to reach a jury.

The bulk of evidence that Plaintiff presented at trial regarded her administrative leave in 2007 and non-renewal in 2009 and the reasons she felt they were based on unlawful discrimination.  However, Dr. Connors failed to present evidence that she suffered *any* economic losses as a result of either. It is undisputed that Dr. Connors was paid her full residency stipend from June 2006 through April 2009, even for the time that she was on administrative leave and for the months after her January 2009 non-renewal.  She presented no evidence regarding her economic losses following her non-renewal.  Dr. Connors has thus provided no evidence of compensatory damages under her VFEPA claims.

Dr. Connors similarly cannot show compensatory damages on her contract-based claims.  "It is axiomatic that [a]

plaintiff[] can be compensated only for those damages which proximately resulted from defendants' breach." *B.B. & J. v. Bedell*, 591 A.2d 50, 51-52 (Vt. 1991).  Thus, for her contract claims, Dr. Connors must show that her damages were "reasonably certain and foreseeable and were reasonably within the contemplation of the parties at the time in which they entered into the contract." *Gettis v. Green Mt. Econ. Dev.*, 2005 VT 117, ¶ 33, 892 A.2d 162, 172.  Foreseeability is satisfied if the damages are "reasonably supposed to have been in the contemplation of both parties" at the time they made the contract [] as a probable result of [a] breach." *Albright v. Fish*, 422 A.2d 250, 254 (Vt. 1980) (quotation marks and citation omitted).

Dr. Connors's damages based on moonlighting fail under her contract claims for the same reasons outlined above.  In addition, Dr. Connors's damages allegation fails the causation requirement, as she has not shown that her failure to obtain moonlighting income is in any way connected to her non-renewal from her residency program.  She also failed to present evidence that Dr. Green's refusal to sign off was in violation of any implied contract or covenant of good faith and fair dealing. Dr. Connors therefore has not provided legally sufficient evidence to support a finding of compensatory damages under any of her four claims.

### ii. Punitive Damages

Dr. Connors also seeks punitive damages.  Punitive damages are reserved for especially egregious conduct, and therefore the Vermont Supreme Court has set a high bar for plaintiffs seeking such damages.  *Monahan v. GMAC Mortg. Corp.*, 2005 VT 110, ¶ 55, 893 A.2d 298, 316-17.  Under state law, punitive damages are unavailable unless the plaintiff shows two essential elements: (1) "wrongful conduct that is outrageously reprehensible" and (2) malice.  *Fly Fish Vt., Inc. v. Chapin Hill Estates, Inc.*, 2010 VT 33, ¶ 18, 996 A.2d 1167, 1173.  "[T]he purpose of punitive damages is to punish conduct that is morally culpable to the degree of outrage frequently associated with crime."  *Id.* ¶ 19.  It is not enough that the intentional or reckless conduct is wrongful or illegal, it must be "truly reprehensible."  *Id.* ¶¶ 19.  Even admittedly deplorable conduct has not satisfied the outrageously reprehensible element.  *See Oakley v. Victory in Jesus Ministries, Inc.*, 2010 WL 7794410, at *7 (Vt. July 1, 2010).  Therefore, in order for Dr. Connors to be entitled to punitive damages, she must show that the Defendants' conduct was more than simply unacceptable given the circumstances.

To prevail on a claim for punitive damages, a plaintiff must also provide evidence that Defendants' acts were made with malice.  The Vermont Supreme Court has defined malice as "bad motive, ill will, personal spite or hatred, reckless disregard,

11

and the like." *Fly Fish*, 2010 VT 33, ¶ 18.  Malice can be shown through recklessness, but only where there was "egregious harm resulting from [the] reckless conduct." *Id.* ¶ 25.  "[A] defendant's knowing and even gross indifference to a plaintiff's rights [is] insufficient to satisfy the malice threshold." *Id.* ¶ 28 (citing *Brueckner v. Norwich Univ.*, 730 A.2d 1086, 1096-97 (Vt. 1999)).

Dr. Connors claims that punitive damages are appropriate in this instance based on four allegations: first, that her VAMC supervisors in or about January and February 2007 refused to give her time off to see her psychiatrist to get her prescription refilled; second, for the first four months of her second stint at the VAMC in early 2008 she was assigned to the small kitchenette rather than her own office; third, there were periods of time when she had no assigned patients; and fourth, that they failed to give her adequate feedback in advance of her January 2009 non-renewal.  Because there is insufficient evidence to support a finding that the Defendants' conduct was malicious and outrageously reprehensible on any of these bases, Dr. Connors is not entitled to punitive damages as a matter of law.

