UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


JENNIFER A. CONNORS          *
                            *
        V                   *
                            *
DARTMOUTH MEDICAL SCHOOL,   *
et al.                      * CIVIL FILE NO. 10-94



JURY TRIAL
Monday, March 31, 2014
Burlington, Vermont



BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
        District Judge


APPEARANCES:

    NORMAN E. WATTS, JR., Watts Law Firm, P.C.,
        19 Central Street, Woodstock, Vermont; Attorney
        for the Plaintiff

    EDWARD M. KAPLAN, ESQ. and WILLIAM D. PANDOLPH,
        ESQ., Sulloway & Hollis, PLLC, 9 Capital Street,
        Concord, New Hampshire; Attorneys for the
        Defendants




ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402

# <u>I N D E X</u>

## E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **JENNIFER CONNORS, M.D.** | | |
| Direct by Mr. Watts | 5 | 7 |
| Cross by Mr. Kaplan | 18 | 5 |
| Redirect by Mr. Watts | 27 | 15 |
| **MICHAEL SATEIA, M.D.** | | |

(Note: Italicization of record indicates
testimony of Dr. Sateia from his
deposition read into the record.)

| | PAGE | LINE |
|---|---|---|
| Direct by Mr. Watts | 34 | 6 |
| Cross by Mr. Kaplan | 45 | 16 |

## E X H I B I T S

| PLAINTIFF'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 123 | 2013 1099 tax form | 16 |

## M I S C E L L A N E O U S

| | PAGE |
|---|---|
| Plaintiff rests | 51 |
| Defendants' motion for judgment as a matter of law | 52 |
| Court's ruling on defendant's motion | 94 |

1   MONDAY, MARCH 31, 2014

2   (The following was held in open court without the jury

3   present at 9:05 a.m.)

4               COURTROOM DEPUTY:   This is case number 10-94,

5   Jennifer Connors versus Dartmouth-Hitchcock Medical

6   Center, et al.   Present in the courtroom on behalf of

7   the plaintiff is attorney Norman Watts.   Also present on

8   behalf of defendants are attorneys Edward Kaplan and

9   William Pandolph.

10       The matter before the Court is trial by jury day

11   four.

12               THE COURT:   All right.   This is the fourth day

13   of trial.   The plaintiff had filed a motion to recall

14   Dr. Connors, submitted in writing.   I read that motion,

15   read the response from the defendant, and also the

16   reply.

17       This is an effort to briefly call back Dr. Connors

18   to testify about compensatory damages.   It is highly

19   discretionary at this point.   I appreciate the fact that

20   Dr. Connors had a lengthy opportunity to testify about

21   compensatory damage; did not.   It is discretionary at

22   this point.   And I am going to permit Dr. Connors to

23   testify briefly in regard to compensatory damages.

24       That's the full extent of the testimony that you

25   seek to introduce; is that correct?

| | |
|---|---|
| 1 | MR. WATTS:  Yes, sir. |
| 2 | THE COURT:  Okay. |
| 3 | MR. WATTS:  Thank you. |
| 4 | THE COURT:  All right.  I appreciate that it's |
| 5 | a discretionary call, and I am going to permit the |
| 6 | plaintiff to be recalled.  So I think with that, we are |
| 7 | ready to proceed, are we not? |
| 8 | MR. WATTS:  Yes. |
| 9 | MR. KAPLAN:  I believe. |
| 10 | THE COURT:  All right.  Do you want to call |
| 11 | the jury in. |
| 12 | (The following was held in open court with the jury |
| 13 | present at 9:09 a.m.) |
| 14 | THE COURT:  Good morning.  Just want to remind |
| 15 | you that you are still under oath.  Has anyone spoken to |
| 16 | you about the case or have you learned anything about |
| 17 | this case from outside the courtroom? |
| 18 | (The jury all indicate in the negative.) |
| 19 | THE COURT:  And no one has conducted any |
| 20 | investigations either on the internet or anything with |
| 21 | regards to the facts of the case? |
| 22 | (The jury all indicate in the negative.) |
| 23 | THE COURT:  Okay. |
| 24 | All right.  Mr. Watts, do you want to proceed? |
| 25 | MR. WATTS:  Yes.  Thank you, your Honor. |

```
 1          I call Jennifer Connors.

 2                    JENNIFER CONNORS, M.D.,

 3      having been duly sworn by the courtroom deputy,

 4      was further examined and testified as follows:

 5          THE COURT:  Good morning, Dr. Connors.

 6          THE WITNESS:  Good morning, sir.

 7                    DIRECT EXAMINATION

 8  BY MR. WATTS:

 9  Q    Good morning, Dr. Connors.

10  A    Good morning.

11  Q    Dr. Connors, what are you asking this jury for?

12  A    I am asking you for the compensation for the losses

13  that I had while -- due to my treatment from

14  Dartmouth-Hitchcock Medical Center.

15  Q    The losses in connection with the facts that you

16  have testified to today?

17  A    That's correct.

18  Q    Would you give the jury an idea, specific idea of

19  what those losses are, please?

20  A    Yes.  There's two elements to the losses, as I see

21  them:  One related to being precluded from doing

22  moonlighting activities or moonlighting work and the

23  other for the delay in starting my practice as a

24  psychiatrist.

25  Q    You mentioned moonlighting.  Would you describe
```

1    what moonlighting is and when it might have occurred,
2    please?
3    A    Sure.  Moonlighting is taking on extra paid work as
4    a physician while one is a resident enrolled in a
5    training program.  So it requires a full state licensure
6    as well as permission from the program director to do
7    that.
8    Q    And I think you mentioned a moment ago you were not
9    permitted to moonlight.  Why not?
10   A    I wasn't -- I wasn't supported.  In fact, I was --
11   Dr. Green, my program director, didn't sign off on my
12   licensure applications to the state of Vermont.  I had a
13   Utah license when I started in the Dartmouth program,
14   but I needed a state license to practice, because
15   moonlighting requires independent practice as a doctor.
16   Q    What request did you express, if any, to Dr. Green
17   for that licensure documentation?
18   A    I requested a number of different times through my
19   years at Dartmouth, but the first time I remember doing
20   so in writing was in June or July of 2007.
21   Q    Okay.  So would you please give the jury insight
22   into what your losses were when you were precluded from
23   moonlighting.
24   A    Sure.  Typically the moonlighting activity that a
25   resident would do would be at New Hampshire Hospital.

1   It's a weekend type of stint or duty, and income that

2   one is paid is around $1500.  So I would -- based on my

3   pattern of moonlighting in Utah and my schedule at

4   Dartmouth, I would reasonably have moonlighted about

5   once a month at New Hampshire Hospital.

6   Q    Once a month for what period of time?

7   A    That would be from the -- from June of 2007 through

8   to, I think -- well, through the end of my -- of my

9   training there, which would have been 2000 and -- well,

10  9, if I had graduated.  But because it was a delay, it

11  was through to 2010 when --

12  Q    What is your understanding of what residents earn

13  during that moonlighting on the weekends?

14  A    About $1500 for the weekend per -- per weekend.

15  Q    So what do you figure the total of your losses in

16  that regard are?

17  A    About $55,000.

18  Q    And did you moonlight when you -- after you

19  transferred to the University of Vermont, did you have

20  moonlighting experiences there?

21  A    I did.  I -- I had a full medical license in

22  joining that program, and I worked at Vermont State

23  Hospital in that capacity moonlighting.

24  Q    What did you earn during that period of time?

25  A    Just short of $5,000.  Because of the -- because of

```
1    their requirements, I had to first rotate through

2    Vermont State Hospital before I could moonlight there

3    and then be welcome as a -- be admitted with

4    credentialling.  And so all of that happened in the

5    spring of 2011.

6         So I worked there as soon as I could in terms of

7    moonlighting and had a $5,000 contract, which I worked

8    through all of that.  So just shy of 5,000.

9    Q    So please describe your loss, net losses that you

10   have computed with regard to those dollars you have just

11   identified.

12   A    If you -- if you take the $5,000 that I was able to

13   make in -- for moonlighting and subtract it from the

14   55,000, when -- it comes down to $50,000 losses.

15   Q    And you mentioned a second category of losses.

16   Please describe.

17   A    The second category related to the delay in terms

18   of starting practice as a general psychiatrist or as a

19   psychiatrist.

20   Q    What was the delay?

21   A    The delay was due to excessive -- essentially from

22   being barred for the six-month period of time between

23   the beginning of March 2007 through till September and

24   the period of nonrenewal that summer; and then the delay

25   in -- or the refusal to -- to go from PGY-3 year to
```

1    PGY-4 year in January of -- the beginning of January of

2    2009; and then there was a six-month period of time

3    there that -- until the conclusion of the fair hearing,

4    and then I had to apply for new residency that whole --

5    which takes an entire year.  So I wasn't able --

6        And then during that time, there was a year period

7    in delay in terms of Dartmouth and Dr. Green, my program

8    director, again, signing off on his responsibilities

9    towards my medical licensure.

10       I got my medical licensure in June of 2010, just a

11   few days before entrance into the program here at UVM to

12   finish my year, my PGY-4 year.  That took a year

13   obviously to finish up.  And then I was able to practice

14   as a general psychiatrist.  And I otherwise would have

15   graduated from the Dartmouth program as a general

16   psychiatrist and entered practice in 2009.  So a

17   couple-year delay.

18   Q   Okay.  Please describe the earnings that you had

19   during the period of time once you started practicing in

20   2011, please.

21           MR. KAPLAN:  Your Honor, I am going to object

22   to this, and I think it would be best if we approach and

23   explain why.

24           THE COURT:  Right.  I think you should

25   approach the bench.

1    (The following was held at the bench.)

2              MR. KAPLAN:  Your Honor, the reason I am

3    objecting, and I didn't want to do it in open court, is

4    this is one of the issues that you considered in

5    connection with the expert and rejected this testimony.

6    So I object to it.

7              THE COURT:  It's totally speculative.

8              MR. KAPLAN:  And I object to it, and I just

9    want to -- I felt it best to approach.

10             MR. WATTS:  She is going to be speaking about

11   her actual losses, not about future losses.

12             THE COURT:  What is she going to say about her

13   actual losses?

14             MR. WATTS:  She is going to say she earned X,

15   Y and Z once she started practicing, and she could have

16   started practicing two years earlier and would have had

17   that income.

18             THE COURT:  That's totally speculative.

19             MR. KAPLAN:  Thank you, your Honor.

20             THE COURT:  And that's totally speculative.

21   That's essentially what I relied upon in excluding the

22   testimony of the expert.

23       I appreciate the fact that after she graduates from

24   UVM she gets a particular placement, but who is to say

25   what placement she would have gotten two years before

1  that.  That's the difficulty that you have, frankly, in

2  compensatory damages.

3          MR. KAPLAN:  The issue also is there was

4  moonlighting, but we did let that in.  We debated.

5          MR. WATTS:  Well, I mean, she -- she can

6  testify about her various job applications and how she

7  was -- you know, she was -- started working with the

8  Vermont State Hospital while she was at UVM.  So there

9  wasn't a period of time that was delayed, and there

10  wasn't really any uncertainty about it, because she has

11  already been moonlighting there.  And --

12          THE COURT:  But we are not talking about

13  moonlighting.  We are talking about compensatory

14  damages --

15          MR. KAPLAN:  Correct.

16          THE COURT:  -- for lost income, and what you

17  are suggesting is she takes her first year of

18  moonlighting after becoming a psychiatrist and then

19  essentially backdate that to give her an estimate of

20  what she would have earned two years ago, and there's

21  really not foundation for that.

22          MR. WATTS:  Well, that's what I am trying to

23  edge into here, is that she was already working at

24  Vermont State Hospital, and that's what -- she just

25  continued right on working at Vermont State Hospital.

1    And the same is true as she continued in the job market

2    working at HCRS.

3        They -- it's virtually an automatic job entry, and

4    so it wouldn't be speculative in a sense that she has to

5    search for a job, you know, being different jobs.

6            THE COURT:  But after she left UVM, she didn't

7    go to New Hampshire Hospital.  She may have gone to New

8    Hampshire Hospital in the meantime, on an interim basis,

9    but I didn't think that she went to New Hampshire

10   Hospital.  Did she?

11           MR. WATTS:  No, Vermont State Hospital.

12   That's where she --

13           THE COURT:  She went to Vermont State

14   Hospital.

15           MR. WATTS:  She had been moonlighting there

16   and she just continued.

17           THE COURT:  But I thought you said New

18   Hampshire.

19           MR. WATTS:  If I did, I'm sorry.

20           MR. KAPLAN:  She -- the moonlighting she was

21   talking about, New Hampshire Hospital, your Honor.

22           THE COURT:  Right.  He just said she went --

23   while going to UVM, was working at New Hampshire

24   Hospital.

25           MR. KAPLAN:  I missed it if he said that.

1          THE COURT:  That's literally what he said,

2     actually.  So now it's Vermont State Hospital.

3          MR. WATTS:  Yes.

4          THE COURT:  What does that mean?

5          MR. WATTS:  She moonlighted at Vermont State

6     Hospital, and she just continued at Vermont State

7     Hospital, and so there was no period of time when she

8     had to search for a job or any speculation about her

9     future income or what she -- what she was going to

10    pursue.  So the idea that it's speculative, it seems to

11    me, is drastically reduced because she just continued on

12    working for Vermont State Hospital.

13         MR. KAPLAN:  The problem, from our position,

14    your Honor, is that when she was moonlighting --

15    moonlighting is different than working in -- what they

16    are trying to do, no matter how they color it, is take

17    what she earned that next year, however they got it, and

18    attribute it to the prior year.  And that's what we

19    objected to in connection with the expert, that's what

20    you ruled on, and that's what they are trying to get

21    back in.