Dr. Connors failed to present legally sufficient evidence at trial to support her claim for punitive damages under any of her theories.  Her first complaint is that her VAMC supervisors

12

reprimanded her for leaving work early and told her she needed to take a day off to see her prescribing physician to refill her ADHD prescription.  Even if Dr. Connors understandably found this hurtful or inconvenient, this behavior certainly did not have "the degree of outrage frequently associated with crime" required to meet the punitive damages standard.  *Fly Fish*, 2010 VT 33, ¶ 19.  Furthermore, their conduct did not preclude her from accessing her prescription.  Plaintiff's own witness, Dr. Beck, testified that Dr. Connors could have called Dr. Sateia's office when she was running low to have them send the medication to her, and there was evidence introduced from Dr. Sateia's deposition confirming that this was an option.  Dr. Connors testified that her supervisors at DHMC played a major role in helping her find a convenient psychiatrist to ensure that she would have easy access to prescriptions.

Moreover, this conduct did not constitute malice.  Dr. Connors testified that one of her supervisors stated that no one cared about her ADHD and that she was responsible for her own disability.  While being told by a supervisor that no one cared about her mental condition was wrong, even deplorable, it still does not support a finding of malice under Vermont precedent. In *Fly Fish*, the Vermont Supreme Court explained that even where a defendant is intentionally indifferent to the plaintiff's rights, this is insufficient to constitute malice in the absence

13

of "egregious harm."  *See id.* ¶¶ 25, 28.  Because the evidence

taken in a light most favorable to Dr. Connors only shows that

the VAMC supervisors were indifferent to her need to get her

prescriptions filled, but did not show that there was any

egregious harm resulting from this indifference, this is

insufficient to support a punitive damages finding.

Next, Dr. Connors argues that being assigned to the small

kitchenette was punishment for complaining about supervision.

Dr. Lambert, the residency director of the VAMC at that time,

testified that Dr. Connors received office space as soon as she

started seeing patients; Dr. Connors did not immediately start

seeing patients because she had to complete an orientation.[8]

Plaintiff's expert Dr. Beck testified that he believed that the

office assignment showed the Defendants' "deliberate

indifference" because they knew that Dr. Connors needed a quiet

---

[8] Contrary to Dr. Connors's assertion that every PGY-3 resident receives an
office, Dr. Lambert stated that residents use one of two "swing" rooms that
they share with other staff and trainees, but no resident had a permanent
office.  When residents had patients, they would be assigned an office for
the entire day.  Moreover, in May 2008, upon Dr. Connors's request, the
administrative assistant agreed to only assign Dr. Connors to a specific room
(Room 116) so that she could settle into one place.  Pl.'s Ex. 51.  This was
made possible because the V.A. moved some staff to another area, which opened
up more clinical space for Dr. Connors.  Prior to being assigned Room 116,
the staff would assign Dr. Connors to a room that was available that day.
The staff had initially offered her an office used by a part time employee
who was not at the VAMC on Fridays, but Dr. Connors rejected the office
because it was too cluttered.  Dr. Connors also stated that she was not
immediately given a key, which was a constant disruption to her day, as she
had to go to the call desk for the master key and then return the key.  Dr.
Lambert stated that VAMC used to give residents their own keys, but that
residents kept losing them so VAMC switched to using one master key.  She
added that when Dr. Connors requested to have her own key and she was given
her own key at that time.  See Pl.'s Ex. 54.

work area and the kitchenette had constant foot traffic.
However, as Dr. Lambert testified, Dr. Connors never explained
to Dr. Lambert that she had ADHD when she made specific office
accommodation requests.  Even if Dr. Lambert was aware of Dr.
Connors's needs, "a defendant's knowing and even gross
indifference to a plaintiff's rights [is] insufficient to
satisfy the malice threshold." *Id.* ¶ 28.  Thus, Dr. Connors has
not shown that the failure to immediately give her a personal
workspace was a result of Defendants' malice.