22         THE COURT:  I mean, I agree with that.  So I

23    am going to sustain the objection.

24         MR. KAPLAN:  Thank you, your Honor.

25         THE COURT:  Okay.

```
 1    (The following was held in open court.)

 2    BY MR. WATTS:

 3    Q    Jennifer, Dr. Connors, would you please describe

 4    the specific -- specifically the periods of time when

 5    you worked at Vermont State Hospital?

 6    A    Yes.  I was there in my capacity as a resident for

 7    Fletcher Allen Healthcare and UVM in November and

 8    December, so a month-long period, or a month-long block

 9    in 2010.  And then received admitting privileges for --

10    as a staff psychiatrist for the purpose of moonlighting

11    in March of 2000 -- 2011.  I then worked calls during

12    the weekend and calls overnight and was paid under a

13    contract with the state of Vermont during the spring

14    through to the July 1st of 2011, and that contract was

15    for $5,000.

16         There was a gap of time of maybe about a month, and

17    then I was rehired by Vermont State Hospital in a

18    similar capacity, after my graduation from my residency

19    program at UVM, and worked there under a number of

20    different contracts through to the closure of Vermont

21    State Hospital due to the flood in 2012.

22         So about a -- no, no, I'm sorry.  Several months

23    later.  So -- and then for a year after that working

24    actually as the only psychiatrist for Vermont State

25    Hospital for some displaced patients who we treated out
```

1    of the -- a unit out of a prison down in the southern

2    part of the state.  So I was a psychiatrist for that *ad*

3    *hoc* hospital there for about a year.

4    Q    And then what -- what did you do after that

5    professionally?

6    A    Well, during that time I also worked for HCRS,

7    which is a community-based mental health system for

8    folks with serious and persistent mental illness, at

9    first on a contract basis and then as a salaried

10   psychiatrist.

11   Q    And what about after that?

12   A    Pardon?

13   Q    What about after that?

14   A    That pretty much brings us to today.

15   Q    Okay.  And so that's what you are currently

16   pursuing, true?

17   A    That's what I am currently doing, yes.

18   Q    Okay.  I am going to show you a document that has

19   been marked as Exhibit No. 123, and if you can identify

20   it?

21   A    Yes.

22   Q    What is it?

23   A    It's a 2013 1099 tax form.

24   Q    And is it yours?

25   A    Yes.

1  Q    And it's the form that was the basis for your

2  filing for your taxes?

3  A    Yes, that we would be using this year, yes.

4          MR. WATTS:  I move the admission.

5          THE COURT:  This is the 2013 --

6          MR. WATTS:  Yes.

7          THE COURT:  -- W-2?

8          MR. WATTS:  Yes, sir.

9          THE COURT:  Okay.

10          MR. KAPLAN:  No objection.

11          THE COURT:  So admitted.

12          MR. KAPLAN:  It's not a W-2, however,

13  your Honor.  We're looking at both the -- I don't know

14  if Mr. Watts intended this.  It's a W-2 and I believe a

15  1099 as well, but --

16          MR. WATTS:  Right.  It does include the 1099

17  also.  Sorry.

18          THE COURT: All right.  It is admitted.

19          THE WITNESS:  I didn't look at the second

20  page.

21          (Plaintiff's Exhibit 123 was received in

22  evidence.)

23  BY MR. WATTS:

24  Q    And we have in evidence Exhibit No. D-1.  Would you

25  please just describe that to the jury?

1    A    It's a tax return, 2012, 1040.

2    Q    Is there anything else attached to that document?

3    A    There's a number of different pages.  Attached to

4    it is a 1099 for 2012 from the state of Vermont as well

5    as a 1099 from 2012 for HCRS.

6    Q    Okay.  And these are your tax returns?

7    A    Yes.

8    Q    This is for 2012?

9    A    Correct.

10   Q    And you are aware that Exhibit No. D-12 is your

11   earnings tax return for 2011; is that true?

12        You want me to show it to you?

13   A    (Witness nods head.)

14        Sorry.  Yes.

15        So D-12, yeah, 2011, same thing, 1040 and --

16   Q    So that's your tax return package that you filed in

17   2011?

18   A    Correct.

19   Q    Okay.  And similarly, we have in evidence the 2010

20   tax returns that you submitted to us and we gave to the

21   defense.  True?

22   A    True.

23   Q    And that's Exhibit No. D-11.

24   A    Okay.

25   Q    Okay.

```
 1              MR. WATTS:  Thank you, your Honor.
 2              THE COURT:  Okay.  All right.  Any cross
 3    examination?
 4              MR. KAPLAN:  Thank you, your Honor.
 5                    CROSS EXAMINATION
 6    BY MR. KAPLAN:
 7    Q    Dr. Connors, in terms of the testimony you just
 8    gave, I just have a few things I want to clarify.
 9         You continued to refer to the period of your
10    suspension as the period you were banned.  You just said
11    that again; is that correct?
12    A    Yes.
13    Q    Okay.  You were here, by the way, when your own
14    expert, Dr. Beck, said that was a reasonable reaction to
15    your behaviors at the time, weren't you?
16              MR. WATTS:  Objection.  Facts not in evidence.
17              THE COURT:  Objection overruled.
18         You can answer that.
19              MR. KAPLAN:  Thank you.
20              THE WITNESS:  I'm sorry.  What was the
21    question?
22    BY MR. KAPLAN:
23    Q    My question was, you were here when your own
24    expert, Dr. Beck, took the stand and testified that, in
25    his view, he could not challenge the decision of those
```

1    who put you on suspension for the actions that occurred.

2    Do you remember that testimony, ma'am?

3    A    I don't remember the testimony, actually.

4    Q    We'll move on.

5         I want to make sure of a couple of things.

6    During -- you started at the medical center in June of

7    2006, and you ended at the medical center around April

8    of 2009, correct?

9    A    Um, well, I guess -- it depends on what capacity

10   you are actually asking the question.

11   Q    How about when you showed up and when you left.

12   You started in June of 2006.  Can we agree to that?

13   A    Yes.

14   Q    And you last worked there sometime around April of

15   2009, I believe that's what you said in your testimony,

16   when you finished up the piece after the nonrenewal.  Do

17   you remember that?

18   A    The -- my last clinical day was April 10th.  I

19   moved out of my office the 12th.

20   Q    I will go with April 10th.  So basically -- you

21   were there, basically, from June to April, 2006 to 2009.

22   Correct?

23   A    I was -- still had the capacity as a resident until

24   August 1st, 2009.

25   Q    Okay.  And that was one of my points.  So you --

1    you had a residency contract that carried you through,

2    and I just want to ask if you can agree that you were

3    paid for three full years on residency contracts at the

4    medical center?

5    A    I don't know if -- I don't know if I could agree to

6    that.

7    Q    Well, did you have a residency contract from June

8    of 2006 to around June or July of 2007?  I mean, I can

9    mark all these and we can talk about it.

10    A    Right.  I --

11    Q    Don't you know you had a residency contract then?

12    A    Could you repeat your question, please, Mr. Kaplan.

13    Q    Sure.

14         Aren't you aware of the fact that you entered and

15    had a resident's contract from June, roughly, 2006, to

16    roughly the end of June 2007?

17    A    Yes, that's true.

18    Q    And do you recall that you got paid fully for that

19    particular year?  Correct?

20    A    Yes.  Based on the contract, yes.

21    Q    And you got paid fully whether you were on

22    suspension or whether you were on leave or whether you

23    were working.  Every payment under that contract was

24    paid to you.  Correct, ma'am?

25    A    Yes.

1    Q    Okay.  And then you entered into another residency

2    contract in September of 2007.  I think it was actually

3    September 17th when you ultimately came to agreement on

4    your remediation program?  Do you remember that?

5    A    That's -- that's not when the agreement was, but

6    what's the question related to the contract?  I'm sorry.

7    Q    My question is, you had a contract for another

8    yearlong period of time and got paid fully for that

9    particular contract, didn't you?

10   A    So the second contract was not a yearlong contract.

11   So, no.

12   Q    Did you get -- did you miss any pay while you were

13   at the medical center from the time you began until the

14   end of 2000 -- until June of 2009?  Three years, ma'am.

15   A    Right.  So -- so when -- the time -- so I, frankly,

16   am -- it's not an easy question, Mr. Kaplan.  So --

17   because the contract was nonrenewed in the summer of

18   2007, and then, so --

19   Q    Let's forget the contract.

20   A    Oh.

21   Q    I will try it a different way.  From the time you

22   began until June of 2009, all right, from the time you

23   began until June of 2009, did the medical center fail to

24   pay you your salary at any time?

25   A    So I was paid until -- I don't know, because I was

```
 1    paid for one -- until August 1st for one.  So I had pay

 2    and benefits all the way through the fair hearing

 3    process till the decision made, and then --

 4    Q    What you just said, doesn't that lead you to

 5    conclude, ma'am, that from June of 2006 until the end of

 6    your fair hearing process, you received your pay whether

 7    you were working or not working at the medical center?

 8    A    I was paid, but the -- but the accuracy to the

 9    amount that I was paid and periods of time were -- my

10    status was uncertain or my -- my PG year may have been

11    extended provides confusion in terms of whether I would

12    have been paid at a -- at a PG-2 level or PGY-3 level or

13    what have you.

14         So I can't concretely answer your question yes or

15    no, so -- that's an explanation as to why I can't.

16    Q    Can you point to a single week between June of 2006

17    and August 1 of 2009, when you did not receive

18    compensation and benefits from the medical center?

19    A    No, I can't.

20    Q    Thank you.

21         You have been critical of Dr. Green and his -- I

22    think your testimony was, his lack of assistance in

23    securing -- helping you secure a Vermont license.  Do

24    you remember that testimony a few moments ago?

25    A    Yes, something to that effect.
```

1    Q    When did you actually apply for your Vermont

2    license?  When did you physically apply for that

3    license?

4    A    For the -- for the license that I was provided in

5    June of 2010, the application process, I started

6    applying in October, November 2009.

7    Q    You sure it was that early?

8    A    I'm pretty sure it was that early.

9            MR. KAPLAN:  Bill, could you bring up Exhibit

10   D-1, D477.

11           MR. PANDOLPH:  Say that again.

12           MR. KAPLAN:  D477.  I think it's the first

13   page, actually.  That's it.

14       Can you highlight the part about the picture, that

15   whole -- just that part.  Yeah, from about there.  Thank

16   you.

17   BY MR. KAPLAN:

18   Q    Dr. Connors, this is your application for your

19   residence -- excuse me, for your license, and actually,

20   although it is dated 7 the 17th, the applicant's --

21   didn't you actually file this on November --

22       Didn't you actually file this application in

23   November of 2009?  Actually, I think it's --

24           MR. KAPLAN:  The exhibit number is D-1.

25   BY MR. KAPLAN:

1    Q    Dr. Connors, I know you prefer having documents

2    handed, so let me do it that way.

3    A    Appreciate it.

4    Q    Is that your application for your Vermont license,

5    ma'am?

6    A    This --

7    Q    The redacted material is your personal information

8    which we took out.

9    A    Um, this may be part of it, but it's not all of it.

10   Q    Okay.  On the front of it there's a stamp

11   indicating when it was received.  Do you see that stamp

12   and the date on it?

13   A    Yes, I see the stamp.  It's not -- the copy's

14   difficult, so I don't know where it's received from

15   or -- actually, I can't even make out received, but I

16   see the date.

17   Q    And what is the date on it, ma'am?

18   A    Actually, there's two dates on this document as

19   well.

20   Q    What's the date in the box that I just asked you

21   about?

22   A    The date in the box is December 17, 2009.

23   Q    Thank you.  Can I have it?

24        Now, regardless of when you applied for your

25   license, this license wouldn't permit you to work at New

1    Hampshire Hospital, would it?

2    A    Well, I would have to see the document again

3    because, like I say, that wasn't a complete document.

4    So the document actually could have been part of the New

5    Hampshire medical license application.

6    Q    It could have been part of anything, ma'am, but it

7    is an application for Vermont.  City:  Windsor; state:

8    Vermont.  This was your Vermont physician's license

9    application, wasn't it?

10   A    It may have been part of my application to this --

11   to the medical board of Vermont, but it -- there's

12   common applications that can be used in different

13   states.

14   Q    Did you file a request after your training license

15   in New Hampshire?

16   A    No.

17   Q    So regardless of whether there might have been

18   something, you never filed for a license in the state of

19   New Hampshire, did you, other than your training

20   license?

21   A    No, that's not actually correct.

22   Q    Did you file for a license in the state of New

23   Hampshire?  A medical license to practice medicine.

24   A    At some point in time, I believe in the summer of

25   2007 into the fall of 2007, and maybe other times, I was

1    in the process of applying for both Vermont and New

2    Hampshire, and at my -- end of my -- at the time that I

3    was leaving, you know, my clinical duties in 2009, I was

4    seeking that same letters of reference from my program

5    director for New Hampshire as I was in the fall of 2009.

6    Q    Did you file a license application in the state of

7    New Hampshire to practice medicine in New Hampshire?

8    A    At some point in those years, I believe I did.

9    Q    Okay.  Do you have a copy of that anywhere, that

10   you know of?