Dr. Connors also claims that she was either not assigned
patients or had an exceedingly low number of patients for
several months.  For instance, she started at Dartmouth in June
2006, but did not start her clinic until August and only
received her first patient around August 25, 2006.  She then
only had five patients throughout those initial months.  She
complained to her supervisor, Dr. Watts, about the low number of
patients, but he did not give her more patients.  Dr. Connors
also commented that there was a delay in her picking up patients
when she started working at the VAMC in January 2008.  However,
the evidence indicates that Dr. Connors picked up patients
fairly quickly and had an average caseload.  Dr. Lambert
explained in her testimony that any delay in Dr. Connors
receiving patients was not intentional, but was due to the
difficulty of her starting in January, unlike the other

residents who started in July and could take on patients from the residents who were completing their PGY-3 year.

Regardless of the reason for the delay, Dr. Connors's purported lack of patients does not support a finding of punitive damages.  Dr. Connors has only alleged that she did not have as many patients as she expected she would receive and that her supervisors repeatedly denied her opportunities to take on more patients.  There is no evidence that these refusals were outrageously reprehensible, or that they were done out of spite or hatred such to constitute malice.

Finally, Dr. Connors argues that rather than give her feedback on her performance, her supervisors were secretly sharing their complaints with one another and that Dr. Green actively collected the complaints and ambushed her at the November 20, 2008, meeting with all the emails and evidence of her misconduct.  She argues that because she never received specific feedback and continued to receive satisfactory or exemplary marks, the Defendants were in essence deceiving her.

However, Dr. Connors does not provide evidence in the support of this theory.  Instead, the evidence indicates that Dr. Green only sought feedback from supervisors to share with Dr. Connors at the November meeting in response to concerns voiced by Dr. Lambert and her other supervisors at the VAMC. This does not evidence a malicious attempt to actively form a

16

case against her, as Dr. Lambert was the initiator and she did not even know about Dr. Connor's ADHD.  In fact, Dr. Connors herself testified that she did not tell any of her supervisors at the VAMC about her ADHD, which makes it unlikely that the criticisms were made with personal spite due to her requests for accommodations.  Furthermore, emails introduced into evidence show that numerous supervisors voiced concerns that Dr. Connors was psychologically ill, indicating that the meeting was motivated by concern for her wellbeing, not malice.  Finally, the November meeting did not result in any adverse employment action, and occurred well in advance of Dr. Connors's non-renewal in January.  Thus, the meeting itself represented an opportunity for Dr. Connors to respond to the concerns voiced by her supervisors, rather than the ambush she describes, and thus was not outrageously reprehensible conduct that supports punitive damages.

Dr. Connors has therefore presented no evidence to support an award of punitive damages under Vermont law.  Dr. Connors also failed to show compensatory damages and has not requested nominal damages.  Thus, at the close of Plaintiff's case, the evidence presented was legally insufficient for a reasonable jury to make an award of damages based on any theory.  Because Plaintiff has failed to show damages as a matter of law, her claims are dismissed.

### B. Substantive Claims

Even if Dr. Connors could make a showing of damages, her individual claims still fail as a matter of law because she did not present legally sufficient evidence for a reasonable jury to find for Plaintiffs on her claims of (1) disability discrimination under the VFEPA; (2) illegal retaliation under the VFEPA; (3) breach of an implied contract; and (4) breach of an implied covenant of good faith and fair dealing.

### i. Vermont Fair Employment Practices Claims

VFEPA makes it unlawful for any employer to discriminate against a qualified disabled individual.  Vt. Stat. Ann. tit. 21, § 495(a)(1); *see Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 9, 955 A.2d 1082, 1088.  A "qualified" disabled individual is "[a]n individual with a disability who is capable of performing the essential functions of [her] job . . . with reasonable accommodation to the disability."  Vt. Stat. Ann. tit. 21, § 495d(6).  It likewise forbids any employer from discharging or discriminating against an employee because the employee has lodged a complaint of discriminatory acts or practices, or is about to lodge a complaint, or because the employer believes that the employee may lodge a complaint. § 495(a)(5).