11   A    In my records.

12   Q    Okay.  So you think you filed in New Hampshire?

13   A    Yes.  There's some -- there's common applications.

14   There's a number of different clearinghouses where

15   applications for licensure goes through.  Some of --

16   some states use 'em, some states don't use 'em, but you

17   have to go through those --

18   Q    Okay.

19          MR. KAPLAN:  You can take that down, Bill.

20   Bill, you can take that exhibit down.

21          MR. PANDOLPH:  I did.

22          MR. KAPLAN:  Oh, thank you.

23   BY MR. KAPLAN:

24   Q    You are -- if I understand an exhibit shown to you

25   by counsel -- and I won't be much longer -- in 2013, you

```
1    earned a total of about $240,000, correct?

2    A    I believe -- yes.

3    Q    Okay.  In 2012, you earned about 140,000, correct?

4    A    You'd have to show it to me.

5    Q    You don't recall that, having just gone over it

6    with counsel?  Your own.

7         Do you remember what you earned approximately in

8    2012 without actually looking at the document?

9    A    I'd have to look at the document, sir.

10              MR. KAPLAN:  Your Honor, I have nothing

11   further.  Thank you.

12              THE COURT:  All right.  Anything further,

13   Mr. Watts?

14              MR. WATTS:  Yes, sir.

15                    REDIRECT EXAMINATION

16   BY MR. WATTS:

17   Q    Dr. Connors, would you please take a moment and

18   describe the licensing application process that you

19   began when you were a resident at Dartmouth-Hitchcock.

20   A    Yes.  It started with informing actually the

21   Graduate Medical Education department that I was -- that

22   I had a full license to practice in Utah, practice

23   medicine in Utah, and I had one for about a year and a

24   half before coming to the Dartmouth program, and so I

25   first asked for their assistance in continuing my
```

1    credentials in -- locally, so the state of Vermont, New

2    Hampshire, because I live right at the border of both

3    states.

4         And the -- so what I was seeking was to be -- was

5    to ensure that I had continued licensure to practice as

6    a physician as well as keep the other credentials

7    involving prescribing medications out- -- outside one's

8    credentials as a resident.  So I was seeking to maintain

9    my full credentials, just essentially, but have them

10   not -- have them not -- have the same that I had in Utah

11   in the state of Vermont and New Hampshire.

12   Q    So when did you start that process?

13   A    So that was in June, July, August 2006 when I first

14   got there.

15   Q    And what steps do you go through internally,

16   specifically, in that process?

17   A    There -- there -- their process for supporting

18   folks in their applications for licensure wasn't

19   particularly robust, and I was used to it being more

20   robust in Utah, so I essentially then took it upon

21   myself to understand the process in terms of the

22   application procedures, the different clearinghouses

23   that -- or data of repositories you have to go through

24   in terms of applying -- it's slightly different in

25   Vermont than it is in New Hampshire -- and submitting

1   information to those clearinghouses, getting the

2   necessary letters of references and recommendations, and

3   then filling out the state-specific forms that go along

4   with those applications, most of which are electronic,

5   some are paper -- Vermont is actually paper --

6   completing them.

7        And so through that period of time then,

8   specifically very notably in the summer of 2007, I

9   sought the same from Dr. Green as well as Dr. Nordby,

10  who was a faculty person; Dr. West.  Each -- each

11  licensure application requires either a reference and

12  completion of a certain portion of the application by

13  either a chief of staff, if one is an

14  independently-practicing attending physician or, in the

15  case of a person just coming out of training or involved

16  in a training program, then from the training program

17  director him or herself.  They are required to sign off

18  on your competencies, your ability to perform, your

19  ethical standing, and your fitness or wellness as a

20  physician.

21       So there's a couple pages in the Vermont

22  application, similarly in New Hampshire, as I remember

23  it, that needs to be completed by the training director,

24  in my case, and so I was denied that in the summer of

25  2007, in that I continued to go back to Dr. Green, as

1 well as in discussions with Graduate Medical Education

2 folks in that process.

3   So I again -- when I was finishing up at New

4 Hampshire Hospital, I asked Dr. Coursin for letters of

5 recommendation as well, talked with Mr. Kelleher, who

6 was administrative director out of Graduate Medical

7 Education to let him know I was pursuing -- and,

8 frankly, to ask him to answer the questions on my part

9 of the application that related to the programs part of

10 the application.

11   I then sought the same from Dr. Green notably in

12 May and June of 2008; was denied actually -- was -- his

13 actual response was to --

14     MR. KAPLAN:  Objection, your Honor.

15 A To --

16     THE COURT:  Objection.  You have an exception

17 to the hearsay rule?

18     MR. WATTS:  I'm sorry.  I was distracted and I

19 didn't hear what she was saying.

20     THE COURT:  Okay.  Objection sustained.  She

21 was going into comments that were made.

22     MR. WATTS:  Oh, yes, of course.  Dr. Green.

23 A And then the following time was in late October;

24 October, November of 2008.  Then I went back with the

25 forms to Dr. Green, to meet with him; actually,

1    specifically November 20th, 2008; was rejected; and then

2    I continued to seek the same forms, the same letters of

3    recommendation and the same part that he needed to

4    complete, from Dr. Green as well as others, including

5    Dr. Sateia, Dr. West, through -- all the way through

6    until April 10th and then beyond, actually.

7        Ultimately the final responsibilities of the

8    program and Dr. Green were met days before I entered the

9    UVM psychiatry program in 2011.

10   BY MR. WATTS:

11   Q    So you testified a moment ago about applying to

12   Vermont in this process you just described.  What

13   application, if any, did you make to New Hampshire?

14   A    The -- the -- I remember making application or --

15   to New Hampshire in the summer of 2007, and then

16   carrying forward when I was at New Hampshire Hospital.

17   So in that fall time period of 2007 until January.

18       And then after that, my -- my discussions with Dr.

19   Green were slightly more biased on the Vermont side

20   because I was a -- because I had a -- I had gotten a --

21   scholarship money from the University of Vermont to

22   practice in Vermont.  So -- but I continued to seek

23   both -- letters of recommendation, and in fact Dr. Green

24   provided me letters that were addressed both to the

25   medical board in Vermont as well as to the medical board

1    in New Hampshire.

2    Q    So your final application was only to Vermont, and

3    when did you file that?

4    A    It seems to me, as I remember it, it was in the

5    November time frame, 2009.

6              MR. WATTS:  Thank you, Dr. Connors.

7              MR. KAPLAN:  Nothing further.

8              THE COURT:  All right.  Thank you, Dr.

9    Connors.

10             (Witness excused.)

11             THE COURT:  All right.  The plaintiff want to

12   call the next witness?

13             MR. WATTS:  The next witness is a reading

14   witness, Dr. Sateia, but we are going -- I think we are

15   going to need a few moments to discuss their objections

16   to some of the reading material that we want to present.

17             THE COURT:  I thought you had agreed --

18             MR. KAPLAN:  And he agreed to read the first

19   two --

20             THE COURT:  The first two sections you had

21   agreed to.  There were disputes in regard to others.  I

22   thought you had withdrawn that.  As a result, those two

23   sections were to be read.

24             MR. KAPLAN:  And there is cross examination

25   from mine as well in there -- or an examination of mine

1  as well, your Honor.

2          THE COURT:  Okay.  Am I incorrect, Mr. Watts?

3  You have some dispute left?

4          MR. WATTS:  I guess not.  If they're in

5  agreement with what transpired previously, then we don't

6  have a disagreement.

7          THE COURT:  Okay.  All right.  Now, my

8  question is, how do you want to do this?  Ordinarily I

9  ask the law clerk to take the witness stand and you ask

10  the questions.

11          MR. WATTS:  Yes, that's what I intend to do.

12  She just left the courtroom.

13          THE COURT:  Miss Clark, would you like to take

14  the witness stand?

15          MR. KAPLAN:  Putting pressure on people.

16          THE COURT:  Absolutely.

17     You don't need to be sworn.  You just need to

18  read -- do you have a copy of the deposition?

19          LAW CLERK RACHEL CLARK:  No.

20          THE COURT:  All right.  I will introduce Miss

21  Clark as Rachel Clark.  She is a resident of Lincoln and

22  graduate of Harvard Law School; is clerking with me this

23  year.  Okay.

24          MR. WATTS:  So this is the transcript of

25  Dr. Michael Sateia's deposition taken in February -- on

1    February 24, 2011, at the Dartmouth-Hitchcock Medical

2    Center.

3         And if you will proceed to page number five at line

4    eight.

5         Dr. Sateia was sworn in and was under oath for this

6    deposition.

7         And at line eight, I asked Dr. Sateia:

8    BY MR. WATTS:

9         Q    *I understand that you are acquainted with*

10        *Jennifer Connors?*

11        A    *I am.*

12        Q    *And that that acquaintance may have begun as*

13        *early as 2005; is that accurate?*

14        A    *That sounds correct.*

15        Q    *And -- and that you didn't actually treat her*

16        *as a psychiatric patient?*

17        A    *Correct.*

18        Q    *But rather --*

19        A    *A prescriber of convenience.*

20        Q    *Okay.  I am going to show you what has been*

21        *marked as Exhibit No. 2, which appears to be an*

22        *e-mail from you to Dr. Green and -- Dr. Ron Green,*

23        *dated April 13, 2007.  I will give you a chance to*

24        *look at it.*

25        A    *Yes.*

1          Q     Okay.

2          A     I wrote this.

3          Q     Do you remember it?  I think that's attached

4          to -- I think that's what's attached to a

5          duplicate.

6                MR. KAPLAN:  I made a comment but you can go

7     ahead.

8     BY MR. WATTS:

9          Q     So Dr. West is the individual who asked you to

10         be the prescriber?

11         A     Yes, as an inpatient psychiatrist, and I was

12         asked, I believe, primarily because I do not have

13         regular interaction with the residents, that is,

14         they do not routinely rotate through the service

15         that I direct, and for that reason, you know, I was

16         not likely to have contact with Dr. Connors on any

17         kind of regular basis and, therefore, would

18         minimize any discomfort about the interaction

19         between being a supervising attending physician and

20         a prescribing physician for her.

21         Q     My understanding is, though, that you spent

22         some time with her over the course of those years;

23         is that true?

24         A     Jennifer would check in, we would have brief

25         discussions, kind of how are things going, and, um,

1    *provide her with her prescriptions; and basically I*

2    *would describe it, as I said here, as a brief*

3    *supportive context.*

4    *Q    Okay.  Apparently you reviewed some neuropsych*

5    *evals, according to the e-mail?*

6    *A    Right.*

7    *Q    What was the purpose of reviewing the items*

8    *described in the e-mail?*

9    *A    Just to satisfy myself, you know, that she had*

10    *been adequately evaluated and diagnosed, and those*

11    *reports were in front of me, and I satisfied the*

12    *diagnosis had been well established.*

13    *Q    That is the diagnosis of ADHD?*

14    *A    Correct.*

15    *Q    Any other medical issues besides that*

16    *diagnosis that you discerned?*

17    *A    Not based on this, no.*

18    *Q    Or that you perceived over time?*

19    *A    No.  Well, other than the fact that I think*

20    *that Dr. Connors was certainly stressed by the*

21    *issues at hand related to her residency and, um,*

22    *some of the, um, issues that had been raised by*

23    *supervising physicians and was being followed by*

24    *her treating psychiatrist for those issues.  But it*

25    *certainly was clear to me that, you know, that was*

1          *some stress there for her, though I, you know, did*
2          *not perceive that that was -- you know, reached the*
3          *level of any psychiatric illness.*
4                    MR. WATTS:  So we are going to skip to page
5     10, line 17.
6     BY MR. WATTS:
7          *Q     Okay.  So Exhibit No. 3 is one of the letters*
8          *that you refer to?*
9          *A     Yes.*
10         *Q     "To whom it may concern" letter dated April*
11         *10, 2009.*
12         *A     It says, Hm-hmm.*
13         *Q     "Hm-hmm."*
14         *What was your reason for writing this letter?*
15         *A     I was requested by Dr. Connors.*
16         *Q     Okay.  Did you contribute to the letter --*
17         *A     No.*
18         *Q     -- in words or thoughts?*
19         *A     No.*
20         *Q     Okay.*
21         *A     These were my observations and impressions.*
22         *Q     Okay.  So you indicated in the language here*
23         *that you thought she was straightforward, friendly*
24         *and considerate, and you refer to a number of*
25         *stresses related to her training, and I think you*

1          *refer to them as issues that arose during the*
2          *course of her residency.*
3     *A     Hm-hmm.*
4     *Q     What is your understanding of what those*
5          *stresses were?*
6     *A     Well, my understanding, you know, based*
7          *entirely on what Dr. Connors related to me, was*
8          *that, um, she had received, ah, a variety of*
9          *criticism and negative feedback from supervisors;*
10         *that she felt she was being singled out for*
11         *particular scrutinization with respect to her*
12         *performance, I think it's fair to say unjustly so,*
13         *in her view; that, um, efforts on her part to*
14         *rectify the situation or to address the issues that*
15         *had been raised by her supervisors seemed to be*
16         *unsuccessful; and that, um, she felt that her*
17         *training and career were being threatened, and*
18         *that, needless to say, would be highly stressful*
19         *for anyone.*
20    *Q     Did you have any reason to dispute her reports*
21         *to you?*
22    *A     No.*
23    *Q     And --*
24    *A     I should say, I had no firsthand observation*
25         *on which one could have disputed those reports.   My*

```
 1              information was entirely related to what Dr.

 2              Connors related to me.

 3         Q    Sure.

 4              And I asked you earlier about communication

 5         with Dr. Ronald Green.

 6         A    Hm-hmm.

 7         Q    What about other individuals who may have been

 8         in a supervisory role, such as Alan Green or even

 9         Dr. West?  Discussions --

10         A    No communications or discussions, ah, that I

11         have any recollection of.

12         Q    You indicate that your sense is that it would

13         have been quite easy -- quote, It would have been

14         quite easy for anyone to become somewhat unhinged

15         in the face of these stresses, unquote.

16              Again, you were basing that observation about

17         your sense, quote/unquote, on her reports to you.

18         That's true; isn't it?

19         A    Yes.

20         Q    You indicate further, quote, To be sure, she

21         was -- she has been disappointed, injured, and at

22         times angered by the decisions, unquote.

23              Was it your view -- why did you write you felt

24         she had been injured?

25         A    Well, um, because she had been placed in a
```

1    situation which, in her view, was, um, I think it's

2    fair to say, untenable.