Disability discrimination claims under VFEPA are subject to the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To

18

establish a prima facie case of disability discrimination, the
plaintiff must show that she is a qualified disabled individual,
that she suffered an adverse employment action, and the action
occurred under circumstances such to give rise to an inference
of discrimination. *Kennedy v. Dep't of Pub. Safety*, 719 A.2d
405, 406 (Vt. 1998). For a retaliation action under the VFEPA,
a plaintiff bears the initial burden of proving that she was
engaged in a protected activity, that the employer was aware of
that activity, that she suffered an adverse employment action,
and that there was a causal connection between the protected
activity and the adverse employment action. *Gallipo v. City of
Rutland*, 2005 VT 83 ¶ 15, 882 A.2d 1117, 1182.

In this case, the plaintiff is able to present a prima facie case of
discrimination or retaliation, the burden shifts to the
defendants to present a legitimate, non-discriminatory reason
for the adverse employment action. This burden is one of
production, not persuasion. *Boulton v. CLD Consulting
Engineers, Inc.*, 2003 VT 72 ¶ 15, 834 A.2d 37, 44. If the
defendant meets this burden, the burden shifts back to the
plaintiff to prove by a preponderance of the evidence that the
legitimate reasons given are merely a pretext for
discrimination. *Id.*

In this case, the parties do not dispute that Dr. Connors
has presented a prima facie case of discrimination and

retaliation, and clearly Defendants have met their burden of production in supplying non-discriminatory bases for Dr. Connors's termination.  These include the concerns and complaints raised by multiple supervisors and employees based on, among other things, her failure to call the Department of Children & Families to report a child endangerment situation, submitting clinical notes late, and unusual patient interactions.  Thus, the burden shifts back to Dr. Connors to present evidence that these legitimate reasons are merely pretextual.

At the close of her case, Dr. Connors had presented *no* evidence that Defendants' conduct was motivated by unlawful discrimination.  In fact, she did not demonstrate at trial that her supervisors at the VAMC (who gave her the unfavorable reviews) were even aware of her condition.  Furthermore, her non-renewal was subject to a formal Fair Hearing process.  After a two-day hearing in 2009, the non-renewal decision was affirmed.  Dr. Connors presented no evidence at trial that the Fair Hearing process was deficient in any way.  She also provides no evidence that her residency supervisor, Dr. Green, acted with discriminatory motive in refusing to sign off on her licensure application to moonlight.  Her claims of discrimination and retaliation therefore fail as a matter of law.

Dr. Connors also claims under the VFEPA that Defendants failed to reasonably accommodate her ADHD.  To make a *prima facie* failure to accommodate claim, Plaintiff must show that (1) Plaintiff is a person with a disability under the meaning of the VFEPA; (2) Plaintiff's employer had notice of her disability; (3) with reasonable accommodation, Plaintiff could perform the essential functions of her position; and (4) the employer refused to make such accommodations.  *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 97 (2d Cir. 2009) (internal quotation marks and citations omitted).  Under the VFEPA, a "reasonable accommodation" refers to the "changes and modifications which can be made in the structure of a job or in the manner in which a job is performed unless it would impose an undue hardship on the employer."  Vt. Stat. Ann. tit. 21 § 495d(12).

Dr. Connors claims that Defendants denied her reasonable accommodations in five ways.  She submits that her requested accommodations included additional time to take tests, a quiet area to prepare clinical notes and see patients, and the ability to acquire medication and treatment for her disability.  She also claims that she was denied feedback and was not assigned patients.  Dr. Connors did not present evidence at trial to support any of these claims.

It is undisputed that she was granted additional time to take tests.  Dr. Connors claims that she had difficulty acquiring her medication during her rotation at the VAMC in 2007; however, this was addressed in her remediation plan and it is undisputed that she was granted time to see her physician and receive prescriptions for the remainder of her residency.  The bulk of Dr. Connors's concern centers on a period at the VAMC during which she was assigned to the kitchenette.  However, the evidence put on during the Plaintiff's case demonstrates that the VAMC had space constraints and made efforts to assign her an office as soon as one became available and it is undisputed that Dr. Connors had an office to use as soon as she had patients.  Plaintiff also fails to show that she was denied feedback or denied patients; in fact, the evidence indicates that she had an extra supervisor and an average patient caseload.  From the facts as Plaintiff presented them, no reasonable jury could find that Plaintiff was denied reasonable accommodations for her disability.[9]

### ii. Contract Claims

Dr. Connors also brought claims against Defendants for breach of an implied contract and breach of an implied covenant of good faith and fair dealing.  At the close of Plaintiff's