3         She felt that she was, um, ah, in some

4    respects, ah, um, being subjected, as I said

5    earlier, to excessive scrutinization.

6         I think it's fair to say that Dr. Connors'

7    view of this was that in the view of some

8    individuals in the program, that she, um, was not

9    able to perform up to expectations, and in some

10   respects I believe it's fair to say that, um, she

11   viewed some as having a foregone conclusion that

12   she could not succeed.  That, I believe, would be

13   injurious to anyone who felt that they were in that

14   position.

15   Q    Did you have any reason to disagree with her

16   feeling as you just described it?

17   A    Again, you know, my sense was that Dr.

18   Connors's expression to me was, um,

19   straightforward, honest, forthright.  But, again,

20   I -- it just ought to be acknowledged I had no

21   outside contact regarding this, so the perspective

22   on this was, of course, entirely Dr. Connors'.

23   Q    Sure.  Okay.

24        I am going to show you what's been marked as

25   Exhibit No. 4.  This is the second letter that you

1          *wrote; is that true?*

2          *A     Yes.*

3                  MR. KAPLAN:  That's --

4                  MR. WATTS:  I am on page 14, line 8 -- I mean

5      line 16.

6                  MR. KAPLAN:  Thank you.

7          Continuing on line 19:

8      BY MR. WATTS:

9          *Q     And that's dated July 2, 2007.*

10                 *Was it -- was this written on Dr. Connors' --*

11         *at her request?*

12         *A     Yes.*

13         *Q     Okay.  And you made some statements in there*

14         *about -- in there that I wanted to inquire about.*

15         *A     Yes.*

16         *Q     You indicate that you believe she is a capable*

17         *clinician?*

18         *A     Right.*

19         *Q     What was your basis for that -- making that*

20         *conclusion?*

21         *A     As I said in the preceding clause, I mean, my*

22         *clinical contact with her had been quite limited.*

23         *It was really limited, in fact, to probably less*

24         *than a handful of on-call times that we shared and*

25         *then, you know, my general impression of her as an*

 1          individual.

 2              So with the caveat that my exposure was

 3          limited, she struck me as being a responsible

 4          person, you know, caring, certainly espoused

 5          dedication to her patients and concern for her

 6          patients.  And on that basis I would describe her

 7          in that way.

 8      Q   You indicate you had experience within a

 9          handful of clinical situations.

10              Do you have recollection of any of these

11          situations?

12      A   Specific recollection, no.  General

13          impression, ah, certainly that she performed

14          capably in delivery of emergency psychiatric

15          services.  I -- as one is wont to do, I suppose,

16          you tend to remember the times that go badly, and

17          you have concerns about residents, and I certainly

18          would not say that I had any of those concerns in

19          Dr. Connors' case, that I recall.

20      Q   So as far as you were concerned, in your

21          experience with her, there were no failures on her

22          part; is that true?

23      A   In my limited experience with her, certainly

24          not.

25      Q   Did she show any signs of psychotic

1    behavior --

2    A    No.

3    Q    -- or mental disorder of any type other than

4    ADHD?

5    A    Not to my knowledge.

6    Q    Did you have any experience with her in a

7    clinical setting to conclude whether or not she was

8    dependable as a physician?

9    A    Well, again, quite limited.  Insofar as my

10   limited contact went with her, I would say she

11   proved dependable, but that is based on a very,

12   very small fraction of her overall training.

13   Q    There were some medications that you

14   prescribed in your role as prescriber.  One of them

15   is Adderall.

16       Just for the record, what is the purpose of

17   Adderall, of prescribing Adderall for her?

18   A    Well, Adderall is a psycho-stimulant

19   medication.  It is, ah, commonly used in the

20   treatment of attention deficit disorder.  And Dr.

21   Connors had been using that medication and found it

22   to be helpful.

23   Q    Can you say when -- at the beginning of the

24   deposition --

25       MR. KAPLAN:  Your Honor?

1          You are beyond where we agreed.

2                    (Brief pause.)

3                    THE COURT:  Counsel want to speak directly to

4     each other as opposed to trying to putting this on the

5     record?

6          So is there some objection as to what the --

7                    MR. WATTS:  Your Honor, I think we concluded

8     our testimony, actually, with Dr. Sateia.

9                    MR. KAPLAN:  That's fine.

10                   THE COURT:  Okay.

11                   MR. WATTS:  Thank you.

12                   THE COURT:  All right.

13                   MR. KAPLAN:  Your Honor, we do have some other

14    aspects that we would like to read into the record.

15                   THE COURT:  Is that agreed to by the

16    plaintiff?

17                   MR. KAPLAN:  I believe so.

18                   MR. WATTS:  I am not aware of it.

19                   MR. KAPLAN:  I thought we just talked about

20    it.  I am going to begin on line 41.

21                   THE COURT:  All right.  Just take a brief

22    recess; both counsel consult with each other and make

23    sure we are in agreement that this other section should

24    be admitted.

25                   MR. KAPLAN:  That's fine, your Honor.  It

```
 1    wouldn't take more than two minutes to do that.
 2              THE COURT:  Okay.  We will just sit right
 3    here.
 4              MR. KAPLAN:  Okay.
 5              (Brief pause.)
 6              MR. WATTS:  I have no objection, your Honor.
 7    Thank you for the time.
 8              THE COURT:  Okay.
 9              MR. KAPLAN:  Dr. Sateia --
10         Would you begin on page 41, line 23, please, is
11    where I will start reading.
12         You there?
13              LAW CLERK RACHEL CLARK:  Yes.
14              MR. KAPLAN:  Okay.
15         Let's see.
16    BY MR. KAPLAN:
17         Q    Okay.  I want to talk to you for a moment
18         about the medication issue.
19              If I understand correctly, you did not
20         diagnose -- independently you did not diagnose Dr.
21         Connors with ADHD?
22         A    No.  And as I indicated to Dr. West, and as I
23         indicated to Dr. Green in my e-mail, you know, I
24         did not consider adult ADHD to be a particular area
25         of expertise for me and based my judgments in that
```

1          *regard on prior evaluation.*

2          *Q     You said in your first few answers that -- and*

3          *I want to use your quote.  You said, I am, quote, a*

4          *prescriber of convenience, close quote.*

5          *Do you recall those terms?*

6          *A     Yes.*

7          *Q     And, in fact, your role with regard to Dr.*

8          *Connors, as I understand it, was to be available to*

9          *prescribe the medications that she may need?*

10         MR. KAPLAN:  We've agreed --

11         *A     Right.  In particular, you know, one area that*

12         *is probably worth noting about this is that, um,*

13         *unlike almost all other medications, these*

14         *particular medications, the amphetamine medication,*

15         *Adderall specifically, cannot be written with*

16         *refills.  It cannot be phoned in.  It must be*

17         *filled with a hard copy written prescription within*

18         *five days of the issuance of the prescription or*

19         *the date thereof, which makes it particularly*

20         *difficult and challenging for patients who take*

21         *these medications to keep up with the scripts.*

22    BY MR. KAPLAN:

23         *Q     Sure.  But so let me --*

24         *A     Hence the convenience in particular with*

25         *regard --*

1          Q      So let me ask this question, though, in
2     connection with that specific matter.
3          Could Dr. Connors, if she chose to do so, have
4     called your office and told you that she was
5     running short of Adderall, or was out of it, and
6     needed a prescription, would that be consistent
7     with your being a prescriber of convenience?
8          A      Yes.   And in the e-mails that have been
9     entered -- the e-mail entered into evidence,
10    Exhibit 5 -- hang on.
11         Q      That's okay.
12         A      Exhibit 6.
13         Q      Right.
14         A      Ah, she --
15         Q      The one where you say, "I'm out Wednesday and
16    Friday"?
17         A      Yes.
18         Q      Okay.
19         A      And I offered to do essentially that.
20         Q      And I just want to follow up on that.
21    So is it correct, sir, that she did not have to be
22    physically in front of you in order to have you
23    write a prescription for the Adderall?
24         A      No.
25         Q      That's wrong or that's correct?

1    A    It's correct that she did not have to be

2    physically in front of me.

3    Q    And if she called to get a prescription for

4    Adderall, where would she -- if you know, what

5    would be the options about receiving the actual

6    medication, the pills?

7    A    Well, the options are that she can either

8    present herself to the office and pick it up from

9    the staff to whom I have provided it, or, um, that

10   it could be mailed to her.

11   Q    So if she, for example, was in a rotational

12   process at the V.A., and it made it difficult for

13   her to get here, in this building, in the building

14   at DHMC, first of all, she could have, if I

15   understand correctly, called you to request the

16   prescription?

17        Is that true?

18   A    Correct.

19   Q    And secondly, she could have had an option of

20   picking it up, whether or not you were here, from

21   your particular staff, correct?

22   A    Correct.

23   Q    And thirdly, if that was inconvenient for her,

24   she could have requested that your office send the

25   prescription to her?

1        *A        Correct.*

2        *Q        Did you ever recall asking for a prescription*

3        *to be sent there?*

4        *A        Not specifically.*

5        *Q        Do you recall whether or not Dr. Connors was*

6        *aware of the various options that were available to*

7        *her to secure her Adderall?*

8        *A        Well, she certainly was aware of the options*

9        *to come and pick it up because I offered it in*

10       *writing.*

11               MR. KAPLAN:  Okay.  Now we are going to turn

12       to page 50.  And I am going to be reading on page

13       four -- excuse me, line four.

14       BY MR. KAPLAN:

15       *Q        Sir, I want to read to you an answer to an*

16       *interrogatory that she -- that is Dr. Connors --*

17       *provided and ask you to comment on it.*

18               *It says, quote, Although -- I'm reading*

19       *literally from -- or verbatim from a response to*

20       *interrogatory number nine, in plaintiff's responses*

21       *to defendant's first set of interrogatories.  And*

22       *it says, quote, Although both accommodated my*

23       *disability early in my training, neither Doctors*

24       *West nor Sateia acted on my behalf such that I*

25       *could rightly continue my training and graduate*

1    *from defendants' psychiatry program.  Both allowed*
2    *the same injurious treatment established by the*
3    *defendants against me.  That's a direct quote.*
4    *In your view, does that quote accurately depict*
5    *your relationship with her?*
6    *A    No, it doesn't.  I have no recollection of Dr.*
7    *Connors ever requesting that I intercede on her*
8    *behalf.  And in my discussions with her, I believe*
9    *that I was clear that that was not a role that I*
10   *had been asked to play, nor was it a role that I*
11   *felt it appropriate to play, and that my*
12   *interaction with her would be limited to the*
13   *specific task of prescribing her prescriptions,*
14   *which was accompanied, as I have indicated, by some*
15   *intermittent supportive meetings.*
16   *Q    Just one other thing, I believe.*
17   *In Exhibit 7, that was placed in front of you,*
18   *could you take a look at that for a moment, sir.*
19   *A    One moment.  It's here.  It's burred [sic].*
20   *All right.  Got it.*
21   MR. KAPLAN:  For the record, your Honor,
22   Exhibit 7 to this deposition is Exhibit Z as in zebra in
23   our files.
24   BY MR. KAPLAN:
25   *Q    I am actually referring to some of the middle*

1      *of the first paragraph.  It says, quote, Just so*
2      *you know --*
3           *You see that?  It's five lines down.*
4      A    *Yes.*
5      Q    *"Just so you know, I am still grappling with*
6      *the disclosure versus discretion idea and have not*
7      *yet met with the disability officer, Kalinda*
8      *Trietley, to discuss the philosophy around this,"*
9      *and so forth.*
10          *Do you know whether or not Dr. Connors*
11     *actually ever met with the disability officer to*
12     *identify with particularity the accommodations she*
13     *claimed to be entitled to.*
14     A    *I do not know.*
15     Q    *Did she ever report to you that she did so?*
16     A    *I do not recall any report.*
17          MR. KAPLAN:  That's all we have.
18     Thank you.
19          THE COURT:  All right.  Okay.  Thank you.
20     Mr. Watts?
21          MR. WATTS:  Yes, your Honor.  Plaintiff rests.
22          THE COURT:  All right.  We are going to take a
23     break at this point.  I am going to actually stay on the
24     bench and talk with the lawyers, and this is going to be
25     of some length.  I really don't anticipate returning to

1  further hearing until at least quarter of 11.  So you

2  are going to get some extra time at this point.

3       You are certainly free to leave, but just be back

4  by quarter of 11 again.  All right?

5  (The jury was excused after which the following was held

6  in open court at 10:14 a.m.)

7            THE COURT:  Okay.  Does the defendant have --

8  Mr. Pandolph, do you have a motion?

9            MR. PANDOLPH:  Yes, your Honor.

10      We have a motion for -- seeking judgment as a

11  matter of law with respect to plaintiff's claims.  I

12  have a brief outline of the motion.  May I approach?

13            THE COURT:  Yes.

14            MR. WATTS:  Your Honor, may I have a moment to

15  go to counsel room?

16            THE COURT:  Pardon me?  To go to counsel room?

17            MR. WATTS:  Yes.

18            THE COURT:  Yes, that's fine.

19            (Brief pause.)

20            THE COURT:  All right?

21            MR. PANDOLPH:  Thank you, your Honor.  I will

22  try to be brief, your Honor.