---

[9] Moreover, Plaintiff has not even established whether she met her prima facie burden of demonstrating that her employer had notice of her disability or that she requested such accommodations, as the evidence suggests that her supervisors at the VAMC were unaware of her ADHD.

case, Dr. Connors had not explained her implied contract theory
to the jury, nor had she presented any evidence of any promises,
express or implied, made by Defendants as to her residency.  For
example, Dr. Connors introduced no evidence that she was
impliedly promised a place at Dartmouth Hitchcock for her PGY-4
year.  The Agreements of Appointment expressly provided that
they were for specified terms, and that reappointment would be
"dependent upon satisfactory evaluations and fulfillment of
program and institutional requirements."  Ex. 14.  Dr. Connors
also presented no evidence that she was denied the educational
training promised in her express contracts: Defendants allowed
Dr. Connors to complete her PGY-3 training through April 2009
after she was non-renewed in January so that she would be able
to continue her residency at another institution.  She received
her stipend and benefits throughout this period, and also during
her administrative leave in 2007.  Her supervisors also provided
recommendations to get her a placement elsewhere for her PGY-4
year.  She therefore did not demonstrate at trial that she was
denied anything promised to her under her residency agreement.

Though she did not discuss it in any detail, Dr. Connors
also introduced the "Red Book" of policies for residents as
evidence at trial.  Policy manuals may sometimes provide the
basis for an implied contract action.  Even assuming that the
"Red Book" made implied promises to Dr. Connors, she introduced

no evidence at trial that any specific provisions of the Red Book were denied to her.  Notably, the Red Book included provisions regarding Defendants' Fair Hearing Policy, which provided a process by which an aggrieved resident could contest a decision not to renew her appointment, and provided that the decision of the Fair Hearing Committee would be final.  Dr. Connors sought and was granted a Fair Hearing after her non-renewal, and she does not allege that this process was deficient or denied to her.  Plaintiff also introduced the DHMC Residency Training Program in Adult Psychiatry handbook into evidence, but did not demonstrate whether provisions of Training Program as described in the overview were not provided.  Thus, there is no indication that Dr. Connors did not receive the educational and training experiences promised to her under her contracts, whether express or implied.

Plaintiff has also failed to show that Defendants violated an implied covenant of good faith and fair dealing.  In a pretrial briefing, Plaintiff explained her implied covenant claim as based on Defendants' "assault" against her.  ECF No. 136.  This "assault" was premised on her purported lack of patients, her 2007 administrative suspension, her subjection to fitness for duty evaluations, and the failure to provide accommodations.  As detailed above, Plaintiff has not provided evidence that she was denied reasonable accommodations.

24

Moreover, the evidence suggests that while she began her time at VAMC with a light patient load, her patient load ramped up quickly to the point where she had an average number of patients.  Thus Plaintiff has not presented evidence to suggest that she was denied patients in bad faith.

Nor does Dr. Connors's 2007 administrative suspension support a finding of bad faith.  Dr. Connors was placed on paid administrative leave after supervisors expressed legitimate concerns about her, and was welcomed back into the program subject to a remediation plan that included provisions requested by Dr. Connors herself (such as the ability to take select time off from clinic to see her prescribing physician).  This paid leave and subsequent remediation plan therefore represents evidence of Defendants' *good faith* efforts to help Dr. Connors with the difficulties she was having and make her residency a success.  In fact, Dr. Connors herself testified that her remediation period, which she spent at New Hampshire Hospital, was a positive experience for her.

Finally, Dr. Connors does not show that her fitness for duty evaluations were performed in bad faith.  Instead, the evidence indicates that they were administered in response to concerns of supervisors.  Dr. Connors has presented no evidence to suggest that these evaluations were administered for any reason other than to ensure her wellbeing.  Plaintiff therefore

failed to present any evidence at trial to support her claim under an implied covenant of good faith and fair dealing.

## IV.  Conclusion

At the close of Plaintiff's case, the evidence presented was legally insufficient for a reasonable jury to support a finding of compensatory or punitive damages for Plaintiff, or to find for the Plaintiff on her individual claims of discrimination and retaliation under the VFEPA, breach of implied contract, and breach of an implied covenant of good faith and fair dealing.  Accordingly, Defendants' motion for judgment as a matter of law is **granted.**

Dated at Burlington, in this District of Vermont, this 2nd day of April, 2014.

<u>/s/ William K. Sessions III</u>
District Court Judge