23      Basically talk about the discrimination claims

24  first, and our position is, even assuming the plaintiff

25  has met her initial burden, clearly the defendants have

1    articulated legitimate --

2             THE COURT:  All right.  Before you actually go

3    to the claims, we have now been talking about

4    compensatory damages, obviously punitive damages.  We

5    have already dealt with emotional damages, although

6    technically I am not so sure that that's right when you

7    are talking about a good faith and fair dealing.

8         I would be interested to get your argument in

9    regard to whether the plaintiff has proven compensatory

10   damages, punitive damages, et cetera.

11            MR. PANDOLPH:  First, obviously, with respect

12   to punitive damages, we think that that should not get

13   to a jury.  Simply stated, the evidence doesn't come

14   close to what is necessary to support an award of such

15   damages.  If you read the Fly Fish line of cases --

16            THE COURT:  Sure.  It requires malice.

17            MR. PANDOLPH:  I'm sorry?

18            THE COURT:  It requires malice, essentially.

19            MR. PANDOLPH:  It requires two elements:

20   wrongful conduct that is outrageously reprehensible and

21   then malice, the two elements.  And I think that -- I

22   don't have much more to say than I don't think the

23   evidence supports that.

24            THE COURT:  Okay.

25            MR. PANDOLPH:  With respect -- I didn't hear

1    much testimony about compensatory damages.  I think that

2    the contract -- compensatory damages are not available

3    under contract law even for an emotional distress

4    damages, so I thought that had already been resolved.

5        We filed a motion *in limine* with respect to the

6    contract claims and good faith and fair dealings as the

7    contract claim.

8            THE COURT:  Well --

9            MR. PANDOLPH:  As you noted in your response,

10   there was no response to that.  So we --

11       Second, the only compensatory damages that I heard

12   was this moonlighting aspect, which is a little bit

13   different as, I believe, when the economist testified

14   that she had some moonlighting income.  So I was

15   surprised to hear that she claims she didn't have any

16   moonlighting income.  But as I understand it, it's mere

17   speculation to say that if she had a license, she would

18   have went to work at New Hampshire Hospital or would

19   have been assigned at a particular weekend and would

20   have made a particular dollar amount.  Other than that,

21   I don't think there's been any evidence --

22           THE COURT:  Well, it's -- I mean, the first is

23   the issue of whether it's purely speculative, and --

24   right.  The question is whether there's sufficient

25   foundation to say that she had a reasonable expectation

1    of making that kind of money.

2              MR. PANDOLPH:  I don't think --

3              THE COURT:  The second part, just advise me

4    of -- if this is in dispute or if I'm wrong, but this

5    asking for a support letter for licensure in Vermont, or

6    New Hampshire, for that matter, was not a part of the

7    complaint; I didn't think necessarily was a part of the

8    discovery that I was aware of.  It was something new.

9        I never heard of that particular allegation that

10   she's entitled to moonlighting damages because Dr. Green

11   did not write a letter supporting her licensure request,

12   and I --

13             MR. PANDOLPH:  I agree with that, and let

14   alone link it to any alleged discriminatory conduct.

15   That has never been an allegation.  It's not in any of

16   the expert reports, and I agree with that.

17             THE COURT:  Well, that is my question.  Is

18   that in an expert report?  In other words, if -- you

19   know, when she makes the allegations about moonlighting,

20   she could have gotten a job some place, now she's

21   linking that in some way to a failure to respond in a

22   letter of support from -- well, various individuals, but

23   Dr. Green among them.  And there seems to be no evidence

24   of actual submissions of requests for licensure in

25   Vermont until after she's gone in November -- November

1    25th of 2009.  Is this all new to you?

2          MR. PANDOLPH:  It is new to us.

3          MR. KAPLAN:  Well, your Honor, I don't want

4    to -- I want to be absolutely accurate because Bill

5    wasn't involved in some of that discovery.

6       We did know that she was claiming the issue of --

7    with regard to the letters, but it was never linked to

8    the inability -- either through their economist

9    originally, which you excluded, nor was it linked by

10    Beck to anything in connection with any expert report.

11       So the answer to your question is that -- I believe

12    she testified in her deposition that she felt she didn't

13    fairly get the letters.  I'm not going to deny that

14    fact.  But it was never linked to any claim that went

15    further than that testimony and has not been until just

16    now.

17          THE COURT:  And was not a part of the

18    economist's expert disclosure?

19          MR. KAPLAN:  It was not, your Honor.

20          MR. PANDOLPH:  I mean, the economist disclosed

21    that she had moonlighting income, and as you may recall,

22    she said it was --

23          MR. KAPLAN:  It was contrary.

24          MR. PANDOLPH:  Yes, it was --

25          MR. KAPLAN:  It was the opposite.  He said she

1    actually got moonlighting income.

2              THE COURT:  Oh, all right.  Okay.  Go ahead.

3    So --

4              MR. PANDOLPH:  You want me to move on?

5              THE COURT:  So, your objection to the

6    moonlighting income and your objection to the

7    compensatory damages claim is what?

8              MR. PANDOLPH:  My objection?

9              THE COURT:  Yes.

10             MR. PANDOLPH:  As I said before, it's

11   speculative.  It was not a claim that was made.  There

12   is no link between the alleged failure to submit

13   whatever letters needed to be submitted to Vermont or

14   New Hampshire and the discriminatory conduct alleged by

15   the defendants.

16             THE COURT:  Okay.  And the -- as far as you

17   understand the compensatory damages claim about lost

18   income, what you are basically saying, I think, what

19   they're saying, is that because she made money after

20   becoming a psychiatrist, the delay in the period of time

21   of now two years -- not one year but two years, forms

22   the basis of compensatory damages she would have been

23   making a certain amount of money two years earlier.

24             MR. PANDOLPH:  Yeah.  That's not sufficient

25   evidence to support that, and it's a speculative theory.

1    They didn't present an expert that said, you know, in

2    2009 or 2008, the average psychiatrist in Vermont --

3    maybe have done that.  They didn't do that.  They can't

4    say, okay, I earned -- as you indicated before, you

5    can't say that I earned X in 2000 whatever and somehow

6    that would have meant that that was the kind of income I

7    would have earned if I had been in the work force a year

8    earlier.  I thought that had already been ruled on.

9        They don't have any testimony to support loss of

10   income based on a delay in obtaining -- completing her

11   residency.

12           THE COURT:  All right.  Okay.  Anything else

13   that you want to add in regard to damages?

14           MR. PANDOLPH:  No.

15           THE COURT:  Okay.

16           MR. PANDOLPH:  You want me to go on to the

17   claim?

18           THE COURT:  Yes.

19           MR. PANDOLPH:  Okay.  So as I said before, you

20   know, we have briefed this in our summary judgment

21   motion.  It's the same -- basically the same argument,

22   even assuming that the plaintiffs have met their --

23   plaintiff has met her initial burden.

24       We have articulated a legitimate, nondiscriminatory

25   reason for any adverse employment action, namely, that

1     there were multiple complaints about her performance,

2     concerns that would have allowed us to reasonably

3     determine that she was not ready to advance to the next

4     level in late 2008 and early 2009.

5          My argument is fairly simple:  There's just

6     insufficient evidence upon which a reasonable jury could

7     determine that this was a pretext for intentional

8     discrimination in terms of her nonrenewal or any

9     retaliation.

10          The same is true with respect to failure to

11    accommodate.  I don't think there's sufficient evidence

12    upon which a jury could conclude that we failed to

13    provide her with any reasonable accommodation that she

14    requested.  It's nothing more complicated than that.

15               THE COURT:  All right.  So you take the

16    failure to accommodate and divide it into subcategories.

17    What is your understanding of what she specifically says

18    the claim is made up of?

19               MR. PANDOLPH:  I think she --

20               THE COURT:  The office space, et cetera.

21               MR. PANDOLPH:  Sure.  It's a quiet office.

22    The inability to obtain her medications or to see her

23    prescribing physician.

24               THE COURT:  Okay.  It's the office space.

25    It's the medication.  It's additional time for the

1    taking of tests.

2                    MR. PANDOLPH:  That's right.

3                    THE COURT:  And what else?

4                    MR. PANDOLPH:  I don't -- I don't think

5    there's anything else.

6                    THE COURT:  Okay.  And in regard to the office

7    space, that actually is limited to her time at the V.A.,

8    roughly three months before they actually got her a

9    permanent space, but the testimony is that they gave her

10   use of a space when she started to see patients.

11                   MR. PANDOLPH:  Right.

12                   THE COURT:  She always had space available.

13                   MR. PANDOLPH:  That's correct.

14                   THE COURT:  And that, as I understand it, is a

15   limited period of three months?

16                   MR. PANDOLPH:  Well, when she was in her --

17   there's two parts here.  When she was in her psychopharm

18   clinic in 2006 going into 2007, there's -- she had an

19   office every time that she saw her patient and for that

20   half of -- that half day once a week.

21       In terms of the inpatient rotation, the residents

22   don't have offices.  They see patients in the hospital

23   setting, so we're getting into 2007 for that.  And

24   that's testimony there.  There was a resident -- but

25   more importantly, I think, the testimony is there was no

1   evidence that anyone there knew she had ADHD.

2        So then we go into 2008.  That's the period of time

3   where Dr. Lambert testified that, no, any time that she

4   had a patient, she had an office on the days that she

5   was at the V.A. Medical Center.  Of course, there's no

6   dispute, apparently appears to be no dispute about what

7   happened at Dartmouth.  That's a little bit different

8   than saying I need a quiet place to work versus I need

9   the same office every time I come to the facility.

10        It is true that it took a little bit longer.  Then

11   she got the same office every time she came to the

12   facility.  So that's the -- that's the -- I think

13   basically maybe a two- or three-month period where she

14   had an office every time that she saw her patient, that

15   she had an office for the complete time, all the time

16   that she was at the V.A. Medical Center on those days,

17   and then it turned into an office that -- she had the

18   same office for the rest of her tenure there.

19        THE COURT:  So your understanding is that

20   there really is no dispute in regard to quiet space

21   in -- at Dartmouth.

22        MR. PANDOLPH:  Right.

23        THE COURT:  That it's just limited to the

24   period of time at the V.A.  That was extended for about

25   two to three months, but she still would get an office

1    to see people, and then she got her own space.

2                    MR. PANDOLPH:  I wouldn't say it's a period of

3    time where she didn't have quiet space.  I would say it

4    was a period of time where she was not assigned, you

5    know, Office 10 for every time that she came there as

6    opposed to one week she would have Office 10 as opposed

7    to one week she would have Office 5.  All were the same

8    quiet space, certainly.

9                    THE COURT:  Okay.  Then how about the

10   medication?  What do you think her claim is here, and

11   why is that not -- why does that not justify denial of

12   your motion?

13                   MR. PANDOLPH:  Well, the claim is -- well, you

14   heard the testimony from Dr. Sateia.  The claim is

15   basically for, I think, a two-month period where she was

16   doing an inpatient rotation at the V.A. Medical Center

17   in late 2006, early 2007.  She claims that she was

18   not -- she did not have the ability or they kept her

19   from getting her medication.  I think you heard the

20   evidence that that's not the case.  There were other

21   means to get her medication.

22       More importantly, again, the testimony from the

23   V.A. people is that they were not aware that she had

24   ADHD and this was a specific reason for her to go get

25   her medication.

1    Our position is on a failure to accommodate that
2    requires some obligation on the part of the plaintiff to
3    make it known:  Look, I gotta go get my prescription
4    here.  I gotta take time off.
5        And if you look -- and then when the remediation
6    plan came into place, they clearly made -- made --
7    indicated that she would be entitled to go get that
8    medication.  And the testimony, frankly, is that when
9    she came back from New Hampshire Hospital and started at
10   the V.A. Medical Center again in 2008, she had no
11   trouble getting her medication because she was at
12   Dartmouth on Tuesdays and Thursdays.  I think that's the
13   direct testimony.
14           THE COURT:  Okay.  And how about the
15   additional time claim --
16           MR. PANDOLPH:  I think that that's --
17           THE COURT:  -- which is what she told Dr.
18   Green at the very beginning, she needed additional time
19   to take tests.  Any indication that that was not
20   accommodated?
21           MR. PANDOLPH:  I don't think there's any
22   evidence that that was not accommodated.
23           THE COURT:  Okay.  And do you understand her
24   to argue any other failures to accommodate?
25           MR. PANDOLPH:  I did not hear any.

```
 1              THE COURT:  Okay.  All right?  How about the
 2    contract?
 3              MR. PANDOLPH:  Similarly, I heard -- there was
 4    no testimony, no evidence of any promise, express or
 5    implied, made by defendants as to her residency, let
 6    alone that there was some promise made --
 7              THE COURT:  What's at issue -- I mean, you
 8    have an express contract, theoretically.  Of course the
 9    contract ends in 2008.  So we were going forward on an
10    implied contract, the potential of some representations
11    that were made to her which form the basis of an implied
12    contract, which were separate and apart from the good
13    faith and fair dealing because you can't have
14    duplicative arguments here.  And so I allowed that good
15    faith and fair dealing to go forward.
16         So my question is, what evidence is there about an
17    implied contract, representations upon which she
18    reasonably relied to form the basis of an implied
19    contract, and then how are those facts distinguishable
20    from the ones which -- which related to the good faith
21    and fair dealing claim?
22              MR. PANDOLPH:  I didn't hear any evidence -- I
23    mean, there was no evidence, no testimony from Dr.
24    Connors about any promise, any such promise.  There was
25    no pointing to any documentation or anything of that
```

 1    nature, any oral promise by anybody.  There was just no

 2    testimony on that point.

 3              THE COURT:  Okay.  And no distinction in fact

 4    between the good faith and fair dealing claim and the

 5    breach of contract claim?

 6              MR. PANDOLPH:  Right.  And with the good

 7    faith -- you know, even assuming that the defendants are

 8    bound by a duty of good faith to evaluate her

 9    performance, again, I don't think any reasonable jury

10    could conclude that they did not act in good faith

11    evaluating her performance.

12       I mean, sort of -- the premise of the plaintiff's

13    testimony, frankly, has been, you know, not just cause,

14    but it's essentially been -- is criticisms or -- did not

15    provide sufficient cause to allow defendants not to

16    renew my contract.

17       I don't know where that intersects with good faith

18    and fair dealing, but I don't think a reasonable jury

19    could conclude that.

20              THE COURT:  But of course the Court has the

21    obligation to interpret the evidence at this point in

22    the light most favorable to the plaintiff.

23              MR. PANDOLPH:  Still, I still don't think a

24    reasonable jury could conclude that they acted in bad

25    faith.  You know, maybe you disagree; maybe she

```
 1    disagrees.  That's not bad faith.  Maybe -- you know,
 2    the evidence is that there were concerns, multiple
 3    concerns from third parties, from psychologists,
 4    psychiatrists, people at the V.A. Medical Center, and
 5    the defendants acted on those concerns and took those
 6    into consideration.  I don't know how you get bad faith
 7    from that.
 8              THE COURT:  Well, my initial concern is how do
 9    you differentiate between the claims for implied
10    contract as opposed to good faith and fair dealing?
11    Aren't there -- is that the same conduct essentially
12    underlying both claims?
13              MR. PANDOLPH:  I -- I mean, I suppose you
14    could say the good --
15              THE COURT:  Well, I guess you would agree with
16    that representation at this --
17              MR. PANDOLPH:  Yes.
18              THE COURT:  Right.  Okay.
19              MR. PANDOLPH:  Thank you.
20              THE COURT:  Okay.  All right?  Anything --
21         All right, Mr. Watts?
22              MR. WATTS:  Naturally we dispute the motion.
23              THE COURT:  Okay.  Can we go first to the
24    damages that you think you have established.
25              MR. WATTS:  I think that there is sufficient
```

1    evidence for the jury to conclude that Dr. Connors could

2    have engaged in moonlighting while she was at Dartmouth

3    during the '06-'09 period and that she was precluded

4    from doing so by Dr. Green's reluctance to and refusal,

5    essentially, to support her.

6            THE COURT:  Did you, in the course of

7    discovery, or in preparation of the case, disclose to

8    the other side, either in your expert's report or in any

9    other way, that you linked up the moonlighting damages

10   to Dr. Green's refusal to support her by making a

11   specific letter of recommendation available to her?

12           MR. WATTS:  Yes.  In her deposition, Dr.

13   Connors discussed the denial of moonlighting

14   opportunities and the fact that Dr. Green had refused or

15   ignored her requests for many, many, many months, and

16   that that precluded her until, finally, after she had

17   already left the program to make the applications.

18           THE COURT:  And you can say that she was

19   unable to moonlight because she couldn't get a

20   licensure, and she couldn't get a licensure because Dr.

21   Green didn't write a letter of recommendation?

22           MR. WATTS:  Absolutely.  And that's what she

23   testified to in her deposition, and that's what she

24   testified to here.

25           THE COURT:  Is there a -- some requirement of

1   the state of New Hampshire or the state of Vermont that

2   would require a letter of recommendation from the head

3   of the program?

4           MR. WATTS:  Yes.  As she testified, the

5   program director must sign off on her application.

6           THE COURT:  I didn't hear that, actually.

7           MR. WATTS:  That's what she was --

8           THE COURT:  That --

9           MR. WATTS:  That was the -- that she testified

10  to that just a moment ago, and she has testified to it

11  in her deposition.

12          THE COURT:  That the state of Vermont requires

13  that the head of the program sign off?

14          MR. WATTS:  That's what she said:  that Dr.

15  Green had to support her application for licenses in

16  both states.  And without that, she couldn't pursue any

17  moonlighting, and, from her own observations, she

18  testified, that resident physicians who have a license

19  are permitted and encouraged to moonlight and do

20  moonlight, and when they do moonlight, they earn $1500 a

21  weekend, from her own experience.  That's not

22  speculative; that's observation.

23          THE COURT:  Okay.

24          MR. WATTS:  And that she was precluded from

25  earning those funds.

1           THE COURT:  And did she actually request

2    licensure?  I mean, there's some dispute as to whether

3    she ever made a formal request, did any -- anything in

4    writing.

5           MR. WATTS:  You mean to the state or --

6           THE COURT:  To the state or --

7           MR. WATTS:  -- with Dr. Green?

8           THE COURT:  -- for that matter, to Dr. Green.

9           MR. WATTS:  Well --

10          THE COURT:  Anything in writing to verify that

11   claim?

12          MR. WATTS:  There is in evidence

13   communications to Dr. Green requesting that he sign off

14   on her application.  And then as far as the state's

15   concerned, I think she testified that she was

16   essentially discouraged from applying in New Hampshire

17   because of his reluctance, and then later decided

18   because of her commitments on her scholarship to just

19   pursue Vermont.  That didn't happen until well into

20   2009.

21          THE COURT:  So, you are suggesting there are

22   documents in the record which verified the fact that she

23   had made these requests of Dr. Green?

24          MR. WATTS:  That's my understanding, yes.

25          THE COURT:  Do you know where that is?

```
 1              MR. KAPLAN:  Your Honor, may I step out for
 2     one second, just pick something up?
 3              THE COURT:  Yes.  Yep, okay.
 4              MR. KAPLAN:  Thank you.
 5              MR. WATTS:  I can't identify it at the moment,
 6     but I will be happy to as soon as we take a break and I
 7     can look through the evidence -- the documents --
 8              THE COURT:  Okay.
 9              MR. WATTS:  -- if I may?
10              THE COURT:  All right.
11              MR. WATTS:  So she described the process that
12     is required for her to fulfill in order to apply for the
13     license, and without the license she could not
14     moonlight.
15              THE COURT:  Okay.  And so that would be a
16     lost -- that would be compensatory damages under what
17     theory?  Under breach of implied contract?  Under good
18     faith and fair dealing?  Under retaliation?  Or --
19              MR. WATTS:  It's under -- it's essentially
20     losses under the discrimination claim, retaliation claim
21     and the contract claim, not so much -- not the covenant
22     claim.  Each one of those carries, of course, a
23     potential for compensatory losses, and that's what we
24     are presenting.
25              THE COURT:  Okay.
```

1          MR. WATTS:  And then as far as the

2     discrimination claim and the retaliation --

3               THE COURT:  Well, what about punitive damages?

4          MR. WATTS:  I'm sorry?

5               THE COURT:  Do you think this is outrageous

6     conduct?  Do you think she has established outrageous

7     conduct --

8          MR. WATTS:  I do.

9               THE COURT:  -- or malice?

10          MR. WATTS:  I do.  And Dr. Beck particular --

11     specifically testified that, in his view, based on his

12     experience, it was reckless disregard of Dr. Connors'

13     rights, and that, in the case law, equates with malice,

14     and so I think we have presented that.

15          And she has presented many episodes of the

16     defendant misleading her, misinterpreting and miscasting

17     her conduct, and Dr. Lambert, for instance, saying her

18     notes are later and later to Dr. Green, and yet there's

19     zero evidence of that.

20          It became clear, especially after Dr. Connors asked

21     for a new supervisor to replace Dr. Watts, and then a

22     new supervisor to replace Dr. Green as program director

23     for her, that these people were not only just annoyed

24     but they were upset, angry with Dr. Connors, to the

25     point where they were distorting almost everything that

1     she did.  And that is *prima facie* evidence of malice and

2     disregarding her rights by ignoring the one -- the item

3     we were just discussing, ignoring her request for

4     licensure application cooperation and repeatedly

5     miscasting her conduct.

6          This has to be purposeful.  It has -- it is a

7     pattern.  And there's just -- there's no escaping that.

8               THE COURT:  Well, how is that argument

9     impacted by the fact that she had a -- she had a

10    hearing?  She had a full hearing, and she was able to

11    argue her case, and essentially the nonrenewal was

12    upheld.

13              MR. WATTS:  Your Honor, everyone that was

14    judging her conduct in that hearing was an employee of

15    Dartmouth-Hitchcock Medical Center, and that alone casts

16    bias against these people.

17              THE COURT:  Okay.  So what you are suggesting

18    is because the hearing committee was made up of people

19    who were employed by Dartmouth, that necessarily they

20    also engaged in malice?

21              MR. WATTS:  No, I don't think they engaged in

22    malice.  I think that they had a preconceived notion or

23    a bias because of their loyalty to the organization.  I

24    mean, ultimately they all report to the same person at

25    the top, through the channels, and sitting in judgment

1      of a person who is essentially an outsider to a program

2      director, that's -- I think it's unrealistic.

3              THE COURT:  But what evidence do you have of

4      that?  The only evidence you have is that they're

5      employees of Dartmouth, but to say that you have got

6      evidence that they -- they were biased, I mean, there is

7      no evidence on the record in regard to the good faith

8      hearing at all, for that matter.

9          So then the question becomes, how does the fact

10     that there was in fact a good faith hearing impact the

11     nonrenewal and therefore becomes relevant to this

12     litigation?

13         What you are basically saying is that Dr. Green

14     nonrenewed her.  It was Dr. Green, and all Dr. Green, as

15     if -- as if the hearing didn't exist.  And of course the

16     process is they had the full power to ignore or reverse

17     the determination made by Dr. Green.

18         It becomes a little bit more complex, doesn't it,

19     when you have a full good -- full hearing in which she

20     is afforded due process rights?

21             MR. WATTS:  It does become more complex

22     because you have to take a look at the process and who's

23     involved in the process.  There's no doubt about that.

24     She did have the opportunity to present -- there were

25     two hearings, actually.

1          At the first hearing, Dr. Green really didn't make

2     much of a presentation, apparently, according to

3     Jennifer Connors, and so they had to have another

4     hearing because she didn't know what to respond to

5     because he hadn't delineated out what his case was

6     against her.

7          At the second hearing, the -- his hearing memo is

8     in evidence here, and he portrayed her in the same way

9     that he had portrayed and his colleagues had portrayed

10    her throughout the process, and then she had an

11    opportunity to speak.

12         The bottom line here is -- I don't have any -- I

13    don't have a specific transcript and so I cannot

14    evaluate that, but I can say that -- what I said before:

15    That it appears to have been a bias formed because all

16    these people worked for Dartmouth.

17              THE COURT:  But there's no evidence in the

18    record here about what happened during that process:

19    transcript, et cetera?  Okay.

20              MR. WATTS:  That's true.

21              THE COURT:  All right.  So now going to

22    your -- your claims; first, the discrimination claim.

23              MR. WATTS:  The discrimination claim.  It's

24    clear that -- that Dartmouth people, the Dartmouth

25    institution, which includes New Hampshire Hospital and

1    the V.A., were well aware that Jennifer Connors has

2    ADHD.

3         As you observed, Dr. Green and Dr. Beck testified

4    that Dr. Green should have concluded right from the very

5    beginning because of her requests for tests, testing

6    time, extra testing time, and the fact that she

7    testified that he -- she told him she had a learning

8    disability -- that should have triggered something.

9         The employer --

10             THE COURT:  What is the evidence of what she

11   said to Dr. Green or, for that matter, to anyone else

12   defining her -- her disability and in requesting

13   accommodation?  What specifically did she say?

14             MR. WATTS:  She in -- well, she, first of all,

15   informed Dr. Green, specifically telling him that she

16   had a learning disability right up front in 2006.

17             THE COURT:  Okay.  That was not ADHD.  That

18   was just a learning disability.  Needed extra time to

19   take tests.

20             MR. WATTS:  Right, but --

21             THE COURT:  Okay.

22             MR. WATTS:  But that has a broader

23   connotation.  It should have a broader connotation to a

24   psychiatrist what a learning disability is requiring

25   tests.  But beyond that, there are e-mails in evidence

```
1    and notes in evidence and requests in evidence,
2    particularly the request that she made for -- when she
3    prepared the remediation statement, the remediation
4    plan.  Her proposal for remediation plan referred
5    specifically to ADA accommodations and her repeated
6    request for officers -- an office instead of being
7    shuffled off to the coffee cove that was used as a
8    common --
9              THE COURT:  Okay.  So let me just try to again
10   get a list of the actual claims that you have of how she
11   was discriminated.  Number one is the office space.
12             MR. WATTS:  Correct.
13             THE COURT:  She -- and that particularly, is
14   it not, is limited to that period of time at the V.A.
15   during which she did not have her own space, her own
16   office?
17             MR. WATTS:  That's correct.
18             THE COURT:  There's nothing about Dartmouth or
19   Mary Hitchcock and office space that forms the basis of
20   your claim.
21             MR. WATTS:  That's correct.
22             THE COURT:  Okay.  So then the second is the
23   medication, that she was not afforded an adequate
24   opportunity to go get her medication.
25             MR. WATTS:  Correct.
```

```
 1              THE COURT:  And then the third is that she
 2    needed additional time for the taking of tests.
 3              MR. WATTS:  Correct.
 4              THE COURT:  There really has been no evidence
 5    about that.  I assume that she was afforded additional
 6    time --
 7              MR. WATTS:  I think so.
 8              THE COURT:  -- for test taking.  Okay.  So
 9    what else is there?  What else is the basis of your
10    claim?
11              MR. WATTS:  Feedback from her supervisors that
12    would advise her as to what their concerns were.  There
13    were times when she -- for instance, in 2008, when the
14    only feedback she received from Dr. Lambert, who didn't
15    even evaluate her for many months in 2008, formal
16    evaluations that Dr. Connors could review and understand
17    what it is that they had -- may have concerns about.
18    Dr. Connors didn't know about any of that until November
19    of 2008; that -- that Dr. Connors --
20              THE COURT:  How is that related to your
21    discrimination claim?  In other words, how does the fact
22    that she did not get feedback, how does that stem out of
23    a sense that she's going to be discriminated against
24    because of her, at that point, learning disability?
25              MR. WATTS:  Because the standard practice in
```

1    these residencies is to -- is for heavy supervision,

2    particularly in the psychotherapy setting, in the

3    inpatient setting, for residents, and the ACGME and the

4    Dartmouth regulations are replete with requirements that

5    these people had to provide her with feedback and

6    supervision and monitoring, and --

7            THE COURT:  And you think they didn't do that

8    because they were discriminating against her?

9            MR. WATTS:  That's right.  Well, look at the

10   example that I just made:  That Dr. Lambert didn't

11   provide her with any evaluations from June through the

12   end of -- into October, and she was her supervisor at

13   the V.A. and oftentimes not even showing up for

14   supervision, hands-on supervision.  That was her

15   testimony.

16           THE COURT:  But Dr. Lambert testified that she

17   had a lot of contact with Dr. Connors and was

18   continually giving her feedback.  I mean, that's the

19   evidence which has been --

20           MR. WATTS:  Well, that's --

21           THE COURT:  -- introduced from her.  Obviously

22   Dr. Connors disagrees with that.

23           MR. WATTS:  Correct.

24           THE COURT:  But --

25           MR. WATTS:  Dr. Connors' record of all of that

1    is diametrically opposed to that, and it's clear from

2    the evaluations that there was no evaluation from June

3    on, and the only thing that was happening is Dr. Lambert

4    was back-channeling with e-mails, Dr. Green telling her

5    she was later and later, and there was other concerns

6    about her conduct, and she didn't -- there was no

7    advisories to Dr. Connors about that until she walked

8    into a meeting in November -- on November 20th, 2008,

9    where it was supposed to be a meeting to discuss her

10   fellowship and her application for the fellowship in

11   child and adult psychiatry, and, bang, they hit her with

12   all these e-mails that had been -- that Dr. Green had

13   collected against her.

14       And, I mean, that alone, that ambush-type conduct

15   alone, shows that these people were, in essence,

16   deceiving her, not evaluating her formally, as they are

17   supposed to do, but actually back-channeling criticism

18   against her to undermine her in the program.

19              THE COURT:  So really, the thrust of the

20   discrimination claim is not laid at the hands of Dr.

21   Green because he is in receipt of all these negative

22   observations of Dr. Connors.  What you are now saying is

23   that the problem lies more with the people with whom she

24   was working who were saying these negative things about

25   her to Dr. Green.

1      MR. WATTS:  No, that's not what I am saying.

2      THE COURT:  Is that correct?

3      MR. WATTS:  What I am saying is that Dr. Green

4  led the way in terms of negativity about Dr. Connors, in

5  terms of his collecting negative perceptions of her, and

6  all the while he personally evaluating her very

7  positively, so that it's -- it's a deception that, you

8  know, he says to her, You have done a fine job when I am

9  supervising you, and at the same time he is going out

10  and collecting criticisms against her.

11      THE COURT:  Well, right.  She does well at New

12  Hampshire Hospital.  He then responds, You are doing

13  very well, which is an accurate reflection of what she

14  is told.  And then later on he begins to get all of

15  these negative responses, and that leads ultimately to

16  the November 2008 meeting.

17      MR. WATTS:  There is a memo in the file, in

18  Exhibit 96, where Dr. Green says, in late 2007, after

19  she had gone through the -- successfully through the

20  remediation, he didn't want to renew her.

21      THE COURT:  Okay.  All right.  Well, we have

22  got office space.  You have got the medication.

23  Additional time, there's no evidence about that.  And

24  now you have feedback, the lack of feedback.

25      What other areas of discrimination are you relying

1    upon?

2              MR. WATTS:  The fact that for much of the time

3    during her residency she was not assigned any patients.

4    Residents, as Dr. Beck testified, residents are to be --

5    and the ACGME regulations --

6              THE COURT:  You have got testimony from

7    witnesses you called who say that when she went to the

8    V.A., she started with no patients at all.  There was a

9    period of time in which perhaps she didn't have an

10   office, but that not only did she get patients, but she

11   took on more than the average person, and, in fact, I

12   think your client actually said that.  I mean, all of a

13   sudden she was taking on a lot of patients, more than

14   perhaps others were taking on.  So how -- how did you

15   prove that she was denied patients?

16             MR. WATTS:  That was -- what you are referring

17   to, that testimony, was in late 2008.  Periods of time

18   in 2006, she did start out slow with patients, but

19   working on through 2006, and then after New Hampshire

20   Hospital, in the spring of 2007, when she was not a new

21   resident and had not just arrived on campus, she had no

22   patients.  None.  And the documentation is replete with

23   requests for patients and her observing, Hey, I have no

24   patients.

25        It is true that when she had no patients, she also

1    had no office, but the fact is, she needed an office to

2    write notes and do research and other endeavors that

3    residents are expected to do.

4              THE COURT:  So then how would you respond to

5    what probably would be their response?  They would say

6    she complained about the lack of patients and the

7    office, and then within a period of two to three months

8    not only did she have a dedicated office but a dedicated

9    office to herself, and also she was getting more

10   patients than other people, and that was in response to

11   the complaints that she made.  And then how is that

12   evidence of discrimination?

13             MR. WATTS:  Your Honor, she was without an

14   office for five months.  There's no excuse for that.

15   She didn't have a telephone assigned to her.  She didn't

16   have a pager assigned to her.  She was taken off of the

17   roster so that the central assigning people had no idea

18   of how to reach her.  She was lost in space, and that --

19   they didn't do that to other residents.  There's no

20   evidence of that.  That's not a standard practice, is to

21   send a resident off into space.

22        And yes, ultimately, finally in July of 2007, sure,

23   she did have a phone, she did have an office, and she

24   did have a pager, but there were key times in '06 and

25   '07 when she didn't.  She didn't have patients and she

1    didn't have an office, and those are the times when

2    these allegations arose.

3            THE COURT:  Okay.  So what you are saying is

4    that as of July of 2007, she got her own office.  She

5    had her own patients.

6            MR. WATTS:  2008, I'm sorry.

7            THE COURT:  Oh, all right.  Okay.  Go ahead.

8            MR. WATTS:  Okay.  So those accumulate at

9    these key points in time when some of the supervisors

10   were elicited to offer up -- some people that were

11   supervisors and some people that weren't even

12   supervisors -- Dr. Bolton, for instance, supervised her

13   for one day -- and various others.

14       Dr. Coursin, C-O-R-S-O-N [sic], indicated that he

15   had failed her.  He failed to supervise her.  He didn't

16   teach her properly.  Dr. Detore, who I guess we are

17   going to hear from, blasted her for a bizarre note that

18   he taught her to perform.  He taught her to explore a

19   particular approach, and she testified about that.

20       And so it's -- there are elements all the way

21   throughout her residency that indicate that, from Dr.

22   Green on down, these people were averse to her,

23   especially Dr. Watts yelling at her and humiliating her

24   in front of others, and no doubt he will deny it, but --

25   saying that we don't give a damn about your ADHD.

1    These are facts that Jennifer Connors experienced,

2    and you can imagine the repeated drum beat of these

3    negative vibes pounding away on someone with ADHD, or

4    even someone without ADHD, would be at minimum

5    discouraging if not fatal.

6          THE COURT:  Okay.  What else?

7          MR. WATTS:  And the point that I made earlier

8    was that they forced her into a no-win situation, and

9    that is discrimination.  I'm sorry to interrupt you.

10         THE COURT:  What else -- anything else aside

11   from office space, medication, the additional time,

12   again, and the lack of feedback and not getting enough

13   patients?

14         MR. WATTS:  I think that covers it, as long as

15   there's an understanding that the criticisms and

16   allegations radiated from those times when she --

17         THE COURT:  Now, in regard to retaliation --

18         MR. WATTS:  -- combinations.

19         THE COURT:  -- you are focusing in upon Dr.

20   Green.  Dr. Green, by the time he made the decision of

21   nonrenewal, had received a lot of comments -- you have

22   acknowledged that -- from various participants in the

23   program, Dr. Lambert being one, but other doctors as

24   well; Dr. Watts, et cetera.  So how do you think you

25   have proven termination -- or nonrenewal in linking it

1      to discrimination?

2                  MR. WATTS:  Well, I think it's a complete

3      process, your Honor.  The whole -- the treatment that

4      she received led up to her nonrenewal; that during these

5      times, as I had mentioned, when she didn't have

6      accommodations, there were these allegations against

7      her, and that created a background, an aura, that, you

8      know, this person is a loser as far as Dr. Green's

9      concerned.

10                 THE COURT:  But you in your complaint said

11     that she got nonrenewed, or terminated, in your words,

12     because she made a complaint of discrimination.

13                 MR. WATTS:  Well, that's true.  What I am

14     saying here is that when she requested the

15     accommodations and she requested ADA accommodations and

16     the remediation plan that she proposed, from there on

17     out they were on notice -- they were on notice before

18     that, but they were formally on notice at that point,

19     and they began to respond with an office, but by then

20     the damage had been done.

21              And there was a record that Dr. Green would create

22     with these e-mails eliciting, you know, How are these

23     things going with Jennifer Connors?  And yet none of

24     those -- very few, one or two of those criticisms made

25     it into her evaluations, that she knew about, except, of

1    course, for when Dr. Schwartz and others sat her down

2    and said, Look, this is -- you know, these are -- I am

3    trying to teach you and counsel you and supervise you

4    about how residents handle these particular problems.

5        And those are teaching moments, and that's

6    understood, and that's not necessarily a distorted

7    criticism by whoever the supervisor was at the time.

8    But the point is that the nonrenewal was based upon a

9    fountain of misleading, exaggerated claims against her

10   that Dr. Green encouraged and didn't even look into.

11       I mean, for instance, he told Dr. Connors, as she

12   testified, that there would be an investigation into the

13   events surrounding her conduct in 2006 concerning some

14   of those allegations against her, and Dr. Pomeranz

15   ultimately said there was no harm done to any patients.

16   Dr. Green said there was going to be an investigation,

17   and they would decide whether or not to fire her at that

18   point.

19       Well, there was no evidence of an investigation at

20   all.  He didn't do anything.  He didn't investigate any

21   of -- so far as we know in the evidence, he didn't

22   investigate any of the allegations against her.  He took

23   them at face value.  And that is disregard, reckless

24   disregard of Dr. Connors' rights.

25       The fair hearing people are not going to, for

1     instance, formally investigate what happened, that we

2     know of anyway.  And so they take what he presents and

3     she presents, and that's it.

4         Well, Dr. Green, all he did was present what his

5     e-mail research discovered, and as we go through each

6     one of those when Dr. Green testifies, I think the Court

7     will see that most of them are hollow; all the others

8     are exaggerated.

9              THE COURT:  All right.  To the extent --

10             MR. WATTS:  This is a purposeful --

11             THE COURT:  To the extent there was a lack of

12    investigation, you certainly had the opportunity to call

13    Dr. Green to show there was no investigation other than

14    reliance upon the statements that were made by other

15    persons who were dealing with Dr. Connors directly.

16        And then of course there's the more subtle question

17    as to whether in fact there's an obligation on his part

18    to conduct a separate, independent, thorough

19    investigation other than to rely upon people who were

20    working with her.

21             MR. WATTS:  Well, he --

22             THE COURT:  Regardless.  And the last thing is

23    the implied contract and good faith and fair dealing.

24    How have you established those?

25             MR. WATTS:  As we set out in our complaint,

1    the ACGME and the GME and Dartmouth-Hitchcock

2    established certain standards upon which they would --

3    these are in evidence -- in which they would act in the

4    residency, and they failed to do that.

5        Jennifer Connors likely relied on these policy

6    documents that indicated that you will have strong

7    supervision; strong monitoring; evaluation system is

8    electronic-based system that will give you feedback,

9    current feedback on your progress; and they also --

10   these same policies indicate that the institution will

11   not discriminate against individuals with disabilities,

12   and we contend that their conduct breached their -- the

13   implied contract that is found in the -- those policy

14   documents.

15       As far as the covenant is concerned, the contract

16   claim does not include or focus upon some key acts that

17   the defendant engaged in.  For instance, the contract

18   claim does not address the fact that rather than

19   assigning her an office, they sent her to a room with a

20   coffee pot and a kitchenette that was a common room for

21   everybody to use and come in and use the phones and the

22   computers and all that.  And when Dr. Schwartz sent her

23   to that common room, rather than considering that she

24   needed an office because she had ADHD, has ADHD, that

25   was an act of bad faith.

1    He was apparently angry after some of these events

2    that he either misinterpreted or misconstrued, and -- so

3    I think the coffee pot episode is one example.

4    Another example is Dr. Watts yelling at her, saying

5    that nobody -- Everybody here hates you, or Nobody here

6    likes you, and We don't -- Nobody here gives a damn

7    about your ADHD.

8    Those are above and beyond the call and above and

9    beyond the contract claim and demonstrate bad faith,

10   and -- on the part of the defendant.  She was

11   humiliated.  And the fact that they made decisions,

12   pivotal decisions based upon back-channeled e-mails

13   rather than advising her directly, sitting down with her

14   and speaking with her.  In a couple of cases, the

15   supervisor said to her, You have done a fine job here,

16   and yet ended up telling Dr. Green the opposite.

17   And so these are -- these are evidences of bad

18   faith that support the claim to -- of covenant and fair

19   dealing.

20            THE COURT:  They are also facts that you are

21   relying upon to show implied contract, by the way,

22   aren't they?

23            MR. WATTS:  I'm sorry?

24            THE COURT:  Aren't you?  I mean, the fact that

25   she went to the room, the coffee pot room, you have made

1    a very big point of the fact that that is evidence of

2    discrimination, and it's also evidence of implied

3    contract violation, I thought, and so now you are going

4    to use that same conduct to show good faith and fair

5    dealing violation.

6              MR. WATTS:  Well, your Honor, with all due

7    respect, I believe we filed a memo that delineated out

8    the evidence that is separate from an implied contract.

9              THE COURT:  Yeah, that's your argument.

10   Right.  I thought there was going to be some evidence in

11   which you talked about this is what the contract meant.

12   This is what the contract meant to me.  This is what the

13   contract meant to you.  And it's separate and apart from

14   the issue about the manner, you know.  It's a little

15   closer with Dr. Watts screaming at her.

16        All right.  So I understand -- you know, I

17   understand what your position is.  Is there anything

18   else that you want to say at this point?

19              MR. WATTS:  I don't think so.

20              THE COURT:  Okay.  You want to respond?

21              MR. PANDOLPH:  One small point, your Honor.

22        I think that's -- that was a remarkable distortion

23   of the evidence.  I mean, there was a complete

24   distortion of the evidence, but I am not going to go

25   into responding to every point here.

1          But the other point is this:  The V.A. Medical

2     Center is not a defendant in this case.  It's a

3     federally-operated, federally-controlled facility.

4     Dartmouth-Hitchcock, Mary Hitchcock Memorial Hospital,

5     is not responsible for the acts or omissions -- alleged

6     acts or omissions of employees of the V.A. Medical

7     Center.

8               THE COURT:  So that would mean that the whole

9     argument about office space becomes immaterial?

10              MR. PANDOLPH:  Among other things because, as

11    you have heard, yeah, he said DHMC office space, that's

12    correct, that was fine.  Everything else, frankly, that

13    I have heard for the last 15 minutes, has been the

14    conduct of the employees of the V.A. Medical Center, not

15    conduct of employees of Dartmouth-Hitchcock Medical

16    Center or Mary Hitchcock Memorial Hospital.

17              THE COURT:  Well, remind me, Dr. Watts is --

18              MR. PANDOLPH:  Dr. Watts is a federal

19    employee.  He is an employee of the V.A. Medical Center.

20    He has never been employed by any defendant.

21              THE COURT:  He has never been employed by

22    Dartmouth or Mary Hitchcock?

23              MR. PANDOLPH:  No.

24              THE COURT:  Dr. Lambert obviously the same?

25              MR. PANDOLPH:  The same with Dr. Schwartz.

1    The same with all of the people that sent those e-mails

2    to Dr. Lambert or sent them to others in the fall of

3    2008 that were provided to Dr. Green.

4              THE COURT:  All right.  I am going to take

5    this --

6              MR. KAPLAN:  Your Honor, can I clarify?

7              THE COURT:  Yes.

8              MR. KAPLAN:  You had asked him a question and

9    just so I clarified for the record on the moonlighting

10   issue?

11             THE COURT:  Yes.

12             MR. KAPLAN:  There was -- there was a couple

13   of questions on that, and I want to -- because I

14   commented on it, I just want to be as accurate as I can.

15        I will tell you that Dr. Connors said in regard to

16   this in her deposition, because you were inquiring about

17   this:  "And with whom did you make a request to work or

18   moonlight?

19        "I requested the license that's required to

20   moonlight from GME and Dr. Green."

21        If you continue to read through the next three

22   pages, there's no accusation or allegation that Dr.

23   Green improperly denied her in any way that application

24   or that material.  It came up here.  But she did not

25   testify to that here.  And she did not raise it in her

```
 1    deposition, and I don't think it had ever been raised
 2    before.  And you asked about that and I just wanted to
 3    try and clarify that.
 4              THE COURT:  Okay.  I am going to take a
 5    15-minute -- yes?
 6              MR. WATTS:  May I just respond to what Mr.
 7    Pandolph --
 8              THE COURT:  Right.
 9              MR. WATTS:  -- indicated?
10              THE COURT:  Yes.
11              MR. WATTS:  Thank you.
12         The Graduate Medical Education handbook is in
13    evidence here.  First page:  DHMC Reporting
14    Relationships.  Dartmouth Medical School Board of
15    Trustees, Mary Hitchcock Memorial Hospital, U.S.
16    Veterans Affairs Department, all governed by the board.
17    DHMC board of governors and the Graduate Medical
18    Education program encompasses those other facilities but
19    is operated and directed and supervised by
20    Dartmouth-Hitchcock Medical Center and Mary Hitchcock
21    Memorial Hospital.
22         Dr. Green in this case or -- no matter what the
23    program is, whether it's surgery or whatever the --
24    these people are -- the defendants are operating the
25    residency program.
```

1          THE COURT:  Okay.

2          MR. PANDOLPH:  And operating the V.A. Medical

3   Center, in fact, you will see Dr. Green wrote a letter

4   to Dr. Shirley at the V.A. Medical Center asking if Dr.

5   Connors could come back and continue her residency

6   there.  He had to get that permission from the V.A.

7   Medical Center.  That was not something he directed or

8   controlled.

9          MR. WATTS:  And Dr. Watts was the assistant

10  director of the residency program.

11         THE COURT:  Okay.  All right.  I am going to

12  take a 15-minute break.

13  (Court was in recess at 11:11 a.m.)

14  (The following was held in open court at 11:25 a.m.)

15         THE COURT:  The defendants have filed a motion

16  for judgment based upon the state of the record.  They

17  have raised a number of issues:

18      First, there has been a lack of proof in regard to

19  damages; second, the discrimination and retaliation

20  claims should be dismissed, first, because of lack of

21  damages, but also on the merits, and that there's been

22  no evidence of an implied contract separate and apart

23  from the renewal of additional contract, and also no

24  proof of good faith and fair dealing.

25      The Court intends to write a lengthy opinion on the

1    issues that have been raised by the defense, but I want

2    to address each of them on the record.  Again, this is

3    going to be followed up with the opinion, and it's

4    intended to be the definitive ruling from the Court, now

5    the ruling today, but these are the definitive reasons

6    for the ruling.

7         First, in regard to damages:  There are a number of

8    damages, types of damages which have been raised by the

9    lawsuit in general.  The plaintiff has not requested

10   nominal damages.  She did request emotional damages.

11   She did request compensatory damages, and she did

12   request punitive damages.  And let me address all of

13   those.

14        First, no nominal damages requested.

15        Second, in regard to emotional damages, the Court

16   excluded earlier in these proceedings the emotional

17   damages.  Arguably, emotional damages could have been

18   asserted in regard to the good faith and fair dealing

19   claim.  It would be a matter of some dispute.  It could

20   not be raised in regard to the discrimination and

21   retaliation and contract claims for the reasons stated

22   in my earlier opinion.  However, there was no evidence

23   in regard to emotional damages, and, frankly, emotional

24   damages is not at issue in this case.

25        Next, punitive damages.  The Court will write a

1    lengthy opinion on punitive damages.  Essentially, the

2    requirement is that this be outrageous conduct and that

3    there be malice.  That's the law in Vermont, New

4    Hampshire, and just about everywhere in the world.

5         And in this particular case, I find that there is

6    no way the jury could find punitive damages and will

7    rule as a matter of law that the Court would not

8    instruct on punitive damages.

9         If one takes the evidence in the light most

10   favorable to the plaintiff, as I do in this particular

11   context, arguably there could be a disregard of her

12   rights.  That's insufficient as a matter of law for

13   punitive damages.  There is a complete lack of any

14   suggestion, really, of malice on the part of anyone,

15   including Dr. Green, but what makes this extraordinarily

16   complex is that ultimately there's a review by a panel,

17   and Dr. Connors is permitted to present evidence, and

18   the panel agrees to the nonrenewal.  I find just no

19   evidence which would justify punitive damages.

20        Finally, in regard to compensatory damages, let me

21   just address why I ruled the way I did in permitting the

22   plaintiff to go forward with the additional witnesses --

23   additional witness today.

24        I appreciate that if the plaintiff had been unable

25   to introduce evidence about compensatory damages, that

1    the case would be over.  A claim without damages doesn't

2    go to a jury.  So I afforded the plaintiff just an

3    opportunity to present compensatory damages, and they

4    come in two forms.

5         The first is the moonlighting, and the second is

6    extrapolating what she may have earned for the two years

7    after nonrenewal prior to her larger income as a

8    psychiatrist.

9         I, frankly, had anticipated that the evidence would

10   be different; may have been some focus on the year after

11   her leaving Fletcher -- leaving Dartmouth, but that was

12   not the evidence presented at all.  So we're left with

13   those damages which relate to moonlighting and

14   essentially speculation as to what she would have earned

15   after finishing Dartmouth and having two years of

16   additional employment.

17        Now, that latter issue I raised with the expert and

18   found that he couldn't testify to that because it's

19   overly speculative, and this was merely an effort on the

20   part of Dr. Connors to say, This is what I would have

21   earned had I not been nonrenewed.  That is totally

22   speculative, in my view.

23        How even could one argue to a jury about the nature

24   of the damages here when you have no idea what her

25   placement would have been, no idea what her employment

1    would have been, and how it would have impacted her

2    income?

3         That is why I ruled the way I did in regard to the

4    expert, and it's essentially the same ruling in regard

5    to her ability to pinpoint what she would have earned.

6         Now, as to the moonlighting:  She testifies that

7    she could have earned $55,000 minus the $5,000, so

8    $50,000.  Well, where does that figure come from?  And

9    where does the income come from in moonlighting?  How is

10   it pinpointed?  And then how does it relate to the

11   complaint as well as the testimony?

12        Now she complains that she had made various

13   requests of various people for letters of

14   recommendation, but there's nothing established on the

15   record.  There's no filings at all, and there's no

16   filings of complaints by her that other people haven't

17   written the letters.  But more than that, there's a lot

18   of evidence here which suggests that she may not have

19   been a good candidate to moonlight.

20        This is a person who, by the plaintiff's theory,

21   suffers from a disability, and she needs additional time

22   for the taking of tests, et cetera.  So is this the kind

23   of person who also would have moonlighted?  Who knows.

24   And the point is that this is extraordinarily

25   speculative.

1          There's nothing concrete about jobs that she was

2     denied, opportunities that she was denied and, in

3     particular, specific demands and requests that she made

4     to fulfill her wish to moonlight.  In my view, it is

5     entirely speculative, and as a result, there are no

6     compensatory damages proven.  There are no damages

7     proven in this case.  And that warrants granting of the

8     judgment.

9          I will also say that I am going to address the

10    discrimination retaliation claims as well as the implied

11    contract and good faith and fair dealing claims.

12         I would have anticipated testimony about the terms

13    of implied contract.  You have the potential of an

14    additional contract for her PGY-4, but there's no

15    testimony about all the things that form the terms of an

16    implied contract, representations that were made by Dr.

17    Green or others, and reasonable reliance.

18         And what makes this particularly troublesome is

19    that the initial representations made by Dr. Green,

20    according to the plaintiff, were essentially that she

21    suffered from a learning disability and that she needed

22    additional time.  And then one goes through the various

23    representations that she made to others and it becomes

24    very confusing as to whether she's in fact established

25    notice to the other side of the disability.

1    Eventually people learn and are aware of attention

2    deficit hyperactivity disorder, but in fact many of the

3    people with whom she was working at the V.A. never

4    knew -- including Dr. Lambert, never knew that she had

5    this form of disability.  So where is the implied

6    contract here?  And then, ultimately, where is the good

7    faith and fair dealing?

8        The good faith and fair dealing claim should be

9    dismissed, in my view, for a number of reasons:

10       Number one, the conduct essentially that the

11   plaintiff relies upon for the good faith and fair

12   dealing is the same conduct that constitutes their claim

13   of breach of implied contract.  But more than that, I,

14   frankly, do not believe in assessing the evidence that

15   any jury could necessarily find there was sufficient

16   lack of good faith to warrant a judgment.

17       And, again, as to the discrimination and

18   retaliation claims, I am going to analyze them unto

19   their own merits.  In my view, there is sufficient

20   evidence introduced by the plaintiff to establish those

21   claims.  So the opinion will be drafted in such a way as

22   to first address the lack of proof in regard to damages,

23   and then second, I will address the Court's assessment

24   of each of the claims, finding that based upon the state

25   of the record there's -- no reasonable jury could render

1    a verdict in favor of the plaintiff.

2         I appreciate this is a unique circumstance.  It is

3    a rare, rare thing indeed that the Court grants judgment

4    in the midst of trial, but I feel very strongly in

5    regard to the issues as I have described them, and so

6    the judgment motion raised by the defendants is granted,

7    and judgment is entered.

8         Is there anything else at this point?  I will go in

9    and tell the jury that they're excused.

10              MR. KAPLAN:  Nothing from the defense,

11   your Honor.  Thank you.

12              THE COURT:  Anything further?

13              MR. WATTS:  Nothing at this point.

14              THE COURT:  All right.  Thank you.

15              MR. KAPLAN:  Thank you, your Honor.

16              (Concluded at 11:38 a.m.)

17                   *** ** ***

18

19

20              C E R T I F I C A T I O N

21        I certify that the foregoing is a correct
     transcript from the record of proceedings in the
22   above-entitled matte

23

     April 24, 2014          _____
24   Date                         Anne Nichols Pierce

25